# IN THE COURT OF GEARY COUNTY
## STATE OF KANSAS

IN THE MATTER OF THE APPLICATION   }
}
FOR AN ORDER AUTHORIZING THE     }    No. _____
}
INTERCEPTION OF WIRE COMMUNICATIONS}

## <u>AFFIDAVIT IN SUPPORT OF APPLICATION</u>

    I, Glen F. Virden, Senior Special Agent, Kansas Bureau of Investigation, being of lawful age and duly sworn upon my oath depose and state:

    1.    I am an "Investigative" law enforcement officer duly deputized with statutory authority for the State of Kansas, and as further recognized and defined by K.S.A. 22-2514(5).

    2.    This affidavit is submitted in support of an application for an order authorizing the interception of the wire communications of **Albert Dewayne Banks, B/M Date of Birth** ▮▮▮▮▮ and others listed below, over telephone number **(785) 375-6704**, a personal cellular telephone currently in service with Sprint Nextel with Mobile Station Identification Number (MSID) 00007856601961 and Electronic Serial Number (ESN) 268435459909788757. Sprint Nextel records indicate the phone to be an Individual Boost Prepaid Account with no subscriber name attached to the account. The Affiant knows this phone to be used by **Albert Banks** as indicated within this document. The Affiant requests authority to intercept the wire communications of individuals communicating on telephone number **(785) 375-6704**.

    3.    Affiant believes the following individuals will be intercepted over telephone number **(785) 375-6704; Albert Dewayne Banks, Anthony Carlyle Thompson**, Patricia Foy, Kari Stutheit, Charles Foster and others yet unknown.

    4.    Affiant requests authority to intercept the conversations and the background conversations intercepted in the vicinities of the aforementioned telephone

1

<b>EXHIBIT 2</b>

while the telephone is off the hook or otherwise in use. Affiant requests this authority in order to obtain evidence concerning the above persons' involvement in the following offenses: Possession of Cocaine in violation of Kansas Statutes Annotated (K.S.A.) 21-5706(a); Distribution of Cocaine in violation of K.S.A. 21-5705(a)(1); Conspiracy to commit these offenses in violation of K.S.A. 21-5302; and the Use of a Communications Facility to facilitate the commission of the above offenses in violation of K.S.A. 21-5707(a)(1). All offenses are in violation of Kansas Law, which have been and are being committed by the persons identified herein and others yet unknown.

5.     The Affiant has been a law enforcement officer since 2001 with the Kansas Bureau of Investigation (KBI). The Affiant is currently a Senior Special Agent with the Topeka Region of the Special Operations Division for the KBI. The Affiant is a graduate of Cowley County Community College with an associate of applied science degree in Criminal Justice and Southwestern College with a bachelor's degree in Criminal Justice. The Affiant, while so employed in law enforcement, has received training in narcotics investigations to include, but not limited to: Kansas Law Enforcement Training Center's Basic Training Academy, the Kansas Bureau of Investigation's Advanced Investigations Academy, the Kansas Bureau of Investigation's Clandestine Lab Certification School, Kansas Top Gun Narcotics training, and the U.S. Drug Enforcement Administration's Basic Narcotics Investigators School. Affiant has investigated numerous narcotics cases. These investigations have included, but are not limited to undercover purchases of narcotics, controlled purchases of narcotics using cooperating individuals and search warrants. The Affiant has arrested numerous individuals for violations of both state and federal violations of controlled substances statutes. As a result, Affiant has interrogated many defendants, informants and others who were either sellers, distributors, purchasers, manufacturers or users of controlled substances. The Affiant is familiar with how controlled substances are obtained, diluted, packaged, distributed, sold, used, and manufactured. Affiant is also familiar with the records, books, and documents needed to carry on such illicit activity.

(a)     Based on the above experience, Affiant believes there is probable cause to believe the subjects of this investigation, both known and unknown, have committed, are committing and will continue to commit offenses involving possession,

2

distribution and conspiracy to distribute cocaine. Such violations involve the use of communication facilities in order to facilitate the commission of the above offenses, each being in violation of Kansas Uniformed Controlled Substances Act.

(b)     That particular wire communications of the subjects of this investigation concerning the above offenses will be obtained through the interception of such communications to and from telephone number **(785) 375-6704**. In particular, there is probable cause to believe that the communications to be intercepted will concern dates, times, and places for commission of the aforementioned offenses when the above named interceptee communicates with the listed interceptees and other unknown suppliers, co-conspirators, aiders and abettors. There is further probable cause to believe that the communications to be intercepted will disclose the location of assets owned or controlled by the persons involved, and the manner, extent and identity of persons who direct and/or participate in the illegal activities set forth herein. These communications are expected to constitute admissible evidence of the above-described offenses.

(c)     That telephone number **(785) 375-6704**, has been, is being, and will continue to be used in connection with the commission of the above offenses.
The interception of these communications is expected to concern verbal and messaging discussions of the continuing conduct, financing, managing, supervising, directing, or ownership of all or part of an illegal narcotics enterprise, including orders and instructions to subordinates, the receipt of information pertaining to the obtaining and distribution of controlled substances, and other conversations relating to the administration, control, and management of the aforementioned illegal drug activity.

6.     Normal investigative procedures have been tried and have failed to achieve the goals of this investigation, or reasonably appear unlikely to succeed if tried, or are too dangerous to employ, as more fully explained below.

## INVESTIGATIVE INVOLVEMENT OF STATE AND LOCAL LAW ENFORCEMENT

7.　　This investigation is a result of a joint effort by the Affiant, other Agents of the Kansas Bureau of Investigation (KBI), Officers of the Junction City Police Department (JCPD), Officers of the Geary County Sheriff's Office (GESO) and Officers of the Riley County Police Department (RCPD). The investigation covers a period of time from June 2012 to the present. The statements contained in this affidavit are based in part on information provided by Agents/Officers of the above-listed law enforcement agencies.　　Because this affidavit is being submitted for the purpose of securing authorization for the interception of wire communications, Affiant has not included each and every fact known to the Affiant concerning this investigation. Affiant has set forth only the facts that Affiant believes are necessary to establish the necessary foundation for an order authorizing the interception of wire communications. If a court order is granted authorizing the interception of wire communications in this case, only those persons and agencies authorized by law to make such interceptions will be allowed to do so.

8.　　In April, 2012, Detective Nate Boeckman of the RCPD contacted Detective Alvin Babcock of the JCPD Drug Operation Group (DOG) with information that **Anthony Thompson (AKA "Ant")** and **Albert Banks (AKA "AB")** were distributing cocaine within the Junction City, Geary County, KS area and the Manhattan, Riley County, KS area. RCPD received this information from a Source of Information (SOI) to be referred to as "SOI #1" from this point forward. SOI #1 appeared to have knowledge of some of the criminal elements related to **Anthony Thompson and Albert Banks**, but was not allowed to have intimate knowledge of the day to day operations or the source of supply of the cocaine.

9.　　SOI #1 did give information saying **Anthony Thompson and Albert Banks** were receiving powder cocaine from an unknown supplier/s then transporting (or having it transported) back to the Junction City, Geary County, KS area where they would convert the powder cocaine to crack cocaine themselves (evidence of this conversion will be explained in this affidavit). SOI #1 did not have direct knowledge of when the powder cocaine purchases were occurring, who was driving to purchase the

4

powder cocaine and even if one of the aforementioned persons were actually obtaining the cocaine or having another person unknown to this investigation acquire and transport the cocaine to **Anthony Thompson** and **Albert Banks**. SOI #1 has continued to give some credible information to Agents/Officers but beyond that, SOI #1 has not been beneficial to the investigation. As stated above, SOI #1 has limited knowledge related to the full scope of the cocaine distribution network, other co-conspirators and the source of supply for the cocaine.

10.     The Affiant was contacted by Lieutenant Mike Life of the JCPD and asked to assist with the investigation.   The Affiant met with Agents/Officers of the aforementioned agencies to in an attempt to garner information related to persons who might be involved in the distribution of cocaine.   The Affiant then contacted an individual who had been a Cooperating individual (CI) for the KBI since 1985 (to be referred to as CI #1 from this point forward). The Affiant had a meeting with CI #1 and asked if CI #1 would be willing to assist in the investigation to which CI #1 agreed. Since CI #1's association with the KBI beginning in 1985, CI #1 has successfully been an integral part of a number of State and Federal investigations which culminated with the prosecution and convictions of numerous persons related to the distribution of drugs. CI #1 has had a number of Agents within the KBI as his/her handler. The Affiant has had contact with a number of these Agents who spoke highly of CI #1 and his/her abilities to assist in investigations culminating in successful prosecution.

11.     On 05-16-2012, then KBI Task Force Agent (TFA) John Culver was contacted by RCPD in reference to **Albert Banks** possibly leaving the Junction City, KS area en route to Topeka, Shawnee County, KS to purchase drugs for distribution. TFA Culver, RCPD and JCPD coordinated a surveillance operation to follow **Albert Banks** in an attempt to locate the person whom he was receiving his drugs from for distribution. TFA Culver was told **Albert Banks** was supposedly traveling with a white female who was later seen as the driver of the vehicle. The vehicle **Albert Banks** and the white female were in was described as a maroon colored Cadillac Escalade.   TFA Culver observed this vehicle leave the Junction City area and observed the license tag on the vehicle which was bearing Kansas tag 669BHV. This vehicle was later found to be registered to a 2002 Cadillac Escalade with a primary owner of Mike Roth and secondary

owner of Kristina Orth both of Junction City, Geary County, KS. The Affiant would later find out Kristina Orth is the girlfriend of Mike Roth.

12.     As Agents followed **Albert Banks** and Kristina Orth from Junction City, Geary County, KS the vehicle made several overt actions which appeared to be in an attempt to make sure they were not being followed. The vehicle traveled east on I-70 where it exited at the Maple Hill exit. The vehicle then made a u-turn in the middle of the road and then re-entered I-70 and continued eastbound on I-70. Once the vehicle reached the Topeka, Shawnee County, KS area, it exited onto SE California Avenue and traveled south where it entered the McDonald's drive thru at SE 29th and California. It then went south on California Avenue to SE 30th Street where it turned east then south on SE Swygart and pulled into the parking lot of 3024 SE Swygart. **Albert Banks** then exited the vehicle walked into the apartment building at this location. Kristina Orth remained in the vehicle with an undetermined number of children who were found to have been traveling in the vehicle.

13.     3024 SE Swygart Apartment F was, at that time, the residence of Johnny Lee Ivory III (AKA "5", "J5" and "Jizzle"). Johnny Lee Ivory is a confirmed member of the Traveling Vice Lords Gang. He has a lengthy criminal history to include; possession of opiates/opium/narcotic drugs, possession of depressants/stimulants, discharge of a firearm at an occupied dwelling as well as others which will be explained further later in this affidavit. Johnny Lee Ivory, at that time, was believed to reside at this residence with his then girlfriend, Whitnie A. Livingston. RCPD had received information from SOI #1 indicating Johnny Lee Ivory was perhaps a source of supply for cocaine for **Albert Banks** and **Anthony Thompson.** This has not been confirmed as Johnny Lee Ivory has not been located as to his whereabouts at this time although it is believed he still resides in Topeka, Shawnee County, KS. On 05-10-2012, Topeka Police Department (TPD) Officers located one-half (1/2) pound of marijuana, two (2) loaded handguns and approximately $10,000.00 in US Currency at this apartment where Johnny Lee Ivory stated he resided (TPD case number 10732-12).

14.     **Albert Banks** eventually exited the apartment complex and got into the passenger side of the vehicle Kristina Orth was driving. The vehicle exited the parking lot, drove north on SE California Avenue, turned east on SE 29th, turned north into the

Dillon's parking lot, circled the parking lot, exited the parking lot and crossed SE 29th Street where it entered into a shopping center parking lot and parked in front of the Subway restaurant and remained there for approximately 15 minutes without anyone entering or exiting the vehicle.  After approximately 15 minutes, the vehicle got back onto SE 29th Street and turned north on SE California Avenue.  The vehicle entered onto I-70 and traveled west to Junction City, Geary County, KS where it was followed to an unknown address (address unknown to the Affiant) on 13th Street where it was believed **Albert Banks** was possibly distributing cocaine from.

15.     On 05-30-2012, Detective Alvin Babcock of the JCPD received phone call from Detective Nate Boeckman of the RCPD informing him that Detective Nate Boeckman had received information alleging **Albert Banks** had left a package of cocaine wrapped in either brown tape or a brown paper bag in an alley between 13th and 14th Streets and Franklin and Monroe Streets in Junction City, Geary County, KS the previous evening.  Detective Nate Boeckman advised Detective Alvin Babcock that RCPD was conducting surveillance on a residence in Manhattan, Riley County, KS where it was believed **Albert Banks** was residing at the time.  Detective Nate Boeckman advised a white in color Chrysler 300 having black rims had arrived at the residence.  The driver of the vehicle was identified by RCPD Detectives as Chris Howard.  A short time later, Chris Howard and **Albert Banks** were seen leaving the residence in the aforementioned vehicle.

16.     Lieutenant Mike Life and Detective Alvin Babcock drove to the aforementioned alley in Junction City, Geary County, KS in an attempt to locate the package of cocaine but were unable to locate it.  Detective Nate Boeckman contacted Detective Alvin Babcock and stated he had lost sight of the Chrysler 300 and was unaware if the vehicle was still in Manhattan, Riley County, KS or in the Junction City, Geary County, KS area.  A short time later, Detective Alvin Babcock observed the Chrysler 300 in the aforementioned alley and stopped in wooded area where Detective Alvin Babcock was told the package of cocaine was possibly located.  The vehicle then left the alleyway and sight was lost of it.  Detective Alvin Babcock was not able to see who exited the vehicle or if anything was retrieved when it stopped in the alleyway but Detective Alvin Babcock did observe the driver of the vehicle did not get out of the

vehicle. The vehicle was later located at a liquor store in Junction City, Geary County, KS.

17.    On 05-31-2012, CI #1 made two (2) phone calls to Martye Madkins III in reference to purchasing Oxycontin pills. In the first phone call, Martye Madkins III stated he would have to call other unknown person/s in an attempt to obtain the pills. The second call to Martye Madkins III was not answered and the attempted purchase was discontinued.

18.    On 06-01-2012, CI #1 contacted Martye Madkins III once again in reference to purchasing a $50.00 quantity of crack cocaine from him. Martye Madkins III agreed to sell CI #1 the crack cocaine. While talking to Martye Madkins III, CI #1 made mention of needing to call a female by the name of "Ro" who is actually Lavern Roshell Jackson. Martye Madkins III said he was with Lavern Jackson at that time. CI #1 talked to her about purchasing three to four (3 to 4) Oxycontin pills. Lavern Jackson stated she could obtain Dilaudid and Morphine pills as well. Lavern Jackson stated she would make some phone calls and inquiries into obtaining some pills for CI #1.

19.    CI #1 was prepared for purchasing crack cocaine from either Martye Madkins III or Lavern Jackson. The Affiant gave CI #1 $50.00 in US Currency to purchase the crack cocaine. CI #1 called Martye Madkins III and inquired as to Martye Madkins III ability to sell CI #1 $50.00 worth of crack cocaine. Martye Madkins III said he would call CI #1 back in five (5) minutes. Martye Madkins III called CI #1 back and they agreed to meet at the Casey's General Store in Junction City, Geary County, KS to complete the transaction. Detectives Shawn Peirano and Josh Brown of the JCPD DOG observed Martye Madkins III arrive at the location in a gray colored Chevrolet HHR bearing a Missouri license tag. Martye Madkins III exited the vehicle, got into CI #1's vehicle and sold CI #1 the crack cocaine. The HHR had three (3) African American males in it at the time and as it left, one of the males was identified by Sergeant Todd Godfrey of the JCPD as **Albert Banks** and the driver was identified by Detective Alvin Babcock as **Anthony Thompson**.

20.    The Affiant submitted the evidentiary item, which was actually two (2) small individually wrapped baggies, to the KBI for analysis and received a Forensic

Laboratory Report stating cocaine base was detected in Lab Item 1 with both being examined and having a total net weight of 0.20 grams.

21.     On 06-30-2012, CI #1 contacted a male by the name of Gevonni Roberto Davis whom CI #1 had been introduced to earlier. CI #1 told Gevonni Davis that CI #1 was attempting to make contact with **Martye Madkins III** in reference to purchasing crack cocaine from him. CI #1 asked Gevonni Davis if he had seen Martye Madkins III and/or if Gevonni Davis knew whether or not Martye Madkins III had any crack cocaine to sell. Gevonni Davis stated he had seen Martye Madkins III at approximately 7:30 AM that morning and had purchased the last portion of crack cocaine Martye Madkins III had to sell at that time. CI #1 asked Gevonni Davis if he could contact **Anthony Thompson** and inquire as to whether or not he had any crack cocaine to sell. Gevonni Davis asked if CI #1 knew **Anthony Thompson** to which CI #1 said he/she had met **Anthony Thompson** but did not have a telephone number for him. Gevonni Davis said he would call **Anthony Thompson** and call CI #1 back.

22.     Gevonni Davis called CI #1 and stated he had made contact with **Anthony Thomson**. **Anthony Thompson** stated he was in Ogden, KS at that time but would turn around and come to Junction City, KS to meet CI #1 at his/her motel room to sell him/her the crack cocaine. The Affiant gave CI #1 $50.00 with which to purchase the crack cocaine. **Anthony Thompson** arrived at the motel room and met with CI #1. CI #1 siad **Anthony Thompson** produced approximately 15 "rocks" of crack cocaine from his pocket and thought CI #1 wanted to purchase $100.00 worth of crack cocaine. CI #1 said he/she only wanted $50.00 worth and at that time **Anthony Thompson** sold the crack cocaine to CI #1. CI #1 asked for and was given **Anthony Thompson's** telephone number for further transactions. The telephone number given to CI #1 is not the current number for **Anthony Thompson**, but was his telephone number at that time. **Anthony Thompson** was driving a red in color Chrysler Sebring bearing Arkansas license tag 227RMJ which was not registered to that vehicle.

23.     The Affiant submitted the evidentiary item to the KBI for analysis and received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 1 having a net weight of 0.15 grams.

24.     On 07-11-2012, the Affiant and other Agents/Officers met with CI #1 for the purpose of CI #1 attempting to make a purchase of crack cocaine from Martye Madkins III. CI #1 contacted Martye Madkins III and he told CI #1 to call him back in 10 to 20 minutes as Martye Madkins III "was checking on it now" referring to Martye Madkins III inquiring with someone as to the availability of the crack cocaine CI #1 wanted to purchase. This would indicate the crack cocaine did not belong to Martye Madkins III but instead belonged to another party whom Martye Madkins III had to obtain it from prior to distributing it. While waiting on Martye Madkins III to contact CI #1, Detective Alvin Babcock was watching video surveillance of Martye Madkins III residence located at 227 west 14th Street in Junction City, Geary County, KS in an attempt to observe any person/s arriving or departing from the residence. Detective Alvin Babcock observed **Albert Banks** and Chris Howard leave the residence. After the two (2) aforementioned persons left the Martye Madkins III residence, CI #1 received a call from Martye Madkins III. The two (2) aforementioned males returned to the residence shortly thereafter.

25.     Martye Madkins told CI #1 to meet "his man" (referring to another unknown person) at Wood Oil in Junction City, Geary County, KS and asked how much CI #1 wanted. CI #1 said he/she wanted $60.00 worth of crack cocaine. The Affiant gave CI #1 $60.00 in US Currency to purchase the crack cocaine. CI #1 left and drove toward Wood Oil. While en route, CI #1 was contacted by Martye Madkins III and told to change the location where CI #1 was to meet someone. Martye Madkins III said to meet in the area of the intersection of 15th Street and Adams Street in Junction City, Geary County, KS.

26.     CI #1 arrived at the location and continued to attempt to make contact with Martye Madkins III by cellular telephone to tell him CI #1 was at the location. Martye Madkins III told CI #1 someone would be coming to the location soon to distribute the crack cocaine to CI #1. 26 minutes after CI #1 arrived at the intersection location; Martye Madkins III called CI #1 and told CI #1 to drive to another location. During the course of these events, Detective Alvin Babcock once again observed **Albert Banks** leave the aforementioned residence. Surveillance members observed **Albert Banks** approach a vehicle described as a grey in color Chevrolet Malibu. An unknown

black female exited the vehicle. **Albert Banks**, the unknown black female and another unidentified black male (later believed to be Martye Madkins III due to identified clothing) were observed walking back and entering into the aforementioned residence. A short time later, a black male (believed to be Martye Madkins III from the clothing description) was observed leaving the residence and walking toward 14th Street in Junction City, Geary County, KS. Then, Chris Howard was observed arriving and entering the residence and the unknown black male (believed to be Martye Madkins III) returned to the residence once again. The black male believed to be Martye Madkins III (identified by the clothing description of the person who later met with CI #1) then departed the residence once again and walked toward 14th Street in Junction City, Geary County, KS. A short time after the black male (believed to be Martye Madkins III) left the residence, Chris Howard also left the residence. Surveillance members observed CI #1 driving towards 14th Street and then travel west on 14th Street. Surveillance members then observed CI #1 driving east in the 300 block of 15th Street.

27.     While en route and in the 300 block of west 15th Street in Junction City, Geary County, KS; CI #1 was stopped by the same black male who had been observed walking from the residence. The black male, who was later positively identified as Martye Madkins III, walked up to the passenger side of the vehicle CI #1 was driving. Martye Madkins III sold CI #1 the crack cocaine at that time. While CI #1 was making the purchase of crack Cocaine, Gevonni Davis entered the rear seat of the vehicle CI #1 was driving and observed the transaction take place which did not detour Martye Madkins III from completing the sell. This sell of crack cocaine was less than 1000' from Washington Elementary School which is located at 1500 N Washington Street in Junction City, Geary County, KS.

28.     The Affiant took possession of the evidentiary item and later submitted the evidentiary item to the KBI for analysis and received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 2 having a net weight of 0.33 grams.

29.     On 08-17-2012, Detective Alvin Babcock received a phone call from CI #1 advising CI #1 had been in contact with **Anthony Thomson** and **Anthony Thompson** was willing to sell CI #1 $100.00 worth of crack cocaine. CI #1 met with Agents/Officers and made a controlled phone call to **Anthony Thompson**. CI #1 told

11

**Anthony Thompson** he/she was not currently in Junction City but would be shortly. **Anthony Thompson** told CI #1 to call him when CI #1 arrived in Junction City, Geary County, KS. Detective Alvin Babcock gave CI #1 $100.00 in US Currency to purchase the crack cocaine from **Anthony Thompson**. CI #1 drove to the Casey's General Store located at 624 S Washington Street in Junction City, Geary County, KS. While en route to the location, CI #1 called **Anthony Thompson** and advised him CI #1 would meet him there to which **Anthony Thompson** agreed. A grey in color Ford Focus bearing Kansas license tag 807FEE arrived at the location. A registration check was competed on the tag and found to be registered to a 2002 Ford Focus registered to Anna Thompson who is **Anthony Thompson's** sister. The driver of the vehicle was identified as **Anthony Thompson**.

30.     CI #1 exited his/her vehicle and entered the front passenger side of **Anthony Thompson's** vehicle. A short time later, CI #1 exited the vehicle and entered his/her own vehicle. **Anthony Thompson** backed up and parked at the gas pumps then exited his vehicle and walked over to CI #1's vehicle to look at items of clothing CI #1 had for sell. Approximately a minute later, **Anthony Thompson** entered into the Casey's General Store. CI #1 walked over to **Anthony Thompson's** vehicle, entered into the driver's side front door then exited and got back in to his/her vehicle and left the location to meet with Agents/Officers.

31.     The Affiant took possession of the evidentiary item and later submitted the evidentiary item to the KBI for analysis and received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 2 having a net weight of 1.01 grams.

32.     On 08/24/2012, CI #1 met with Detective Alvin Babcock and other officers for the purpose of purchasing crack cocaine from a black male with the alias of "JD". Detective Alvin Babcock determined this black male to be Jason Dixon. CI #1 drove to an agreed upon location, which was Handy's Convenience Store located a 1734 W. Ash Street in Junction City, Geary County, KS. Jason Dixon arrived and was observed meeting with CI #1. A short time later, CI #1 and Jason Dixon left the location. CI #1 met with Detective Alvin Babcock and gave him the suspected crack cocaine CI #1 had purchased from Jason Dixon. Detective Alvin Babcock later processed the evidentiary item per his agency policies and had it submitted to the KBI for analysis.

Detective Alvin Babcock received a Forensic Laboratory Report stating cocaine was detected in the item having a net weight of .22 grams. It should be noted that during the review of the covert electronic audio/video recording device which had been utilized during the transaction with Jason Dixon, Detective Alvin Babcock observed Jason Dixon retrieve the crack cocaine from his mouth prior to selling it to CI #1. This is a common tactic utilized by illegal drug distributors for the transporting of illegal drugs. If he/she has contact with law enforcement, the illegal drugs can be swallowed prior to being located by law enforcement.

33.    On 08-31-2012, Detective Alvin Babcock and other Officers met with CI #1 for the purpose of CI #1 purchasing crack cocaine from Charles Foster. CI #1 told Detective Alvin Babcock that Charles Foster had contacted CI #1 the previous evening and said he had $50.00 worth of crack cocaine for sell. CI #1 told Charles Foster he/she was unavailable at that time and would contact him the next day. Detective Alvin Babcock gave CI #1 the US Currency to be used in the transaction. CI #1 called Charles Foster via cellular telephone and Charles Foster told CI #1 to come to his residence which was located at 149 E Anchor Street in Grandview Plaza, Geary County, KS.

34.    Surveillance units were in place to observe CI #1 arrive at the residence. CI #1 drove to the residence and entered with items of clothing for Charles Foster's wife to look at. After approximately 30 minutes, CI #1 and Charles Foster left the residence and drove to and entered the alley behind 126 W 12th Street in Junction City, Geary County, KS. Charles Foster exited CI #1's vehicle and met with another black male who was later identified as **Anthony Thompson**. Charles Foster entered back into the vehicle CI #1 was driving and they exited the alley. A grey in color Ford Focus driven by **Anthony Thompson** exited the alleyway behind CI #1. CI #1 transported Charles Foster back to his residence where he exited. CI #1 met with Officers once again and gave Detective Alvin Babcock the evidentiary item.

35.    Detective Alvin Babcock submitted the evidentiary item per his policy to be submitted to the KBI for analysis. Detective Alvin Babcock received a Forensic Laboratory report stating cocaine base was detected in Lab Item 1 having a net weight of .28 grams.

36.     On 09-05-2012, Detective Alvin Babcock received an email from Detective Nate Boeckman of the RCPD indicating a Cooperating Individual who was providing assistance to the RCPD had told Detective Nate Boeckman **Anthony Thompson** was in possession of what he/she deemed to be a large amount of crack cocaine.  The RCPD CI stated he/she was at the **Anthony Thompson** residence and observed several packages of crack cocaine lying on the kitchen counter.  The RCPD CI stated **Anthony Thompson** had measured out and packaged the crack cocaine for distribution.

37.     Detective Nate Boeckman stated he drove past the residence and observed a maroon in color Buick Century parked bearing Kansas license tag 071FEG.  This vehicle is registered to a 1998 Buick Century with the primary owner listed as Michael Harris of Manhattan, Riley County, KS.  The RCPD CI told Detective Nate Boeckman the vehicle belonged to a female by the name of Monica and that she was a crack cocaine user.  The RCPD CI told Detective Nate Boeckman Monica was allowing **Anthony Thompson** to use her vehicle.  Later that same day, the RCPD CI told Detective Nate Boeckman **Anthony Thompson** had left the residence and took the crack cocaine he had packaged for distribution with him.  The RCPD CI estimated the total amount of crack cocaine to be greater than one (1) ounce in quantity.

38.     That same day, 09/05/2012, the Affiant and other Officers met with CI #1 for the purpose of CI #1 making a crack cocaine purchase from **Anthony Thompson**.  CI #1 contacted **Anthony Thompson** via cellular telephone and both parties agreed to meet at the Casey's General Store located at 624 S Washington Street in Junction City, Geary County, KS.  **Anthony Thompson** told CI #1 he was approximately 30 seconds away from the location at the current time.  The Affiant gave CI #1 $250.00 in US Currency to purchase the crack cocaine.

39.     Once CI #1 arrived at the agreed upon location CI #1 once again attempted to contact **Anthony Thompson** via cellular telephone to advise him CI #1 was at the location.  **Anthony Thompson** did not answer the phone call.  After approximately one and a half (1 ½) hours, CI #1 sent **Anthony Thompson** a text message.  **Anthony Thompson** replied and changed the location and told CI #1 to meet him in the 100 block

of W 12th Street in Junction City, Geary County, KS which is the location of the Corner Club.

40.     CI #1 drove to this location and met with **Anthony Thompson**. CI #1 gave **Anthony Thompson** the $250.00 in US Currency and **Anthony Thompson** gave CI #1 a large plastic baggie containing numerous smaller plastic baggies containing crack cocaine. **Anthony Thompson** also gave CI #1 a small single baggie containing crack cocaine. **Anthony Thompson** had CI #1 give him a ride to another location from this location.

41.     A covert electronic audio/video recorder was used during this transaction. Detective Alvin Babcock reviewed the recording and found that **Anthony Thompson** asked CI #1 to take him to Cottonwood (mobile home park in Junction City, Geary County, KS). **Anthony Thompson** told CI #1 he needed to go to this location "so he can give this girl some shit" referring to distributing more crack cocaine to a female. As they departed the location en route to the Cottonwood, **Anthony Thompson** was observed putting something in his mouth. This is a common practice utilized by drug distributors to transport small amounts of drugs to thwart law enforcement detection should the person encounter a law enforcement officer. Persons who maintain this type of practice can swallow the illegal drugs if they encounter law enforcement. As CI #1 reaches the mobile home park **Anthony Thompson** tells CI #1 what location to drive to. Once **Anthony Thompson** exits the vehicle, CI #1 states he/she was directed to drive to lot 41B. Detective Alvin Babcock knows this location to be the residence of Audrey Ali or Audrey Nelson, both being the same person.

42.     The Affiant took possession of the evidentiary items and later submitted the evidentiary items to the KBI for analysis and received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 3 which were found to be seven (7) plastic baggies total and having a net weight of 2.70 grams total.

43.     On 09/06/2012, CI #1 met with Detective Alvin Babcock and other Officers in reference to purchasing prescription pills from Garland Hull. CI #1 contacted Garland Hull at telephone number (785) 762-5346. CI #1 met with Garland Hull at the intersection of 10th and Webster Streets in Junction City, Geary County, KS. Garland Hull gave CI #1 a prescription bottle with numerous pills in it and CI #1 gave Garland

Hull the US Currency for the pills. Garland Hull then departed and entered the residence at 922 N Webster Street in Junction City, Geary County, KS. Detective Alvin Babcock took possession of the evidentiary items and determined the pills were Oxycodone (Schedule II) and Clonazepam (Schedule IV). Detective Alvin Babcock submitted the evidentiary times to the KBI for analysis.

44. On 09/25/2012, Detective Alvin Babcock and other Officers met with CI #1 for the purpose of CI #1 purchasing ten (10) Oxycodone 20 mg pills from Garland Hull. CI #1 drove to 922 N Webster Street in Junction City, Geary County, KS where he/she met with Garland Hull who exited from the residence at the aforementioned address. Garland Hull entered the vehicle CI #1 was driving and eventually received ten (10) pills from him. CI #1 exited the location and met with Detective Alvin Babcock. CI #1 gave the evidentiary items to Detective Alvin Babcock who determined the pills were Oxycodone/Hydrochloride 20 mg pills (Schedule II). Detective Alvin Babcock submitted the evidentiary items to the KBI for analysis.

45. On 09/27/2012, CI #1 met with the Affiant and other law enforcement officers for the purpose of purchasing crack cocaine from Jason Dixon. CI #1 called Jason Dixon using telephone number (785) 375-3222. Jason Dixon answered the phone and a conversation ensued in regards to CI #1 purchasing methamphetamine from him. Jason Dixon told CI #1 he would have to call CI #1 back to which he did and stated he was not able to locate any methamphetamine to distribute but that he had crack cocaine in his possession to distribute if CI #1 was interested. CI #1 said he/she was interested in purchasing the crack cocaine.

46. CI #1 told Jason Dixon he/she wanted two (2) $50.00 rocks of crack cocaine ($100.00 worth of crack cocaine). The two agreed to meet at Handy's Convenience Store located at 1734 W. Ash Street in Junction City, Geary County, KS. CI #1 drove to the location and a short time later Jason Dixon arrived and completed the transaction with CI #1. CI #1 drove back to a predetermine location where he/she then gave the two (2) plastic bag corners containing an off white substance in each to the Affiant.

47.     The Affiant took possession of the evidentiary items and later submitted the evidentiary items to the KBI for analysis and received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 2 and having a net weight of 0.82 grams.

48.     On 09/28/2012, the Affiant was contacted by CI #1 and told CI #1 had been in contact with **Anthony Thompson** who agreed to sell CI #1 one-half (1/2) ounce of crack cocaine for $700.00.  **Anthony Thompson** had previously told CI #1 he would sell him/her one-half (1/2) ounce of crack cocaine for $700.00 but at that time he was not in possession of that quantity.  Then earlier the day of 09/28/2012, **Anthony Thompson** contacted CI #1 and said he was now in possession of more crack cocaine and was willing to sell CI #1 the one-half (1/2) ounce.  CI #1 had made several attempts throughout the day (after the previous call) to contact **Anthony Thompson** but the calls were going straight to voicemail and the voicemail box was full so CI #1 was unable to leave a message.  It should be noted throughout this investigation it has been found when **Anthony Thompson** did not answer his phone the voicemail box was nearly always full therefore no voicemail could be left indicating **Anthony Thompson** was apparently receiving a large number of phone calls with voicemails being left.  **Anthony Thompson** eventually contacted CI #1 via cellular telephone and stated he would meet CI #1 and complete the transaction.

49.     CI #1 met with the Affiant and other Officers prior to the purchase.  The Affiant gave CI #1 $700.00 in US Currency to purchase the crack cocaine.  CI #1 once again contacted **Anthony Thompson** via cellular telephone and advised him he/she was ready to meet with him.  **Anthony Thompson** told CI #1 to meet him at the Taco Bell which was located at 407 W 18th Street in Junction City, Geary County, KS.  CI #1 arrived at the location and shortly thereafter was approached by a black male and asked if CI #1 was the person who was there to receive something from "Ant" (**Anthony Thompson**).  CI #1 said "yes" and the black male said he would be right back with "it" referring to the crack cocaine.  Sergeant Todd Godfrey of the JCPD identified the black male who approached CI #1 as **Albert Banks**.  Approximately four (4) minutes later, **Albert Banks** reappeared and entered the passenger side of CI #1's vehicle where he sold CI #1 the crack cocaine.  CI #1 told **Albert Banks** to tell **Anthony Thompson** if the crack cocaine was good, CI #1 would want one (1) ounce of crack cocaine next week.

**Albert Banks** agreed and told CI #1 to contact **Anthony Thompson** next week. **Albert Banks** then exited the vehicle and walked to the south and was not surveilled due to the location and the fact he was walking.

50.     Prior to the purchase taking place, Detective Alvin Babcock recalled seeing a black male with dreadlocks and a white t-shirt leave Wood Oil Convenience Store (located at 439 W 19th Street in Junction City, Geary County, KS adjacent to the Taco Bell) and walk towards Taco Bell. This was the same black male later identified as **Albert Banks**. **Albert Banks** met with another unknown black male in front of Taco Bell in the parking lot who then departed shortly after meeting with **Albert banks**. Shortly thereafter, Detective Alvin Babcock recalled seeing a heavy set black female exit the Wood Oil Convenience Store and enter into a gold in color Four Taurus which Detective Alvin Babcock knew belonged to **Albert Banks** and his girlfriend Glenda Robertson. The vehicle was bearing Kansas license tag 882FEE. A registration request was run and the vehicle was found to be registered to Glenda Robertson and Ola Mae Gavin. Ola Mae Gavin is the mother of Glenda Robertson. This vehicle remained at its location throughout the purchase of crack cocaine.

51.     The Affiant took possession of the evidentiary item and later submitted the evidentiary items to the KBI for analysis and received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 3 and having a net weight of 13.89 grams.

52.     On 10/02/2012, the Affiant and Detective Alvin Babcock met with CI #1 for the purpose of making a controlled phone call to **Anthony Thompson** for the purpose of trying to obtain one (1) ounce of crack cocaine from him. **Anthony Thompson** did not answer and the call went to voicemail but once again the voicemail box was full and CI 31 was not able to leave a message. A recording device was left with CI #1 in order for him/her to make a phone call later and have a recording of it.

53.     On 10/03/2012, Detective Alvin Babcock and Detective Angie Weeks met with CI #1 to obtain the recording device from him and listen to the completed phone between CI #1 and **Anthony Thompson**. During the phone call, CI #1 talked to **Anthony Thompson** in reference to obtaining a "full one" referring to one (1) ounce of crack cocaine. **Anthony Thompson** told CI #1 the cost would be $1,400.00. CI #1 told **Anthony Thompson** he/she didn't have $1,400.00 and **Anthony Thompson** told CI #1

he would sell CI #1 an ounce of crack cocaine for $1,200.00. CI #1 asked **Anthony Thompson** if "homeboy was going to meet CI #1 again like he did the other day" referring to **Albert Banks**. **Anthony Thompson** said he would call "him" (**Albert Banks**) and find out. CI #1 and **Anthony Thompson** agreed to meet at approximately 2:00 PM to complete the transaction.

54.     At approximately 2:00 PM, CI #1 contacted **Anthony Thompson** via cellular telephone where CI #1 asked **Anthony Thompson** if he was ready (meaning CI #1 wanted to know if **Anthony Thompson** had the ounce of crack cocaine to distribute to CI #1). **Anthony Thompson** asked CI #1 if he/she had the "12" referring to the $1,200.00 to which he/she replied "yes". CI #1 asked **Anthony Thompson** if he was going to have "little homeboy" bring the crack cocaine to CI #1 referring to **Albert Banks** delivering it to CI #1 as he did on 09/28/2012. **Anthony Thompson** said "he had it anyway" referring to **Albert Banks** having the crack cocaine **Anthony Thompson** and **Albert banks** were distributing. **Anthony Thompson** said he would call "him" referring to **Albert Banks** and call CI #1 right back.

55.     Approximately two (2) minutes later, **Anthony Thompson** called CI #1 back, asked where he/she was and where CI #1 wanted to meet. CI #1 stated he/she liked the Taco Bell location, where he had met **Albert Banks** previously. **Anthony Thompson** indicated he had talked to **Albert Banks** and **Albert Banks** wanted to know if CI #1 would pay $1,250.00 for the ounce of crack cocaine instead of the earlier agreed upon price of $1,200.00. CI #1 agreed upon the price of $1,250.00. **Anthony Thompson** agreed upon the meeting location and asked CI #1 when he/she would be arriving at the location to which CI #1 replied, 15 minutes". **Anthony Thompson** told CI #1 to call him (**Anthony Thompson**) when CI #1 arrived at the location.

56.     CI #1 arrived at the location and attempted to contact **Anthony Thompson** via cellular telephone but **Anthony Thompson** did not answer. Approximately 17 minutes later, **Anthony Thompson** called CI #1 back and said he had seen a JCPD patrol vehicle parked near the meeting location and therefore wanted CI #1 to exit the parking lot, turn right and then turn left at the first intersection and meet **Anthony Thompson** in that area to which CI #1 complied. It should be noted this location is actually a dead end street making surveillance complicated as to seeing the

vehicle **Anthony Thompson** was driving. CI #1 parked in the 2000 block of N Madison Street in Junction City, Geary County, KS at which time **Anthony Thompson** appeared and entered into the passenger side of CI #1's vehicle.

57.     The transaction was completed and CI #1 had a conversation with **Anthony Thompson**. CI #1 asked **Anthony Thompson** how much crack cocaine he was purchasing per week to distribute. **Anthony Thompson** said it was approximately nine (9) ounces per week. The two continued to converse further and then **Anthony Thompson** exited the vehicle and CI #1 drove away en route to a pre-determined location. Detective Alvin Babcock and Captain Shawn Peirano of the Grandview Plaza Police Department (GPPD) were able to observe **Anthony Thompson** leave the location where the transaction took place and as he left, **Albert Banks** was seen in the vehicle with **Anthony Thompson**.

58.     The Affiant took possession of the evidentiary item and later submitted the evidentiary item to the KBI for analysis and received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 4 and having a net weight of 27.74 grams.

59.     On 10/10/2012, Agents/Officers met with CI #1 for the purpose of purchasing one (1) ounce of crack cocaine from **Anthony Thompson**. Detective Alvin Babcock retrieved a digital audio recorder from CI #1 which contained a recorded phone call between CI #1 and **Anthony Thompson** prior to this date. During the phone call, CI #1 told **Anthony Thompson** he/she would be in town (Junction City, Geary County, KS) on Wednesday instead of Thursday and wanted to know if **Anthony Thompson** was "still good" referring to **Anthony Thompson** having crack cocaine to distribute. **Anthony Thompson** told CI #1 he was "good" and asked CI #1 what "he needed". CI #1 said he/she wanted "a yard" referring to an ounce of crack cocaine to which **Anthony Thompson** responded he is "good' meaning he had that quantity to distribute.

60.     CI #1 contacted **Anthony Thompson** via cellular telephone and told him CI #1 was in town (Junction City, Geary County, KS) and wanted to know where **Anthony Thompson** wanted to meet. **Anthony Thompson** told CI #1 to meet him at the McDonald's on 6th Street and then changes the location to the Discount Liquor Store (located at 744 W 6th Street in Junction City, Geary County, KS). CI #1 told **Anthony Thompson** he/she was not aware of the location for that establishment. **Anthony**

**Thompson** told CI #1 it was "up the street from Dillon's" and to give **Anthony Thompson** 15 to 20 minutes (to arrive). Detective Alvin Babcock gave CI #1 directions to the location and he/she departed soon after.

61.     CI #1 arrived at the location and approximately 37 minutes later a grey in color Ford Focus arrived at the location. **Anthony Thompson** exited the vehicle and got into the vehicle CI #1 was driving. A second black male could be seen in the vehicle **Anthony Thompson** arrived in who was later identified as **Albert Banks**. The transaction was completed and as **Anthony Thompson** departed the location, surveillance was attempted on the vehicle he was driving but he was able to avoid being followed by Agents/Officers.

62.     The covert audio/video recording device from CI #1's vehicle was viewed by Detective Alvin Babcock and during the transaction **Anthony Thompson** told CI #1 "if he is unable to get in touch with him, CI #1 could call his bro (**Albert Banks**) at 785-317-1164 and his name is AB (**Albert Banks**)". **Anthony Thompson** told CI #1, AB (**Albert Banks**) was the person CI #1 met with the first time. It should be noted **Anthony Thompson** was referring to CI #1 making a purchase from **Albert Banks** on 09/28/2012 in the Taco Bell parking lot. It should also be noted this transaction took place within 1000' of Larry Dixon Alternative School.

63.     KBI Task Force Agent (TFA) Vidal Campos took possession of the evidentiary item and later submitted the evidentiary item to the KBI for analysis. The Affiant received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 5 and having a net weight of 27.74 grams.

64.     On 10/23/2012, Detective Alvin Babcock received a telephone call from CI #1 stating CI #1 attempted to contact **Albert Banks** several times to initiate a controlled purchase of crack cocaine from him but **Albert Banks** did not answer any of the incoming phone calls from CI #1. CI #1 did say he/she had a conversation with **Albert Banks** via text messaging though and forwarded the text messages to Detective Alvin Babcock. The messages are as follows;

- Is this AB that knows Ant who I got # from I am *******(omitted)
- What up yea this AB
- Will be comeing to Junk City if u got some work for me tomorrow

- Yep hit me up when u ready
- Is there a money cut on 2

This conversation is translated to mean CI #1 sent a text message to **Albert Banks** asking if the number texted was **Albert Banks**. He indicated it was **Albert Banks**. CI #1 advised him he/she would be coming to Junction City, Geary County, KS tomorrow and wanted to know if **Albert Banks** had crack cocaine to purchase. **Albert Banks** indicated he had crack cocaine for distribution and for CI #1 to call him when CI #1 was ready. CI #1 asked if he/she would receive a discounted cost if he/she purchased two (2) ounces.

65.  CI #1 then contacted **Albert Banks** via cellular telephone later and they conversed in reference to CI #1 not being able to make it to Junction City on this date. CI #1 said he/she would be in Junction City tomorrow (10/24/2012) and if **Albert Banks** had more (more than one or two ounces), CI #1 may want to purchase more quantity. **Albert Banks** stated he may possibly have more available and for CI #1 to call him tomorrow. CI #1 later received a text message from **Albert Banks** which read; U still want this o if not I am bout to get rid of it. This text was asking CI #1 if he/she was still planning on purchasing the ounce of crack cocaine CI #1 had asked for and if CI #1 did not want it, **Albert Banks** was going to sell it to someone else.

66.  On 10/24/2012, the Affiant and other Officers met with CI #1 for the purpose of CI #1 making a crack cocaine purchase from **Albert Banks**. CI #1 called **Albert Banks** via cellular telephone and told him CI #1 was approximately 15 minutes from Junction City, Geary County, KS and asked **Albert Banks** if he was "good" referring to whether or not he had crack cocaine available for distribution. **Albert Banks** told CI #1 he was "good" and waiting on CI #1. CI #1 asked **Albert Banks** if CI #1 would receive a discount if CI #1 were to purchase two (2) ounces. **Albert Banks** said he did not believe he had that much crack cocaine left but he would "have to go see how much he has" and that he "thinks it's only like 1 ½" meaning he did not have the crack cocaine with him at that time and believed he only had one and one-half (1 ½) ounces left to sell. **Albert Banks** told CI #1 he would give CI #1 a "deal", referring to a break in price, and CI #1 said he/she would take what **Albert Banks** had. CI #1 asked **Albert Banks** where he wanted to meet CI #1 at and **Albert Banks** said to meet him 12th and Jefferson Street (Junction City, Geary County, KS). CI #1 told **Albert Banks** he/she

knew where the Corner Club was (the intersection of 12th and Washington in Junction City, Geary County, KS) and he/she would meet **Albert Banks** there.

67.     CI #1 drove to the aforementioned location where CI #1 met with **Albert Banks** and purchased what was supposed to be 1 ½ ounces of crack cocaine for $1,800.00 which was given to CI #1 by the Affiant. Detective Alvin Babcock observed **Albert Banks** walking east in the 100 block of W 12th Street prior to meeting with CI #1 and then observed **Albert Banks** exit CI #1's vehicle and walk to a residence having an address of 126 W 12th Street in Junction City, Geary County, KS/

68.     The Affiant took possession of the evidentiary items which were actually two (2) plastic baggies each containing suspected crack cocaine. KBI TFA Vidal Campos later submitted the evidentiary item to the KBI for analysis. The Affiant received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 4 and having a net weight of 40.96 grams.

69.     On 10/25/2012, Detective Alvin Babcock was listening to a recorded phone call from the Geary County Detention Center in which Martye Madkins III called telephone number 785-226-0131 (Martye Madkins III was incarcerated at the time in this facility). The aforementioned telephone number was a cellular telephone number which Jasmine Tipton was utilizing. Jasmine Tipton answered the phone and they talked briefly then she told Martye Madkins III that **Albert Banks** was there and she gives the phone to **Albert Banks**. **Albert Banks** and Martye Madkins III talk in reference to bonding Martye Madkins III out of jail. **Albert Banks** told Marty Madkins III "they already have the money and they are waiting for a co-signor" to bond Martye Madkins III out. Martye Madkins III asks **Albert Banks** the question of, "My cousin did that bullshit man?" **Albert Banks** replied, "There was two (2) onions laying on the table". Martye Madkins III said, "I'm gonna snap on they motherfucking ass". **Albert Banks** told Martye Madkins III that he "hurried up and slid down there". it should be noted this conversation meant there were two (2) ounces of crack cocaine on the table at Jasmine Tipton's residence (227 W 14th Street Apartment #2 in Junction City, Geary County, KS) and **Albert Banks** retrieved it hurriedly. **Albert Banks** also said "they" were trying to bond "Dirty Dwayne" out of jail but "Dirty Dwayne's" stepfather would not co-sign to get him out of jail. Detective Alvin Babcock knows "Dirty Dwayne" to be Dwayne

Alexander who is a partner of **Anthony Thompson, Albert Banks** and Martye Madkins III.

70.     On 10/29/2012, Detective Alvin Babcock received a text message from CI #1 which included a text message conversation CI #1 had with **Albert Banks**. The text message from CI #1 to **Albert Banks** read; "Will be out 4 sure on Friday. Will u be ready for my 2200" indicating CI #1 would be in Junction City, Geary County, KS on Friday and CI #1 wanted to know if **Albert Banks** would have cocaine to distribute to CI #1. **Albert Banks** simply replied back "Yep". A purchase of crack cocaine was attempted but **Albert Banks** indicated, during a telephone conversation, that it would be a couple of hours. A couple hours later, CI #1 contacted **Albert Banks** once again and **Albert Banks** indicated he was not in town (Junction City, Geary County, KS). CI #1 attempted to contact **Albert Banks** a short time later and he did not answer his cellular telephone so the attempted purchase of crack cocaine was discontinued for this date.

71.     On 10/31/2012, Detective Alvin Babcock observed a green in color Ford Thunderbird being driven by Glenda Robertson in the 500 block of E 8th Street in Junction City, Geary County, KS. The vehicle traveled along multiple streets and made several turns finally entering into an alleyway where Detective Alvin Babcock lost sight of it. Captain Shawn Peirano of the GPPD gained sight of the vehicle traveling through the alleyway where it was last seen. Detective Alvin Babcock drove to the intersection of 12th and Franklin Street in Junction City, Geary County, KS and observed the vehicle with **Albert Banks** in the front passenger seat and Glenda Robertson in the driver's seat. To the best of Detective Alvin Babcock's knowledge, at that time **Albert Banks** and Glenda Robertson were in a domestic relationship. Detective Alvin Babcock observed the vehicle turn west on 12th Street and finally stopping in front of a residence located at 126 W 12th Street in Junction City, Geary County, KS. **Albert Banks** exited the vehicle, approached the residence, then walked past the building and continued toward the alley where Officers lost sight of him. Detective Alvin Babcock was aware of previous information from SOI #1 who stated **Albert Banks** stashes or hides his cocaine in random alleys where it is left until he needs it for distribution. Once **Albert Banks** has a need for an unknown quantity of cocaine, he will proceed to the location where he had hid the cocaine, obtain it and then transport it to the person/s to distribute it. This

practice is done in an effort to conceal the possession of the illegal drugs in case law enforcement were to locate where **Albert Banks** was residing and execute a search warrant at that residence. If the illegal drugs were located in a location other than in or on property where **Albert Banks** resides or was located at, the drugs would not be associated to him.

72.     On 11/07/2012, CI #1 contacted Detective Alvin Babcock and said he/she had sent **Albert Banks** a text message asking him if he had any "work" for CI #1 referring to any crack cocaine for CI #1 to purchase. **Albert Banks** replied back "Yep". It should be noted no certain quantity of crack cocaine had been discussed or agreed up on by either party as the conversation was being conducted via text messaging. CI #1 arrived in Junction City, Geary County, KS and met with Agents/Officers. A controlled phone call was made to **Albert Banks** who told CI #1 to meet him at the same location as before referring to the Corner Club located at the intersection of 12th Street and Washington Street in Junction City, Geary County, KS. The Affiant gave CI #1 $2,200.00 in US Currency to be utilized for the crack cocaine purchase.

73.     CI #1 drove to the aforementioned location and once again called **Albert Banks** via cellular telephone to tell him CI #1 had arrived at the agreed upon location. **Albert Banks** told CI #1 to meet him in front of the residence where he had had contact with **Albert Banks** previously (10/24/2012) which was 126 west 12th Street in Junction City, Geary County, KS. CI #1 did as he/she was instructed to and upon parking, a black male (later identified by Detective Alvin Babcock as **Albert Banks**) exited the residence and approached CI #1. **Albert Banks** gave CI #1 a plastic baggie containing two (2) plastic baggies each having an off white substance in them later, determined to be crack cocaine. CI #1 gave **Albert Banks** the $2,200.00 in US Currency and then asked **Albert Banks** if he/she could purchase three (3) more ounces of crack cocaine in a couple of days if CI #1 was able to sell this two (2) ounces. **Albert Banks** agreed and told CI #1 to call him when he/she was ready. CI #1 left the location and met with the Affiant and other Agents/Officers.

74.     The Affiant took possession of the evidentiary item and later signed it over to KBI TFA Vidal Campos who later submitted the evidentiary item to the KBI for

analysis. The Affiant received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 5 and having a net weight of 56.08 grams.

75.    On 11/14/2012, The Affiant and other Agents/Officers met with CI #1 for the purpose of CI #1 purchasing crack cocaine from **Anthony Thompson**. CI #1 had been in contact with **Anthony Thompson** prior and had asked **Anthony Thompson** if he/she could purchase three (3) ounces of crack cocaine from him. **Anthony Thompson** told CI #1 he/she could as **Anthony Thompson** "was sitting fat right now" referring to having a large quantity of crack cocaine for distribution at that time. A negotiated price of $3,300.00 for the three (3) ounces of crack cocaine was agreed upon.

76.    Later this day (11/14/2012), CI #1 contacted **Anthony Thompson** once again via cellular telephone. **Anthony Thompson** told CI #1 he was not in Junction City, Geary County, KS at that time and would not be returning for two to two and a half (2 to 2 ½) hours as he was trying to "get it" referring to attempting to obtain more cocaine as he had obviously distributed all cocaine he had talked to CI #1 about previously. . CI #1 told **Anthony Thompson** he/she would be waiting for him once he returned. CI #1 and **Anthony Thompson** had contact via cellular telephone at a later time at which **Anthony Thompson** said he wanted to meet CI #1 at the Taco Bell parking lot (located at 407 W 18th Street in Junction City, Geary County, KS) once again. **Anthony Thompson** advised CI #1 he now wanted $3,600.00 for the three (3) ounces of crack cocaine. CI #1 was able to negotiate the price down to $3,400.00 and the transaction was agreed upon.

77.    The Affiant gave CI #1 $3,400.00 in US Currency to complete the transaction. CI #1 drove to the aforementioned location and waited on **Anthony Thompson**. After a period of time, CI #1 called **Anthony Thompson** once again to see if was getting close to the location as earlier, **Anthony Thompson** told CI #1 he was in Manhattan and en route to the location and suspected he would be at the location in 15 minutes but more time had elapsed than that. **Anthony Thompson** eventually arrived at the location and was seen by surveillance units. **Anthony Thompson** entered the front passenger seat of the vehicle CI #1 was driving and they began to converse. **Anthony Thompson** gave CI #1 two (2) plastic baggies each containing an off white chunky substance which was later confirmed to be crack cocaine. **Anthony Thompson** told CI

#1 each baggie weighed one and one-half (1 ½) ounces. **Anthony Thompson** told CI #1 they (the two packages and their contents) were still warm as he had just made it meaning he had just recently converted cocaine powder to crack cocaine immediately prior to meeting with CI #1. CI #1 gave the US Currency to **Anthony Thompson** and asked him to count it to confirm the amount was correct to which he did.

78.     Once the transaction was complete, **Anthony Thompson** exited the vehicle and walked to the south from this location. **Anthony Thompson** was observed by Detective Alvin Babcock walking in the yard of a residence located at 412 Roosevelt Street in Junction City, Geary County, KS but he was not seen entering the residence. Although the grey in color Ford Focus he had been seen driving previously was not seen near this location either. CI #1 drove to a predetermined location where he/she met with Agents/Officers. CI #1 gave the two (2) plastic baggies to the Affiant and the Affiant could feel they were still warm even given the cold ambient temperature outside at the time.

79.     The Affiant took possession of the evidentiary items and later transported and later submitted the evidentiary items to the KBI for analysis. The Affiant received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 6 and having a net weight of 82.95 grams.

80.     On 11/30/2012, Detective Alvin Babcock was contacted by SOI #1. It is unclear if **Albert Banks** was conversing with SOI #1 or if SOI #1 overheard a conversation **Albert Banks** was having with someone else (on 11/30/2012) but SOI #1 told Detective Alvin Babcock that **Anthony Banks** had eluded "them" (Detective Alvin Babcock and someone else) on 11/29/2012.

81.     On 11/29/2012, Detective Alvin Babcock and Detective Angie Weeks were in his unmarked police vehicle when they observed **Albert Banks** driving a silver in color Dodge Stratus in the 1200 block of north Jefferson Street in Junction City, Geary County, KS. Detective Alvin Babcock turned his police vehicle around in an attempt to follow **Albert Banks** and obtain the vehicle tag number displayed on the vehicle he was driving. **Albert Banks** turned east into an alleyway and continued at a high rate of speed indicated to Detective Alvin Babcock by the cloud of dust in the alleyway. Detective Alvin Babcock then observed **Albert Banks** run to a residence located at 126 W. 12th

27

Street.  Detective Alvin Babcock was able to observe the tag number on the grey in color Dodge Stratus which was 214 EBL.  Detective Alvin Babcock knows this vehicle to belong to Barbara Shaw.  Detective Alvin Babcock is aware from previous law enforcement contact and recent CI conversation that Barbara Shaw (AKA "Smiley") is heavily ingesting crack cocaine at the residence located at 126 ½ W. Chestnut Street in Junction City, Geary County, KS.

82.  SOI #1 also told Detective Alvin Babcock a person SOI #1 knows as "Ace' (known to Detective Alvin Babcock as Adrian Muse) was in Junction City, Geary County, KS on 11/29/2012 and was observed with **Anthony Thompson**.  This was the first time SOI #1 had met "Ace" (Adrian Muse).  SOI #1 had received information indicating Adrian Muse had been "raided" (search warrant executed at his residence) by the "Feds" (Federal Law Enforcement Officers) and a stolen firearm was located.  SOI #1 was told the "feds" issued Adrian Muse a citation for being in possession of the stolen firearm and then told Adrian Muse something about the "Cartel" and therefore Adrian Muse is frightened the Cartel is looking for him.  SOI #1 also advised he/she believed **Anthony Thompson** had been supplied cocaine by Adrian Muse in the past but since Adrian Muse had been "raided" by the "Feds", he hadn't supplied **Anthony Thompson** with cocaine.

83.  It should be noted, the Affiant is aware of a search warrant which had been executed at a residence located at 18921 W. 160th Terrace in Olathe, Johnson County, KS on 10/24/2012 (residence of Adrian Muse) in which a large digital scale, a Springfield Armory Xd-40 pistol (which was found to have been reported as stolen), an Apple I-phone, one (1) firearm magazine and nine (9) rounds of Springfield 40 caliber ammunition were seized.  This information/documentation is in reference to Olathe Police Department case number 2012-0016325.

84.  SOI #1 also told Detective Alvin Babcock that SOI #1 had heard **Anthony Thompson** had recently drove to Kansas City (no indication whether it was Kansas City, KS or Kansas City, MO) to obtain more cocaine for conversion to crack cocaine and ultimately for distribution.  **Anthony Thompson** met with an unknown cocaine supplier who he gave $3,000.00 in US Currency to purchase the cocaine.  The unknown supplier stole the $3,000.00 from **Anthony Thompson**.

85.    SOI #1 believed **Anthony Thompson** and **Albert Banks** were to be obtaining two (2) ounces of cocaine on this day but it was unknown where they were going to obtain it and who they were to obtain it from.

86.    SOI #1 also told Detective Alvin Babcock that **Albert Banks** allegedly moved to a residence located behind a residence Caress Jackson resided at. Detective Alvin Babcock believes Caress Jackson to reside at 235 E 3rd Street in junction City, Geary County, KS. Detective Alvin Babcock knows **Albert Banks** and Caress Jackson have a child together.

87.    On 01/22/2013, CI #1 contacted **Anthony Thompson** in reference to purchasing crack cocaine from him on 01/23/2013 at approximately 11:30 AM. **Anthony Thompson** stated he would not be out of school classes until 12:00 PM. CI #1 asked him if they could meet at approximately 12:30 PM to which **Anthony Thompson** agreed. **Anthony Thompson** asked CI #1 if he/she wanted "a whole one" referring to one (1) ounce of crack cocaine to which CI #1 replied "yes". CI #1 asked **Anthony Thompson** if he/she could purchase the ounce of crack cocaine for $1,275.00. **Anthony Thompson** replied, "I can't swing it right now buddy. Ain't no possible way". CI #1 asked if he/she could purchase it for $1,300.00 and at approximately the same time, **Anthony Thompson** stated "whole, 14. It's going to be worth it though". CI #1 was trying to negotiate a lower price for the ounce of crack cocaine but **Anthony Thompson** stated the price would be higher and wanted $1,400.00 for it. The conversation continued ending with the two of them agreeing to meet on 01/23/2013 at approximately 12:30 PM.

88.    On 01/23/2013, CI #1 met with Agents/Officers and made a controlled phone call to **Anthony Thompson**. CI #1 asked **Anthony Thompson** if he was ready to meet and **Anthony Thompson** said he was just getting out of school. **Anthony Thompson** went on to say, "Gotta get everything ready. I got it ready" referring to preparing the crack cocaine for distribution and then stated he had it prepared. CI #1 asked **Anthony Thompson** where he wanted to meet at and **Anthony Thompson** stated they could meet at the Taco Bell in approximately one (1) hour.

89.    Approximately one (1) hour later, CI #1 called **Anthony Thompson** once again. **Anthony Thompson** said, "On my way there now buddy". CI #1 asked **Anthony Thompson** if he wanted CI #1 to proceed to the meeting location. **Anthony Thompson**

said, "No, I'm coming from Manhattan. I'll meet you on the edge (referring to the east side of Junction City, Geary County, KS), that gas station by Wal-Mart (referring to the Shell Travel Center located at 821 East Chestnut Street in Junction City, Geary County, KS)". CI #1 asked, "The truck stop" to which **Anthony Thompson** replied, "I'm about two or three (2 or 3) minutes out" and the conversation ended. The Affiant gave CI #1 $1,400.00 in US Currency to purchase the crack cocaine.

90.     CI #1 drove to the agreed upon location and waited for **Anthony Thompson** to arrive. **Anthony Thompson** eventually arrived in a vehicle being driven by a black male whom Detective Alvin Babcock identified as Michael Asbury. **Anthony Thompson** entered into the passenger side of the vehicle CI #1 was driving and the $1,400.00 was exchanged for the ounce of crack cocaine. CI #1 asked **Anthony Thompson** for a phone number for **Albert Banks** as CI #1 had been trying to contact **Albert Banks** but the phone number CI #1 had for **Albert Banks** was not in working order anymore. **Anthony Thompson** said the phone number for **Albert Banks** was **(785) 375-6704**. CI #1 and **Anthony Thompson** then departed. CI #1 was followed to a pre-determined location where CI #1 met with Agents/Officers once again. CI #1 gave the Affiant a clear plastic baggie with an off white chunky substance in it.

91.     The Affiant took possession of the evidentiary item and later transported and later submitted the evidentiary item to the KBI for analysis. The Affiant received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 7 and having a net weight of 27.22 grams.

92.     CI #1 contacted **Albert Banks** via cellular telephone at telephone number **(785) 375-6704**. It should be noted this phone number was collected from a telephone being used by Patricia Foy on 12/29/2012 and was listed in the contacts of the phone memory as "**AB**" which is an alias for **Albert Banks**. **Albert Banks** answered and Detective Alvin Babcock recognized the voice as that of **Albert Banks**. CI #1 asked **Albert Banks** to meet him/her as CI #1 stated he/she had some clothes for **Albert banks** to look at. They agree to meet at the Dollar General Store located at the intersection of Chestnut and Franklin Streets in Junction City, Geary County, KS. CI #1 drove to the aforementioned location and a person arrived whom Detective Alvin Babcock identified as **Albert Banks**. **Albert Banks** arrived in a gold in color vehicle bearing Kansas license

tag 181DMY. The vehicle was found to be registered to a 2001 Buick Century with Robert Thomas Keeley of 6826 Meade Loop Fort Riley, KS listed as the owner. After CI #1 and **Albert Banks** were finished conversing, CI #1 met with Agents/Officers once again at which time CI #1 stated he/she conversed with **Albert Banks** in reference to purchasing crack cocaine and **Albert Banks** told CI #1 to contact him anytime CI #1 was ready and he could receive crack cocaine from him thus indicating this phone belonging to **Albert Banks** is being used for the distribution of illegal drugs.

93.     On 02/13/2013, CI #1 met with the Affiant and other Agents/Officers in reference to purchasing crack cocaine from **Albert Banks**. CI #1 contacted **Albert Banks** at telephone number **(785) 375-6704** and the two (2) agreed to meet at the Dollar General Store located at 201 S. Franklin Street in Junction City, Geary County, KS. CI #1 told **Albert Banks** he/she wanted to purchase one (1) ounce of crack cocaine from him to which **Albert Banks** agreed. CI #1 arrived at the location and approximately 30 minutes later, CI #1 contacted **Albert Banks** who said he was en route to the location. Approximately 35 minutes later, **Albert Banks** arrived and met with CI #1. This transaction was recorded on a covert electronic audio/video device. **Albert Banks** got into the passenger side of the vehicle CI #1 was driving and shortly thereafter a white female approached **Albert Banks**. **Albert Banks** told the white female, who was later identified as Kari Stutheit, to get back into her vehicle (which was a silver in color Mitsubishi Eclipse) to which she did. The transaction between CI #1 and **Albert Banks** ensued at which time **Albert Banks** told CI #1 the quantity of crack cocaine would be cheaper in price ($1,250.00) as it was "3 off" meaning the weight was 25 grams instead of the 28 grams earlier agreed upon. The transaction concluded and CI #1 left the location to meet with the Affiant.

94.     **Albert Banks** was observed getting out of CI #1's vehicle by SSA Amanda Young and KBI TFA Vidal Campos. They observed **Albert Banks** approach the white female earlier identified as Kari Stutheit sitting in the vehicle she drove to this location in. SSA Amanda Young and TFA Vidal Campos observed what they described as a hand-to-hand transaction between Kari Stutheit and **Albert Banks**. This refers to **Albert Banks** selling Kari Stutheit crack cocaine.

95.     Surveillance members observed **Albert Banks** enter into a dark in color Ford Focus bearing Kansas license tag 781FDR which was registered to Karen Johnson. Detective Alvin Babcock stated he notes Karen Johnson as being involved in the drug trade in Junction City, Geary County, KS area.

96.     When CI #1 met with the Affiant, he/she gave the Affiant the evidentiary item he/she purchased from **Albert Banks.** This was described as a clear plastic baggie containing an off white substance.  The Affiant took possession of the evidentiary item and later completed an Evidence Custody Receipt and signed the item over to SSA Amanda Young to transport to the KBI Evidence Control Center to be held for analysis.

97. The Affiant received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 8 and having a net weight of 24.63 grams.


## CONFIDENTIAL SOURCES


98.     To date, there are two cooperating individuals (CI's) that have been developed and assisting in the investigation. Only one of the CI's has been able to infiltrate this organization actively.  This particular CI has been able to make purchases of crack cocaine from only certain persons involved in this organization.  Multiple crack cocaine purchases have been made beginning with small amounts of crack cocaine with progressively larger purchases being made up to three ounces in quantity.  Although this particular CI has been able to gain limited trust from these individuals, the full scope of the organization, the persons involved and the source of supply have not been identified as is doubtful this information will be identified due to the guarded nature of the distribution ring and the source of supply.  Early within the investigation, it was hoped purchasing larger quantities of crack cocaine would afford law enforcement the ability to identify the source of supply but as of this date, that has not been available as **Anthony Thompson** and **Albert Banks** have been able to supply the quantities requested, therefore it is the belief of law enforcement that the source of supply would not be identified to law enforcement utilizing this traditional means of investigation.  Others within this distribution organization will likely never be identified as the CI has reached

the upper echelon of this organization, therefore, others distributing crack cocaine for **Anthony Thompson** and **Albert Banks** will likely not ever be identified to this CI.

99.    The other CI has indicated an unwillingness to be identified or testify in court for fear of his/her physical safety. Fear not only of **Anthony Thompson** and **Albert Banks,** but also of others associated with the organization. This CI is unwilling to make purchases from any of the individuals and therefore provides limited information related to this organization.

100.    A person whom has been identified as a Source of Information has been developed but once again has very limited knowledge of the organization therefore making it difficult to corroborate all the information the SOI is receiving. Much of the information the SOI receives is dated information as it is learned by the SOI after the fact. This SOI has also indicated an unwillingness to be identified or testify in court for fear of his/her physical safety

101.    No other cooperating individuals have been developed and none are anticipated to be developed to assist in this investigation due to the inherent risks of bodily harm that persons have expressed may occur if they were to assist in the arrest of **Anthony Thompson, Albert Banks** or any of their co-conspirators. Due to the structure and loyalty of the members of this organization, it is unlikely that any other CI's can, or will be, developed from those who associate with or are members of this organization.

## PEN REGISTER INFORMATION AND ANALYSIS

102.    To further the investigation, Pen Register was initiated on the target phone number **(785) 375-6704** pursuant to a Kansas Court Order. The Affiant was aware **Albert Banks** used the telephone for illegal drug transactions, as purchases CI #1 made from **Albert Banks** were arranged over the telephone. In February 2013, Affiant began receiving Pen Register information for the telephone number **(785) 375-6704**, for a period of time from 02-09/2013 to 02/22/2013. The subscriber information was obtained through the official phone provider business records. This particular phone is what is known as an Individual Boost Prepaid Account phone and is utilized through Sprint Nextel. The subscriber information indicated this phone has no name associated with it

as a subscriber but the Affiant knows it to be used by **Albert Banks** through this investigation. This type of phone service does not require a positive identification by the subscriber prior to the authorization.

103.    The Pen Register for the 14 days indicated 2,224 total phone calls and 3,658 text messages were recorded Of the 2,224 total phone calls; 1,640 were incoming calls with 582 outgoing and 2 unknown to the phone number. The records show 170 separate phone numbers were either dialed or dialed into the target phone number. The average number of calls/text messages per day was 420.  The average length of incoming call in duration was 40 seconds and the average length of outgoing call in duration was 1 minute and 02 seconds which does not include text messages sent or received as those means of communication do not record any minute usage. The Affiant is aware through experience and training that many calls involving illegal drug transactions are of short duration. The short duration of those phone calls occurring on the target phone is indicative of illegal drug transactions.

104.    Of the 170 phone numbers only 49 of them have been identified or are believed to have been identified, thus far in the investigation.  Of these 49 identified phone numbers, 41 of the known (or believed to be identified) subscribers named are known associates of **Albert Banks** and/or have past arrests for narcotics violations.


## TELEPHONE SUBSCRIBER INFORMATION OF INTEREST


105.    On 02/09/2013, a Pen Register was initiated on telephone number **(785) 375-6704**. The following phone numbers, frequency of calls/text messages, and subscriber information is detailed below. This is not an inclusive list, but a list of frequently dialed numbers and criminal information related to the subscriber; or in some cases the person believed to be actually utilizing the particular telephone as some of the phone numbers subpoenaed had no subscriber attached to the phone. This is indicative of a pay-as-you-go type phone, which do not require a person to list their actual name and in some cases no name is required at all to activate the phone.  In some cases the phone was in the name of a person (as the subscriber) which was other than the actual person using the phone.

34

106.    The phone number **(785) 717-9386** was indicated a total of 299 times from 02/09/2013 to 02/22/2009.  This phone number was subpoenaed but as of 02/22/2012 the subscriber information had not been provide by the phone carrier.  Therefore, the identity of the person this phone was subscribed to is unknown.

107.    The phone number **(785) 789-2019** was indicated a total of 309 times from 02/09/2013 to 02/21/2009.  This phone number was subpoenaed but as of 02/22/2012 the subscriber information had not been provide by the phone carrier.  Therefore, the identity of the person this phone was subscribed to is unknown.

108.    The phone number **(785) 317-7682** was indicated a total of 151 times from 02/09/2013 to 02/19/2013.  The subscriber information shows this phone registered to Angela Foy, W/F DOB 04/12/1933 but is believed to be used by Patricia Foy (Park), W/F DOB ▮▮▮▮▮▮  Patricia Foy has the following criminal history indicating arrests. 02/28/2002 Possession of opiates, opium or narcotic drugs; possession of depressants/stimulants/hallucinogenics/anabolic steroids; possession of controlled substances or drug paraphernalia.  05/15/2002 Possession of opiates, opium or narcotic drugs; possession of simulated controlled substances or drug paraphernalia.  06/27/2006 Possession of opiates, opium or narcotic drugs.  03/14/2007 theft.  08/24/2007 Sale etc. of opiates, opium, or narcotic drugs; possession of paraphernalia to grow, distribute marijuana.    07/29/2008 Conspiracy to aiding a felon; conspiracy theft; burglary. 08/06/2008 Probation violation.    06/27/2009 Domestic battery; disorderly conduct; criminal restraint.  09/22/2011 Possession of opiates, opium or narcotic drugs; possession of simulated controlled substances or drug paraphernalia.  12/29/2011 Theft.  It should be noted; Patricia Foy was arrested on December 29, 2012 by the Junction City Police Department and was in possession of a cellular telephone (believed to be the phone having this telephone number but not confirmed) which had telephones numbers for **Anthony Thompson** and **Albert Banks** which are the same telephone numbers mentioned in this affidavit.    Other phone numbers for persons involved in this investigation were also found within the cellular telephone which indicates association between Patricia Foy, **Anthony Thompson, Albert Banks**, and others mentioned in this investigation.    Some of the persons phone numbers found in the phone were; Jason Dixon, Richard Verkerke, Sammy Pleas, Delantis Hairston, Linnie Sanders, Jason

Roberts (which was the name used as the subscriber for the phone in the possession of **Anthony Thompson**), Charles Foster, Gevonni Davis, Kenneth Wayne Bellamy, Akwete Burd and Felix Jenkins.

109.    The phone number **(904) 994-1672** was indicated a total of 167 times from 02/09/2013 to 02/21/2013.  The subscriber information shows this phone registered to Tiffany Young, W/F ████████████  Tiffany Young has the following criminal history indicating arrests.  09/12/2001 Giving a worthless check<$500.00.  No other criminal history was found for Tiffany young and she is unknown to the JCPD.

110.    The phone number **(316) 347-0088** was indicated a total of 164 times from 02/09/2013 to 02/22/2013.  This phone number was subpoenaed and was listed as a "Phone in the box" with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

111.    The phone number **(785) 317-1453** was indicated a total of 132 times from 02/09/2013 to 02/21/2013.  The subscriber information shows this phone registered to Tom Stutheit, W/M DOB ████████ but is believed to be used by Kari Stutheit, W/F DOB ████████  Kari Stutheit has the following criminal history indicating arrests. 04/16/1994 giving a worthless check.  12/04/1997 Possession of simulated controlled substances or drug paraphernalia.  12/08/1999 Failure to appear.  02/16/2000 Prostitution. 02/17/2000 Prostitution; failure to appear.  06/23/2001 Driving under influence of alcohol or drugs.  03/10/2002 Driving while license cancelled/suspended/revoked.  09/13/2007 Driving under influence of alcohol or drugs.  On 02/13/2013, Kari Stutheit was observed with meeting with **Albert Banks** when he sold crack cocaine to CI #1 and she was believed to obtain crack cocaine from **Albert Banks** as well at that time.

112.    The phone number **(785) 418-4926** was indicated a total of 115 times from 02/09/2013 to 02/21/2013.  This phone number was subpoenaed and no subscriber information was available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

113.    The phone number **(785) 226-1783** was indicated a total of 116 times from 02/09/2013 to 02/21/2013.  The subscriber information shows this phone registered to Jason Roberts but is known, through this investigation to belong to **Anthony Thompson**,

B/M DOB ███ who has been detailed throughout this affidavit. **Anthony Thompson** has the following criminal history indicating arrests. 09/12/2000 Felony possession of paraphernalia. 11/07/2001 Domestic battery; criminal threat; criminal trespass. 02/16/2002 Possession with the intent to sell/sale etc within 1000' of school property; obstruction legal process or official duty in misdemeanor case; no drug tax stamp. 06/18/2002 Probation violation. 06/28/2002 Possession of depressant/stimulants/hallucinogenics/steroids. 12/24/2002 Possession of depressant/stimulants/hallucinogenics/steroids; violation of a protective order; aggravated burglary. 02/25/2003 Sale etc. of opiates, opium or narcotic drugs. 06/15/2007 Conspiracy sale or possession with the intent to sell stimulant; sale, offer depressants/hallucinogenics/stimulants/anabolic steroids. 06/25/2010 driving under the influence of alcohol or drugs. 12/05/2010 Obstructing legal process or official duty. 07/01/2012 Domestic battery.

114.    The phone number **(785) 210-4680** was indicated a total of 91 times from 02/09/2013 to 02/19/2013. This phone number was subpoenaed and was listed as a "Phone in the box" with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

115.    The phone number **(785) 307-2624** was indicated a total of 93 times from 02/09/2013 to 02/21/2013. The subscriber information shows this phone registered to Carmean Ridley, B/F DOB ███ No criminal history was located for this subscriber. It is not known whether this person is using the phone or has obtained the phone for use by someone else.

116.    The phone number **(785) 727-5196** was indicated a total of 125 times from 02/09/2013 to 02/22/2013. This phone number was subpoenaed and listed T-Mobile as the carrier with no subscriber information available meaning the person activating the phone was not require to provide a name or any type of identification for activation.

117.    The phone number **(785) 307-8346** was indicated a total of 55 times from 02/09/2013 to 02/22/2013. The subscriber information shows this phone registered to Charles with no last name provided. Charles is believed to be Charles Foster according to JCPD records. This phone number was found in Patricia Foy's phone when she was

arrested on 12/29/2012 and listed as Charles as well.   Charles Foster has the following criminal history indicating arrests.  06/15/1991 Possession of opiate, opium or narcotic drugs.   09/11/1992 Sale etc. opiates, opium or narcotic drugs.   01/20/1995 Sale etc. opiates, opium or narcotic drugs; no drug tax stamp.  04/19/2001 possession of simulated controlled substances or drug paraphernalia; possession of paraphernalia to grow, distribute marijuana.  03/04/2003 Possession of simulated controlled substances or drug paraphernalia;  possession  of  opiates,  opium  or  narcotic  drugs;  possession  of depressant/stimulants/hallucinogenics/steroids.  12/18/2008 Conspiracy to possess with the intent to sell, sale, etc. within 1000' of a school; attempt to arrange sale/purchase using communication facility for drug; no drug tax stamp for marijuana or controlled substance.  On 08/31/2012, CI #1 made a purchase of crack cocaine from Charles Foster and **Anthony Thompson**.

118.    The phone number **(785) 761-7975** was indicated a total of 65 times from 02/09/2013 to 02/21/2013.  The subscriber information shows this phone registered to Norma Mohammed, B/F DOB ███████   No criminal history was located for this subscriber.  It is not known whether this person is using the phone or has obtained the phone for use by someone else.

119.    The phone number **(785) 717-9028** was indicated a total of 81 times from 02/10/2013 to 02/21/2013.  The subscriber information shows this phone registered to Elisa Davis, B/F DOB ███████   Elisa Davis has the following criminal history for arrest.  01/02/2007 Criminal damage to property.

120.    The phone number **(785) 492-9602** was indicated a total of 40 times from 02/11/2013 to 02/19/2013.   The subscriber information shows this phone to be a TracFone with no subscriber information available.

121.    The phone number **(954) 649-5125** was indicated a total of 54 times from 02/09/2013 to 02/21/2013.  The subscriber information shows this phone registered to John Dichiarra but the investigation has shown the phone to be used by Gevonni Davis, B/M DOB ███████   This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Javontae.  Gevonni Davis has been indicated earlier in this affidavit as to his involvement in distribution of crack cocaine with **Anthony Thompson**, Martye Madkins III and CI #1.  Gevonni Davis has the following

criminal history indicating arrests.  12/31/2000 Giving a worthless check.  03/12/2004 Unlawful removal of theft detection device.  01/06/2012 Making false information; theft. 05/14/2012 Failure to appear.

122.    The phone number **(785) 761-6510** was indicated a total of 55 times from 02/10/2013 to 02/21/2013.    The subscriber information shows this phone to be a TracFone with no listed person as the subscriber.

123.    The phone number **(785) 375-3222** was indicated a total of 45 times from 02/09/2013 to 02/21/2013.    The subscriber information shows this phone registered to Nance with no last name provided.  According to the JCPD this phone is used by Jason Dixon.  This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Nance as well.  On 09/27/2012, CI #1 had cellular telephone contact with Jason Dixon B/M DOB███████using telephone number (785) 375-3222 at which time, Jason Dixon sold CI #1 crack cocaine.  Jason Dixon has the following criminal history indicating arrests.  10/14/1999 Aggravated battery; rape.  03/14/2000 Attempt to commit aggravated criminal threat causing loss >$500.00<$25,000.00. 07/24/2000 Criminal threat.  04/30/2002 Probation violation.  08/01/2002 Failure to appear.    10/07/2002 Failure to appear.    3/28/2003 Battery; possession of depressant/stimulants/hallucinogenics/steroids.        03/06/2004 Domestic battery. 04/14/2004 Failure to appear on a misdemeanor.    05/13/2004 Failure to appear. 12/27/2004 failure to appear on a misdemeanor.    03/05/2005 Domestic battery. 03/25/2005 failure to appear.  05/02/2005 Domestic battery.  05/24/2005 Aggravated battery.  07/26/2005 Violation of a protective order.  10/13/2005 Probation violation. 11/07/2005 Violation of a protective order.  11/14/2005 Probation violation.  05/25/2006 Failure to appear on a misdemeanor; probation violation.    09/07/2006 Probation violation. 09/29/2006 Disorderly conduct.  05/31/2008 Failure to appear X2; aggravated failure to appear; probation violation.  08/16/2011 Failure to appear.  02/17/2012 failure to appear.

124.    The phone number **(785) 492-0021** was indicated a total of 32 times from 02/09/2013 to 02/18/2013.    The subscriber information was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

125.    The phone number **(785) 317-1591** was indicated a total of 53 times from 02/09/2013 to 02/20/2013.   The subscriber information was subpoenaed but as of 02/22/2013, the subscriber information was not available.

126.    The phone number **(785) 317-1281** was indicated a total of 39 times from 02/09/2013 to 02/22/2013.  The subscriber information shows this phone registered to Jalisa Carson, B/F DOB ███████ who resides at 2035 Fort Riley Boulevard, Manhattan, Kansas.    Jalisa Carson reported suspicious activity at the aforementioned address on 01/11/2013 and provided law enforcement with this phone number as belonging to her. Jalisa Carson resides with **Anthony Thompson** and they have a child together. Jalisa Carson has the following criminal history indicating arrests.  06/18/2004 Contempt of court indirect X2.  07/14/2004 Battery.  07/16/2004 Probation violation. 01/21/2007 Aggravated assault; battery; operating a motor vehicle without a valid license.

127.    The phone number **(785) 307-2000** was indicated a total of 31 times from 02/09/2013 to 02/20/2013.  The subscriber information shows this phone registered to Kriste Lienberger, W/F DOB ███████ Kriste Lienberger has the following criminal history indicating arrests.  03/08/1995 Battery.  10/24/1997 Forgery.  10/02/2003 Delivery manufacture drug paraphernalia other; possession of simulated controlled substances or drug paraphernalia; attempted sale of opiates, opium or narcotic drugs. 10/06/2006 Use or possess drug paraphernalia to introduce in human body.  06/01/2007 Failure to appear.  12/20/2007 Domestic battery against a family household member; criminal damage to property.  05/15/2008 Probation violation.  05/15/2008 Failure to appear. 09/18/2008 Criminal threat.  10/08/2008 Probation violation.  01/15/2009 Failure to appear.  02/15/2009 Failure to appear.  08/04/2009 Failure to appear.  09/08/2009 Failure to appear.

128.    The phone number **(785) 223-1181** was indicated a total of 43 times from 02/11/2013 to 02/22/2013.  This phone number was subpoenaed and found to have Verizon as the carrier with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

129.    The phone number **(785) 317-0425** was indicated a total of 26 times from 02/09/2013 to 02/19/2013.  The subscriber information shows this phone registered to Jalisa Carson B/F DOB█████████ however it is believed Kathy Carson B/F DOB 06/03/1954 (the mother of Jalisa Carson) may be using this telephone.  Kathy Carson has the following criminal history indicating arrests.  04/16/1996 Possession of cocaine with the intent to sell; possession of drug paraphernalia; obstruction of official duty; possession of marijuana.

130.    The phone number **(785) 375-6921** was indicated a total of 24 times from 02/11/2013 to 02/18/2013.  The subscriber information shows this phone registered to Sheilaa Scott, B/F DOB█████████ Sheilaa Scott has the following criminal history indicating arrests.        01/07/1989 Aggravated assault on law enforcement officer. 10/08/1994 Worthless checks.  04/10/1995 Four (4) counts forgery.   10/30//1997 Criminal threat; violation of conditions of bond.  03/03/1998 Theft by deception; making false writing.  08/17/1998 Obstruction.  02/11/1999 Possession of controlled substance. 08/26/1999 Worthless check and Failure to appear.   12/15/2000 Probation violation. 01/23/2001 Theft and forgery.   08/18/2001 Theft and three (3) counts of forgery. 12/03/2001 Probation violation. 04/07/2003 Probation violation.  07/03/2004 Violation of a protective order; criminal damage to property.  08/21/2004 Violation of a protective order; intimidation of a victim or witness; criminal damage to property.  08/31/2004 Forgery; theft.   05/13/2005 Probation violation.   10/01/2005 Probation violation. 05/19/2006 Harassment by telephone and Terroristic threat.   06/22/2006 Probation violation.  08/04/2007 Criminal threat; violation of a protective order; harassment by telephone. 08/30/2007 Violation of a protective order.  10/01/2011 Aggravated battery.

131.    The phone number **(785) 375-3247** was indicated a total of 21 times from 02/10/2013 to 02/19/2013.  The subscriber information shows this phone registered to Shenna Bronson, B/F DOB█████████ Shenna Bronson was arrested on 11/30/2012 for Domestic battery; no other criminal history was located for Shenna Bronson.

132.    The phone number **(785) 717-9676** was indicated a total of 25 times from 02/15/2013 to 02/20/2013.  The subscriber information was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

133.   The phone number **(785) 317-0145** was indicated 20 times from 02/09/2013 to 02/12/2013.  The subscriber information shows this phone registered to Sarah Forrest B/F DOB ▮▮▮▮▮▮ Sarah Forrest has the following criminal history indicating            arrests.            08/06/2008            Possession            of depressant/stimulants/hallucinogenics/steroids; Possession of opiates, opium or narcotic drugs.

134.   The phone number **(785) 317-1164** was indicated a total of 23 times from 02/10/2013 to 02/19/2013.  This phone number was subpoenaed and found to be a prepaid phone with no listed person as the subscriber.  In the early stages of the investigation, **Albert Banks** was the user of this phone as it had been used by CI #1 to contact **Albert Banks**.  The phone use was discontinued as minutes had not been added to it for approximately 1 ½ months.  At that time, **Albert Banks** obtained another phone (the one he is currently using).  In late January, 2013, the previous phone was re-activated once again but it is believed **Albert Banks** is not using it consistently and may have provided this phone to another person/s to use.  Per the subpoena, no name is associated with this phone meaning the person activating the phone was not required to produce any identification or a name to activate the phone.

135.   The phone number **(785) 226-5278** was indicated a total of 31 times from 02/09/2013 to 02/20/2013.  This phone number was subpoenaed and listed T-Mobile as the carrier with no subscriber information available meaning the person activating the phone was not require to provide a name or any type of identification for activation.

136.   The phone number **(913) 240-4047** was indicated a total of 28 times from 02/09/2013 to 02/21/2013.  The subscriber information shows this phone registered to Corress Jackson (actually Caress Jackson), B/F ▮▮▮▮▮▮▮▮ Caress Jackson has the following criminal history indicating arrests.  08/18/2008 Theft.  05/24/2011 Possession of certain hallucinogenic drugs.  11/22/2011 Probation violation.

137.   The phone number **(785) 477-7560** was indicated a total of 18 times from 02/10/2013 to 02/21/2013.  This phone number was subpoenaed and listed AT&T as the carrier with no subscriber information available meaning the person activating the phone was not require to provide a name or any type of identification for activation.

42

138.    The phone number **(785) 338-4149** was indicated a total of 19 times from 02/12/2013 to 02/18/2013.  This phone number was subpoenaed and listed T-Mobile as the carrier but as of 02/22/2013, the subscriber information has not been obtained.

139.    The phone number **(785) 307-9731** was indicated a total of 28 times from 02/15/2013 to 02/20/2013.  The subscriber information shows this phone registered to Felix.  It is believed the phone is being used by Felix Vinson, B/M ██████████ according to the JCPD.  This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Felix as well.  Felix Vinson has the following criminal history indicating arrests for.  09/30/1995 Driving while license suspended or revoked; willful obstruction of law enforcement officers.  05/30/2002 Breaking and/or entering (felony) with force; larceny after break/enter $200.00 and up.  08/26/2002 Larceny misdemeanor $50.00 - $199.00.  01/03/2003 Unauthorized use of a motor vehicle; possession of drug paraphernalia; carrying a concealed weapon - other; driving while license revoked.  09/19/2003 Unauthorized use of a motor vehicle; fugitive/extradition other state.  09/07/2004 Extradition/fugitive other state.  11/21/1989 Felony theft; conspiracy to commit theft - felony.  05/21/1990 Warrant arrest.  07/21/1991 Probation violation.  09/26/1991 Burglary unknown structure; theft value unknown.  03/30/1992 Attempted burglary unknown structure.  12/15/1992 Contempt of court indirect.  04/04/1993 Driving under influence of alcohol or drugs; transporting an open container.  05/28/1993 Contempt of court indirect.  07/16/1993 Prison inmate under control of Kansas DOC; theft; attempted burglary unknown structure.  04/24/1994 Sale/etc., opiates, opium or narcotic drugs.  11/25/1994 Driving under influence of alcohol or drugs.  03/05/1995 Failure to appear.  03/05/1995 Possession of depressant/stimulants/hallucinogenics/steroids; Possession of opiates, opium or narcotic drugs; Possession of simulated controlled substances or drug paraphernalia.  03/16/1995 Possession of depressant/stimulants/hallucinogenics/steroids; Possession of opiates, opium or narcotic drugs.  10/26/1995 Failure to appear.  05/27/1996 Driving while license cancelled/suspended/revoked.  08/17/1996 Possession of depressant/stimulants/hallucinogenics/steroids; Possession of simulated controlled substances or drug paraphernalia.  09/16/1996 Probation violation.  01/29/1997 Failure to appear.  07/07/2003 Possession of paraphernalia to grow, distribute marijuana;

Possession of depressants/stimulants/hallucinogenics/anabolic steroids.   12/08/2003
Aggravated failure to appear.   12/15/2003 Failure to appear.   12/23/2003 Possession of
stolen property value over $500.00.   03/08/2004 Obstructing legal process or official
duty.   02/17/2004 Failure to appear.   03/08/2004 Obstructing legal process in
misdemeanor case; theft. 10/14/2004 Theft value $25,000.00 to <$100,000.00; probation
violation; failure to appear.   11/18/2004 Probation violation.   12/22/2004 Prison inmate
under control of Kansas DOC Possession of paraphernalia to grow, distribute marijuana.
11/15/2007 Operating a motor vehicle without valid license; Possession of opiates, opium
or narcotic drugs.   04/27/2008 Contempt of court indirect.   05/19/2009 Forgery;
attempted theft; criminal use of weapons.   09/16/2009 Aggravated assault; possession of
simulated controlled substances or drug paraphernalia.   04/15/2010 Probation violation.
04/29/2010 Probation violation.   12/18/2010 Probation violation.   03/22/2012 Failure to
appear.   11/06/2012 Obstructing legal process in misdemeanor case; criminal trespass.

140.    The phone number **(785) 317-0015** was indicated a total of 20 times from
02/13/2013 to 02/18/2013.  This phone number was subpoenaed and listed T-Mobile as
the carrier with no subscriber information available meaning the person activating the
phone was not require to provide a name or any type of identification for activation.

141.    The phone number **(773) 572-9143** was indicated a total of 15 times from
02/10/2013 to 02/11/2013.  This phone number was subpoenaed but as of 02/22/2013, the
subscriber information had not been obtained.

142.    The phone number **(785) 226-1283** was indicated a total number of 33
times from 02/09/2013 to 02/21/2013.  The subscriber information shows this phone
registered to Wig. This phone number was found in Patricia Foy's phone when she was
arrested on 12/29/2012 and listed as Wig as well. According to the JCPD, this person is
also known as Linnie Sanders B/M DOB ███████.   Linnie Sanders has the following
criminal history indicating arrests. 04/28/2001 Possession of marijuana <= 5 pounds >4
ounces.    10/19/2001 Escape from custody.    08/01/2004 Possession of
depressant/stimulants/hallucinogenics/steroids.  01/10/2006 Battery; Criminal damage to
property.  01/31/2006 Battery; Criminal damage to property.  03/09/2006 Sale etc. of
opiates, opium or narcotic drugs.

143.   The phone number **(830) 600-1020** was indicated a total of 20 times from 02/09/2013 to 02/22/2013.  This phone number was subpoenaed and as of 02/22/2013, the subscriber information had not been obtained.

144.   The phone number **(785) 830-0001** was indicated a total of 17 times from 02/09/2013 to 02/22/2013.  This phone number was subpoenaed and found to be have AT&T as the carrier but as of 02/22/2013, the subscriber information had not been obtained.

145.   The phone number **(785) 209-4155** was indicated a total of 13 times from 02/21/2013 to 02/22/2013.  This phone number was subpoenaed and as of 02/22/2013, the subscriber information had not been obtained.

146.   The phone number **(202) 802-1577** was indicated a total of 13 times from 02/09/2013 to 02/20/2013.  The subscriber information shows this phone registered to Korena Scheible, W/F ▐▐▐▐▐▐▐▐.  No criminal history was located for this subscriber.  It is not known whether this person is using the phone or has obtained the phone for use by someone else.

147.   The phone number **(785) 375-0822** was indicated a total of 12 times from 02/10/2013 to 02/17/2013.  The subscriber information shows this phone registered to Kelly Vargas, W/F DOB ▐▐▐▐▐▐ Kelly Vargas has the following criminal history indicating arrests.  09/05/2004 Driving under the influence of alcohol or drugs. 07/11/2006 Obstructing legal process in misdemeanor case; disorderly conduct. 09/10/2006 Possession of depressant/stimulants/hallucinogenics/steroids.   09/21/2006 Sale of opiates, opium or narcotic drugs.  11/09/2006 Probation violation.  11/15/2006 Warrant arrest.  04/28/2012 Driving under the influence of alcohol or drugs.

148.   The phone number **(830) 615-1200** was indicated a total of 16 times from 02/09/2013 to 02/20/2013.  This phone number was subpoenaed and found to be an AT&T phone.  As of 02/22/2013 the subscriber information had not been obtained.

149.   The phone number **(785) 209-8842** was indicated a total of 12 times from 02/09/2013 to 02/20/2013.  The subscriber information shows this phone registered to John Brown B/M DOB ▐▐▐▐▐▐.  John Brown has the following criminal history indicating arrests.  09/06/1999 required obedience to lawful order of police officer or fireman.  05/07/2003 Domestic battery.  01/22/2004 Probation violation.  02/20/2004

Failure to appear.  05/14/2004 Possession of simulated controlled substance or drug paraphernalia.  12/16/2004 Weapon offense - prohibited person possession firearm. 05/10/2005 Possession of depressant/stimulants/hallucinogenics/steroids.  10/19/2005 Possession of a forearm by a prohibited person.  02/17/2008 Failure to appear X2. 05/06/2009 Failure to appear.  06/09/2010 Failure to appear.  03/08/2011 Failure to appear.

150.   The phone number **(785) 210-9767** was indicated a total of 9 times from 02/12/2013 to 02/13/2013. This phone number was subpoenaed and listed as a TracFone with no subscriber information available.

151.   The phone number **(785) 764-8628** was indicated a total of 10 times from 02/14/2013 to 02/18/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

152.   The phone number **(785) 375-3822** was indicated a total of 8 times from 02/14/2013 to 02/15/2013.  The subscriber information shows this phone registered to Michael Asbury, B/M DOB ███████   Michael Asbury has the following criminal history indicating arrests.  02/01/2005 Theft; possession of opiates, opium or narcotic drugs; possession of simulated controlled substances or drug paraphernalia.  08/05/2005 Probation violation.

153.   The phone number **(785) 226-3233** was indicated a total of 8 times from 02/10/2013 to 02/20/2013.  This phone number was subpoenaed and listed T-Mobile as the carrier with no subscriber information available meaning the person activating the phone was not require to provide a name or any type of identification for activation.

154.   The phone number **(785) 210-0277** was indicated a total of 7 times from 02/09/2013 to 02/13/2013.  The subscriber information shows this phone registered to Elizabeth Heaven, B/F DOB ███████   Elizabeth Heaven has the following criminal history indicating arrests.  08/05/2006 Disorderly conduct; receive stolen property; damage property-criminal mischief; making a false report.   10/04/2003 Theft. 10/07/2003 Possession of stolen property less than $500.00.  02/01/2004 Transporting an open container.  05/19/2007 Probation violation.  02/24/2008 Possession of paraphernalia to grow, distribute marijuana; Possession of opiates, opium or narcotic drugs. 01/01/2010 Aggravated assault; criminal threat; domestic battery.

155.    The phone number **(785) 762-5471** was indicated a total of 7 times on 02/19/2013.  This phone number was subpoenaed with the subscriber listed as Jerome Kirksey.  No criminal history has been located for Jerome Kirksey.

156.    The phone number **(785) 307-3123** was indicated a total of 6 times from 02/09/2013 to 02/10/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

157.    The phone number **(316) 806-2831** was indicated a total of 7 times from 02/10/2013 to 02/20/2013.  The subscriber information shows this phone registered to Dejuan Gonzales, B/F DOB ▮▮▮▮▮▮   Dejuan Gonzales has the following criminal history indicating arrests.    08/29/1998  Sale,  offer  depressants/hallucinogenics /stimulants/anabolic steroids;  Possession of simulated controlled substances or drug paraphernalia.  11/10/2000 Possession of depressant/stimulants/hallucinogenics/steroids. 11/12/2000  Criminal threat; aggravated assault.    02/05/2003  Aggravated burglary; criminal damage to property; theft; burglary.  11/19/2004 Driving under the influence of alcohol or drugs.   12/28/2004  Probation violation.   02/21/2005  Aggravated robbery. 11/02/2007 Driving under the influence of alcohol or drugs.   03/08/2007 Murder in the first degree.

158.    The phone number **(929) 268-6183** was indicated a total of 6 times on 02/17/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

159.    The phone number **(785) 761-6481** was indicated a total of 14 times from 02/15/2013 to 02/21/2013.   This phone number was subpoenaed and found to have Centurylink as the carrier but as of 02/22/2013 the subscriber information had not been obtained.

160.    The phone number **(785) 307-1489** was indicated a total of 5 times from 02/11/2013 to 02/14/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

161.    The phone number **(785) 375-3002** was indicated a total of 5 times from 02/12/2013 to 02/14/2013.   This phone number was subpoenaed and found to be registered to Cliff Howard B/M DOB ▮▮▮▮▮▮.   No criminal history was found for Cliff Howard.

162.   The phone number **(785) 492-0965** was indicated a total of 5 times from 02/14/2013 to 02/16/2013. The subscriber information shows this phone registered to R Rusty. This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as R Rusty as well. The JCPD is unaware of any persons using the name R Rusty at this time.

163.   The phone number **(830) 631-1020** was indicated a total of 4 times from 02/11/2013 to 02/17/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

164.   The phone number **(785) 307-6060** was indicated a total of 6 times from 02/16-2013 to 02/19/2013. This phone number was subpoenaed and listed Verizon as the carrier with no subscriber information available meaning the person activating the phone was not require to provide a name or any type of identification for activation.

165.   The phone number **(785) 830-0000** was indicated a total of 5 times from 02/09/2013 to 02/22/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

166.   The phone number **(785) 830-0002** was indicated a total of 4 times from 02/09/2013 to 02/12/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

167.   The phone number **(785) 830-0200** was indicated a total of 4 times from 02/09/2013 to 02/16/2013 This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

168.   The phone number **(785) 579-5462** was indicated a total of 2 times on 02/19/2013. The subscriber information shows this phone registered to Jerry Ruble but the JCPD confirmed the user of the telephone to be Claudette Ruble, B/F DOB 07/12/1949. Claudette Ruble has no current criminal history indicating arrests.

169.   The phone number **(785) 438-0895** was indicated a total of 1 time on 02/09/2013. The subscriber information shows this phone registered to James Smith, W/M DOB ██████. James Smith has the following criminal history indicating arrests.  06/02/1995 Possession of depressant/stimulants/hallucinogenics/steroids; Possession of simulated controlled substances or drug paraphernalia; criminal use of

weapons; fleeing or attempting to elude a LEO; driving under the influence of alcohol or drugs.

170.    The phone number **(785) 307-0127** was indicated a total of 1 time on 02/10/2013. This phone number was subpoenaed and found to be a TracFone with no listed person as the subscriber.

171.    The phone number **(785) 579-5546** was indicated a total of 1 times on 02/19/2013. The subscriber information shows this phone registered to Oretha Robinson B/F DOB ███████ Oretha Robinson has the following criminal history indicating arrest.  03/07/1978 Possession of heroin.  09/12/1992 Aggravated battery.  09/23/2004 Driving under the influence of alcohol or drugs; driving while license cancelled /suspended/revoked.

172.    The phone number **(785) 226-2611** was indicated a total of 4 times on 02/10/2013. The subscriber information shows this phone registered to Zachary Patmon, B/M DOB ███████ Zachary Patmon has the following criminal history indicating arrests.  04/13/1969 Attempted robbery.  06/08/1969 Aggravated assault.  02/17/1971 AWOL UCMJ.   06/17/1977 Pimping.   02/08/1978 Aid and abet sale of cocaine. 04/11/1982 Carrying a concealed weapon.   05/08/1984 Criminal use of weapons. 04/08/1990 2 counts sale of cocaine; 2 counts unlawful use of a communication facility; no drug tax stamp.  09/20/1990 Unlawful use of a communication facility.  09/12/1991 Obstructing legal process or official duty.  08/17/1991 Disorderly conduct.  11/12/1991 Failure to appear.   11/30/1991 Battery against a law enforcement officer; obstructing legal process or official duty; disorderly conduct.   01/09/1992 Failure to appear. 01/07/1993 Failure to appear.   01/08/1993 Failure to appear.   01/30/1993 Battery. 04/24/1993 Fail to comply with bond restrictions; disorderly conduct.   04/29/1993 Battery against a law enforcement officer; obstructing legal process or official duty. 10/02/1994 Falsely reporting a crime.   10/02/1994 Failure to appear.   05/17/1996 Possession of cocaine.  07/13/1996 Possession of cocaine; possession of cocaine with the intent to sell; possession of marijuana.  09/12/2000 Parole violation.  12/19/2000 failure to appear.  04/12/2001 Failure to appear.  01/07/2002 Probation violation.  12/31/2002 Failure to appear.   01/30/2003 Failure to appear.   02/05/2003 Failure to appear. 01/07/2005 Probation violation.  01/30/2005 Failure to appear on misdemeanor charge;

possession of opiates, opium or narcotic drugs; possession of controlled substances or drug paraphernalia.   05/24/2012 Driving while license cancelled/suspended/revoked; failure to appear.

173.   The phone number **(785) 762-2370** was indicated a total of 3 times from 02/15/2013 to 02/16/2013.   The phone number **(785) 375-1838** was indicated 4 times from 02/10/2013 to 02/12/2013.   The subscriber information shows both these phones registered to Charles B/M DOB █████████ and Olivia Humphreys (AKA Big O) B/F DOB █████████ Charles Humphreys has the following criminal history indicating arrest. 02/18/1972 Criminal use of weapons, carrying firearm concealed on one's person. Olivia Humphreys has the following criminal history indicating arrest.   11/03/1985 Driving under the influence of alcohol or drugs.   06/29/1990 liquor consumption in public places prohibited.

174.   The phone number **(830) 600-2200** was indicated a total of 4 times from 02/10/2013 to 02/16/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

175.   The phone number **(785) 830-0151** was indicated a total of 6 times from 02/10/2013 to 02/21/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

176.   The phone number **(785) 375-7233** was indicated a total of 4 times from 02/13/2013 to 02/15/2013.   The subscriber information shows this phone registered to "James" with no last name given.   The phone number is believed to be associated with Catrina Watson, B/F DOB 07/17/1969.   No criminal record could be found for Catrina Watson.

177.   The phone number **(561) 829-2170** was indicated a total of 4 times on 02/15/2013.   This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

178.   The phone number **(316) 806-9195** was indicated a total of 4 times on 02/15/2013.   The subscriber information shows this phone registered Kilie Bowie B/F DOB █████████ Kilie Bowie has the following criminal history indicating arrests.

05/04/2004 Giving worthless check.   06/06/2005 Aggravated assault with a deadly weapon; criminal damage to property.   06/06/2005 Aggravated assault; criminal damage to property; battery.   04/20/2006 Probation violation.

179.   The phone number **(830) 606-2420** was indicated a total of 3 times on 02/10-2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

180.   The phone number **(785) 226-2907** was indicated a total of 3 times from 02/10/2013 to 02/16/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

181.   The phone number **(830) 600-0020** was indicated a total of 3 times from 02/11/2013 to 02/15/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

182.   The phone number **(316) 617-9894** was indicated a total of 3 times from 02/11/2013 to 02/16/2013.   The subscriber information shows this phone registered to Wayne.   According to the JCPD this phone is used by Kenneth Wayne Bellamy Jr. B/M DOB███████   This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Wayne as well.   Kenneth Wayne Bellamy Jr. has the following criminal history indicating arrest.   06/21/1989 Burglary; theft.   04/03/2012 Conspiracy to robbery; driving under influence of alcohol or drugs.   05/03/2012 Failure to appear.

183.   The phone number **(830) 620-0020** was indicated a total of 3 times from 02/12/2013 to 02/17/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

184.   The phone number **(785) 210-9605** was indicated a total of 3 times from 02/12/2013 to 02/18/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

185.   The phone number **(785) 762-9679** was indicated a total of 5 times from 02/15/2013 to 02/20/2013.   This phone number was subpoenaed with no subscriber

information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

186. The phone number **(419) 341-8130** was indicated a total of 2 times on 02/09/2013. This phone number was subpoenaed with the subscriber given as "Emily" with no last name given or required. The identity of Emily cannot be obtained at this time with this limited information.

187. The phone number **(830) 600-0220** was indicated a total of 2 times from 02/09/2013 to 02/12/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

188. The phone number **(785) 210-9034** was indicated a total of 2 times on 02/10/2013. This phone number was subpoenaed and listed as a "phone in the box" with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

189. The phone number **(785) 375-0314** was indicated a total of 2 times from 02/10/2013 to 02/12/2013. The subscriber information shows this phone registered to Kimberly Reese B/F ███████████ No criminal history was found for Kimberly Reese.

190. The phone number **(785) 210-5030** was indicated a total of 2 times on 02/11/2013. This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

191. The phone number **(646) 480-6908** was indicated a total of 2 times on 02/11/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

192. The phone number **(316) 613-3573** was indicated a total of 2 times on 02/11/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

193. The phone number **(785) 830-0062** was indicated a total of 2 times from 02/11/2013 to 02/12/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

194.    The phone number **(785) 762-2106** was indicated a total of 2 times from 02/11/2013 to 02/14/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

195.    The phone number **(785) 317-1704** was indicated a total of 3 times from 02/11/2013 to 02/21/2013. This phone number was subpoenaed with the subscriber listed as Darryl McLaurin B/M ███████████. Darryl McLaurin has the following criminal history indicating arrests.   06/19/1999 Domestic violence; public intoxication. 09/28/2002 Contempt of court.   03/14/2009 Domestic battery; criminal restraint. 04/26/2009 Disorderly conduct brawling and fighting. 11/14/2009 Battery. 03/13/2010 Domestic battery.   03/19/2011 Battery.   04/30/2011 Probation violation.   05/25/2011 Domestic battery; intimidation of a witness or victim; criminal damage to property.

196.    The phone number **(785) 307-4768** was indicated a total of 2 times from 02/12/2013 to 02/18/2013. This phone number was subpoenaed with the subscriber listed as Randy Anderson B/M ████████████ No criminal history was found for Randy Anderson.

197.    The phone number **(907) 563-6966** was indicated a total of 2 times on 02/13/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

198.    The phone number **(785) 307-0425** was indicated a total of 2 times from 02/13/2013 to 02/17/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

199.    The phone number **(785) 210-4278** was indicated a total of 2 times on 02/14/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

200.    The phone number **(785) 375-7607** was indicated a total of 2 times on 02/21/2013. This phone number was subpoenaed with the subscriber indicated as Audrey Nelson or Audrey Ali, both being the same person.  Audrey Nelson B/F ███████████ has the following criminal history indicating arrests; 10/01/1995 Failure to appear. 12/09/1995 Forgery.   06/30/1996 Worthless checks.   01/09/1997 Failure to appear. 02/22/1997 Possession of cocaine; possession of drug paraphernalia.  03/09/1997 Failure to appear.  11/29/1997 Probation violation.  08/01/1999 Failure to appear.  10/25/2000

Failure to appear.  02/15/2001 Failure to appear.  04/16/2002 Delivery/manufacture simulated controlled substance; possession of paraphernalia to grow, distribute; no drug tax stamp; sale etc. of opiates, opium or narcotic drugs; possession of depressant/stimulants/hallucinogenics/steroids.  04/17/2002 Possession of paraphernalia to grow, distribute marijuana; no drug tax stamp; sale etc. of opiates, opium or narcotic drugs.  06/13/2002 Failure to appear.  03/06/2003 Failure to appear.  06/03/2003 Conspiracy to possession of opiates, opium or narcotic drugs; conspiracy to criminal possession of a firearm; possession of depressants/stimulants/hallucinogenics/steroids; conspiracy to possess simulated controlled substances/drug paraphernalia.  12/30/2003 Contempt of court indirect X2.

201.    The phone number **(785) 341-9118** was indicated a total of 2 times on 02/16/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

202.    The phone number **(785) 210-9873** was indicated a total of 8 times from 02/13/2013 to 02/20/2013.  The subscriber information shows this phone registered to Lamont Hill (believed to be Lemont Hill), B/M ▮▮▮▮▮▮▮▮  Lemont Hill has the following criminal history indicating arrests.  05/30/1987 2 counts sale of cocaine; 1 count delivery of cocaine.  06/03/1987 Sale of cocaine.  07/21/1987 Sale of cocaine; conspiracy to sell cocaine.  04/01/1994 Parole violation.  09/05/1994 Battery; criminal use of a weapon; aggravated weapons violation; possession of stolen property.  11/15/1994 Criminal threat.  03/04/2001 Criminal threat; domestic battery.  11/14/2004 Battery.  06/29/2005 Failure to appear on a misdemeanor.  09/22/2005 Failure to appear on a misdemeanor.  12/13/2005 Forgery.  09/25/2006 Probation violation.  01/08/2008 Probation violation.  02/06/2009 Probation violation.  Lemont Hill was listed as a suspect in a 2010 JCPD case (10-09428) involving the sale/distribution/cultivation of opiates. opium, narcotic drugs or designated stimulants.

203.    The phone number **(785) 210-4812** was indicated a total of 1 time on 02/18/2013.  The subscriber information shows no name associated as the subscriber.  According to the JCPD this phone is used by Barbara Jones Smith B/F ▮▮▮▮▮▮▮▮ Barbara Jones Smith has the following criminal history indicating arrests.  04/10/1998 Possession cocaine; possession drug paraphernalia; criminal use of a weapon; aggravated

assault.   03/28/1999 Worthless check; failure to appear.   01/23/2001 2 counts of probation violation.   09/08/2004 Aggravated battery.   11/19/2004 Driving under the influence of alcohol or drugs.   06/29/2005 Driving while license cancelled/suspended/revoked; attempt to flee or attempt to elude LEO; obstruction legal process or official duty, resist arrest.   10/22/2006 Battery against a law enforcement officer; disorderly conduct X2.   06/01/2007 Driving under the influence of alcohol or drugs.   08/13/2007 Following another vehicle too closely; driving under the influence of alcohol or drugs.   01/22/2008 driving under the influence of alcohol or drugs; driving while license cancelled/suspended/revoked.   08/04/2009 Failure to appear.   11/01/2010 Sale etc. of opiates, opium or narcotic drugs X2.   05/12/2011 Probation violation.

204.   The phone number **(785) 307-8447** was indicated a total of 2 times from 02/10/2013 to 02/19/2013.   The subscriber information shows this phone registered to Dorian Bivins (AKA Dwight Bivins) B/M ███████████ Dwight Bivins has the following criminal history indicating arrests. 01/04/2001 Probation violation; obstructing legal process in felony case.   04/01/2002 Failure to appear.   08/28/2003 Failure to appear. 04/13/2004 Possession of opiates, opium or narcotic drugs; possession with the intent to sell, sale etc. within 1000' of school property; knowingly intentionally receiving/acquiring proceeds from uniform controlled substances; no drug tax stamp for marijuana or controlled substance.   04/07/2005 Driving while license cancelled/suspended/revoked.   12/15/2005 Probation violation.   03/14/2006 Probation violation.   08/25/2006 Probation violation.   10/02/2006 Sale etc. of opiates, opium or narcotic drugs.

205.   The phone number **(785) 307-0774** was indicated a total of 2 times on 02/17/2013.   This phone number was subpoenaed and listed as a "phone in the box" which is a pay as you go type phone with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

206.   The phone number **(785) 209-0139** was indicated a total of 2 times on 02/17/2013.   This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

207.   The phone number **(319) 242-7343** was indicated a total of 1 time on 02/09/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

208.   The phone number **(785) 830-0476** was indicated a total of 1 time on 02/09/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

209.   The phone number **(316) 573-5616** was indicated a total of 1 time on 02/09/2013. This phone number was subpoenaed with the subscriber listed as Sherry Mills W/F ███████████ No criminal history was found for Sherry Mills.

210.   The phone number **(785) 225-1617** was indicated a total of 1 time on 02/10/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

211.   The phone number **(830) 636-9220** was indicated a total of 1 time on 02/10/2013. This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

212.   The phone number **(785) 238-6888** was indicated a total of 1 time on 02/10/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

213.   The phone number **(785) 830-0892** was indicated a total of 1 time on 02/10/2013. This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

214.   The phone number **(785) 307-0127** was indicated a total of 1 time on 02/10/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

215.   The phone number **(785) 761-7610** was indicated a total of 1 time on 02/10/2013. This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

216.   The phone number **(785) 830-0365** was indicated a total of 1 time on 02/10/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

217.   The phone number **(785) 830-0209** was indicated a total of 1 time on 02/11/2013.   This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

218.   The phone number **(785) 317-2070** was indicated a total of 2 times from 02/11/2013 to 02/19/2013.   This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

219.   The phone number **(708) 965-4220** was indicated a total of 1 time on 02/11/2013.   This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

220.   The phone number **(830) 621-3420** was indicated a total of 1 time on 02/11/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

221.   The phone number **(788) 226-1783** was indicated a total of 1 time on 02/12/2013.   This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

222.   The phone number **(785) 717-9456** was indicated a total of 1 time on 02/12/2013.   This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

223.   The phone number **(855) 429-7567** was indicated a total of 1 time on 02/12/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

224.   The phone number **(830) 645-7620** was indicated a total of 1 time on 02/12/2013.   This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

225.    The phone number **(785) 830-0542** was indicated a total of 1 time on 02/12/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

226.    The phone number **(830) 616-2220** was indicated a total of 1 time on 02/12/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

227.    The phone number **(830) 633-0920** was indicated a total of 1 time on 02/13/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

228.    The phone number **(830) 606-9320** was indicated a total of 1 time on 02/13/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

229.    The phone number **(808) 398-5780** was indicated a total of 1 time on 02/14/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

230.    The phone number **(785) 830-0946** was indicated a total of 1 time on 02/14/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

231.    The phone number **(830) 664-3120** was indicated a total of 1 time on 02/14/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

232.    The phone number **(785) 913-2404** was indicated a total of 1 time on 02/14/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

233.    The phone number **(830) 651-0920** was indicated a total of 1 time on 02/14/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

234.    The phone number **(830) 620-4020** was indicated a total of 1 time on 02/15/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

235.    The phone number **(785) 830-0052** was indicated a total of 1 time on 02/15/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

236.    The phone number **(785) 307-3214** was indicated a total of 1 time on 02/15/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

237.    The phone number **(785) 830-0400** was indicated a total of 2 times from 02/15/2013 to 02/22/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

238.    The phone number **(785) 512-0333** was indicated a total of 8 time from 02/15/2013 to 02/20/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

239.    The phone number **(785) 307-5573** was indicated a total of 1 time on 02/15/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

240.    The phone number **(785) 375-5065** was indicated a total of 2 times from 02/15/2013 to 02/19/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

241.    The phone number **(785) 307-2923** was indicated a total of 1 time on 02/16/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

242.    The phone number **(785) 233-1696** was indicated a total of 1 time on 02/16/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

243.    The phone number **(785) 830-0983** was indicated a total of 1 time on 02/16/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

244.    The phone number **(785) 830-0795** was indicated a total of 1 time on 02/16/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

245.    The phone number **(785) 830-0766** was indicated a total of 1 time on 02/16/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

246.    The phone number **(830) 618-9720** was indicated a total of 1 time on 02/17/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

247.    The phone number **(830) 626-1120** was indicated a total of 1 time on 02/17/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

248.    The phone number **(785) 830-0311** was indicated a total of 1 time on 02/17/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

249.    The phone number **(785) 375-9653** was indicated a total of 1 time on 02/18/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

250.    The phone number **(785) 207-2904** was indicated a total of 1 time on 02/18/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

251.    The phone number **(830) 601-0020** was indicated a total of 1 time on 02/18/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

252.    The phone number **(785) 304-6385** was indicated a total of 1 time on 02/19/2013. This phone number was subpoenaed with the subscriber listed as Jason Smith. No information could be located on Jason Smith. It is believed Kathy Carson, B/F█████████(the mother of Jalisa Carson) may be using this telephone. Kathy

Carson has the following criminal history indicating arrests.  04/16/1996 Possession of cocaine with the intent to sell; possession of drug paraphernalia; obstruction of official duty; possession of marijuana.

253.    The phone number **(785) 307-2456** was indicated a total of 1 time on 02/20/2013.  The subscriber information shows this phone registered to Akwete Burd, B/F DOB ▇▇▇▇▇▇▇ This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Who Johnny.  Akwete Burd has the following criminal history indicating arrest.  07/20/1999 Transfer firearm without background check to prohibited person. 08/01/1999 Theft-take/use/transfer movable property without consent.  08/28/1999 Drugs - 1st degree - sale - 50 kilos or more marijuana/25 kg in zone. 03/24/2011 Driving while license cancelled/suspended/revoked. 05/11/011 Driving while license    cancelled/suspended/revoked.        08/07/2011    Driving    while    license cancelled/suspended/revoked.        08/23/2011        Driving        while        license cancelled/suspended/revoked.        09/24/2011        Driving        while        license cancelled/suspended/revoked.    11/14/2011 Failure to appear.    02/03/2012 Failure to appear.    02/08/2012 Probation violation.    On 04/18/2012, Akwete Burd facilitated a purchase of crack cocaine to a Riley County Police Department CI but was not charged in the case for unknown reasons (RCPD case #12-017984).  06/13/2012 Failure to appear X2; probation violation. 10/01/2012 Failure to appear X3.

254.    The phone number **(785) 830-0774** was indicated a total of 1 time on 02/19/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

255.    The phone number **(785) 494-2762** was indicated 2 times from 02/15/2013 to 02/20/2013.  The subscriber information shows this phone registered to Michael Lillibridge (AKA Lloyd Lillibridge) W/M DXXXXXXXXXXXX4.  No criminal history could be located for this subscriber.

256.    The phone number **(830) 648-4320** was indicated a total of 1 time on 02/20/2013.  This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

257.    The phone number **(830) 650-8920** was indicated a total of 1 time on 02/20/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

258.    The phone number **(830) 608-8220** was indicated a total of 1 time on 02/20/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

259.    The phone number **(785) 492-7903** was indicated a total of 1 time on 02/21/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

260.    The phone number **(830) 695-7220** was indicated a total of 1 time on 02/21/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

261.    The phone number **(830) 630-8620** was indicated a total of 1 time on 02/21/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

262.    The phone number **(830) 633-1520** was indicated a total of 1 time on 02/20/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

263.    The phone number **(785) 830-0509** was indicated a total of 1 time on 02/19/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

264.    The phone number **(785) 307-5415** was indicated a total of 1 time on 02/20/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

265.    The phone number **(830) 640-1020** was indicated a total of 1 time on 02/20/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

266.    The phone number **(830) 603-8120** was indicated a total of 1 time on 02/20/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

267.    The phone number **(785) 226-4919** was indicated a total of 1 time on 02/20/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.

268.    The phone number **(785) 830-0400** was indicated a total of 1 time on 02/15/2013.   This phone number was subpoenaed with no subscriber information available meaning the person activating the phone was not required to provide a name or any type of identification for activation.


## FACTS AND CIRCUMSTANCES

269.    Based upon the Affiant's investigation and those of other law enforcement agencies, the following facts and circumstances are set forth.   The Affiant believes the investigation has revealed that **Anthony Thompson** and **Albert Banks** are involved in the distribution of illegal drugs and have been for quite some time. Given the amounts sold to CI #1 and the amounts of controlled substances available to sell (by their own admission), the Affiant believes **Anthony Thompson** and **Albert Banks** have been and will continue to be involved in an ongoing conspiracy to distribute illegal drugs. The conspiracy includes numerous persons named above and individuals both known and unknown. **Anthony Thompson** and **Albert Banks** continue to realize profits from the sale of controlled substances. Based on all the information the investigation has been able to gather thus far, it is the consensus of the law enforcement investigators that **Anthony Thompson** and **Albert Banks,** in association with others, are involved in extensive illegal drug activity. This is evident by the sales of controlled substances to CI #1, observations made during those sales, and statements made by **Anthony Thompson** and

**Albert Banks** to CI #1. **Anthony Thompson** told CI #1 on 10/03/2012 that he is purchasing approximately nine (9) ounces of cocaine per week for distribution. The sources of **Anthony Thompson** and **Albert Banks'** illegal drugs appear to come from Kansas City, Topeka and/or Wichita, KS. The actual source of the narcotics is unidentified thus far in the investigation. Earlier in the investigation, Investigators believed the illegal narcotics to come from the Kansas City area from a source known as Adrian Muse. It appears as though Adrian Muse may not be the source of supply lately due to the information obtained from SOI #1 who has indicated he/she has heard conversations stating this source is possibly not used at this time. Johnny Lee Ivory was believed to be a source of supply in the Topeka, KS area. Johnny Lee Ivory has not been located during this investigation and it is unclear if he is still a source of supply. **Albert Banks** has been making tips to Wichita, KS recently as well, but investigators do not know when he is going or with whom he is going. Therefore, the source of supply, if in fact it is in Wichita, KS, is still unknown. Thus this conspiracy extends to multiple regions of the State of Kansas and multiple jurisdictions with yet unidentified persons. **Anthony Thompson** and **Albert Banks** obviously have currency at their disposal without having any legal, gainful employment. Throughout this investigation, the quantity of illegal narcotics purchased by CI #1 has increased in an effort to purchase more than **Anthony Thompson** and/or **Albert Banks** could supply, thus forcing them to either introduce CI #1 to their supplier or take CI #1 with them to their supplier so CI #1 could purchase quantities which **Anthony Thompson** or **Albert Banks** could not produce. This investigative technique has failed to date. CI #1 has purchased as small of quantity of less than one (1) gram to as much as three (3) ounces, all the while being distributed by **Anthony Thompson** and/or **Albert Banks** working in conjunction with each other.

270.    Although **Albert Banks** has not always had this same telephone number (785-375-6704) throughout this investigation, he has had it since January 2013 and currently uses this number to conduct illegal narcotic distribution at this time as indicative of the sells to CI #1. Those believed to be involved in the ongoing conspiracy are continuing to use telephone number **(785) 375-6704**, with no subscriber name attached to it, but used by **Albert Banks** to facilitate their illegal activities.

## GOALS OF THE INVESTIGATION

271.    It is the goal of the Law Enforcement personnel involved in this investigation to identify all persons involved in this operation whether they are in Kansas or any other state.   The identity of persons that are transporting, manufacturing and/or storing illegal drugs in Kansas is being and will continue to be pursued.   The identities and prosecution of the conspirators involved in the transportation, manufacturing, storing and distribution of illegal drugs to and from the state of Kansas is hoped to be achieved. Another goal of this investigation is to dismantle this organization that is under the control of **Anthony Thompson** and **Albert Banks**.   It is believed this organization is responsible for the distribution of large amounts of illegal drugs in Geary and Riley County, Kansas.   At this time, the clear scope of the organization, all the conspirators, their involvement and the amount of illegal drugs being distributed have not been identified.   Without the ability to monitor the phone belonging to **Albert Banks**, it is believed the full scope of the operation will not be disclosed nor will it be dismantled. While a prosecutable case has been made on **Albert Banks;** CI #1 is not able to breech the conspiracy to learn the role of all the players. CI #1 is only able to make purchases from **Anthony Thompson, Albert Banks** and possibly a select few within the organization.    These purchases will not reveal the sources of supply, fruits, instrumentalities or assets of the distribution of illegal drugs, or the roles of other co-conspirators.    Without a wire interception the persons involved in this targeted distribution operation will be allowed to continue.

## NEED FOR WIRE INTERCEPTIONS

272.    Investigation to date has failed to disclose and prove the full scope of the targeted organization and the locations and sources of any and all supply sources currently being used by the subject(s) of this investigation.  Direct evidence linking the source of the supply to the flow of illegal drugs in the present conspiracy would be difficult, if not impossible, to obtain using standard investigative techniques.  This is evidenced by the fact CI #1 has not and will not be taken into the organization's full confidence and advised of the source or sources of the illegal drugs.

273.    Affiant believes the requested wire interception will produce the requisite information identifying and establishing a direct link to the sources and supply of the illegal drugs.  Based upon the combined experience of Affiant and all law enforcement personnel involved in this investigation based upon all of the facts set forth herein, it is the Affiant's belief that the interception of wire communications is the only available technique which has a reasonable likelihood of securing evidence demonstrating the scope of the illegal drug activity.

## OTHER INVESTIGATIVE PROCEDURES

274.    There are numerous investigative procedures, which are usually employed in an investigation of this type which have been tried and failed, or which reasonably appear unlikely to succeed if attempted. Other procedures which might reveal the scope of this conspiracy and those involved are simply too dangerous to employ, or would compromise the integrity of the investigation. Some of these procedures have been described above; others are stated below.

**EXHIBIT 3**

## A.  PHYSICAL SURVEILLANCE

275.   Physical surveillance has been utilized in this investigation and has proven to be of limited value. Although it has identified some activities and associates of the targets, physical surveillance – if not used in conjunction with other techniques, including electronic surveillance – is of limited value.   Physical surveillance, even if highly successful, does not always assist in gathering evidence of the criminal activity under investigation.   It is an investigative technique that is used to confirm meetings between alleged co-conspirators, but, in many cases, only leads investigators to speculate as to the purposes of these meetings, because the surveillance itself often proves association between the conspirators at a given time and place.   It is also a technique used to corroborate information obtained from cooperating individuals. Physical surveillance of alleged conspirators will not, however, conclusively establish the elements of the subjects' violations, and this technique has not, and most likely will not, establish the identities of all conspirators.  In addition, continued physical surveillance is not expected to enlarge information now available to substantiate the elements of criminal violations for which the state's application seeks to intercept wire communications.  Prolonged or regular surveillance of the movements of the suspects is instead likely to be noticed, causing the suspects to become even more cautious and secretive in their illegal activities, causing them to flee to avoid apprehension and prosecution causing a real threat to the safety of the CI and/or possibly compromising the investigation.  It must also be noted that the conspirators have utilized techniques to avoid being surveilled by law enforcement such as driving erratic or slower than all other traffic, making sudden stops or unexpected sudden turns while engaged in physical surveillance by law enforcement. It should also be noted that the conspirators have employed counter surveillance techniques such as having lookouts place themselves around buildings, vehicles and/or residences to watch for persons that continue to drive past or near the locations where suspected drug trafficking offenses are, or will be committed.   Finally, it is not possible to determine the full nature and scope of the aforementioned offenses by the use of simple physical surveillance, given the number of conspirators, the complexity of the criminal violations, the multi-jurisdictional locations and travels of some of the

conspirators, and the varying rolls played by the targets of this investigation. Officers of the Junction City Police Department and Kansas Bureau of Investigation agents have attempted to conduct surveillance in the vicinity of some of the residences mentioned in this investigation. Officers have seen individuals that were placed outside residences appearing to look for persons that were watching the residences.

## B.     COOPERATING INDIVIDUALS

276.    No cooperating individuals other than the ones aforementioned have been identified due to the mistrust the subjects have of individuals they are acquainted with or have conducted business with prior. Additional cooperating individuals have not been developed because of their apparent fear of the repercussions they would face if their identity were ever disclosed.

## C. UNDERCOVER AGENTS

277.    To date, no undercover Agents have been able to make purchases from any of those involved in this organization. It is the belief of law enforcement, any undercover person/s who may have the chance encounter of purchasing illegal narcotics from this group would have to do so at a very low level within the organization and would most likely never be given the opportunity to advance within the ranks of the organization to a place where the true conspiracy/conspirators would be identified. It is also the belief of law enforcement that the possibility of gaining the knowledge of the source of supply for this organization would not occur as the identity of this person/s has been kept secret throughout this investigation. The undercover agent would never be fully trusted and any further relevant information related to the scope of the illegal drug activity would never be known.

## D.  PEN REGISTERS

278.    On 02/09/2013 a Pen Register was initiated on the target phone number **(785) 375-6704** pursuant to a Kansas Court Order.  From 02/09/2013 to 02/22/2013 a total of 5,882 calls/text messages were made into and out of **(785) 375-6704**. The Pen register information demonstrates to the Affiant **Albert Banks** is using telephone number **(785) 375-6704** to distribute controlled substances as demonstrated by, but not limited to, the number of calls/text messages registered per day, the length of the phone conversations and/or the parties calling or being called on phone number **(785) 375-6704**. The Pen Register has demonstrated to the Affiant that the phone number **(785) 375-6704** has been, is being and will continue to be used to communicate criminal activity concerning the distribution of controlled substances by **Albert Banks** and his associates.

## E.    USE OF JUDICIAL AND ADMINISTRATIVE SUBPOENAS

279.    Based upon Affiant's experience and conversations with other Agents and Administration of the Kansas Bureau of Investigation as well as Officers and Administration of the Junction City Police Department, who have considerable experience in investigating these individuals, similar operations and violations of the law such as these, it is the common consensus that the service of subpoenas to persons believed to be involved in this conspiracy and their associates would not be successful in achieving the stated goals of this investigation.  If any principals of this conspiracy, their co-conspirators, or any other participants were approached to cooperate each and every one would refuse to assist. This is especially true in this case, given the close ties among the inner circle of conspirators and many of the principals. Many of the principals in this investigation have been subjects of previous investigations and are aware of the techniques used by law enforcement to garner information. Moreover it would be unwise to afford any kind of immunity to such persons given that such immunity would not guarantee truthful admissions concerning the scope of the illegal drug activity being investigated. Additionally, service of subpoenas would alert the conspirators to the existence of this investigation and prompt the targets to take measures to thwart it.

Finally, participants in such a criminal enterprise are often reluctant to implicate others out of fear for their own safety or as a result of their loyalty to their fellow conspirators.

## F.   SEARCH WARRANTS

280.   The execution of search warrants in this investigation has been considered. The execution of search warrants involving principals of this investigation has been used in the past resulting in retrieval of a limited amount of controlled substances and records. Use of warrants alone is unlikely to reveal the total scope of the criminal operation, the identities of all conspirators, or the precise roles each plays within the conspiracy. It is extremely unlikely, given the history of this criminal organization, that the majority of the contraband controlled by the conspirators could be located at any given time unless electronic surveillance was employed. Affiant believes the execution of search warrants at this time would compromise the investigation and reveal the identities of those cooperating individuals.

281.   For the reasons set forth in the preceding paragraphs, normal methods of investigation have been attempted and failed, or reasonably appear unlikely to succeed, and/or are too dangerous to employ. At this time the only reasonable method of developing the necessary evidence of the above-listed violations is to intercept the wire communications of the subjects of this investigation. Such interceptions will reveal the details of this conspiracy involving the importation and distribution of controlled substances, possession with the intent to distribute controlled substances, and use of communication facilities to further these offenses, in violation of Kansas Law.

## MINIMIZATION

282.    All monitoring of wire communications will be conducted in such a way as to minimize the interception of communication.   Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Conversations, which are of a non-criminal or non-evidentiary nature, once minimized, will be spot-monitored in order to determine if the topic of the conversation has switched to a criminal or evidentiary nature.

283.    The interception of communications will be discontinued if the voice of one or more of the named interceptees is not identified as participating in the communication within a reasonable period of time, or in the case of conversations of others unknown which are of a non-criminal or non-evidentiary nature; spot-monitoring will be used to determine if conversations have switched to an evidentiary or criminal nature.    Monitoring will be conducted subject to the requirements to minimize interception of all non-pertinent communications.  All monitoring will be recorded.

## PERIOD OF INTERCEPTION

284.    Because of the continuing nature of the offenses as discussed above, it is further requested that authorization to intercept not automatically terminate when the types of communications described above are first obtained, but be permitted to continue until all wire communications are intercepted which fully reveal the manner in which the subjects of this investigation conduct and participate in the above-described offenses, and which reveal the full nature, scope and extent of the above-described offenses; the identities and roles of accomplices, aiders and abettors, co-conspirators, other participants in the offenses; the dispositions and locations of the proceeds from the offenses; and the types, existence and locations of all records and other physical evidence of the offenses.

Even if the objectives set forth in the preceding sentence have not been fully achieved, it is hereby requested that the court's order provide that authorization to intercept shall automatically terminate after thirty days, the thirty day period running from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under the court's order or ten days after the order is entered.


GLEN F. VIRDEN
Senior Special Agent
Kansas Bureau of Investigation


Sworn to before me and subscribed in my presence this ___5___ day of March, 2013.


Judge of the Geary County District Court
State of Kansas

*BANK 3*

## IN THE DISTRICT COURT OF GEARY COUNTY, KANSAS

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION | ) | |
| OF THE STATE OF KANSAS | ) | CASE NO. |
| FOR AN ORDER AUTHORIZING THE | ) | |
| INTERCEPTION OF WIRE | ) | UNDER SEAL |
| COMMUNICATIONS TO AND FROM | ) | |
| SPRINT/NEXTEL WIRELESS TELEPHONE: | ) | |
| 785-375-6704 | ) | |
| BEARING MOBILE STATION IDENTIFICATION # | ) | |
| (MSID) 00007856601961 AND ELECTRONIC SERIAL | ) | |
| # (ESN) 268435459909788757 | ) | |

### ORDER AUTHORIZING THE INTERCEPTION
### OF WIRE COMMUNICATIONS

Application under oath having been made before me by Steven L. Opat, Geary County Attorney,

based on the sworn affidavit of Glen F. Virden, Senior Special Agent, Kansas Bureau of

Investigations, an investigative or law enforcement officer of the State of Kansas within the meaning

of Section 5 of K.S.A. 22-2514, *et seq*, for an Order authorizing the interception of wire

communications pursuant to K.S.A. 22-2514, *et seq*, and full consideration having been given to the

matter set forth therein, the Court finds:

A.     there is probable cause to believe that Albert DeWayne Banks, DOB ████ and Anthony

Carlyle Thompson, DOB ████, and others named in the affidavit of the said Glen F.

Virden, and others yet unknown (hereinafter "Target Subjects"), have committed, and are

committing, and will continue to commit offenses enumerated in Article 57 of K.S.A. 21-

5701 *et seq*, specifically possession of controlled substances with intent to distribute, and

distribution of controlled substances, in violation of K.S.A. 21-5701 *et seq*, specifically 21-

5705 and 5706, unlawful use of a communication facility to commit and facilitate the commission of drug trafficking offenses, in violation of K.S.A. 21-5707; attempts, conspiracies or solicitations to possess with intent to distribute or to distribute controlled substances, in violation of K.S.A. 21-5701 *et seq*, and K.S.A. 21-5301 and 21-5302 and 21-5304; unlawful acts involving proceeds derived from violations of K.S.A. 21-5701-5717. (Hereinafter the "Target Offenses");

B.   there is probable cause to believe that particular wire communications of the said Albert DeWayne Banks and the said Anthony Carlyle Thompson and others yet unknown (hereinafter "Target Interceptees"), concerning the above-described Target Offenses will be obtained through the interception for which authorization has herewith been applied. In particular, there is probable cause to believe that the interception of wire communications to and from the cellular telephone with the assigned telephone number 785-375-6704, bearing MSID 00007856601961 and ESN 268435459909788757 with service provided by Sprint/Nextel Wireless which is a subscribed prepaid account but with no subscriber name attached, although it is clear that the principal user is and has been identified as Albert DeWayne Banks, will further disclose, detail and reveal the specifics of the above offenses, including the depth of the conspiracy and the manner and means of how and with whom these offenses are being committed, including the unknown sources from which the distribution by Albert DeWayne Banks, Anthony Carlyle Thompson, and others is made possible;

C.   it has been established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ; and

D.   there is probable cause to believe that 785-375-6704 has been and will continue to be used

D000693

in connection with commission of the above-described offenses.

WHEREFORE, IT IS HEREBY ORDERED that Special Agents of the Kansas Bureau of Investigation, and other agencies acting under the supervision of the KBI, are authorized, pursuant to an application as authorized by K.S.A. 22-2515, made by Steven L. Opat, the duly elected and authorized County Attorney for Geary County, State of Kansas, to intercept wire communications to and from the above-described telephone.

PROVIDED that such interception(s) shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, or for a period of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct an interception under this order or ten (10) days after this order is entered, whichever is earlier.

1T IS ORDERED FURTHER that in the event that the target telephone is transferred outside the territorial jurisdiction of this court, interceptions may take place in any other jurisdiction within the United States.

IT 1S ORDERED FURTHER that the authorization given is intended to apply not only to the target telephone number listed above, but also to any other telephone number or telephone accessed through the above-referenced MSID number, and to any other MSID number accessed through the target telephone number referenced above, within the thirty (30) day period. The authorization is also intended to apply to the target telephone number referenced above regardless

D000694

of service provider, and to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

IT IS ORDERED FURTHER that, based upon the request of the Applicant pursuant to K.S.A. 22-2514, and the definitions set forth therein, and K.S.A. 22-2515 and 2516, Sprint / Nextel, an electronic communication service provider as defined in Section 2510(15) of Title 18, United States Code and K.S.A. 22-2514, shall furnish the KBI and/or it's agents or designees with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such provider is according the persons whose communications are to be intercepted, with the service provider to be compensated by the KBI for reasonable expenses incurred in providing such facilities or assistance.

IT IS ORDERED FURTHER that, to avoid prejudice to the government's criminal investigation, the provider of the electronic communications service and its agents and employees are Ordered Not To Disclose or Cause Disclosure of the Order or the request for information, facilities and assistance by the KBI or the existence of the investigation to any person other than those of its agents and employees who require this information to accomplish the services hereby ordered. In particular, said provider and its agents and employees shall not make such disclosure to a lessee, telephone subscriber or any interceptee or participant in the intercepted communications.

IT IS ORDERED FURTHER that this Order shall be binding on any subsequent provider of electronic communications services as defined in Title 18, United States Code, Section 2510(15) and K.S.A. 22-2514 *et seq*, that provides services to the target telephone number(s) listed above upon service of a certified copy of this Order without any further court order being required.

IT IS ORDERED FURTHER that this order shall be executed as soon as practicable and that all monitoring of wire communications shall be conducted in such a way as to minimize the

RICHARD FINK    RCPD                              3-6-2013
Justin Stopper   GLSO                            3/6/2013
Eric S. Coffman   GESO                           3-6-2013

D000696

interception and disclosure of the communications intercepted to those communications relevant to the pending investigation. The interception of wire communications must terminate upon the attainment of the authorized objectives, not to exceed thirty (30) days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception of this order or ten (10) days after he order is entered.

Monitoring of conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119, Title 18, United States Code and K.S.A. 22-2514 *et seq.*. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named Target Interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall spot check to insure that the conversation has not turned to criminal matters.

IT IS ORDERED FURTHER that, pursuant to Section 2518(5), Title 18, United States Code and K.S.A. 22-2514 *et seq*, in the event intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

IT IS ORDERED FURTHER that Steven L. Opat, Geary County Attorney and/or Antonio Cruz Assistant Geary County Attorney shall provide this Court with a report on or about the tenth, twentieth, and thirtieth days following the date of this Order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If any of the above-ordered reports should become due on a weekend or holiday, IT IS ORDERED

D000697

Luke Brewall   RCPD

John M. Doehling

Brad Schoen

Dan Breci

Tony Cruz GELA

Jeff Childs

Kurt Moldrup

Julia Goggins

Jessie Beck

Emmett Smith

Robert Duerkes

BRIAN JOHNSON   RCPD

Rick Deutsch

Brek C. Jager   BREK C. JAGER   03/06/13

Mark French RCPD   03/06/13

Dustin J. Weisbrod RCPD   3/6/13

Michael PARR   3/6/13

Sherri Moore KBI   3/6/13

Robert Lewis KBI   3/6/13

DAVE BREDE KBI   3/6/13

Nate Boeckman   3/6/13

Bill White   3/6/13

Andrew Bezdek   3 6-13

RyAN Boyer KBI   3-6-13

3-16-13

03

3-4-13

3/6/13

3-6-13

3-6-13

3/4/13

3-6-13

3-6-13

3-6-13

3-06-13

3/6/2013

03-06-2013
03/06/13

3/6/13

D000698

FURTHER that such report shall become due on the next business day thereafter.

IT IS ORDERED FURTHER that this Order, the application, affidavit and proposed order, and all interim reports filed with this Court with regard to this matter, shall be sealed until further order of this Court, except that copies of the order, in full or redacted form, may be served on the KBI and the service provider as necessary to effectuate this order.

DONE and ORDERED this __5__ day of __March__, 20_13_, at in Junction City, Kansas.

HONORABLE _David R. Platt_
_District Judge_

| Print Name/Agency | Sign | Date |
|---|---|---|
| Ian Shedden – KBI | Ian Shedden | 3-6-13 |
| Scott Ferris – KBI | Scott Ferris | 3/6/13 |
| Steve Bundy – KBI | Steve Bundy | 3/6/13 |
| Tim Leakey KBI | Tim Leakey | 3/06/13 |
| Amanda Young KBI | Amanda Young | 3/06/13 |
| Vidal Campos KBI | | 3/06/13 |
| Chris Turner KBI | | 3/6/13 |
| MATTHEW LYON KBI | Matthew Lyon | 03.06.2013 |
| Rod Page KBI | Rod Page | 03-06-2013 |
| ED BARTKOSK KBI | | 03-06-2013 |
| Brad Ingalls RCPD | | 03/06/2013 |
| SHAWN STRATTON RCPD | | 3/6/2013 |

D000699

| PRINT NAME/AGENCY | SIGN | DATE |
|---|---|---|
| GLEN VIRDEN   KBI | | 03/06/13 |
| Doug Younger   KBI | | 03-06-2013 |
| Michael Lind   KBI | | 03-06-2013 |
| Shane Finley   KBI | | 03-06-2013 |
| Robert Conde   KBI | | 03-06-2013 |
| Frank Papish   KBI | | 3/6/13 |
| KELLY W. RALSTON KBI | | 3/6/13 |
| JON  RANKIN   KBI | | 3/6/13 |
| Shawn Campiti   KBI | | 03-06-2013 |
| Traci Allen   KBI | | 3-6-13 |
| Chris Farris   KBI | | 3-6-13 |
| JOSH KYLE   RCPD | | 3-6-13 |
| Mike Lile   JCPD | | 03-06-13 |
| Angela C Weeks  GCSO | Angela C Weeks | 03-06-13 |
| Cathy Fahey   JCPD | Cathy Fahey | 3-6-13 |
| JOSHUA BROWN   JCPD | | 03062013 |
| TODD GOODREY   JCPD | | 030613 |
| STEVEN L. OPAT   GCDA | | 3/6/13 |
| Alvin Babcock   JCPD | | 3-6-13 |
| Tim Brown   JCPD | Tim Brown | 030613 |
| MAVERICK CAMPBELL  GCSO | | 03-06-13 |
| Tony Wolf   Geary County S.O. | | 03-06-13 |
| William P. Arnold Jr.   JCPP JCPD | | 03/06/13 |
| Cory Odell   JCPD | | 3/6/13 |
| Trish Gordan   JCPD | | 3-6-13 |
| Kelly Roberts   TPD | | 3-6-13 |
| n. the Rumford   KBI | | 3-6-13 |
| Deu Swann   KBI | | 3/6/15 |

D000700

# IN THE COURT OF GEARY COUNTY
# STATE OF KANSAS

IN THE MATTER OF THE APPLICATION   }

FOR AN ORDER AUTHORIZING THE   }     No. _____

INTERCEPTION OF WIRE COMMUNICATIONS}

## AFFIDAVIT IN SUPPORT OF APPLICATION

    I, Glen F. Virden, Senior Special Agent, Kansas Bureau of Investigation, being of lawful age and duly sworn upon my oath depose and state:

    1.    I am an "Investigative" law enforcement officer duly deputized with statutory authority for the State of Kansas, and as further recognized and defined by K.S.A. 22-2514(5).

    2.    This affidavit is submitted in support of an application for an order authorizing the interception of the wire communications of **Anthony Carlyle Thompson, B/M Date of Birth** XX/XX/XXXX and others listed below, over telephone number **(785) 226-1783**, a personal cellular telephone currently in service with T-Mobile USA with International Mobile Security Identity (IMSI) 310260445955245. T-Mobile USA records indicate the phone number to be subscribed to **Jason Roberts, Date of Birth 02/17/1981** which the Affiant knows is not the person using the cellular telephone as described in detail within this document. The Affiant requests authority to intercept the wire communications of individuals communicating on telephone number **(785) 226-1783**.

    3.    Affiant believes the following individuals will be intercepted over telephone number **(785) 226-1783; Anthony Carlyle Thompson, Albert Dewayne Banks**, Patricia Foy, Martye Madkins III, Charles Foster and others yet unknown.

    4.    Affiant requests authority to intercept the conversations and the background conversations intercepted in the vicinities of the aforementioned telephone

1

**EXHIBIT 4**

while the telephone is off the hook or otherwise in use. Affiant requests this authority in order to obtain evidence concerning the above persons' involvement in the following offenses: Possession of Cocaine in violation of Kansas Statutes Annotated (K.S.A.) 21-5706(a); Distribution of Cocaine in violation of K.S.A. 21-5705(a)(1); Conspiracy to commit these offenses in violation of K.S.A. 21-5302; and the Use of a Communications Facility to facilitate the commission of the above offenses in violation of K.S.A. 21-5707(a)(1). All offenses are in violation of Kansas Law, which have been and are being committed by the persons identified herein and others yet unknown.

     5.    The Affiant has been a law enforcement officer since 2001 with the Kansas Bureau of Investigation (KBI). The Affiant is currently a Senior Special Agent with the Topeka Region of the Special Operations Division for the KBI. The Affiant is a graduate of Cowley County Community College with an associate of applied science degree in Criminal Justice and Southwestern College with a bachelor's degree in Criminal Justice. The Affiant, while so employed in law enforcement, has received training in narcotics investigations to include, but not limited to: Kansas Law Enforcement Training Center's Basic Training Academy, the Kansas Bureau of Investigation's Advanced Investigations Academy, the Kansas Bureau of Investigation's Clandestine Lab Certification School, Kansas Top Gun Narcotics training, and the U.S. Drug Enforcement Administration's Basic Narcotics Investigators School. Affiant has investigated numerous narcotics cases. These investigations have included, but are not limited to undercover purchases of narcotics, controlled purchases of narcotics using cooperating individuals and search warrants. The Affiant has arrested numerous individuals for violations of both state and federal violations of controlled substances statutes. As a result, Affiant has interrogated many defendants, informants and others who were either sellers, distributors, purchasers, manufacturers or users of controlled substances. The Affiant is familiar with how controlled substances are obtained, diluted, packaged, distributed, sold, used, and manufactured. Affiant is also familiar with the records, books, and documents needed to carry on such illicit activity.

     (a)    Based on the above experience, Affiant believes there is probable cause to believe the subjects of this investigation, both known and unknown, have committed, are committing and will continue to commit offenses involving possession,

distribution and conspiracy to distribute cocaine. Such violations involve the use of communication facilities in order to facilitate the commission of the above offenses, each being in violation of Kansas Uniformed Controlled Substances Act.

(b) That particular wire communications of the subjects of this investigation concerning the above offenses will be obtained through the interception of such communications to and from telephone number **(785) 226-1783**. In particular, there is probable cause to believe that the communications to be intercepted will concern dates, times, and places for commission of the aforementioned offenses when the above named interceptee communicates with the listed interceptees and other unknown suppliers, co-conspirators, aiders and abettors. There is further probable cause to believe that the communications to be intercepted will disclose the location of assets owned or controlled by the persons involved, and the manner, extent and identity of persons who direct and/or participate in the illegal activities set forth herein. These communications are expected to constitute admissible evidence of the above-described offenses.

(c) That telephone number **(785) 226-1783**, has been, is being, and will continue to be used in connection with the commission of the above offenses.
The interception of these communications is expected to concern verbal and messaging discussions of the continuing conduct, financing, managing, supervising, directing, or ownership of all or part of an illegal narcotics enterprise, including orders and instructions to subordinates, the receipt of information pertaining to the obtaining and distribution of controlled substances, and other conversations relating to the administration, control, and management of the aforementioned illegal drug activity.

6. Normal investigative procedures have been tried and have failed to achieve the goals of this investigation, or reasonably appear unlikely to succeed if tried, or are too dangerous to employ, as more fully explained below.

## INVESTIGATIVE INVOLVEMENT OF STATE AND LOCAL LAW
## ENFORCEMENT

7.      This investigation is a result of a joint effort!by the Affiant, other Agents
of the Kansas Bureau of Investigation (KBI), Officers of the Junction City Police
Department (JCPD), Officers of the Geary County Sheriff's Office (GESO) and Officers
of the Riley County Police Department (RCPD).  The investigation covers a period of
time from June 2012 to the present.  The statements contained in this affidavit are based
in part on information provided by Agents/Officers of the above-listed law enforcement
agencies.    Because this affidavit is being submitted for the purpose of securing
authorization for the interception of wire communications, Affiant has not included each
and every fact known to the Affiant concerning this investigation.  Affiant has set forth
only the facts that Affiant believes are necessary to establish the necessary foundation for
an order authorizing the interception of wire communications.  If a court order is granted
authorizing the interception of wire communications in this case, only those persons and
agencies authorized by law to make such interceptions will be allowed to do so.

8.      In April, 2012, Detective Nate Boeckman of the RCPD contacted
Detective Alvin Babcock of the JCPD Drug Operation Group (DOG) with information
that **Anthony Thompson (AKA "Ant")** and **Albert Banks (AKA "AB")** were
distributing cocaine within the Junction City, Geary County, KS area and the Manhattan,
Riley County, KS area.  RCPD received this information from a Source of Information
(SOI) to be referred to as "SOI #1" from this point forward. SOI #1 appeared to have
knowledge of some of the criminal elements related to **Anthony Thompson** and **Albert
Banks**, but was not allowed to have intimate knowledge of the day to day operations or
the source of supply of the cocaine.

9.      SOI #1 did give information saying **Anthony Thompson** and **Albert
Banks** were receiving powder cocaine from an unknown supplier/s then transporting (or
having it transported) back to the Junction City area where they would convert the
powder cocaine to crack cocaine themselves (evidence of this conversion will be
explained in this affidavit).  SOI #1 did not have direct knowledge of when the powder
cocaine purchases were occurring, who was driving to purchase the powder cocaine and

even if one of the aforementioned persons were actually obtaining the cocaine or having another person unknown to this investigation acquire and transport the cocaine to **Anthony Thompson** and **Albert Banks**. SOI #1 has continued to give some credible information to Agents/Officers but beyond that, SOI #1 has not been beneficial to the investigation. As stated above, SOI #1 has limited knowledge related to the full scope of the cocaine distribution network, other co-conspirators and the source of supply for the cocaine.

10.     The Affiant was contacted by Lieutenant Mike Life of the JCPD and asked to assist with the investigation.     The Affiant met with Agents/Officers of the aforementioned agencies to in an attempt to garner information related to persons who might be involved in the distribution of cocaine.     The Affiant then contacted an individual who had been a Cooperating individual (CI) for the KBI since 1985 (to be referred to as CI #1 from this point forward). The Affiant had a meeting with CI #1 and asked if CI #1 would be willing to assist in the investigation to which CI #1 agreed. Since CI #1's association with the KBI beginning in 1985, CI #1 has successfully been an integral part of a number of State and Federal investigations which culminated with the prosecution and convictions of numerous persons related to the distribution of drugs. CI #1 has had a number of Agents within the KBI as his/her handler. The Affiant has had contact with a number of these Agents who spoke highly of CI #1 and his/her abilities to assist in investigations culminating in successful prosecution.

11.     On 05-16-2012, then KBI Task Force Agent (TFA) John Culver was contacted by RCPD in reference to **Albert Banks** possibly leaving the Junction City, KS area en route to Topeka, Shawnee County, KS to purchase drugs for distribution. TFA Culver, RCPD and JCPD coordinated a surveillance operation to follow **Albert Banks** in an attempt to locate the person whom he was receiving his drugs from for distribution. TFA Culver was told **Albert Banks** was supposedly traveling with a white female who was later seen as the driver of the vehicle.   The vehicle **Albert Banks** and the white female were in was described as a maroon colored Cadillac Escalade.   TFA Culver observed this vehicle leave the Junction City area and observed the license tag on the vehicle which was bearing Kansas tag 669BHV.   This vehicle was later found to be registered to a 2002 Cadillac Escalade with a primary owner of Mike Roth and secondary

owner of Kristina Orth both of Junction City, Geary County, KS. The Affiant would later find out Kristina Orth is the girlfriend of Mike Roth.

12.     As Agents followed **Albert Banks** and Kristina Orth from Junction City, Geary County, KS the vehicle made several overt actions which appeared to be in an attempt to make sure they were not being followed. The vehicle traveled east on I-70 where it exited at the Maple Hill exit. The vehicle then made a u-turn in the middle of the road and then re-entered I-70 and continued eastbound on I-70. Once the vehicle reached the Topeka, Shawnee County, KS area, it exited onto SE California Avenue and traveled south where it entered the McDonald's drive thru at SE 29th and California. It then went south on California Avenue to SE 30th Street where it turned east then south on SE Swygart and pulled into the parking lot of 3024 SE Swygart. **Albert Banks** then exited the vehicle walked into the apartment building at this location. Kristina Orth remained in the vehicle with an undetermined number of children who were found to have been traveling in the vehicle.

13.     3024 SE Swygart Apartment F was, at that time, the residence of Johnny Lee Ivory III (AKA "5", "J5" and "Jizzle"). Johnny Lee Ivory is a confirmed member of the Traveling Vice Lords Gang. He has a lengthy criminal history to include; possession of opiates/opium/narcotic drugs, possession of depressants/stimulants, discharge of a firearm at an occupied dwelling as well as others which will be explained further later in this affidavit. Johnny Lee Ivory, at that time, was believed to reside at this residence with his then girlfriend, Whitnie A. Livingston. RCPD had received information from SOI #1 indicating Johnny Lee Ivory was perhaps a source of supply for cocaine for **Albert Banks** and **Anthony Thompson.** This has not been confirmed as Johnny Lee Ivory has not been located as to his whereabouts at this time although it is believed he still resides in Topeka, Shawnee County, KS. On 05-10-2012, Topeka Police Department (TPD) Officers located one-half (1/2) pound of marijuana, two (2) loaded handguns and approximately $10,000.00 in US Currency at this apartment where Johnny Lee Ivory stated he resided (TPD case number 10732-12).

14.     **Albert Banks** eventually exited the apartment complex and got into the passenger side of the vehicle Kristina Orth was driving. The vehicle exited the parking lot, drove north on SE California Avenue, turned east on SE 29th, turned north into the

Dillon's parking lot, circled the parking lot, exited the parking lot and crossed SE 29th Street where it entered into a shopping center parking lot and parked in front of the Subway restaurant and remained there for approximately 15 minutes without anyone entering or exiting the vehicle. After approximately 15 minutes, the vehicle got back onto SE 29th Street and turned north on SE California Avenue. The vehicle entered onto I-70 and traveled west to Junction City, Geary County, KS where it was followed to an unknown address (address unknown to the Affiant) on 13th Street where it was believed **Albert Banks** was possibly distributing cocaine from.

15.     On 05-30-2012, Detective Alvin Babcock of the JCPD received phone call from Detective Nate Boeckman of the RCPD informing him that Detective Nate Boeckman had received information alleging **Albert Banks** had left a package of cocaine wrapped in either brown tape or a brown paper bag in an alley between 13th and 14th Streets and Franklin and Monroe Streets in Junction City, Geary County, KS the previous evening. Detective Nate Boeckman advised Detective Alvin Babcock that RCPD was conducting surveillance on a residence in Manhattan, Riley County, KS where it was believed **Albert Banks** was residing at the time. Detective Nate Boeckman advised a white in color Chrysler 300 having black rims had arrived at the residence. The driver of the vehicle was identified by RCPD Detectives as Chris Howard. A short time later, Chris Howard and **Albert Banks** were seen leaving the residence in the aforementioned vehicle.

16.     Lieutenant Mike Life and Detective Alvin Babcock drove to the aforementioned alley in Junction City, Geary County, KS in an attempt to locate the package of cocaine but were unable to locate it. Detective Nate Boeckman contacted Detective Alvin Babcock and stated he had lost sight of the Chrysler 300 and was unaware if the vehicle was still in Manhattan, Riley County, KS or in the Junction City, Geary County, KS area. A short time later, Detective Alvin Babcock observed the Chrysler 300 in the aforementioned alley and stopped in wooded area where Detective Alvin Babcock was told the package of cocaine was possibly located. The vehicle then left the alleyway and sight was lost of it. Detective Alvin Babcock was not able to see who exited the vehicle or if anything was retrieved when it stopped in the alleyway but Detective Alvin Babcock did observe the driver of the vehicle did not get out of the

7

vehicle. The vehicle was later located at a liquor store in Junction City, Geary County, KS.

17. On 05-31-2012, CI #1 made two (2) phone calls to Martye Madkins III in reference to purchasing Oxycontin pills. In the first phone call, Martye Madkins III stated he would have to call other unknown person/s in an attempt to obtain the pills. The second call to Martye Madkins III was not answered and the attempted purchase was discontinued.

18. On 06-01-2012, CI #1 contacted Martye Madkins III once again in reference to purchasing a $50.00 quantity of crack cocaine from him. Martye Madkins III agreed to sell CI #1 the crack cocaine. While talking to Martye Madkins III, CI #1 made mention of needing to call a female by the name of "Ro" who is actually Lavern Roshell Jackson. Martye Madkins III said he was with Lavern Jackson at that time. CI #1 talked to her about purchasing three to four (3 to 4) Oxycontin pills. Lavern Jackson stated she could obtain Dilaudid and Morphine pills as well. Lavern Jackson stated she would make some phone calls and inquiries into obtaining some pills for CI #1.

19. CI #1 was prepared for purchasing crack cocaine from either Martye Madkins III or Lavern Jackson. The Affiant gave CI #1 $50.00 in US Currency to purchase the crack cocaine. CI #1 called Martye Madkins III and inquired as to Martye Madkins III ability to sell CI #1 $50.00 worth of crack cocaine. Martye Madkins III said he would call CI #1 back in five (5) minutes. Martye Madkins III called CI #1 back and they agreed to meet at the Casey's General Store in Junction City, Geary County, KS to complete the transaction. Detectives Shawn Peirano and Josh Brown of the JCPD DOG observed Martye Madkins III arrive at the location in a gray colored Chevrolet HHR bearing a Missouri license tag. Martye Madkins III exited the vehicle, got into CI #1's vehicle and sold CI #1 the crack cocaine. The HHR had three (3) African American males in it at the time and as it left, one of the males was identified by Sergeant Todd Godfrey of the JCPD as **Albert Banks** and the driver was identified by Detective Alvin Babcock as **Anthony Thompson**.

20. The Affiant submitted the evidentiary item, which was actually two (2) small individually wrapped baggies, to the KBI for analysis and received a Forensic

8

Laboratory Report stating cocaine base was detected in Lab Item 1 with both being examined and having a total net weight of 0.20 grams.

21.     On 06-30-2012, CI #1 contacted a male by the name of Gevonni Roberto Davis whom CI #1 had been introduced to earlier. CI #1 told Gevonni Davis that CI #1 was attempting to make contact with **Martye Madkins III** in reference to purchasing crack cocaine from him. CI #1 asked Gevonni Davis if he had seen Martye Madkins III and/or if Gevonni Davis knew whether or not Martye Madkins III had any crack cocaine to sell. Gevonni Davis stated he had seen Martye Madkins III at approximately 7:30 AM that morning and had purchased the last portion of crack cocaine Martye Madkins III had to sell at that time. CI #1 asked Gevonni Davis if he could contact **Anthony Thompson** and inquire as to whether or not he had any crack cocaine to sell. Gevonni Davis asked if CI #1 knew **Anthony Thompson** to which CI #1 said he/she had met **Anthony Thompson** but did not have a telephone number for him. Gevonni Davis said he would call **Anthony Thompson** and call CI #1 back.

22.     Gevonni Davis called CI #1 and stated he had made contact with **Anthony Thomson**. **Anthony Thompson** stated he was in Ogden, KS at that time but would turn around and come to Junction City, KS to meet CI #1 at his/her motel room to sell him/her the crack cocaine. The Affiant gave CI #1 $50.00 with which to purchase the crack cocaine. **Anthony Thompson** arrived at the motel room and met with CI #1. CI #1 siad **Anthony Thompson** produced approximately 15 "rocks" of crack cocaine from his pocket and thought CI #1 wanted to purchase $100.00 worth of crack cocaine. CI #1 said he/she only wanted $50.00 worth and at that time **Anthony Thompson** sold the crack cocaine to CI #1. CI #1 asked for and was given **Anthony Thompson's** telephone number for further transactions. The telephone number given to CI #1 is not the current number for **Anthony Thompson**, but was his telephone number at that time. **Anthony Thompson** was driving a red in color Chrysler Sebring bearing Arkansas license tag 227RMJ which was not registered to that vehicle.

23.     The Affiant submitted the evidentiary item to the KBI for analysis and received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 1 having a net weight of 0.15 grams.

24.     On 07-11-2012, the Affiant and other Agents/Officers met with CI #1 for the purpose of CI #1 attempting to make a purchase of crack cocaine from Martye Madkins III. CI #1 contacted Martye Madkins III and he told CI #1 to call him back in 10 to 20 minutes as Martye Madkins III "was checking on it now" referring to Martye Madkins III inquiring with someone as to the availability of the crack cocaine CI #1 wanted to purchase.  This would indicate the crack cocaine did not belong to Martye Madkins III but instead belonged to another party whom Martye Madkins III had to obtain it from prior to distributing it.  While waiting on Martye Madkins III to contact CI #1, Detective Alvin Babcock was watching video surveillance of Martye Madkins III residence located at 227 west 14th Street in Junction City, Geary County, KS in an attempt to observe any person/s arriving or departing from the residence. Detective Alvin Babcock observed **Albert Banks** and Chris Howard leave the residence.  After the two (2) aforementioned persons left the Martye Madkins III residence, CI #1 received a call from Martye Madkins III.  The two (2) aforementioned males returned to the residence shortly thereafter.

25.     Martye Madkins told CI #1 to meet "his man" (referring to another unknown person) at Wood Oil in Junction City, Geary County, KS and asked how much CI #1 wanted.  CI #1 said he/she wanted $60.00 worth of crack cocaine.  The Affiant gave CI #1 $60.00 in US Currency to purchase the crack cocaine.  CI #1 left and drove toward Wood Oil.  While en route, CI #1 was contacted by Martye Madkins III and told to change the location where CI #1 was to meet someone.  Martye Madkins III said to meet in the area of the intersection of 15th Street and Adams Street in Junction City, Geary County, KS.

26.     CI #1 arrived at the location and continued to attempt to make contact with Martye Madkins III by cellular telephone to tell him CI #1 was at the location. Martye Madkins III told CI #1 someone would be coming to the location soon to distribute the crack cocaine to CI #1.  26 minutes after CI #1 arrived at the intersection location; Martye Madkins III called CI #1 and told CI #1 to drive to another location. During the course of these events, Detective Alvin Babcock once again observed **Albert Banks** leave the aforementioned residence.  Surveillance members observed **Albert Banks** approach a vehicle described as a grey in color Chevrolet Malibu.  An unknown

black female exited the vehicle. **Albert Banks**, the unknown black female and another unidentified black male (later believed to be Martye Madkins III due to identified clothing) were observed walking back and entering into the aforementioned residence. A short time later, a black male (believed to be Martye Madkins III from the clothing description) was observed leaving the residence and walking toward 14th Street in Junction City, Geary County, KS. Then, Chris Howard was observed arriving and entering the residence and the unknown black male (believed to be Martye Madkins III) returned to the residence once again. The black male believed to be Martye Madkins III (identified by the clothing description of the person who later met with CI #1) then departed the residence once again and walked toward 14th Street in Junction City, Geary County, KS. A short time after the black male (believed to be Martye Madkins III) left the residence, Chris Howard also left the residence. Surveillance members observed CI #1 driving towards 14th Street and then travel west on 14th Street. Surveillance members then observed CI #1 driving east in the 300 block of 15th Street.

27.     While en route and in the 300 block of west 15th Street in Junction City, Geary County, KS; CI #1 was stopped by the same black male who had been observed walking from the residence. The black male, who was later positively identified as Martye Madkins III, walked up to the passenger side of the vehicle CI #1 was driving. Martye Madkins III sold CI #1 the crack cocaine at that time. While CI #1 was making the purchase of crack Cocaine, Gevonni Davis entered the rear seat of the vehicle CI #1 was driving and observed the transaction take place which did not detour Martye Madkins III from completing the sell. This sell of crack cocaine was less than 1000' from Washington Elementary School which is located at 1500 N Washington Street in Junction City, Geary County, KS.

28.     The Affiant took possession of the evidentiary item and later submitted the evidentiary item to the KBI for analysis and received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 2 having a net weight of 0.33 grams.

29.     On 08-17-2012, Detective Alvin Babcock received a phone call from CI #1 advising CI #1 had been in contact with **Anthony Thomson** and **Anthony Thompson** was willing to sell CI #1 $100.00 worth of crack cocaine. CI #1 met with Agents/Officers and made a controlled phone call to **Anthony Thompson**. CI #1 told

11

**Anthony Thompson** he/she was not currently in Junction City but would be shortly. **Anthony Thompson** told CI #1 to call him when CI #1 arrived in Junction City, Geary County, KS. Detective Alvin Babcock gave CI #1 $100.00 in US Currency to purchase the crack cocaine from **Anthony Thompson**. CI #1 drove to the Casey's General Store located at 624 S Washington Street in Junction City, Geary County, KS. While en route to the location, CI #1 called **Anthony Thompson** and advised him CI #1 would meet him there to which **Anthony Thompson** agreed. A grey in color Ford Focus bearing Kansas license tag 807FEE arrived at the location. A registration check was competed on the tag and found to be registered to a 2002 Ford Focus registered to Anna Thompson who is **Anthony Thompson's** sister. The driver of the vehicle was identified as **Anthony Thompson**.

30.     CI #1 exited his/her vehicle and entered the front passenger side of **Anthony Thompson's** vehicle. A short time later, CI #1 exited the vehicle and entered his/her own vehicle. **Anthony Thompson** backed up and parked at the gas pumps then exited his vehicle and walked over to CI #1's vehicle to look at items of clothing CI #1 had for sell. Approximately a minute later, **Anthony Thompson** entered into the Casey's General Store. CI #1 walked over to **Anthony Thompson's** vehicle, entered into the driver's side front door then exited and got back in to his/her vehicle and left the location to meet with Agents/Officers.

31.     The Affiant took possession of the evidentiary item and later submitted the evidentiary item to the KBI for analysis and received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 2 having a net weight of 1.01 grams.

32.     On 08/24/2012, CI #1 met with Detective Alvin Babcock and other officers for the purpose of purchasing crack cocaine from a black male with the alias of "JD". Detective Alvin Babcock determined this black male to be Jason Dixon. CI #1 drove to an agreed upon location, which was Handy's Convenience Store located a 1734 W. Ash Street in Junction City, Geary County, KS. Jason Dixon arrived and was observed meeting with CI #1. A short time later, CI #1 and Jason Dixon left the location. CI #1 met with Detective Alvin Babcock and gave him the suspected crack cocaine CI #1 had purchased from Jason Dixon. Detective Alvin Babcock later processed the evidentiary item per his agency policies and had it submitted to the KBI for analysis.

Detective Alvin Babcock received a Forensic Laboratory Report stating cocaine was detected in the item having a net weight of .22 grams. It should be noted that during the review of the covert electronic audio/video recording device which had been utilized during the transaction with Jason Dixon, Detective Alvin Babcock observed Jason Dixon retrieve the crack cocaine from his mouth prior to selling it to CI #1. This is a common tactic utilized by illegal drug distributors for the transporting of illegal drugs. If he/she has contact with law enforcement, the illegal drugs can be swallowed prior to being located by law enforcement.

33.    On 08-31-2012, Detective Alvin Babcock and other Officers met with CI #1 for the purpose of CI #1 purchasing crack cocaine from Charles Foster. CI #1 told Detective Alvin Babcock that Charles Foster had contacted CI #1 the previous evening and said he had $50.00 worth of crack cocaine for sell. CI #1 told Charles Foster he/she was unavailable at that time and would contact him the next day. Detective Alvin Babcock gave CI #1 the US Currency to be used in the transaction. CI #1 called Charles Foster via cellular telephone and Charles Foster told CI #1 to come to his residence which was located at 149 E Anchor Street in Grandview Plaza, Geary County, KS.

34.    Surveillance units were in place to observe CI #1 arrive at the residence. CI #1 drove to the residence and entered with items of clothing for Charles Foster's wife to look at. After approximately 30 minutes, CI #1 and Charles Foster left the residence and drove to and entered the alley behind 126 W 12th Street in Junction City, Geary County, KS. Charles Foster exited CI #1's vehicle and met with another black male who was later identified as **Anthony Thompson**. Charles Foster entered back into the vehicle CI #1 was driving and they exited the alley. A grey in color Ford Focus driven by **Anthony Thompson** exited the alleyway behind CI #1. CI #1 transported Charles Foster back to his residence where he exited. CI #1 met with Officers once again and gave Detective Alvin Babcock the evidentiary item.

35.    Detective Alvin Babcock submitted the evidentiary item per his policy to be submitted to the KBI for analysis. Detective Alvin Babcock received a Forensic Laboratory report stating cocaine base was detected in Lab Item 1 having a net weight of .28 grams.

36.     On 09-05-2012, Detective Alvin Babcock received an email from Detective Nate Boeckman of the RCPD indicating a Cooperating Individual who was providing assistance to the RCPD had told Detective Nate Boeckman **Anthony Thompson** was in possession of what he/she deemed to be a large amount of crack cocaine.  The RCPD CI stated he/she was at the **Anthony Thompson** residence and observed several packages of crack cocaine lying on the kitchen counter.  The RCPD CI stated **Anthony Thompson** had measured out and packaged the crack cocaine for distribution.

37.     Detective Nate Boeckman stated he drove past the residence and observed a maroon in color Buick Century parked bearing Kansas license tag 071FEG.  This vehicle is registered to a 1998 Buick Century with the primary owner listed as Michael Harris of Manhattan, Riley County, KS.  The RCPD CI told Detective Nate Boeckman the vehicle belonged to a female by the name of Monica and that she was a crack cocaine user.  The RCPD CI told Detective Nate Boeckman Monica was allowing **Anthony Thompson** to use her vehicle.  Later that same day, the RCPD CI told Detective Nate Boeckman **Anthony Thompson** had left the residence and took the crack cocaine he had packaged for distribution with him.  The RCPD CI estimated the total amount of crack cocaine to be greater than one (1) ounce in quantity.

38.     That same day, 09/05/2012, the Affiant and other Officers met with CI #1 for the purpose of CI #1 making a crack cocaine purchase from **Anthony Thompson**.  CI #1 contacted **Anthony Thompson** via cellular telephone and both parties agreed to meet at the Casey's General Store located at 624 S Washington Street in Junction City, Geary County, KS.  **Anthony Thompson** told CI #1 he was approximately 30 seconds away from the location at the current time.  The Affiant gave CI #1 $250.00 in US Currency to purchase the crack cocaine.

39.     Once CI #1 arrived at the agreed upon location CI #1 once again attempted to contact **Anthony Thompson** via cellular telephone to advise him CI #1 was at the location.  **Anthony Thompson** did not answer the phone call.  After approximately one and a half (1 ½) hours, CI #1 sent **Anthony Thompson** a text message.  **Anthony Thompson** replied and changed the location and told CI #1 to meet him in the 100 block

14

of W 12th Street in Junction City, Geary County, KS which is the location of the Corner Club.

40.     CI #1 drove to this location and met with **Anthony Thompson**. CI #1 gave **Anthony Thompson** the $250.00 in US Currency and **Anthony Thompson** gave CI #1 a large plastic baggie containing numerous smaller plastic baggies containing crack cocaine. **Anthony Thompson** also gave CI #1 a small single baggie containing crack cocaine. **Anthony Thompson** had CI #1 give him a ride to another location from this location.

41.     A covert electronic audio/video recorder was used during this transaction. Detective Alvin Babcock reviewed the recording and found that **Anthony Thompson** asked CI #1 to take him to Cottonwood (mobile home park in Junction City, Geary County, KS). **Anthony Thompson** told CI #1 he needed to go to this location "so he can give this girl some shit" referring to distributing more crack cocaine to a female. As they departed the location en route to the Cottonwood, **Anthony Thompson** was observed putting something in his mouth. This is a common practice utilized by drug distributors to transport small amounts of drugs to thwart law enforcement detection should the person encounter a law enforcement officer. Persons who maintain this type of practice can swallow the illegal drugs if they encounter law enforcement. As CI #1 reaches the mobile home park **Anthony Thompson** tells CI #1 what location to drive to. Once **Anthony Thompson** exits the vehicle, CI #1 states he/she was directed to drive to lot 41B. Detective Alvin Babcock knows this location to be the residence of Audrey Ali or Audrey Nelson, both being the same person.

42.     The Affiant took possession of the evidentiary items and later submitted the evidentiary items to the KBI for analysis and received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 3 which were found to be seven (7) plastic baggies total and having a net weight of 2.70 grams total.

43.     On 09/06/2012, CI #1 met with Detective Alvin Babcock and other Officers in reference to purchasing prescription pills from Garland Hull. CI #1 contacted Garland Hull at telephone number (785) 762-5346. CI #1 met with Garland Hull at the intersection of 10th and Webster Streets in Junction City, Geary County, KS. Garland Hull gave CI #1 a prescription bottle with numerous pills in it and CI #1 gave Garland

15

Hull the US Currency for the pills. Garland Hull then departed and entered the residence at 922 N Webster Street in Junction City, Geary County, KS. Detective Alvin Babcock took possession of the evidentiary items and determined the pills were Oxycodone (Schedule II) and Clonazepam (Schedule IV). Detective Alvin Babcock submitted the evidentiary times to the KBI for analysis.

44.     On 09/25/2012, Detective Alvin Babcock and other Officers met with CI #1 for the purpose of CI #1 purchasing ten (10) Oxycodone 20 mg pills from Garland Hull. CI #1 drove to 922 N Webster Street in Junction City, Geary County, KS where he/she met with Garland Hull who exited from the residence at the aforementioned address. Garland Hull entered the vehicle CI #1 was driving and eventually received ten (10) pills from him. CI #1 exited the location and met with Detective Alvin Babcock. CI #1 gave the evidentiary items to Detective Alvin Babcock who determined the pills were Oxycodone/Hydrochloride 20 mg pills (Schedule II). Detective Alvin Babcock submitted the evidentiary items to the KBI for analysis.

45.     On 09/27/2012, CI #1 met with the Affiant and other law enforcement officers for the purpose of purchasing crack cocaine from Jason Dixon. CI #1 called Jason Dixon using telephone number (785) 375-3222. Jason Dixon answered the phone and a conversation ensued in regards to CI #1 purchasing methamphetamine from him. Jason Dixon told CI #1 he would have to call CI #1 back to which he did and stated he was not able to locate any methamphetamine to distribute but that he had crack cocaine in his possession to distribute if CI #1 was interested. CI #1 said he/she was interested in purchasing the crack cocaine.

46.     CI #1 told Jason Dixon he/she wanted two (2) $50.00 rocks of crack cocaine ($100.00 worth of crack cocaine). The two agreed to meet at Handy's Convenience Store located at 1734 W. Ash Street in Junction City, Geary County, KS. CI #1 drove to the location and a short time later Jason Dixon arrived and completed the transaction with CI #1. CI #1 drove back to a predetermine location where he/she then gave the two (2) plastic bag corners containing an off white substance in each to the Affiant.

16

47.     The Affiant took possession of the evidentiary items and later submitted the evidentiary items to the KBI for analysis and received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 2 and having a net weight of 0.82 grams.

48.     On 09/28/2012, the Affiant was contacted by CI #1 and told CI #1 had been in contact with **Anthony Thompson** who agreed to sell CI #1 one-half (1/2) ounce of crack cocaine for $700.00.  **Anthony Thompson** had previously told CI #1 he would sell him/her one-half (1/2) ounce of crack cocaine for $700.00 but at that time he was not in possession of that quantity.  Then later that same day, **Anthony Thompson** contacted CI #1 and said he was now in possession of more crack cocaine and was willing to sell CI #1 the one-half (1/2) ounce.  CI #1 had made several attempts throughout the day (after the previous call) to contact **Anthony Thompson** but the calls were going straight to voicemail and the voicemail box was full so CI #1 was unable to leave a message.  It should be noted throughout this investigation it has been found when **Anthony Thompson** did not answer his phone the voicemail box was nearly always full therefore no voicemail could be left indicating **Anthony Thompson** was apparently receiving a large number of phone calls with voicemails being left.  **Anthony Thompson** eventually contacted CI #1 via cellular telephone and stated he would meet CI #1 and complete the transaction.

49.     CI #1 met with the Affiant and other Officers prior to the purchase.  The Affiant gave CI #1 $700.00 in US Currency to purchase the crack cocaine.  CI #1 once again contacted **Anthony Thompson** via cellular telephone and advised him he/she was ready to meet with him.  **Anthony Thompson** told CI #1 to meet him at the Taco Bell which was located at 407 W 18th Street in Junction City, Geary County, KS.  CI #1 arrived at the location and shortly thereafter was approached by a black male and asked if CI #1 was the person who was there to receive something from "Ant" (**Anthony Thompson**).  CI #1 said "yes" and the black male said he would be right back with "it" referring to the crack cocaine.  Sergeant Todd Godfrey of the JCPD identified the black male who approached CI #1 as **Albert Banks**.  Approximately four (4) minutes later, **Albert Banks** reappeared and entered the passenger side of CI #1's vehicle where he sold CI #1 the crack cocaine.  CI #1 told **Albert Banks** to tell **Anthony Thompson** if the crack cocaine was good, CI #1 would want one (1) ounce of crack cocaine next week.

17

**Albert Banks** agreed and told CI #1 to contact **Anthony Thompson** next week. **Albert Banks** then exited the vehicle and walked to the south and was not surveilled due to the location and the fact he was walking.

50.     Prior to the purchase taking place, Detective Alvin Babcock recalled seeing a black male with dreadlocks and a white t-shirt leave Wood Oil Convenience Store (located at 439 W 19th Street in Junction City, Geary County, KS adjacent to the Taco Bell) and walk towards Taco Bell. This was the same black male later identified as **Albert Banks**. **Albert Banks** met with another unknown black male in front of Taco Bell in the parking lot who then departed shortly after meeting with **Albert banks**. Shortly thereafter, Detective Alvin Babcock recalled seeing a heavy set black female exit the Wood Oil Convenience Store and enter into a gold in color Four Taurus which Detective Alvin Babcock knew belonged to **Albert Banks** and his girlfriend Glenda Robertson. The vehicle was bearing Kansas license tag 882FEE. A registration request was run and the vehicle was found to be registered to Glenda Robertson and Ola Mae Gavin. Ola Mae Gavin is the mother of Glenda Robertson. This vehicle remained at its location throughout the purchase of crack cocaine.

51.     The Affiant took possession of the evidentiary item and later submitted the evidentiary items to the KBI for analysis and received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 3 and having a net weight of 13.89 grams.

52.     On 10/02/2012, the Affiant and Detective Alvin Babcock met with CI #1 for the purpose of making a controlled phone call to **Anthony Thompson** for the purpose of trying to obtain one (1) ounce of crack cocaine from him. **Anthony Thompson** did not answer and the call went to voicemail but once again the voicemail box was full and CI 31 was not able to leave a message. A recording device was left with CI #1 in order for him/her to make a phone call later and have a recording of it.

53.     On 10/03/2012, Detective Alvin Babcock and Detective Angie Weeks met with CI #1 to obtain the recording device from him and listen to the completed phone between CI #1 and **Anthony Thompson**. During the phone call, CI #1 talked to **Anthony Thompson** in reference to obtaining a "full one" referring to one (1) ounce of crack cocaine. **Anthony Thompson** told CI #1 the cost would be $1,400.00. CI #1 told **Anthony Thompson** he/she didn't have $1,400.00 and **Anthony Thompson** told CI #1

he would sell CI #1 an ounce of crack cocaine for $1,200.00. CI #1 asked **Anthony Thompson** if "homeboy was going to meet CI #1 again like he did the other day" referring to **Albert Banks**. **Anthony Thompson** said he would call "him" (**Albert Banks**) and find out. CI #1 and **Anthony Thompson** agreed to meet at approximately 2:00 PM to complete the transaction.

54.     At approximately 2:00 PM, CI #1 contacted **Anthony Thompson** via cellular telephone where CI #1 asked **Anthony Thompson** if he was ready (meaning CI #1 wanted to know if **Anthony Thompson** had the ounce of crack cocaine to distribute to CI #1). **Anthony Thompson** asked CI #1 if he/she had the "12" referring to the $1,200.00 to which he/she replied "yes". CI #1 asked **Anthony Thompson** if he was going to have "little homeboy" bring the crack cocaine to CI #1 referring to **Albert Banks** delivering it to CI #1 as he did on 09/28/2012. **Anthony Thompson** said "he had it anyway" referring to **Albert Banks** having the crack cocaine **Anthony Thompson** and **Albert banks** were distributing. **Anthony Thompson** said he would call "him" referring to **Albert Banks** and call CI #1 right back.

55.     Approximately two (2) minutes later, **Anthony Thompson** called CI #1 back, asked where he/she was and where CI #1 wanted to meet. CI #1 stated he/she liked the Taco Bell location, where he had met **Albert Banks** previously. **Anthony Thompson** indicated he had talked to **Albert Banks** and **Albert Banks** wanted to know if CI #1 would pay $1,250.00 for the ounce of crack cocaine instead of the earlier agreed upon price of $1,200.00. CI #1 agreed upon the price of $1,250.00. **Anthony Thompson** agreed upon the meeting location and asked CI #1 when he/she would be arriving at the location to which CI #1 replied, 15 minutes". **Anthony Thompson** told CI #1 to call him (**Anthony Thompson**) when CI #1 arrived at the location.

56.     CI #1 arrived at the location and attempted to contact **Anthony Thompson** via cellular telephone but **Anthony Thompson** did not answer. Approximately 17 minutes later, **Anthony Thompson** called CI #1 back and said he had seen a JCPD patrol vehicle parked near the meeting location and therefore wanted CI #1 to exit the parking lot, turn right and then turn left at the first intersection and meet **Anthony Thompson** in that area to which CI #1 complied. It should be noted this location is actually a dead end street making surveillance complicated as to seeing the

vehicle **Anthony Thompson** was driving. CI #1 parked in the 2000 block of N Madison Street in Junction City, Geary County, KS at which time **Anthony Thompson** appeared and entered into the passenger side of CI #1's vehicle.

57.     The transaction was completed and CI #1 had a conversation with **Anthony Thompson**. CI #1 asked **Anthony Thompson** how much crack cocaine he was purchasing per week to distribute. **Anthony Thompson** said it was approximately nine (9) ounces per week. The two continued to converse further and then **Anthony Thompson** exited the vehicle and CI #1 drove away en route to a pre-determined location. Detective Alvin Babcock and Captain Shawn Peirano of the Grandview Plaza Police Department (GPPD) were able to observe **Anthony Thompson** leave the location where the transaction took place and as he left, **Albert Banks** was seen in the vehicle with **Anthony Thompson**.

58.     The Affiant took possession of the evidentiary item and later submitted the evidentiary item to the KBI for analysis and received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 4 and having a net weight of 27.74 grams.

59.     On 10/10/2012, Agents/Officers met with CI #1 for the purpose of purchasing one (1) ounce of crack cocaine from **Anthony Thompson**. Detective Alvin Babcock retrieved a digital audio recorder from CI #1 which contained a recorded phone call between CI #1 and **Anthony Thompson** prior to this date. During the phone call, CI #1 told **Anthony Thompson** he/she would be in town (Junction City, Geary County, KS) on Wednesday instead of Thursday and wanted to know if **Anthony Thompson** was "still good" referring to **Anthony Thompson** having crack cocaine to distribute. **Anthony Thompson** told CI #1 he was "good" and asked CI #1 what "he needed". CI #1 said he/she wanted "a yard" referring to an ounce of crack cocaine to which **Anthony Thompson** responded he is "good' meaning he had that quantity to distribute.

60.     CI #1 contacted **Anthony Thompson** via cellular telephone and told him CI #1 was in town (Junction City, Geary County, KS) and wanted to know where **Anthony Thompson** wanted to meet. **Anthony Thompson** told CI #1 to meet him at the McDonald's on 6th Street and then changes the location to the Discount Liquor Store (located at 744 W 6th Street in Junction City, Geary County, KS). CI #1 told **Anthony Thompson** he/she was not aware of the location for that establishment. **Anthony**

Thompson told CI #1 it was "up the street from Dillon's" and to give **Anthony Thompson** 15 to 20 minutes (to arrive). Detective Alvin Babcock gave CI #1 directions to the location and he/she departed soon after.

61.    CI #1 arrived at the location and approximately 37 minutes later a grey in color Ford Focus arrived at the location. **Anthony Thompson** exited the vehicle and got into the vehicle CI #1 was driving. A second black male could be seen in the vehicle **Anthony Thompson** arrived in who was later identified as **Albert Banks**. The transaction was completed and as **Anthony Thompson** departed the location, surveillance was attempted on the vehicle he was driving but he was able to avoid being followed by Agents/Officers.

62.    The covert audio/video recording device from CI #1's vehicle was viewed by Detective Alvin Babcock and during the transaction **Anthony Thompson** told CI #1 "if he is unable to get in touch with him, CI #1 could call his bro (**Albert Banks**) at 785-317-1164 and his name is AB (**Albert Banks**)". **Anthony Thompson** told CI #1, AB (**Albert Banks**) was the person CI #1 met with the first time. It should be noted **Anthony Thompson** was referring to CI #1 making a purchase from **Albert Banks** on 09/28/2012 in the Taco Bell parking lot. It should also be noted this transaction took place within 1000' of Larry Dixon Alternative School.

63.    KBI Task Force Agent (TFA) Vidal Campos took possession of the evidentiary item and later submitted the evidentiary item to the KBI for analysis. The Affiant received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 5 and having a net weight of 27.74 grams.

64.    On 10/23/2012, Detective Alvin Babcock received a telephone call from CI #1 stating CI #1 attempted to contact **Albert Banks** several times to initiate a controlled purchase of crack cocaine from him but **Albert Banks** did not answer any of the incoming phone calls from CI #1. CI #1 did say he/she had a conversation with **Albert Banks** via text messaging though and forwarded the text messages to Detective Alvin Babcock. The messages are as follows;

- Is this AB that knows Ant who I got # from I am *******(omitted)
- What up yea this AB
- Will be comeing to Junk City if u got some work for me tomorrow

21

- Yep hit me up when u ready
- Is there a money cut on 2

This conversation is translated to mean CI #1 sent a text message to **Albert Banks** asking if the number texted was **Albert Banks**. He indicated it was **Albert Banks**. CI #1 advised him he/she would be coming to Junction City, Geary County, KS tomorrow and wanted to know if **Albert Banks** had crack cocaine to purchase. **Albert Banks** indicated he had crack cocaine for distribution and for CI #1 to call him when CI #1 was ready. CI #1 asked if he/she would receive a discounted cost if he/she purchased two (2) ounces.

65.    CI #1 then contacted **Albert Banks** via cellular telephone later and they conversed in reference to CI #1 not being able to make it to Junction City on this date. CI #1 said he/she would be in Junction City tomorrow (10/24/2012) and if **Albert Banks** had more (more than one or two ounces), CI #1 may want to purchase more quantity. **Albert Banks** stated he may possibly have more available and for CI #1 to call him tomorrow. CI #1 later received a text message from **Albert Banks** which read; U still want this o if not I am bout to get rid of it. This text was asking CI #1 if he/she was still planning on purchasing the ounce of crack cocaine CI #1 had asked for and if CI #1 did not want it, **Albert Banks** was going to sell it to someone else.

66.    On 10/24/2012, the Affiant and other Officers met with CI #1 for the purpose of CI #1 making a crack cocaine purchase from **Albert Banks**. CI #1 called **Albert Banks** via cellular telephone and told him CI #1 was approximately 15 minutes from Junction City, Geary County, KS and asked **Albert Banks** if he was "good" referring to whether or not he had crack cocaine available for distribution. **Albert Banks** told CI #1 he was "good" and waiting on CI #1. CI #1 asked **Albert Banks** if CI #1 would receive a discount if CI #1 were to purchase two (2) ounces. **Albert Banks** said he did not believe he had that much crack cocaine left but he would "have to go see how much he has" and that he "thinks it's only like 1 ½" meaning he did not have the crack cocaine with him at that time and believed he only had one and one-half (1 ½) ounces left to sell. **Albert Banks** told CI #1 he would give CI #1 a "deal", referring to a break in price, and CI #1 said he/she would take what **Albert Banks** had. CI #1 asked **Albert Banks** where he wanted to meet CI #1 at and **Albert Banks** said to meet him 12th and Jefferson Street (Junction City, Geary County, KS). CI #1 told **Albert Banks** he/she

knew where the Corner Club was (the intersection of 12th and Washington in Junction City, Geary County, KS) and he/she would meet **Albert Banks** there.

67.     CI #1 drove to the aforementioned location where CI #1 met with **Albert Banks** and purchased what was supposed to be 1 ½ ounces of crack cocaine for $1,800.00 which was given to CI #1 by the Affiant.  Detective Alvin Babcock observed **Albert Banks** walking east in the 100 block of W 12th Street prior to meeting with CI #1 and then observed **Albert Banks** exit CI #1's vehicle and walk to a residence having an address of 126 W 12th Street in Junction City, Geary County, KS/

68.     The Affiant took possession of the evidentiary items which were actually two (2) plastic baggies each containing suspected crack cocaine.  KBI TFA Vidal Campos later submitted the evidentiary item to the KBI for analysis.  The Affiant received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 4 and having a net weight of 40.96 grams.

69.     On 10/25/2012, Detective Alvin Babcock was listening to a recorded phone call from the Geary County Detention Center in which Martye Madkins III called telephone number 785-226-0131 (Martye Madkins III was incarcerated at the time in this facility).  The aforementioned telephone number was a cellular telephone number which Jasmine Tipton was utilizing. Jasmine Tipton answered the phone and they talked briefly then she told Martye Madkins III that **Albert Banks** was there and she gives the phone to **Albert Banks**.  **Albert Banks** and Martye Madkins III talk in reference to bonding Martye Madkins III out of jail.  **Albert Banks** told Marty Madkins III "they already have the money and they are waiting for a co-signor" to bond Martye Madkins III out.  Martye Madkins III asks **Albert Banks** the question of, "My cousin did that bullshit man?" **Albert Banks** replied, "There was two (2) onions laying on the table". Martye Madkins III said, "I'm gonna snap on they motherfucking ass".  **Albert Banks** told Martye Madkins III that he "hurried up and slid down there".  it should be noted this conversation meant there were two (2) ounces of crack cocaine on the table at Jasmine Tipton's residence (227 W 14th Street Apartment #2 in Junction City, Geary County, KS) and **Albert Banks** retrieved it hurriedly.  **Albert Banks** also said "they" were trying to bond "Dirty Dwayne" out of jail but "Dirty Dwayne's" stepfather would not co-sign to get him out of jail.  Detective Alvin Babcock knows "Dirty Dwayne" to be Dwayne

Alexander who is a partner of **Anthony Thompson, Albert Banks** and Martye Madkins III.

70.     On 10/29/2012, Detective Alvin Babcock received a text message from CI #1 which included a text message conversation CI #1 had with **Albert Banks**. The text message from CI #1 to **Albert Banks** read; "Will be out 4 sure on Friday. Will u be ready for my 2200" indicating CI #1 would be in Junction City, Geary County, KS on Friday and CI #1 wanted to know if **Albert Banks** would have cocaine to distribute to CI #1. **Albert Banks** simply replied back "Yep". A purchase of crack cocaine was attempted but **Albert Banks** indicated, during a telephone conversation, that it would be a couple of hours. A couple hours later, CI #1 contacted **Albert Banks** once again and **Albert Banks** indicated he was not in town (Junction City, Geary County, KS). CI #1 attempted to contact **Albert Banks** a short time later and he did not answer his cellular telephone so the attempted purchase of crack cocaine was discontinued for this date.

71.     On 10/31/2012, Detective Alvin Babcock observed a green in color Ford Thunderbird being driven by Glenda Robertson in the 500 block of E 8th Street in Junction City, Geary County, KS. The vehicle traveled along multiple streets and made several turns finally entering into an alleyway where Detective Alvin Babcock lost sight of it. Captain Shawn Peirano of the GPPD gained sight of the vehicle traveling through the alleyway where it was last seen. Detective Alvin Babcock drove to the intersection of 12th and Franklin Street in Junction City, Geary County, KS and observed the vehicle with **Albert Banks** in the front passenger seat and Glenda Robertson in the driver's seat. To the best of Detective Alvin Babcock's knowledge, at that time **Albert Banks** and Glenda Robertson were in a domestic relationship. Detective Alvin Babcock observed the vehicle turn west on 12th Street and finally stopping in front of a residence located at 126 W 12th Street in Junction City, Geary County, KS. **Albert Banks** exited the vehicle, approached the residence, then walked past the building and continued toward the alley where Officers lost sight of him. Detective Alvin Babcock was aware of previous information from SOI #1 who stated **Albert Banks** stashes or hides his cocaine in random alleys where it is left until he needs it for distribution. Once **Albert Banks** has a need for an unknown quantity of cocaine, he will proceed to the location where he had hid the cocaine, obtain it and then transport it to the person/s to distribute it. This

24

practice is done in an effort to conceal the possession of the illegal drugs in case law enforcement were to locate where **Albert Banks** was residing and execute a search warrant at that residence. If the illegal drugs were located in a location other than in or on property where **Albert Banks** resides or was located at, the drugs would not be associated to him.

72.     On 11/07/2012, CI #1 contacted Detective Alvin Babcock and said he/she had sent **Albert Banks** a text message asking him if he had any "work" for CI #1 referring to any crack cocaine for CI #1 to purchase. **Albert Banks** replied back "Yep". It should be noted no certain quantity of crack cocaine had been discussed or agreed up on by either party as the conversation was being conducted via text messaging. CI #1 arrived in Junction City, Geary County, KS and met with Agents/Officers. A controlled phone call was made to **Albert Banks** who told CI #1 to meet him at the same location as before referring to the Corner Club located at the intersection of 12th Street and Washington Street in Junction City, Geary County, KS. The Affiant gave CI #1 $2,200.00 in US Currency to be utilized for the crack cocaine purchase.

73.     CI #1 drove to the aforementioned location and once again called **Albert Banks** via cellular telephone to tell him CI #1 had arrived at the agreed upon location. **Albert Banks** told CI #1 to meet him in front of the residence where he had had contact with **Albert Banks** previously (10/24/2012) which was 126 west 12th Street in Junction City, Geary County, KS. CI #1 did as he/she was instructed to and upon parking, a black male (later identified by Detective Alvin Babcock as **Albert Banks**) exited the residence and approached CI #1. **Albert Banks** gave CI #1 a plastic baggie containing two (2) plastic baggies each having an off white substance in them later, determined to be crack cocaine. CI #1 gave **Albert Banks** the $2,200.00 in US Currency and then asked **Albert Banks** if he/she could purchase three (3) more ounces of crack cocaine in a couple of days if CI #1 was able to sell this two (2) ounces. **Albert Banks** agreed and told CI #1 to call him when he/she was ready. CI #1 left the location and met with the Affiant and other Agents/Officers.

74.     The Affiant took possession of the evidentiary item and later signed it over to KBI TFA Vidal Campos who later submitted the evidentiary item to the KBI for

analysis. The Affiant received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 5 and having a net weight of 56.08 grams.

75.     On 11/14/2012, The Affiant and other Agents/Officers met with CI #1 for the purpose of CI #1 purchasing crack cocaine from **Anthony Thompson**. CI #1 had been in contact with **Anthony Thompson** prior and had asked **Anthony Thompson** if he/she could purchase three (3) ounces of crack cocaine from him. **Anthony Thompson** told CI #1 he/she could as **Anthony Thompson** "was sitting fat right now" referring to having a large quantity of crack cocaine for distribution at that time. A negotiated price of $3,300.00 for the three (3) ounces of crack cocaine was agreed upon.

76.     Later this day (11/14/2012), CI #1 contacted **Anthony Thompson** once again via cellular telephone. **Anthony Thompson** told CI #1 he was not in Junction City, Geary County, KS at that time and would not be returning for two to two and a half (2 to 2 ½) hours as he was trying to "get it" referring to attempting to obtain more cocaine as he had obviously distributed all cocaine he had talked to CI #1 about previously. . CI #1 told **Anthony Thompson** he/she would be waiting for him once he returned. CI #1 and **Anthony Thompson** had contact via cellular telephone at a later time at which **Anthony Thompson** said he wanted to meet CI #1 at the Taco Bell parking lot (located at 407 W 18th Street in Junction City, Geary County, KS) once again. **Anthony Thompson** advised CI #1 he now wanted $3,600.00 for the three (3) ounces of crack cocaine. CI #1 was able to negotiate the price down to $3,400.00 and the transaction was agreed upon.

77.     The Affiant gave CI #1 $3,400.00 in US Currency to complete the transaction. CI #1 drove to the aforementioned location and waited on **Anthony Thompson**. After a period of time, CI #1 called **Anthony Thompson** once again to see if was getting close to the location as earlier, **Anthony Thompson** told CI #1 he was in Manhattan and en route to the location and suspected he would be at the location in 15 minutes but more time had elapsed than that. **Anthony Thompson** eventually arrived at the location and was seen by surveillance units. **Anthony Thompson** entered the front passenger seat of the vehicle CI #1 was driving and they began to converse. **Anthony Thompson** gave CI #1 two (2) plastic baggies each containing an off white chunky substance which was later confirmed to be crack cocaine. **Anthony Thompson** told CI

#1 each baggie weighed one and one-half (1 ½) ounces. **Anthony Thompson** told CI #1 they (the two packages and their contents) were still warm as he had just made it meaning he had just recently converted cocaine powder to crack cocaine immediately prior to meeting with CI #1. CI #1 gave the US Currency to **Anthony Thompson** and asked him to count it to confirm the amount was correct to which he did.

78.     Once the transaction was complete, **Anthony Thompson** exited the vehicle and walked to the south from this location. **Anthony Thompson** was observed by Detective Alvin Babcock walking in the yard of a residence located at 412 Roosevelt Street in Junction City, Geary County, KS but he was not seen entering the residence. Although the grey in color Ford Focus he had been seen driving previously was not seen near this location either. CI #1 drove to a predetermined location where he/she met with Agents/Officers. CI #1 gave the two (2) plastic baggies to the Affiant and the Affiant could feel they were still warm even given the cold ambient temperature outside at the time.

79.     The Affiant took possession of the evidentiary items and later transported and later submitted the evidentiary items to the KBI for analysis. The Affiant received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 6 and having a net weight of 82.95 grams.

80.     On 11/30/2012, Detective Alvin Babcock was contacted by SOI #1. It is unclear if **Albert Banks** was conversing with SOI #1 or if SOI #1 overheard a conversation **Albert Banks** was having with someone else (on 11/30/2012) but SOI #1 told Detective Alvin Babcock that **Anthony Banks** had eluded "them" (Detective Alvin Babcock and someone else) on 11/29/2012.

81.     On 11/29/2012, Detective Alvin Babcock and Detective Angie Weeks were in his unmarked police vehicle when they observed **Albert Banks** driving a silver in color Dodge Stratus in the 1200 block of north Jefferson Street in Junction City, Geary County, KS. Detective Alvin Babcock turned his police vehicle around in an attempt to follow **Albert Banks** and obtain the vehicle tag number displayed on the vehicle he was driving. **Albert Banks** turned east into an alleyway and continued at a high rate of speed indicated to Detective Alvin Babcock by the cloud of dust in the alleyway. Detective Alvin Babcock then observed **Albert Banks** run to a residence located at 126 W. 12th

27

Street.  Detective Alvin Babcock was able to observe the tag number on the grey in color Dodge Stratus which was 214 EBL.  Detective Alvin Babcock knows this vehicle to belong to Barbara Shaw.  Detective Alvin Babcock is aware from previous law enforcement contact and recent CI conversation that Barbara Shaw (AKA "Smiley") is heavily ingesting crack cocaine at the residence located at 126 ½ W. Chestnut Street in Junction City, Geary County, KS.

82.    SOI #1 also told Detective Alvin Babcock a person SOI #1 knows as "Ace' (known to Detective Alvin Babcock as Adrian Muse) was in Junction City, Geary County, KS on 11/29/2012 and was observed with **Anthony Thompson**.  This was the first time SOI #1 had met "Ace" (Adrian Muse).  SOI #1 had received information indicating Adrian Muse had been "raided" (search warrant executed at his residence) by the "Feds" (Federal Law Enforcement Officers) and a stolen firearm was located.  SOI #1 was told the "feds" issued Adrian Muse a citation for being in possession of the stolen firearm and then told Adrian Muse something about the "Cartel" and therefore Adrian Muse is frightened the Cartel is looking for him.  SOI #1 also advised he/she believed **Anthony Thompson** had been supplied cocaine by Adrian Muse in the past but since Adrian Muse had been "raided" by the "Feds", he hadn't supplied **Anthony Thompson** with cocaine.

83.    It should be noted, the Affiant is aware of a search warrant which had been executed at a residence located at 18921 W. 160th Terrace in Olathe, Johnson County, KS on 10/24/2012 (residence of Adrian Muse) in which a large digital scale, a Springfield Armory Xd-40 pistol (which was found to have been reported as stolen), an Apple I-phone, one (1) firearm magazine and nine (9) rounds of Springfield 40 caliber ammunition were seized.  This information/documentation is in reference to Olathe Police Department case number 2012-0016325.

84.    SOI #1 also told Detective Alvin Babcock that SOI #1 had heard **Anthony Thompson** had recently drove to Kansas City (no indication whether it was Kansas City, KS or Kansas City, MO) to obtain more cocaine for conversion to crack cocaine and ultimately for distribution.  **Anthony Thompson** met with an unknown cocaine supplier who he gave $3,000.00 in US Currency to purchase the cocaine.  The unknown supplier stole the $3,000.00 from **Anthony Thompson**.

85.     SOI #1 believed **Anthony Thompson** and **Albert Banks** were to be obtaining two (2) ounces of cocaine on this day but it was unknown where they were going to obtain it and who they were to obtain it from.

86.     SOI #1 also told Detective Alvin Babcock that **Albert Banks** allegedly moved to a residence located behind a residence Caress Jackson resided at. Detective Alvin Babcock believes Caress Jackson to reside at 235 E 3rd Street in Junction City, Geary County, KS. Detective Alvin Babcock knows **Albert Banks** and Caress Jackson have a child together.

87.     On 01/22/2013, CI #1 contacted **Anthony Thompson** in reference to purchasing crack cocaine from him on 01/23/2013 at approximately 11:30 AM. **Anthony Thompson** stated he would not be out of school classes until 12:00 PM. CI #1 asked him if they could meet at approximately 12:30 PM to which **Anthony Thompson** agreed. **Anthony Thompson** asked CI #1 if he/she wanted "a whole one" referring to one (1) ounce of crack cocaine to which CI #1 replied "yes". CI #1 asked **Anthony Thompson** if he/she could purchase the ounce of crack cocaine for $1,275.00. **Anthony Thompson** replied, "I can't swing it right now buddy. Ain't no possible way". CI #1 asked if he/she could purchase it for $1,300.00 and at approximately the same time, **Anthony Thompson** stated "whole, 14. It's going to be worth it though". CI #1 was trying to negotiate a lower price for the ounce of crack cocaine but **Anthony Thompson** stated the price would be higher and wanted $1,400.00 for it. The conversation continued ending with the two of them agreeing to meet on 01/23/2013 at approximately 12:30 PM.

88.     On 01/23/2013, CI #1 met with Agents/Officers and made a controlled phone call to **Anthony Thompson**. CI #1 asked **Anthony Thompson** if he was ready to meet and **Anthony Thompson** said he was just getting out of school. **Anthony Thompson** went on to say, "Gotta get everything ready. I got it ready" referring to preparing the crack cocaine for distribution and then stated he had it prepared. CI #1 asked **Anthony Thompson** where he wanted to meet at and **Anthony Thompson** stated they could meet at the Taco Bell in approximately one (1) hour.

89.     Approximately one (1) hour later, CI #1 called **Anthony Thompson** once again. **Anthony Thompson** said, "On my way there now buddy". CI #1 asked **Anthony Thompson** if he wanted CI #1 to proceed to the meeting location. **Anthony Thompson**

29

said, "No, I'm coming from Manhattan. I'll meet you on the edge (referring to the east side of Junction City, Geary County, KS), that gas station by Wal-Mart (referring to the Shell Travel Center located at 821 East Chestnut Street in Junction City, Geary County, KS)". CI #1 asked, "The truck stop" to which **Anthony Thompson** replied, "I'm about two or three (2 or 3) minutes out" and the conversation ended. The Affiant gave CI #1 $1,400.00 in US Currency to purchase the crack cocaine.

90.     CI #1 drove to the agreed upon location and waited for **Anthony Thompson** to arrive. **Anthony Thompson** eventually arrived in a vehicle being driven by a black male whom Detective Alvin Babcock identified as Michael Asbury. **Anthony Thompson** entered into the passenger side of the vehicle CI #1 was driving and the $1,400.00 was exchanged for the ounce of crack cocaine. CI #1 asked **Anthony Thompson** for a phone number for **Albert Banks** as CI #1 had been trying to contact **Albert Banks** but the phone number CI #1 had for **Albert Banks** was not in working order anymore. **Anthony Thompson** said the phone number for **Albert Banks** was **(785) 375-6704**. CI #1 and **Anthony Thompson** then departed. CI #1 was followed to a pre-determined location where CI #1 met with Agents/Officers once again. CI #1 gave the Affiant a clear plastic baggie with an off white chunky substance in it.

91.     The Affiant took possession of the evidentiary item and later transported and later submitted the evidentiary item to the KBI for analysis. The Affiant received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 7 and having a net weight of 27.22 grams.

92.     CI #1 contacted **Albert Banks** via cellular telephone at telephone number (785) 375-6704. It should be noted this phone number was collected from a telephone being used by Patricia Foy on 12/29/2012 and was listed in the contacts of the phone memory as "AB" which is an alias for **Albert Banks**. **Albert Banks** answered and Detective Alvin Babcock recognized the voice as that of **Albert Banks**. CI #1 asked **Albert Banks** to meet him/her as CI #1 stated he/she had some clothes for **Albert banks** to look at. They agree to meet at the Dollar General Store located at the intersection of Chestnut and Franklin Streets in Junction City, Geary County, KS. CI #1 drove to the aforementioned location and a person arrived whom Detective Alvin Babcock identified as **Albert Banks**. **Albert Banks** arrived in a gold in color vehicle bearing Kansas license

tag 181DMY.  The vehicle was found to be registered to a 2001 Buick Century with Robert Thomas Keeley of 6826 Meade Loop Fort Riley, KS listed as the owner.  After CI #1 and **Albert Banks** were finished conversing, CI #1 met with Agents/Officers once again at which time CI #1 stated he/she conversed with **Albert Banks** in reference to purchasing crack cocaine and **Albert Banks** told CI #1 to contact him anytime CI #1 was ready and he could receive crack cocaine from him thus indicating this phone belonging to **Albert Banks** is being used for the distribution of illegal drugs.

93.     On 02/13/2013, CI #1 met with the Affiant and other Agents/Officers in reference to purchasing crack cocaine from **Albert Banks**.  CI #1 contacted **Albert Banks** at telephone number (785) 375-6704 and the two (2) agreed to meet at the Dollar General Store located at 201 S. Franklin Street in Junction City, Geary County, KS.  CI #1 told **Albert Banks** he/she wanted to purchase one (1) ounce of crack cocaine from him to which **Albert Banks** agreed.  CI #1 arrived at the location and approximately 30 minutes later, CI #1 contacted **Albert Banks** who said he was en route to the location.  Approximately 35 minutes later, **Albert Banks** arrived and met with CI #1.  This transaction was recorded on a covert electronic audio/video device.  **Albert Banks** got into the passenger side of the vehicle CI #1 was driving and shortly thereafter a white female approached **Albert Banks.  Albert Banks** told the white female, who was later identified as Kari Stutheit, to get back into her vehicle (which was a silver in color Mitsubishi Eclipse) to which she did.  The transaction between CI #1 and **Albert Banks** ensued at which time **Albert Banks** told CI #1 the quantity of crack cocaine would be cheaper in price ($1,250.00) as it was "3 off" meaning the weight was 25 grams instead of the 28 grams earlier agreed upon.  The transaction concluded and CI #1 left the location to meet with the Affiant.

94.     **Albert Banks** was observed getting out of CI #1's vehicle by SSA Amanda Young and KBI TFA Vidal Campos.  They observed **Albert Banks** approach the white female earlier identified as Kari Stutheit sitting in the vehicle she drove to this location in.  SSA Amanda Young and TFA Vidal Campos observed what they described as a hand-to-hand transaction between Kari Stutheit and **Albert Banks**.  This refers to **Albert Banks** selling Kari Stutheit crack cocaine.

31

95.     Surveillance members observed **Albert Banks** enter into a dark in color Ford Focus bearing Kansas license tag 781FDR which was registered to Karen Johnson. Detective Alvin Babcock stated he notes Karen Johnson as being involved in the drug trade in Junction City, Geary County, KS area.

96.     When CI #1 met with the Affiant, he/she gave the Affiant the evidentiary item he/she purchased from **Albert Banks.** This was described as a clear plastic baggie containing an off white substance. The Affiant took possession of the evidentiary item and later completed an Evidence Custody Receipt and signed the item over to SSA Amanda Young to transport to the KBI Evidence Control Center to be held for analysis.

97.     The Affiant received a Forensic Laboratory Report stating cocaine base was detected in Lab Item 8 and having a net weight of 24.63 grams.

## CONFIDENTIAL SOURCES

98.     To date, there are two cooperating individuals (CI's) that have been developed and assisting in the investigation. Only one of the CI's has been able to infiltrate this organization actively. This particular CI has been able to make purchases of crack cocaine from only certain persons involved in this organization. Multiple crack cocaine purchases have been made beginning with small amounts of crack cocaine with progressively larger purchases being made up to three ounces in quantity. Although this particular CI has been able to gain limited trust from these individuals, the full scope of the organization, the persons involved and the source of supply have not been identified as is doubtful this information will be identified due to the guarded nature of the distribution ring and the source of supply. Early within the investigation, it was hoped purchasing larger quantities of crack cocaine would afford law enforcement the ability to identify the source of supply but as of this date, that has not been available as **Anthony Thompson** and **Albert Banks** have been able to supply the quantities requested therefore it is the belief of law enforcement that the source of supply would not identified to law enforcement utilizing this traditional means of investigation. Others within this distribution organization will likely never be identified as the CI has reached the upper

echelon of this organization therefore others distributing crack cocaine for **Anthony Thompson** and **Albert Banks** will likely not ever be identified to this CI.

99.     The other CI has indicated an unwillingness to be identified or testify in court for fear of his/her physical safety. Fear not only of **Anthony Thompson** and **Albert Banks,** but also of others associated with the organization. This CI is unwilling to make purchases from any of the individuals and therefore provides limited information related to this organization.

100.     A person whom has been identified as a Source of Information has been developed but once again has very limited knowledge of the organization therefore making it difficult to corroborate all the information the SOI is receiving. Much of the information the SOI receives is dated information as it is learned by the SOI after the fact. This SOI has also indicated an unwillingness to be identified or testify in court for fear of his/her physical safety

101.     No other cooperating individuals have been developed and none are anticipated to be developed to assist in this investigation due to the inherent risks of bodily harm that persons have expressed may occur if they were to assist in the arrest of **Anthony Thompson, Albert Banks** or any of their co-conspirators. Due to the structure and loyalty of the members of this organization, it is unlikely that any other CI's can, or will be, developed from those who associate with or are members of this organization.

## PEN REGISTER INFORMATION AND ANALYSIS

102.     To further the investigation, Pen Register was initiated on the target phone number **(785) 226-1783** pursuant to a Kansas Court Order. The Affiant was aware **Anthony Thompson** used the telephone for illegal drug transactions, as purchases CI #1 made from **Anthony Thompson** were arranged over the telephone. In January 2013, Affiant began receiving Pen Register information for the telephone number **(785) 226-1783,** for a period of time from 01-07-2013 to 02-22-2013. The subscriber information was obtained through the official phone provider business records. This particular phone is what is known as a Pre-paid phone and is utilized through T-Mobile. The subscriber information indicated this phone was subscribed to Jason Roberts but the Affiant knows

it to be used by **Anthony Thompson** through this investigation.  This type of phone service does not require a positive identification by the subscriber prior to the authorization.   Although **Anthony Thompson** hasn't had this telephone number throughout this entire investigation, this is the telephone number he is utilizing at this time and the telephone number the Pen Register was initiated on.

103.    The Pen Register for the 47 days indicated 6,919 total phone calls and 770 text messages were recorded.  Of the 6,919 total phone calls; 5,607 were incoming calls with 1,285 outgoing and 28 unknown to the phone number. The records show 283 separate phone numbers were either dialed or dialed into the target phone number. The average number of calls/text messages per day was 164.  The average length of incoming call in duration was 33 seconds and the average length of outgoing call in duration was 1 minute and 25 seconds which does not include text messages sent or received as those means of communication do not record any minute usage. The Affiant is aware through experience and training that many calls involving illegal drug transactions are of short duration. The short duration of those phone calls occurring on the target phone is indicative of illegal drug transactions.

104.    Of the 283 phone numbers only 150 of them have been identified, or are believed to have been identified, thus far in the investigation.  Of these 150 identified phone numbers, 31 are registered to businesses that have no names of actual persons attached to the subscriber information.  Of the remaining 119 phone numbers that have been identified, 80 of the known, or believed to be identified, subscribers named are known associates of **Anthony Thompson** and/or have past arrests for narcotics violations.

## TELEPHONE SUBSCRIBER INFORMATION OF INTEREST

105.    On 01/07/2013, a Pen Register was initiated on telephone number **(785) 226-1783**. The following phone numbers, frequency of calls/text messages, and subscriber information is detailed below. This is not an inclusive list, but a list of frequently dialed numbers and criminal information related to the subscriber; or in some cases the person believed to be actually utilizing the particular telephone as some of the

34

phone numbers subpoenaed had no subscriber attached to the phone. This is indicative of a pay-as-you-go type phone, which do not require a person to list their actual name and in some cases no name or identification at all is required to activate the phone. In some cases, the phone was in the name of a person (as the subscriber) which was other than the actual person using the phone.

106.   The phone number **(785) 317-1281** was indicated a total of 509 times from 01/07/2013 to 02/20/2013. The subscriber information shows this phone registered to Jalisa Carson, B/F DOB 0⬛⬛⬛⬛1988, who resides at 2035 Fort Riley Boulevard, Manhattan, Kansas.   Jalisa Carson reported suspicious activity at the aforementioned address on 01/11/2013 and provided law enforcement with this phone number as belonging to her. Jalisa Carson resides with **Anthony Thompson** and they have a child together. Jalisa Carson has the following criminal history indicating arrests. 06/18/2004 Contempt of court indirect X2. 07/14/2004 Battery. 07/16/2004 Probation violation. 01/21/2007 Aggravated assault; battery; operating a motor vehicle without a valid license.

107.   The phone number **(785) 375-6704** was indicated a total of 368 times from 01/07/2013 to 02/20/2013. The subscriber information shows this phone registered to no name but is known, through this investigation to belong to **Albert Banks**, B/M ⬛⬛⬛⬛ 12/23/1981 who has been detailed throughout this affidavit. It is unknown where **Albert Banks** currently resides and throughout this investigation it has been determined **Albert Banks** moves from location to location and doesn't reside at any one location as a permanent residence. **Albert Banks** has the following criminal history for arrests as an adult. 02/08/2002 driving while license cancelled, suspended, revoked and operating a motor vehicle without a valid license.   03/15/2004 sale, etc. depress/stimulants/hallucinogen/ steroids within 1000' of a school; criminal use of weapons; sale, offer depressants/hallucinogen/stimulants/anabolic steroids; obstructing legal process in a felony case; no drug tax stamp for marijuana or controlled substance. 03/25/2004 aggravated battery; criminal threat; kidnapping; aggravated intimidation of a witness or victim. 09/25/2004 use or possess drug paraphernalia to introduce in human body; possession of depressant/stimulants/hallucinogenics/steroids; 09/29/2004 attempt to use or possess drug paraphernalia to introduce in human body; attempt possession of

depressants/stimulants/hallucinogenics/anabolic steroids. 02/10/2005 sale etc. of opiates, opium or narcotic drugs. 09-29-2007 Possession of depressant/stimulants/hallucinogenics/steroids. 10/25/2007 Possession of depressant/stimulants/hallucinogenics/steroids; Possession of opiates, opium or narcotic drugs; Possession of hallucinogenic; Sale, offer depressant/hallucinogenics/stimulants/anabolic steroids; no drug tax stamp for marijuana or controlled substance; Possession of simulated controlled substances or drug paraphernalia. 08/01/2011 Aggravated Assault; Conspiracy criminal damage to property; criminal possession of a firearm by felon; Felony/drug conviction firearm used in crime. 04/21/2012 Felony criminal possession of a firearm; aggravated assault. 06/21/2012 Contempt of court. 07/25/2012 Failure to appear

108.    The phone number **(785) 307-6308** was indicated a total of 282 times from 01/07/2013 to 02/19/2013. The subscriber information shows this phone registered to, or believed to be used by, Christina Peters (Snyder), B/F XXXXXXXXXXX0. Christina Peters has the following criminal history indicating arrests. 09/30/2010 Possession depressant/stimulant/hallucinogen/anabolic steroid; Use/possess with intent to use drug paraphernalia into human body; theft of services; failure to appear.

109.    The phone number **(785) 210-5082** was indicated a total of 334 times from 01/07\2013 to 02\20\2013. This phone number was subpoenaed and found to be a TracFone with no listed person as the subscriber.

110.    The phone number **(785) 418-4926** was indicated a total of 249 times from 01/08/2013 to 02/20/2013. This phone number was subpoenaed and indicated this is a prepaid telephone with no subscriber information available.

111.    The phone number **(785) 317-7682** was indicated a total of 293 times from 01/08/2013 to 02/20/2013. The subscriber information shows this phone registered to Angela Foy, W/F XXXXXXXXXXX but is believed to be used by Patricia Foy (Park), W/F DOB 06/12/1965. Patricia Foy has the following criminal history indicating arrests. 02/28/2002 Possession of opiates, opium or narcotic drugs; possession of depressants/stimulants/hallucinogenics/anabolic steroids; possession of controlled substances or drug paraphernalia. 05/15/2002 Possession of opiates, opium or narcotic drugs; possession of simulated controlled substances or drug paraphernalia. 06/27/2006

Possession of opiates, opium or narcotic drugs. 03/14/2007 theft. 08/24/2007 Sale etc. of opiates, opium, or narcotic drugs; possession of paraphernalia to grow, distribute marijuana. 07/29/2008 Conspiracy to aiding a felon; conspiracy theft; burglary. 08/06/2008 Probation violation. 06/27/2009 Domestic battery; disorderly conduct; criminal restraint. 09/22/2011 Possession of opiates, opium or narcotic drugs; possession of simulated controlled substances or drug paraphernalia. 12/29/2011 Theft. It should be noted; Patricia Foy was arrested on December 29, 2012 by the Junction City Police Department and was in possession of a cellular telephone (believed to be the phone having this telephone number but not confirmed) which had telephones numbers for **Anthony Thompson** and **Albert Banks** which are the same telephone numbers mentioned in this affidavit. Other phone numbers for persons involved in this investigation were also found within the cellular telephone which indicates association between Patricia Foy, **Anthony Thompson, Albert Banks**, and others mentioned in this investigation. Some of the persons phone numbers found in the phone were; Jason Dixon, Richard Verkerke, Sammy Pleas, Delantis Hairston, Linnie Sanders, Jason Roberts (which was the name used as the subscriber for the phone in the possession of **Anthony Thompson**), Charles Foster, Gevonni Davis, Kenneth Wayne Bellamy, Akwete Burd and Felix Jenkins.

112.    The phone number **(785) 492-0122** was indicated a total of 257 times from 01\18\2013 to 02\20\2013. This phone number was subpoenaed and found to be a TracFone with no listed person as the subscriber.

113.    The phone number **(785) 375-3822** was indicated a total of 177 times from 01/09/2013 to 02/20/2013. The subscriber information shows this phone registered to Michael Asbury, B/M ⬛⬛⬛⬛⬛⬛⬛⬛ Michael Asbury has the following criminal history indicating arrests. 02/01/2005 Theft; possession of opiates, opium or narcotic drugs; possession of simulated controlled substances or drug paraphernalia. 08/05/2005 Probation violation.

114.    The phone number **(610) 504-8826** was indicated a total of 213 times from 01\12\2013 to 02\19\2013. This phone number was subpoenaed with Janice Rodriguez, W/F ⬛⬛⬛⬛⬛⬛⬛ listed as the subscriber. No criminal history could be located for Janice Rodriguez.

37

115.    The phone number **(785) 307-2456** was indicated a total of 179 times from 01/19/2013 to 02/21/2013.  The subscriber information shows this phone registered to Akwete Burd, B/F DOB XXXXXXXXX  This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Who Johnny.  Akwete Burd has the following criminal history indicating arrest.  07/20/1999 Transfer firearm without background check to prohibited person.  08/01/1999 Theft-take/use/transfer movable property without consent.  08/28/1999 Drugs - 1st degree - sale - 50 kilos or more marijuana/25     kg     in     zone.     03/24/2011     Driving     while     license cancelled/suspended/revoked.     05/11/011     Driving     while     license cancelled/suspended/revoked.     08/07/2011     Driving     while     license cancelled/suspended/revoked.     08/23/2011     Driving     while     license cancelled/suspended/revoked.     09/24/2011     Driving     while     license cancelled/suspended/revoked.   11/14/2011 Failure to appear.  02/03/2012 Failure to appear.  02/08/2012 Probation violation.  On 04/18/2012, Akwete Burd facilitated a purchase of crack cocaine to a Riley County Police Department CI but was not charged in the case for unknown reasons (RCPD case #12-017984).  06/13/2012 Failure to appear X2; probation violation.  10/01/2012 Failure to appear X3.

116.    The phone number **(785) 307-2624** was indicated a total of 178 times from 01/08/2013 to 02/20/2013.  The subscriber information shows this phone registered to Carmean Ridley, B/F DOB XXXXXXXXX No criminal history was located for this subscriber.  It is not known whether this person is using the phone or has obtained the phone for use by someone else.

117.    The phone number **(785) 375-7607** was indicated a total of 166 times from 01/08/2013 to 02/21/2013.  The subscriber information shows this phone registered to Audrey Nelson, B/F DOB XXXXXXXXX Audrey Nelson has the following criminal history indicating arrests.   12/09/1995 Forgery.   06/30/1996 Worthless checks; forgery. 02/22/1997 Possession of cocaine; possession of drug paraphernalia.  03/28/2001 Sale etc. of opiates/opium or narcotic drugs; conspiracy to sale opiates/opium or narcotic drugs.   04/16/2002 Delivery/manufacture simulated controlled substance.   04/17/2002 Possession of paraphernalia to grow, distribute marijuana; no drug tax stamp; sale of opiates, opium or narcotic drugs; possession of marijuana.  06/03/2003 Conspiracy to

38

possession of opiates, opium or narcotic drugs; conspiracy to criminal possession of a firearm; conspiracy to possess depressants/stimulants/hallucinogenics/steroids; conspiracy to possess simulated controlled substances/drug paraphernalia. 12/30/2003 Contempt of court, indirect.

118. The phone number **(785) 477-8766** was indicated a total of 152 times from 01\07\2013 to 02\18\2013. This phone number was subpoenaed and found to be a TracFone with no listed person as the subscriber.

119. The phone number **(239) 676-4132** was indicated a total of 108 times from 01\13\2013 to 01\20\2013. This phone number was subpoenaed with no information available as to the subscriber.

120. The phone number **(785) 761-7975** was indicated a total of 202 times from 01/09/2013 to 02/21/2013. The subscriber information shows this phone registered to Norma Mohammed, B/F DOB XXXXXXXX. No criminal history was located for this subscriber. It is not known whether this person is using the phone or has obtained the phone for use by someone else.

121. The phone number **(816) 527-7803** was indicated a total of 172 times from 01/07/2013 to 02/20/2013. The subscriber information shows this phone registered to Zachary Patmon, B/M DOB XXXXXXXX. The phone number **(785) 226-2611** was indicated a total of 36 times from 01\07\2013 to 02\15\2013. This number was also associated with Zachary Patmon. Zachary Patmon has the following criminal history indicating arrests. 04/13/1969 Attempted robbery. 06/08/1969 Aggravated assault. 02/17/1971 AWOL UCMJ. 06/17/1977 Pimping. 02/08/1978 Aid and abet sale of cocaine. 04/11/1982 Carrying a concealed weapon. 05/08/1984 Criminal use of weapons. 04/08/1990 2 counts sale of cocaine; 2 counts unlawful use of a communication facility; no drug tax stamp. 09/20/1990 Unlawful use of a communication facility. 09/12/1991 Obstructing legal process or official duty. 08/17/1991 Disorderly conduct. 11/12/1991 Failure to appear. 11/30/1991 Battery against a law enforcement officer; obstructing legal process or official duty; disorderly conduct. 01/09/1992 Failure to appear. 01/07/1993 Failure to appear. 01/08/1993 Failure to appear. 01/30/1993 Battery. 04/24/1993 Fail to comply with bond restrictions; disorderly conduct. 04/29/1993 Battery against a law enforcement officer; obstructing

legal process or official duty.  10/02/1994 Falsely reporting a crime.  10/02/1994 Failure to appear.  05/17/1996 Possession of cocaine.  07/13/1996 Possession of cocaine; possession of cocaine with the intent to sell; possession of marijuana.  09/12/2000 Parole violation.  12/19/2000 failure to appear.  04/12/2001 Failure to appear.  01/07/2002 Probation violation.  12/31/2002 Failure to appear.  01/30/2003 Failure to appear.  02/05/2003 Failure to appear.  01/07/2005 Probation violation.  01/30/2005 Failure to appear on misdemeanor charge; possession of opiates, opium or narcotic drugs; possession of controlled substances or drug paraphernalia.  05/24/2012 Driving while license cancelled/suspended/revoked; failure to appear.

122.    The phone number **(785) 307-6416** was indicated a total of 110 times from 01/13/2013 to 02/19/2013.  The phone number **(785) 579-6738** was indicated 5 times from 01/19/2013 to 02/01/2013.    The subscriber information shows these phones registered to Lisa Austin, W/F XXXXXXXXXXXXXX Lisa Austin has the following criminal history indicating arrests. 09/15/1987 Grand larceny.  08/15/1994 Possession of cocaine.  01/26/1995 Criminal use of a financial card.  01/15/1996 Felony theft.  02/21/1996 Probation violation.  02/29/1996 Probation violation.  06/06/1996 Failure to appear; probation violation.  09/29/1996 Probation violation.  03/13/1997 Probation violation.  05/22/1997    Failure    to    appear.        12/20/1997    Possession    of depressant/stimulants/hallucinogenics/steroids.  02/05/1998 Contempt of court, indirect.  02/05/1998 Probation violation.  11/22/1999 Embezzlement.  09/28/2001 Probation violation.  02/21/2002 Possession of opiates. Opium or narcotic drugs; possession of controlled substances or drug paraphernalia.  11/01/2003 Failure to appear.  03/09/2006 Sale etc. of opiates, opium or narcotic drugs' no drug tax stamp.  03/15/2006 Possession of paraphernalia to grow, distribute marijuana; possession of opiates, opium or narcotic drugs; possession of stimulants/hallucinogenics/steroids.  07/15/2006 Violation of a protective order.  11/26/2006 Probation violation.  11/28/2006 Failure to appear.  04/04/2007 Probation violation.  04/05/2007 Failure to appear.  03/10/2008 Obstructing legal process or official duty; transporting open container.  04/05/2007 Failure to appear.  08/27/2011 Public intoxication.

123.    The phone number **(785) 307-2000** was indicated a total of 158 times from 01/08/2013 to 02/20/2013.  The subscriber information shows this phone registered to

Kriste Lienberger, W/F DOB XXXXXXXX. Kriste Lienberger has the following criminal history indicating arrests. 03/08/1995 Battery. 10/24/1997 Forgery. 10/02/2003 Delivery manufacture drug paraphernalia other; possession of simulated controlled substances or drug paraphernalia; attempted sale of opiates, opium or narcotic drugs. 10/06/2006 Use or possess drug paraphernalia to introduce in human body. 06/01/2007 Failure to appear. 12/20/2007 Domestic battery against a family household member; criminal damage to property. 05/15/2008 Probation violation. 05/15/2008 Failure to appear. 09/18/2008 Criminal threat. 10/08/2008 Probation violation. 01/15/2009 Failure to appear. 02/15/2009 Failure to appear. 08/04/2009 Failure to appear. 09/08/2009 Failure to appear.

124.    The phone number **(785) 375-0822** was indicated a total of 116 times from 01/07/2013 to 02/20/2013. The subscriber information shows this phone registered to Kelly Vargas, W/F DOB XXXXXXXX. Kelly Vargas has the following criminal history indicating arrests. 09/05/2004 Driving under the influence of alcohol or drugs. 07/11/2006 Obstructing legal process in misdemeanor case; disorderly conduct. 09/10/2006 Possession of depressant/stimulants/hallucinogenics/steroids. 09/21/2006 Sale of opiates, opium or narcotic drugs. 11/09/2006 Probation violation. 11/15/2006 Warrant arrest. 04/28/2012 Driving under the influence of alcohol or drugs.

125.    The phone number **(785) 375-6137** was indicated a total of 99 times from 01/09/2013 to 02/16/2013. The subscriber information shows this phone registered to Johnny Dunlap but the JCPD confirmed the user of the phone to be Angela Dunlap, B/F DOB XXXXXXXX Angela Dunlap has the following criminal history indicating arrests. 06/07/2007 Driving while license cancelled/suspended/revoked; possession of depressant/stimulants/hallucinogenics/steroids; possession of opiates, opium or narcotic drugs. According to JCPD, Angela Dunlap has been seen in the past and recently frequenting known and suspected residences which are believed to be distributing illegal narcotics.

126.    The phone number **(785) 579-5462** was indicated a total of 90 times from 01/07/2013 to 02/19/2013. The subscriber information shows this phone registered to Jerry Ruble but the JCPD confirmed the user of the telephone to be Claudette Ruble, B/F DOBXXXXXXXX Claudette Ruble has no current criminal history indicating arrests.

127.    The phone number **(785) 512-0882** was indicated a total of 61 times from 01/26/2013 to 02/02/2013.  The subscriber information shows this phone registered to Lynn Murphy.  No monikers or criminal history were located for Lynn Murphy.  The JCPD was unaware of anyone by that name located at the address received from the subpoena request.  It is unknown if this subscriber information is correct or if this particular person is actual.

128.    The phone number **(785) 238-3262** was indicated a total of 84 times from 01/07/2013 to 02/20/2013.  The subscriber information shows this phone registered to Pamela Thompson, B/F DOBXXXXXXXXXXX Pamela Thompson has the following criminal history indicating arrests.  08/20/1999 Possession of controlled substances or drug paraphernalia; possession of depressant/stimulants/hallucinogenics/steroids.

129.    The phone number **(785) 307-2209** was indicated a total of 108 times from 01/07/2013 to 02/20/2013. The phone number **(785) 431-8707** was indicated a total of 64 times from 01/22/2013 to 02/20/2013.  The subscriber information shows these phones registered to Ella Haymon, B/F DOB XXXXXXXXXXand Jose Garcia W/M DOB XXXXXXXXXX Ella Haymon was listed as a suspect in a 2006 JCPD case (06-20215) involving Sale or distribution of drugs and drug possession.

130.    The phone number **(785) 438-0895** was indicated a total of 93 times from 01/11/2013 to 02/19/2013.  The subscriber information shows this phone registered to James Smith, W/M DOB XXXXXXXXX.  James Smith has the following criminal history indicating      arrests.          06/02/1995          Possession          of depressant/stimulants/hallucinogenics/steroids;   Possession   of   simulated   controlled substances or drug paraphernalia; criminal use of weapons; fleeing or attempting to elude a LEO; driving under the influence of alcohol or drugs.

131.    The phone number **(913) 548-9570** was indicated a total of 90 times from 01\11\2013 to 02\20\2013.  This phone number was subpoenaed and found to be a Prepaid phone with no listed person as the subscriber.

132.    The phone number **(785) 717-9863** was indicated a total of 54 times from 01/08/2013 to 02/17/2013.  The subscriber information shows this phone registered to Mandi Ashmore, W/F DOB XXXXXXXXX  No criminal history was located for Mandi

Ashmore. It is unknown if this subscriber information is correct or if this particular person is the actual person using the phone.

1.      The phone number **(816) 308-0145** was indicated a total of 52 times from 02\01\2013 to 02\13\2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

2.      The phone number **(785) 210-7607** was indicated a total of 49 times from 01/08/2013 to 02/21/2013. The subscriber information shows this phone registered to Anthony Smith, B/M DOB XX/XX/XXXX. Anthony Smith has the following criminal history indicating arrests. 11/21/2007 Possession of paraphernalia to grow, distribute marijuana; possession with the intent to sell, sale, etc. within 1000' of school property; possession of depressants/stimulants/hallucinogenics/steroids; possession of opiates, opium or narcotic drugs. 03/27/2008 Contempt of court, direct. 08/29/2008 Contempt of court, direct.

3.      The phone number **(785) 317-0406** was indicated a total of 57 times from 01/08/2013 to 02/18/2013 and the phone number **(785) 341-5161** was indicated 4 times on 01/18/2013. The subscriber information shows these phones registered to Angel Brown, W/F DOB XX/XX/XXXX. Angel Brown has the following criminal history indicating arrests. 11/19/2004 Disorderly conduct; criminal threat. 12/18/2008 Driving under the influence of alcohol or drugs 3rd conviction. 11/28/2009 Driving under the influence of alcohol or drugs; driving while license suspended; endangering a child <18 yoa. 05/19/2011 Probation violation.

4.      The phone number **(785) 210-9873** was indicated a total of 44 times from 01/07/2013 to 02/13/2013. The subscriber information shows this phone registered to Lamont Hill (believed to be Lemont Hill), B/M DOB XX/XX/XXXX. Lemont Hill has the following criminal history indicating arrests. 05/30/1987 2 counts sale of cocaine; 1 count delivery of cocaine. 06/03/1987 Sale of cocaine. 07/21/1987 Sale of cocaine; conspiracy to sell cocaine. 04/01/1994 Parole violation. 09/05/1994 Battery; criminal use of a weapon; aggravated weapons violation; possession of stolen property. 11/15/1994 Criminal threat. 03/04/2001 Criminal threat; domestic battery. 11/14/2004 Battery. 06/29/2005 Failure to appear on a misdemeanor. 09/22/2005 Failure to appear on a misdemeanor. 12/13/2005 Forgery. 09/25/2006 Probation violation. 01/08/2008

Probation violation. 02/06/2009 Probation violation. Lemont Hill was listed as a suspect in a 2010 JCPD case (10-09428) involving the sale/distribution/cultivation of opiates. opium, narcotic drugs or designated stimulants.

5.      The phone number **(785) 307-0127** was indicated a total of 60 times from 01\10\2013 to 02\20\2013. This phone number was subpoenaed and found to be a TracFone with no listed person as the subscriber.

6.      The phone number **(954) 649-5125** was indicated a total of 88 times from 01/08/2013 to 02/21/2013. The subscriber information shows this phone registered to John Dichiarra but the investigation has shown the phone to be used by Gevonni Davis, B/M DOB XXXXXXXX This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Javontae. Gevonni Davis has been indicated earlier in this affidavit as to his involvement in distribution of crack cocaine with **Anthony Thompson**, Martye Madkins III and CI #1. Gevonni Davis has the following criminal history indicating arrests. 12/31/2000 Giving a worthless check. 03/12/2004 Unlawful removal of theft detection device. 01/06/2012 Making false information; theft. 05/14/2012 Failure to appear.

7.      The phone number **(785) 317-3106** was indicated a total of 47 times from 01\31\2013 to 02\15\2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

8.      The phone number **(785) 307-9731** was indicated a total of 64 times from 01/09/2013 to 02/19/2013. The subscriber information shows this phone registered to Felix. It is believed the phone is being used by Felix Vinson, B/M DOB XXXXXXXX according to the JCPD. This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Felix as well. Felix Vinson has the following criminal history indicating arrests for. 09/30/1995 Driving while license suspended or revoked; willful obstruction of law enforcement officers. 05/30/2002 Breaking and/or entering (felony) with force; larceny after break/enter $200.00 and up. 08/26/2002 Larceny misdemeanor $50.00 - $199.00. 01/03/2003 Unauthorized use of a motor vehicle; possession of drug paraphernalia; carrying a concealed weapon - other; driving while license revoked. 09/19/2003 Unauthorized use of a motor vehicle; fugitive/extradition other state. 09/07/2004 Extradition/fugitive other state. 11/21/1989

Felony theft; conspiracy to commit theft - felony.  05/21/1990 Warrant arrest.
07/21/1991 Probation violation.  09/26/1991 Burglary unknown structure; theft value
unknown.  03/30/1992 Attempted burglary unknown structure.  12/15/1992 Contempt of
court indirect.  04/04/1993 Driving under influence of alcohol or drugs; transporting an
open container.  05/28/1993 Contempt of court indirect.  07/16/1993 Prison inmate under
control of Kansas DOC; theft; attempted burglary unknown structure.   04/24/1994
Sale/etc., opiates, opium or narcotic drugs.  11/25/1994 Driving under influence of
alcohol or drugs.    03/05/1995 Failure to appear.    03/05/1995 Possession of
depressant/stimulants/hallucinogenics/steroids; Possession of opiates, opium or narcotic
drugs; Possession of simulated controlled substances or drug paraphernalia.  03/16/1995
Possession of depressant/stimulants/hallucinogenics/steroids;  Possession of opiates,
opium or narcotic drugs.  10/26/1995 Failure to appear.  05/27/1996 Driving while
license      cancelled/suspended/revoked.        08/17/1996      Possession      of
depressant/stimulants/hallucinogenics/steroids;   Possession   of   simulated   controlled
substances or drug paraphernalia. 09/16/1996 Probation violation. 01/29/1997 Failure to
appear.    07/07/2003 Possession of paraphernalia to grow, distribute marijuana;
Possession of depressants/stimulants/hallucinogenics/anabolic steroids.    12/08/2003
Aggravated failure to appear.  12/15/2003 Failure to appear.  12/23/2003 Possession of
stolen property value over $500.00.   03/08/2004 Obstructing legal process or official
duty.     02/17/2004 Failure to appear.     03/08/2004 Obstructing legal process in
misdemeanor case; theft.  10/14/2004 Theft value $25,000.00 to <$100,000.00; probation
violation; failure to appear.  11/18/2004 Probation violation.  12/22/2004 Prison inmate
under control of Kansas DOC Possession of paraphernalia to grow, distribute marijuana.
11/15/2007 Operating a motor vehicle without valid license; Possession of opiates, opium
or narcotic drugs.  04/27/2008 Contempt of court indirect.   05/19/2009 Forgery;
attempted theft; criminal use of weapons.  09/16/2009 Aggravated assault; possession of
simulated controlled substances or drug paraphernalia.  04/15/2010 Probation violation.
04/29/2010 Probation violation.  12/18/2010 Probation violation.  03/22/2012 Failure to
appear.  11/06/2012 Obstructing legal process in misdemeanor case; criminal trespass.

     9.      The phone number **(785) 375-6921** was indicated a total of 40 times from
01/08/2013 to 02/18/2013.  The subscriber information shows this phone registered to

Sheilaa Scott, B/F DOB XX/XX/X9XX.  Sheilaa Scott has the following criminal history indicating arrests.      01/07/1989 Aggravated assault on law enforcement officer. 10/08/1994 Worthless checks.   04/10/1995 Four (4) counts forgery.   10/30//1997 Criminal threat; violation of conditions of bond.  03/03/1998 Theft by deception; making false writing.  08/17/1998 Obstruction.  02/11/1999 Possession of controlled substance. 08/26/1999 Worthless check and Failure to appear.   12/15/2000 Probation violation. 01/23/2001 Theft and forgery.   08/18/2001 Theft and three (3) counts of forgery. 12/03/2001 Probation violation. 04/07/2003 Probation violation.  07/03/2004 Violation of a protective order; criminal damage to property.   08/21/2004 Violation of a protective order; intimidation of a victim or witness; criminal damage to property.   08/31/2004 Forgery; theft.   05/13/2005 Probation violation.   10/01/2005 Probation violation. 05/19/2006 Harassment by telephone and Terroristic threat.   06/22/2006 Probation violation.   08/04/2007 Criminal threat; violation of a protective order; harassment by telephone. 08/30/2007 Violation of a protective order. 10/01/2011 Aggravated battery.

10.    The phone number **(614) 753-8572** was indicated 38 times from 02/19/2013 to 02/20/2013.  The phone number was subpoenaed with no subscriber information available indicating the subscriber did not have to provide any identification to activate the phone.

11.    The phone number **(785) 762-4708** was indicated a total of 31 times from 01/07/2013 to 02/20/2013.  The phone number is believed to be associated with Adrian Miller, B/M DOB XX/XX/XX/XX   Adrian Miller has the following criminal history indicating arrests. 11/12/2005 Sale or possession with the intent to sell hallucinogen; use or possess drug paraphernalia to introduce into the human body; no drug tax stamp for marijuana or controlled substance.  03/10/2006 obstructing legal process in misdemeanor case; resist arrest.    08/14/2010 Criminal trespass; obstructing legal process in misdemeanor case. 05/08/2011 Domestic battery; criminal damage to property.

12.    The phone number **(785) 209-4664** was indicated a total of 48 times from 01/09/2013 to 02/20/2013.  The subscriber information shows this phone registered to D'ana Eskridge, B/F DOB XX/XX/XX/XX  D'ana Eskridge has no criminal history and it is believed someone else is using the telephone which is subscribed in her name.

46

13.    The phone number **(785) 317-2298** was indicated a total of 29 times from 01/17/2013 to 02/12/2013.  The subscriber information shows this phone registered to Craig Tolliver, B/M XXXXXXXXXXXX  Craig Tolliver has the following criminal history indicating arrests.   12/21/1991 Mob Action.   04/06/1992 Possession of controlled substances.   12/28/1992 Possession of cannabis.   12/26/2007 Driving while license cancelled/suspended/revoked.         04/05/2008      Driving      while      license cancelled/suspended/revoked.   05/02/2011 Failure to appear.   07/16/2011 Domestic battery.  08/01/2012 Domestic Battery.  09/16/2012 Probation violation.

14.    The phone number **(785) 226-6474** was indicated a total of 34 times from 01/10/2013 to 02/20/2013.  The subscriber information shows this phone registered to Casey Francis, B/F DOB XXXXXXXX.  Casey Francis has the following criminal history indicating arrests.   09/12/2000 Possession of simulated controlled substances or drug paraphernalia; possession of depressant/stimulants/hallucinogencis/steroids; possession of opiates, opium or narcotic drugs.  05/26/2002 Domestic battery.  08/09/2002 Failure to appear.   04/03/2003 Criminal threat; aggravated battery.   08/08/2003 Criminal threat; criminal damage to property <$500.00; Theft; aggravated battery; Burglary.  06/13/2005 Driving under influence of alcohol or drugs; transporting an open container.  07/30/2005 Driving while license cancelled/suspended/revoked.   08/26/2005 Driving while license cancelled/suspended/revoked.   11/08/2005 Failure to appear.   12/03/2005 Failure to appear.   12/10/2005 Probation violation.   01/10/2006 Failure to appear.   01/19/2006 Driving while habitual violator.   01/25/2007 Possession of opiates, opium or narcotic drugs; possession of controlled substances or drug paraphernalia; Possession of depressant/stimulants/hallucinogenics/steroids.     03/10/2007    Theft    <$1000.00. 12/09/2007 Theft; burglary; criminal damage to property.  02/02/2008 Battery against a law enforcement officer; Obstructing legal process or official duty; Disorderly conduct. 03/20/2008 Driving while license cancelled/suspended/revoked.   08/14/2009 Driving while   license   cancelled/suspended/revoked.         08/26/2012   Possession opiates/opium/narcotic drug and certain stimulants; Driving while habitual violator.

15.    The  phone  number  **(573)  842-8756**  was  indicated  34  times  from 01/07/2013 to 02/16/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

16.     The phone number **(785) 223-3236** was indicated 31 times from 01/09/2013 to 01/18/2013. The phone number was subpoenaed and listed as a TracFone with no subscriber information available indicating the subscriber did not have to provide any identification to activate the phone.

17.     The phone number **(785) 210-9767** was indicated 31 times from 01/10/2013 to 01/29/2013. The phone number was subpoenaed and listed as a TracFone with no subscriber information available indicating the subscriber did not have to provide any identification to activate the phone.

18.     The phone number **(785) 307-8787** was indicated a total of 47 times from 01/16/2013 to 02/21/2013. The subscriber information shows this phone registered to Charles Sarvis B/M DOB XX/XX/XX. Charles Sarvis has the following criminal history indicating arrests.     03/20/1974 Criminal possession of a controlled substance. 05/01/1977 Assault 3rd degree. 09/01/1978 False statement on bank credit applications; Fraud bank loans.

19.     The phone number **(785) 375-3247** was indicated a total of 22 times from 01/12/2013 to 01/30/2013. The subscriber information shows this phone registered to Shenna Bronson, B/F DOB XX/XX/XX  Shenna Bronson was arrested on 11/30/2012 for Domestic battery. No other criminal history was located for Shenna Bronson.

20.     The phone number **(785) 307-4471** was indicated 22 times from 01/12/2013 to 01/19/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

21.     The phone number **(785) 320-1331** was indicated 21 times from 01/18/2013 to 02/10/2013. The phone number was subpoenaed and listed as a TracFone with no subscriber information available indicating the subscriber did not have to provide any identification to activate the phone.

22.     The phone number **(785) 226-3233** was indicated 20 times from 01/12/2013 to 02/18/2013. The phone number was subpoenaed and listed as a T-Mobile prepaid phone with no subscriber information available indicating the subscriber did not have to provide any identification to activate the phone.

23.     The phone number **(785) 201-6457** was indicated 19 times from 01/19/2013 to 02/20/2013. The subscriber information shows this phone registered to

Willie Pleas B/M DOB XX/XX/XXXX   Willie Pleas has not been fully identified thus far in this investigation therefore no criminal history is available.  It's also not known if Willie Pleas is the actual user of the phone or if he has provided it to someone else for their use.

24.    The phone number **(785) 307-8346** was indicated a total of 26 times from 01/07/2013 to 02/08/2013.  The subscriber information shows this phone registered to Charles with no last name provided.  Charles is believed to be Charles Foster according to JCPD records.  This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Charles as well.   Charles Foster has the following criminal history indicating arrests.  06/15/1991 Possession of opiate, opium or narcotic drugs.  09/11/1992 Sale etc. opiates, opium or narcotic drugs.  01/20/1995 Sale etc. opiates, opium or narcotic drugs; no drug tax stamp.  04/19/2001 possession of simulated controlled substances or drug paraphernalia; possession of paraphernalia to grow, distribute marijuana.  03/04/2003 Possession of simulated controlled substances or drug paraphernalia;  possession  of  opiates,  opium  or  narcotic  drugs;  possession  of depressant/stimulants/hallucinogenics/steroids.  12/18/2008 Conspiracy to possess with the intent to sell, sale, etc. within 1000' of a school; attempt to arrange sale/purchase using communication facility for drug; no drug tax stamp for marijuana or controlled substance.  On 08/31/2012, CI #1 made a purchase of crack cocaine from Charles Foster and **Anthony Thompson**.

25.    The phone number **(785) 307-3214** was indicated 26 times from 01/25/2013 to 02/02/2013.  The phone number was subpoenaed and listed as a TracFone with no subscriber information available indicating the subscriber did not have to provide any identification to activate the phone.

26.    The phone number **(785) 375-3222** was indicated a total of 204 times from 01/08/2013 to 02/20/2013.  The subscriber information shows this phone registered to Nance with no last name provided.  According to the JCPD this phone is used by Jason Dixon.  This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Nance as well.  On 09/27/2012, CI #1 had cellular telephone contact with Jason Dixon B/M DOB XX/XX/XXXX using telephone number (785) 375-3222 at which time, Jason Dixon sold CI #1 crack cocaine.  Jason Dixon has the following criminal history indicating arrests.  10/14/1999 Aggravated battery; rape.  03/14/2000

Attempt to commit aggravated criminal threat causing loss >$500.00<$25,000.00. 07/24/2000 Criminal threat.  04/30/2002 Probation violation.  08/01/2002 Failure to appear.   10/07/2002 Failure to appear.   3/28/2003 Battery; possession of depressant/stimulants/hallucinogenics/steroids.   03/06/2004 Domestic battery. 04/14/2004 Failure to appear on a misdemeanor.  05/13/2004 Failure to appear. 12/27/2004 failure to appear on a misdemeanor.  03/05/2005 Domestic battery. 03/25/2005 failure to appear.  05/02/2005 Domestic battery.  05/24/2005 Aggravated battery.  07/26/2005 Violation of a protective order.  10/13/2005 Probation violation. 11/07/2005 Violation of a protective order.  11/14/2005 Probation violation.  05/25/2006 Failure to appear on a misdemeanor; probation violation.   09/07/2006 Probation violation. 09/29/2006 Disorderly conduct. 05/31/2008 Failure to appear X2; aggravated failure to appear; probation violation. 08/16/2011 Failure to appear. 02/17/2012 Failure to appear.

27.     The phone number **(785) 307-8995** was indicated a total of 81 times from 02/01/2013 to 02/02/2013.  The subscriber information shows no name associated with this phone but as of 12/06/2012, the JCPD has this phone associated with and used by Felicia Austin W/F XXXXXXXXX.   Felicia Austin has the following criminal history indicating arrests.  09/06/2001 Battery.  10/03/2007 Disorderly conduct.  03/02/2009 Theft of services misdemeanor.  03/02/2009 Battery; disorderly conduct.  03/07/2009 Theft of services $1000.00 to <$25000.00.  06/10/2010 Obstruction or impeding of lawful activities. 01/02/2012 Failure to appear.

28.     The phone number **(785) 317-0425** was indicated a total of 69 times from 01\08\2013 to 02\14\2013.  The subscriber information shows this phone registered to Jalisa Carson B/F DOB XXXXXXXX however it is believed Kathy Carson B/F DOB 06/03/1954 (the mother of Jalisa Carson) may be using this telephone.  Kathy Carson has the following criminal history indicating arrests.  04/16/1996 Possession of cocaine with the intent to sell; possession of drug paraphernalia; obstruction of official duty; possession of marijuana.

29.     The phone number **(785) 226-7159** was indicated a total of 54 times from 01/18/2013 to 02/20/2013.  The subscriber information shows this phone registered to Susan Wilson W/F DOB XXXXXXXX.  According to the JCPD this phone is used by

50

Richard Verkerke W/M DOB 07/06/1971. This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Rich as well. Richard Verkerke has the following criminal history indicating arrests. 06/23/2005 Assault. 06/07/2006 Failure to appear. 12/23/2008 Driving while a habitual violator; transporting an open container. 01/14/2009 Drive a commercial vehicle while driving privileges are suspended. 06/21/2009 Driving while a habitual violator; driving under the influence of alcohol or drugs; transporting an open container. 01/07/2010 Falsely reporting a crime. 07/03/2012 Assault of a law enforcement officer; possession of controlled substances or drug paraphernalia.

30.     The phone number **(785) 210-4812** was indicated a total of 40 times from 01/08/2013 to 02/18/2013. The subscriber information shows no name associated as the subscriber. According to the JCPD this phone is used by Barbara Jones Smith B/F DOB XXXXXXXX. Barbara Jones Smith has the following criminal history indicating arrests. 04/10/1998 Possession cocaine; possession drug paraphernalia; criminal use of a weapon; aggravated assault. 03/28/1999 Worthless check; failure to appear. 01/23/2001 2 counts of probation violation. 09/08/2004 Aggravated battery. 11/19/2004 Driving under the influence of alcohol or drugs. 06/29/2005 Driving while license cancelled/suspended/revoked; attempt to flee or attempt to elude LEO; obstruction legal process or official duty, resist arrest. 10/22/2006 Battery against a law enforcement officer; disorderly conduct X2. 06/01/2007 Driving under the influence of alcohol or drugs. 08/13/2007 Following another vehicle too closely; driving under the influence of alcohol or drugs. 01/22/2008 driving under the influence of alcohol or drugs; driving while license cancelled/suspended/revoked. 08/04/2009 Failure to appear. 11/01/2010 Sale etc. of opiates, opium or narcotic drugs X2. 05/12/2011 Probation violation.

31.     The phone number **(785) 492-0965** was indicated a total of 43 times from 01/11/2013 to 02/20/2013. The subscriber information shows this phone registered to R Rusty. This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as R Rusty as well. The JCPD is unaware of any persons using the name R Rusty at this time.

32.     The phone number **(785) 375-0314** was indicated a total of 22 times from 01/09/2013 to 02/07/2013. The subscriber information shows this phone registered to

Kimberly Reese B/F DOB XXXXXXXX   No criminal history was found for Kimberly Reese.

33.     The phone number **(785) 307-5231** was indicated 22 times from 01/28/2013 to 02/05/2013.  This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

34.     The phone number **(785) 776-6876** was indicated a total of 29 times from 01/08/2013 to 02/12/2013.  The subscriber information shows this phone registered to Jack Lindley W/M DOB XXXXXXXX   Jack Lindley has the following criminal history indicating arrest.  04/10/2006 Possession of simulated controlled substances or drug paraphernalia; opiates, opium or narcotic drugs unlawful acts.  04/17/2006 Probation violation.  07/10/2006 Aggravated intimidation of a witness or victim; solicitation to corruptly influence a witness.  09/25/2006 Attempted perjury, false statement in a felony trial; possession of opiates, opium or narcotic drugs; attempted aggravated intimidation of a witness or victim; criminal threat.  03/27/2012 Failure to appear.

35.     The phone number **(785) 226-1283** was indicated a total number of 37 times from 01/08/2013 to 01/30/2013.  The subscriber information shows this phone registered to Wig.  This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Wig as well.  According to the JCPD, this person is also known as Linnie Sanders B/M DOB XXXXXXXX.  Linnie Sanders has the following criminal history indicating arrests.  04/28/2001 Possession of marijuana <= 5 pounds >4 ounces.     10/19/2001   Escape   from   custody.     08/01/2004   Possession   of depressant/stimulants/hallucinogenics/steroids.  01/10/2006 Battery; Criminal damage to property.  01/31/2006 Battery; Criminal damage to property.  03/09/2006 Sale etc. of opiates, opium or narcotic drugs.

36.     The phone number **(785) 492-0098** was indicated a total of 19 times from 01/07/2013 to 01/18/2013.  The subscriber information shows this phone registered to prepaid customer with no actual name associated as subscriber.  According to the JCPD this phone is used by Joyce Burroughs W/F DOB XXXXXXXX.  Joyce Burroughs has the following   criminal   history   indicating   arrests.     05/04/2000   Trafficking   in methamphetamine; possession of marijuana; drug paraphernalia buy/possess.  11/08/2000 Burglary.   10/03/2001 Trafficking in methamphetamine; possession of controlled

substance. 01/09/2002 Trafficking controlled substance methamphetamine; possession of controlled substance.

37.     The phone number **(785) 379-1543** was indicated a total of 18 times from 01/07/2013 to 01/09/2013. The subscriber information shows this phone registered to Sylvester Jackson B/M DOB XXXXXXXX. Sylvester Jackson has the following criminal history indicating arrests. 04/05/1995 Aggravated assault; battery; criminal possession of a firearm; burglary; criminal damage to property; theft. 08/30/1995 Aggravated assault; battery; criminal possession of a firearm. 03/05/1996 Aggravated intimidation of a witness or victim. 03/06/1996 Aggravated intimidation of a witness or victim. 04/02/1996 Probation violation. 04/24/1996 Criminal damage to property. 07/11/1996 Stalking; criminal damage to property. 07/15/1996 Criminal damage to property. 07/06/1998 Disorderly conduct; criminal damage to property. 09/01/1998 Battery. 06/05/1999 Obstructing legal process in misdemeanor case; Possession of depressant/stimulants/hallucinogenics/steroids; Possession of opiates, opium or narcotic drugs. 05/12/2000 Possession of opiates, opium or narcotic drugs. 04/04/2002 Obstructing legal process in misdemeanor case. 10/04/2005 Obstructing legal process or official duty. 06/26/2006 Possession of depressants/stimulants/hallucinogenics/anabolic steroids; Possession of simulated controlled substances or drug paraphernalia. 07/09/2006 Domestic battery; criminal threat. 01/08/2007 Aggravated failure to appear. 10/07/2007 Failure to appear. 07/14/2008 Disorderly conduct. 09/07/2008 Possession of marijuana <2 OZ. 11/22/2008 Failure to appear.

38.     The phone number **(785) 209-8842** was indicated a total of 16 times from 01/10/2013 to 01/25/2013. The subscriber information shows this phone registered to John Brown B/M DOB XXXXXXXX. John Brown has the following criminal history indicating arrests for. 09/06/1999 required obedience to lawful order of police officer or fireman. 05/07/2003 Domestic battery. 01/22/2004 Probation violation. 02/20/2004 Failure to appear. 05/14/2004 Possession of simulated controlled substance or drug paraphernalia. 12/16/2004 Weapon offense - prohibited person possession firearm. 05/10/2005 Possession of depressant/stimulants/hallucinogenics/steroids. 10/19/2005 Possession of a firearm by a prohibited person. 02/17/2008 Failure to appear X2.

05/06/2009 Failure to appear.   06/09/2010 Failure to appear.   03/08/2011 Failure to appear.

      39.    The phone number **(785) 236-9728** was indicated a total of 17 times from 01/21/2013 to 02/18/2013.   The subscriber information shows this phone registered to Jeny J Mart.   According to the JCPD this phone is used by Michael Warren B/M DOB XXXXXXXX.   Michael Warren has the following criminal history indicating arrests. 06/17/1994 Aggravated burglary.   02/05/2000 Obstructing legal process in felony case; criminal possession of paraphernalia.   05/05/2000 Possession of paraphernalia to plant, harvest marihuana plants.   07/28/2003 Failure to appear.

      40.    The phone number **(785) 375-7937** was indicated a total of 42 times from 01/11/2013 to 02/20/2013.   The subscriber information shows this phone registered to Dana Pleas but it is believed the user to be Sammy Pleas B/M DOB XXXXXXXX.   This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Sammy as well.   Sammy Pleas has the following criminal history indicating arrests.   09/05/1979 Disorderly conduct.   02/14/1980 Battery; prostitution.   10/03/1989 Criminal damage to property; disorderly conduct; terroristic threat.   08/06/1990 Battery. 12/05/1990 Probation violation.   04/26/1991 Fail to comply with terms of probation; terroristic threat; aggravated assault.   11/27/1992 Criminal trespass.   03/24/1993 Battery; disorderly conduct.   06/26/1993 Disorderly conduct; criminal damage to property. 09/30/1993 Criminal threat.   08/16/1994 Failure to appear.   11/27/1994 Public intoxication.   01/12/1995 Failure to appear.   02/07/1995 Failure to appear.   04/07/1995 Failure to appear.   04/17/1995 Failure to appear.   11/30/1995 Failure to appear. 01/31/1996 Probation violation.   06/17/1996 Failure to appear.   07/18/1996 Probation violation.   10/24/1996 Failure to appear.   02/15/1998 Theft.   03/25/1998 Theft. 07/01/1998 Failure to appear.   07/18/1998 Rape; aggravated battery; criminal threat. 09/19/1998 Theft; criminal use of weapons.   10/02/1998 Aggravated robbery. 11/02/1998 Probation violation.   03/13/2001 Aggravated criminal threat causing loss of >$25,000.00; domestic battery.   03/23/2001 Burglary; theft; criminal damage to property. 06/29/2001 Battery; disorderly conduct.   02/11/2004 Probation violation.   11/17/2004 Disorderly conduct.

41.     The phone number **(785) 307-8447** was indicated a total of 15 times from 01/07/2013 to 02/15/2013.  The phone number **(785) 307-5992** was indicated 1 time on 01/18/2013.  The subscriber information shows both these phones registered to Dorian Bivins (AKA Dwight Bivins) B/M DOB XX/XX/XXXX Dwight Bivins has the following criminal history indicating arrests. 01/04/2001 Probation violation; obstructing legal process in felony case.  04/01/2002 Failure to appear.  08/28/2003 Failure to appear. 04/13/2004 Possession of opiates, opium or narcotic drugs; possession with the intent to sell,    sale    etc.    within    1000'    of    school    property;    knowingly    intentionally receiving/acquiring proceeds from uniform controlled substances; no drug tax stamp for marijuana    or    controlled    substance.        04/07/2005    Driving    while    license cancelled/suspended/revoked.   12/15/2005 Probation violation.   03/14/2006 Probation violation.  08/25/2006 Probation violation.  10/02/2006 Sale etc. of opiates, opium or narcotic drugs.

42.     The phone number **(785) 580-3843** was indicated a total of 15 times from 01/08/2013 to 02/15/2013.  The phone number **(785) 477-8961** was indicated 6 times from 01/08/2013 to 02/07/2013.  The subscriber information shows both these phones registered to Alvarez Cruz.  According to the JCPD, (785) 477-8961 is being used by Michael Harris B/M DOB XX/XX/XXXX as Monica Walker has been calling this number while incarcerated in the Geary County Jail and Michaels Harris has been answering the telephone.  Michael Harris was reportedly with Monica Walker on a day when she was arrested for possession of cocaine.  Michael Harris has the following criminal history indicating arrests. 02/11/1977 Burglary.  05/18/1977 Burglary and stealing.  08/22/1977 Burglary; stealing.  10/11/1977 Forgery.  02/03/1978 Burglary; stealing.  04/23/1982 Theft.    06/02/1982 Failure to appear.    07/01/1982 DUI; disorderly conduct; open container.    10/19/1983 Possession of controlled substance.    07/16/1984 Obtaining prescription drugs for re-sale.  08/08/1984 Obtaining prescription drugs by fraudulent means for resale.    10/09/1984 Obtaining prescription drugs by fraudulent means. 05/20/1985 Burglary.    07/17/1985 Burglary.    09/16/1985 Probation violation. 09/06/1988 Obtaining prescription drugs by fraudulent means.    01/23/1992 DUI. 09/22/1994 Employment sec fraud.  11/11/2012 Driving under the influence of alcohol or

drugs. 11/23/2012 Driving under the influence of alcohol or drugs; transporting an open container.

43.    The phone number **(856) 650-7734** was indicated 14 times from 02/01/2013 to 02/02/2013. The subscriber information shows this phone registered to Arthur Williams, BM DOB XXXXXXXX Arthur Williams has the following criminal history indicating arrest. 04/06/2006 Possession of marijuana/hash.

44.    The phone number **(785) 789-2019** was indicated 14 times from 02/19/2013 to 02/20/2019. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

45.    The phone number **(785) 512-0333** was indicated 14 times from 02/15/2013 to 02/20/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

46.    The phone number **(317) 348-9959** was indicated 14 times from 01/22/2013 to 01/31/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

47.    The phone number **(785) 307-2923** was indicated 14 times from 02/12/2013 to 02/18/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

48.    The phone number **(316) 264-3031** was indicated 13 times from 01/10/2013 to 01/20/2013. The subscriber information shows this phone registered to Rujeana Davis, B/F DOB XXXXXXXX Rujeana Davis has the following criminal history indicating arrest. 09/04/1973 Theft. 10/02/1994 Failure to appear. 06/05/2008 Burglary; theft.

49.    The phone number **(785) 762-2370** was indicated a total of 16 times from 01/10/2013 to 02/18/2013. The phone number **(785) 375-1838** was indicated 14 times from 01/14/2013 to 02/13/2013. The subscriber information shows both these phones registered to Charles B/M DOB XXXXXXXX and Olivia Humphreys (AKA Big O) B/F DOB 09/10/1955. Charles Humphreys has the following criminal history indicating arrest. 02/18/1972 Criminal use of weapons, carrying firearm concealed on one's person. Olivia Humphreys has the following criminal history indicating arrest. 11/03/1985

Driving under the influence of alcohol or drugs. 06/29/1990 liquor consumption in public places prohibited.

50. The phone number **(619) 213-9143** was indicated a total of 10 times from 01/18/2013 to 01/19/2013. The subscriber information shows this phone registered to Sonia. According to the JCPD this phone is used by Delantis Hairston B/M DOB XX/XX/XXXX who has an AKA of Toast. This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Toast as well. Delantis Hairston has the following criminal history indicating arrest. 02/26/2010 Possession of simulated controlled substances or drug paraphernalia; Possession of depressant/stimulants/hallucinogenics/steroids. 03/18/2011 Possession of hallucinogenic. 12/09/2011 Sale depressants, stimulants or hallucinogenic drugs within 1000' of a school. 01/17/2013 Probation violation. 02/13/2013 Failure to appear

51. The phone number **(316) 617-9894** was indicated a total of 10 times from 01/26/2013 to 02/09/2013. The subscriber information shows this phone registered to Wayne. According to the JCPD this phone is used by Kenneth Wayne Bellamy Jr. B/M DOB XX/XX/XXXX. This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Wayne as well. Kenneth Wayne Bellamy Jr. has the following criminal history indicating arrest. 06/21/1989 Burglary; theft. 04/03/2012 Conspiracy to robbery; driving under influence of alcohol or drugs. 05/03/2012 Failure to appear.

52. The phone number **(785) 375-0596** was indicated a total of 10 times from 01/16/2013 to 02/01/2013. The subscriber information shows this phone registered to Peggy Wearren B/F XX/XX/XXXX. Peggy Wearren has the following criminal history indicating arrest. 02/15/1995 Possession of cocaine; possession of drug paraphernalia. 03/12/1995 Battery; battery against law enforcement officer. 08/30/1995 Pedestrians under influence of alcohol or drugs. 08/23/1998 Disorderly Conduct. 02/03/2004 Possession of simulated controlled substances or drug paraphernalia; possession of opiates, opium or narcotic drugs. 04/13/2005 Probation violation. 02/11/2008 Deliver/manufacture of simulated controlled substances or drug paraphernalia' possession of opiates, opium or narcotic drugs. 04/17/2008 Contempt of court. 04/19/2008 Battery against City/County correction employee. 05/27/2008 Contempt of

court.  07/18/2008 Contempt of court.  12/23/2009 Probation violation.  05/30/2012 Criminal threat; assault; obstructing legal process or official duty.

53.     The phone number **(785) 579-5546** was indicated a total of 15 times from 01/07/2013 to 02/19/2013.  The subscriber information shows this phone registered to Oretha Robinson B/F DOB XX/XX/XXXX.  Oretha Robinson has the following criminal history indicating arrest.  03/07/1978 Possession of heroin.  09/12/1992 Aggravated battery.  09/23/2004 Driving under the influence of alcohol or drugs; driving while license cancelled /suspended/revoked.

54.     The phone number **(785) 727-5196** was indicated 15 times from 02/14/2013 to 02/20/2013.  The number was subpoenaed and found to be a T-Mobile pre-paid phone with no subscriber information attached to the phone number indicating the purchaser was not required to provide a name or any type of identification in order to activate the telephone.

55.     The phone number **(785) 209-8276** was indicated a total of 16 times from 01/25/2013 to 02/08/2013.  The subscriber information shows this phone registered to Larry Jackson.  According to the JCPD this phone is used by Cinderella Jackson B/F DOB XX/XX/XXXX.  Cinderella Jackson has the following criminal history indicating arrest.  03/11/2000 Possession of simulated controlled substances or drug paraphernalia; Conspiracy to possess simulated controlled substances/drug paraphernalia.  01/31/2008 Failure to appear.

56.     The phone number **(785) 307-8041** was indicated 10 times from 01/18/2013 to 02/14/2013.  The subscriber request had no information attached to it.  According to the JCPD this phone us used by Lisa Taylor B/F DOB XX/XX/XXXX.  Lisa Taylor has the following criminal history indicating arrests.  08/30/1991 Disorderly conduct.  01/13/1993 Sale of cocaine.  09/21/1994 Theft.  06/18/1995 Failure to appear.  04/17/1996 Forgery financial instrument.  08/13/1998 Obstructing legal process or official duty.

57.     The phone number **(785) 761-5075** was indicated 9 times from 01/15/2013 to 01/29/2013.  The subscriber information shows this phone registered to Mildred McNeil.  Mildred McNeil has the flowing criminal history indicating arrests for.  08/17/1998 Possession of cocaine.  03/24/2007 Driving under influence of alcohol or

drugs.  08/02/2008 Aggravated failure to appear.  06/18/2008 Delivery/manufacture drug paraphernalia to person <18yoa; Possession of opiates, opium or narcotic drugs; Endangering a child; Involves child <18 yoa.

58.     The phone number **(785) 375-1866** was indicated 7 times from 01/10/2013 to 02/14/2013.   The subscriber information shows this phone registered to Rosella Johnson B/F DOB XX/XX/X96X.   Rosella Johnson has the following criminal history indicating arrests for.    02/08/2008 Deliver/manufacture of simulated controlled substances or drug paraphernalia; Possession of opiates, opium or narcotic drugs; Possession of depressant/stimulants/hallucinogenics/steroids.   04/01/2008 Contempt of court.

59.     The phone number **(785) 477-8570** was indicated 7 times from 01/16/2013 to 01/22/2013. The subscriber information shows this phone registered to Mark.  This is the only information received from the subpoena request indicating the person only gave the first name of Mark when activating the phone.  This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Wayne as well. The JCPD has identified Mark as Gregory Mark Roberts B/M DOB XX/XX/X96X.  Gregory Roberts has the following criminal history indicating arrest.   11/07/1988 Abandonment of child (non support). 03/10/1990 Criminal trespass. 01/16/1991 Theft; obstruction of police; giving false name, address or birthdate to law enforcement officer; DUI. 01/24/1992 Driving while license suspended or revoked. 11/01/1992 Possession, manufacture, distribution, or sale of marijuana; giving false name, address or birthdate to law enforcement officer. 04-31/1994 Purchase/possess/control drug. 07/05/1994 Battery. 08/25/1997 Probation violation.   03/28/1997 Purchase/possess/control drug; willful obstruction of law enforcement officers; forgery; giving false name, address or birthdate to law enforcement officer.  11/08/1999 Violation of Georgia controlled substance act; giving false name, address or birthdate to law enforcement officer.   07/03/2002 Parole violation.   07/07/2004 Parole violation.   09/21/2005 Parole violation.   11/08/2008 Acquiring license plate for purpose of concealing identification of motor vehicle. 03/16/2011 Attempt to unlawfully manufacture, sell theft detection device; theft. 03/30/2012 Probation violation.  08/22/2012 Probation violation.  01/05/2013 Probation violation.

60.     The phone number **(785) 560-1919** was indicated 6 times on 01/19/2013. The subscriber information shows this phone registered to LaDonna (Smith) McCoy B/F DOB XX/XX/X96X.  This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Ladonna as well.  LaDonna (Smith) McCoy has the following criminal history to indicate arrests for.  02/28/1979 Promoting prostitution. 11/30/1983 Prostitution; obstructing legal process or official duty. 05/16/1986 Failure to appear.    09/18/1988 Theft.    09/19/1988 Theft.    09/29/1988 Probation violation. 05/22/1993 Prostitution.    02/15/1994 Theft.    01/13/1995 Prostitution.    01/13/1995 Obstructing legal process or official duty; theft.   01/21/1995 Theft; criminal trespass. 05/08/1995 Theft. 08/07/1995 Probation violation. 02/18/2000 Theft. 10/02/2001 Theft of services. 12/22/2001 Domestic battery. 06/26/2003 Theft by shoplifting. 04/20/2004 Burglary; criminal damage to property; theft. 02/24/2012 Failure to appear. 05/30/2010 Criminal damage to property. 07/14/2012 Failure to appear.

61.     The phone number **(785) 762-5346** was indicated 12 times from 01/21/2013 to 02\17\2013.  The subscriber information shows this phone registered to Lauren Hull B/F DOB XX/XX/XX/XX or Garland. The JCPD indicates the user of the phone to be Garland Hull B/M DOB 05/22/1963.  This phone number was found in Patricia Foy's phone when she was arrested on 12/29/2012 and listed as Garland as well.  Lauren Hull has the following criminal history to indicate arrests for.   11/24/2010 Theft of services; conspiracy to commit theft; unlawful removal of theft detection device. 07/20/2012 Domestic battery; possession of hallucinogenic drug; use possess with the intent to use drug paraphernalia into the human body. On 09/06/2012, CI #1 contacted Garland Hull at this telephone number and subsequently purchased Oxycodone and Clonazepam from him.  On 09/25/2012 CI #1 contacted Garland Hull at this telephone number once again, CI #1 purchased Oxycodone pills from Garland Hull.

62.     The phone number **(785) 307-1667** was indicated 12 times from 02/12/2013 to 02/15/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

63.     The phone number **(785) 210 9605** was indicated 12 times from 01/07/2013 to 02/18/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

64.     The phone number **(785) 317-0015** was indicated 12 times from 01/20/2013 to 02/14/2013. The subpoena results indicated this to be a T-Mobile pre-paid phone with no subscriber information available indicating the purchaser was not required to produce any identification or name to activate the phone.

65.     The phone number **(816) 308-7814** was indicated 12 times from 02/08/2013 to 02/09/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

66.     The phone number **(785) 210-9077** was indicated 11 times from 01/19/2013 to 01/26/2013. This phone number was subpoenaed but as of 02/22/2013, the subscriber information had not been obtained.

67.     The phone number **(785) 210-5030** was indicated 11 times from 01/30/2013 to 02/20/2013.   The subpoena response indicated there was no name associated with this telephone.

68.     The phone number **(785) 717-9028** was indicated a total of 81 times from 02/10/2013 to 02/21/2013. The subscriber information shows this phone registered to Elisa Davis, B/F DOB 06/29/1984.  Elisa Davis has the following criminal history for arrest.  01/02/2007 Criminal damage to property.

## FACTS AND CIRCUMSTANCES

69.     Based upon the Affiant's investigation and those of other law enforcement agencies, the following facts and circumstances are set forth.  The Affiant believes the investigation has revealed that **Anthony Thompson** and **Albert Banks** are involved in the distribution of illegal drugs and have been for quite some time. Given the amounts sold to CI #1 and the amounts of controlled substances available to sell (by their own admission), the Affiant believes **Anthony** Thompson and **Albert Banks** have been and will continue to be involved in an ongoing conspiracy to distribute illegal drugs. The conspiracy includes numerous persons named above and individuals both known and unknown. **Anthony Thompson** and **Albert Banks** continue to realize profits from the sale of controlled substances. Based on all the information the investigation has been able to gather thus far, it is the consensus of the law enforcement investigators that **Anthony**

**Thompson** and **Albert Banks,** in association with others, are involved in extensive illegal drug activity. This is evident by the sales of controlled substances to CI #1, observations made during those sales, and statements made by **Anthony Thompson** and **Albert Banks** to CI #1. **Anthony Thompson** told CI #1 on 10/03/2012 that he is purchasing approximately nine (9) ounces of cocaine per week for distribution. The sources of **Anthony Thompson** and **Albert Banks'** illegal drugs appear to come from Kansas City, Topeka and/or Wichita, KS. The actual source of the narcotics is unidentified thus far in the investigation. Earlier in the investigation, Investigators believed the illegal narcotics to come from the Kansas City area from a source known as Adrian Muse. It appears as though Muse may not be the source of supply lately due to the information obtained from SOI #1 who has indicated he/she has heard conversations stating this source is possibly not used at this time. Johnny Lee Ivory was believed to be a source of supply in the Topeka, KS area. Johnny Lee Ivory had not been located this investigation and it is unclear if he is still a source of supply. **Albert** Banks has been making tips to Wichita, KS recently as well but investigators do not know when he is going or with whom he is going. Therefore, the source of supply, if in fact it is in Wichita, KS, is still unknown. Thus this conspiracy extends to multiple regions of the State of Kansas and multiple jurisdictions with yet unidentified persons. **Anthony Thompson** and **Albert Banks** obviously have currency at their disposal without having any legal, gainful employment. Throughout this investigation, the quantity of illegal narcotics purchased by CI #1 has increased in an effort to purchase more than **Anthony Thompson** or **Albert Banks** could supply, thus forcing them to either introduce CI #1 to their supplier or take CI #1 with them to their supplier so CI #1 could purchase quantities which **Anthony Thompson** or **Albert Banks** could not produce. This investigative technique has failed to date. CI #1 has purchased as small of quantity of less than one (1) gram to as much as three (3) ounces, all the while being distributed by **Anthony Thompson** and/or **Albert Banks** working in conjunction with each other.

70.    Although **Anthony Thompson** has not always had this same telephone number (785-226-1783) throughout this investigation, he has had it for the majority of the investigation and currently uses this number to conduct illegal narcotic distribution at this time as indicative of the sells to CI #1. Those believed to be involved in the ongoing

conspiracy are continuing to use telephone number **(785) 226-1783** subscribed to Jason Roberts but used by **Anthony Thompson** to facilitate their illegal activities.

## GOALS OF THE INVESTIGATION

71.     It is the goal of the Law Enforcement personnel involved in this investigation to identify all persons involved in this operation whether they are in Kansas or any other state.  The identity of persons that are transporting, manufacturing and/or storing illegal drugs in Kansas is being and will continue to be pursued.   The identities and prosecution of the conspirators involved in the transportation, manufacturing, storing and distribution of illegal drugs to and from the state of Kansas is hoped to be achieved. Another goal of this investigation is to dismantle this organization that is under the control of **Anthony Thompson** and **Albert Banks**.  It is believed this organization is responsible for the distribution of large amounts of illegal drugs in Geary and Riley County, Kansas.  At this time, the clear scope of the organization, all the conspirators, their involvement and the amount of illegal drugs being distributed have not been identified.  Without the ability to monitor the phone belonging to **Anthony Thompson**, it is believed the full scope of the operation will not be disclosed nor will it be dismantled. While a prosecutable case has been made on **Anthony Thompson;** CI #1 is not able to breech the conspiracy to learn the role of all the players.  CI #1 is only able to make purchases from **Anthony Thompson, Albert Banks** and possibly a select few within the organization.    These purchases will not reveal the sources of supply, fruits, instrumentalities or assets of the distribution of illegal drugs, or the roles of other co-conspirators.   Without a wire interception the persons involved in this targeted distribution operation will be allowed to continue.

## NEED FOR WIRE INTERCEPTIONS

72.    Investigation to date has failed to disclose and prove the full scope of the targeted organization and the locations and sources of any and all supply sources currently being used by the subject(s) of this investigation.  Direct evidence linking the source of the supply to the flow of illegal drugs in the present conspiracy would be difficult, if not impossible, to obtain using standard investigative techniques.  This is evidenced by the fact CI #1 has not and will not be taken into the organization's full confidence and advised of the source or sources of the illegal drugs.

73.    Affiant believes the requested wire interception will produce the requisite information identifying and establishing a direct link to the sources and supply of the illegal drugs.  Based upon the combined experience of Affiant and all law enforcement personnel involved in this investigation based upon all of the facts set forth herein, it is the Affiant's belief that the interception of wire communications is the only available technique which has a reasonable likelihood of securing evidence demonstrating the scope of the illegal drug activity.

## OTHER INVESTIGATIVE PROCEDURES

74.    There are numerous investigative procedures, which are usually employed in an investigation of this type which have been tried and failed, or which reasonably appear unlikely to succeed if attempted. Other procedures which might reveal the scope of this conspiracy and those involved are simply too dangerous to employ, or would compromise the integrity of the investigation. Some of these procedures have been described above; others are stated below.

## A.   PHYSICAL SURVEILLANCE

75.     Physical surveillance has been utilized in this investigation and has proven to be of limited value. Although it has identified some activities and associates of the targets, physical surveillance – if not used in conjunction with other techniques, including electronic surveillance – is of limited value.   Physical surveillance, even if highly successful, does not always assist in gathering evidence of the criminal activity under investigation.  It is an investigative technique that is used to confirm meetings between alleged co-conspirators, but, in many cases, only leads investigators to speculate as to the purposes of these meetings, because the surveillance itself often proves association between the conspirators at a given time and place.  It is also a technique used to corroborate information obtained from cooperating individuals. Physical surveillance of alleged conspirators will not, however, conclusively establish the elements of the subjects' violations, and this technique has not, and most likely will not, establish the identities of all conspirators.  In addition, continued physical surveillance is not expected to enlarge information now available to substantiate the elements of criminal violations for which the state's application seeks to intercept wire communications.  Prolonged or regular surveillance of the movements of the suspects is instead likely to be noticed, causing the suspects to become even more cautious and secretive in their illegal activities, causing them to flee to avoid apprehension and prosecution causing a real threat to the safety of the CI and/or possibly compromising the investigation.  It must also be noted that the conspirators have utilized techniques to avoid being surveilled by law enforcement such as driving erratic or slower than all other traffic, making sudden stops or unexpected sudden turns while engaged in physical surveillance by law enforcement. It should also be noted that the conspirators have employed counter surveillance techniques such as having lookouts place themselves around buildings, vehicles and/or residences to watch for persons that continue to drive past or near the locations where suspected drug trafficking offenses are, or will be committed.   Finally, it is not possible to determine the full nature and scope of the aforementioned offenses by the use of simple physical surveillance, given the number of conspirators, the complexity of the criminal violations, the multi-jurisdictional locations and travels of some of the

conspirators, and the varying rolls played by the targets of this investigation. Officers of the Junction City Police Department and Kansas Bureau of Investigation agents have attempted to conduct surveillance in the vicinity of some of the residences mentioned in this investigation. Officers have seen individuals that were placed outside residences appearing to look for persons that were watching the residences.

## B.      COOPERATING INDIVIDUALS

76.     No cooperating individuals other than the ones aforementioned have been identified due to the mistrust the subjects have of individuals they are acquainted with or have conducted business with prior. Additional cooperating individuals have not been developed because of their apparent fear of the repercussions they would face if their identity were ever disclosed.

## C. UNDERCOVER AGENTS

77.     To date, no undercover Agents have been able to make purchases from any of those involved in this organization. It is the belief of law enforcement, any undercover person/s who may have the chance encounter of purchasing illegal narcotics from this group would have to do so at a very low level within the organization and would most likely never be given the opportunity to advance within the ranks of the organization to a place where the true conspiracy/conspirators would be identified. It is also the belief of law enforcement that the possibility of gaining the knowledge of the source of supply for this organization would not occur as the identity of this person/s have been kept secret throughout this investigation. The undercover agent would never be fully trusted and any further relevant information related to the scope of the illegal drug activity would never be known.

## D.  PEN REGISTERS

78. On 01/07/2013 a Pen Register was initiated on the target phone number
**(785) 226-1783** pursuant to a Kansas Court Order.  From 01/07/2013 to 02/22/2013 a
total of 7,689 calls/text messages were made into and out of **(785) 226-1783**. The Pen
register information demonstrates to the Affiant **Anthony Thompson** is using telephone
number **(785) 226-1783** to distribute controlled substances as demonstrated by, but not
limited to, the number of calls/text messages registered per day, the length of the phone
conversations and/or the parties calling or being called on phone number **(785) 226-1783**.
The Pen Register has demonstrated to the Affiant that the phone number **(785) 226-1783**
has been, is being and will continue to be used to communicate criminal activity
concerning the distribution of controlled substances by **Anthony Thompson** and his
associates.

## E.      USE OF JUDICIAL AND ADMINISTRATIVE SUBPOENAS

79.      Based upon Affiant's experience and conversations with other Agents and
Administration of the Kansas Bureau of Investigation as well as Officers and
Administration of the Junction City Police Department, who have considerable
experience in investigating these individuals, similar operations and violations of the law
such as these, it is the common consensus that the service of subpoenas to persons
believed to be involved in this conspiracy and their associates would not be successful in
achieving the stated goals of this investigation.  If any principals of this conspiracy, their
co-conspirators, or any other participants were approached to cooperate each and every
one would refuse to assist. This is especially true in this case, given the close ties among
the inner circle of conspirators and many of the principals. Many of the principals in this
investigation have been subjects of previous investigations and are aware of the
techniques used by law enforcement to garner information. Moreover it would be unwise
to afford any kind of immunity to such persons given that such immunity would not
guarantee truthful admissions concerning the scope of the illegal drug activity being
investigated. Additionally, service of subpoenas would alert the conspirators to the

67

existence of this investigation and prompt the targets to take measures to thwart it. Finally, participants in such a criminal enterprise are often reluctant to implicate others out of fear for their own safety or as a result of their loyalty to their fellow conspirators.

### F.   SEARCH WARRANTS

80.   The execution of search warrants in this investigation has been considered. The execution of search warrants involving principals of this investigation has been used in the past resulting in retrieval of a limited amount of controlled substances and records. Use of warrants alone is unlikely to reveal the total scope of the criminal operation, the identities of all conspirators, or the precise roles each plays within the conspiracy. It is extremely unlikely, given the history of this criminal organization, that the majority of the contraband controlled by the conspirators could be located at any given time unless electronic surveillance was employed. Affiant believes the execution of search warrants at this time would compromise the investigation and reveal the identities of those cooperating individuals.

81.   For the reasons set forth in the preceding paragraphs, normal methods of investigation have been attempted and failed, or reasonably appear unlikely to succeed, and/or are too dangerous to employ. At this time the only reasonable method of developing the necessary evidence of the above-listed violations is to intercept the wire communications of the subjects of this investigation. Such interceptions will reveal the details of this conspiracy involving the importation and distribution of controlled substances, possession with the intent to distribute controlled substances, and use of communication facilities to further these offenses, in violation of Kansas Law.

## MINIMIZATION

82.     All monitoring of wire communications will be conducted in such a way as to minimize the interception of communication.  Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Conversations, which are of a non-criminal or non-evidentiary nature, once minimized, will be spot-monitored in order to determine if the topic of the conversation has switched to a criminal or evidentiary nature.

83.     The interception of communications will be discontinued if the voice of one or more of the named interceptees is not identified as participating in the communication within a reasonable period of time, or in the case of conversations of others unknown which are of a non-criminal or non-evidentiary nature; spot-monitoring will be used to determine if conversations have switched to an evidentiary or criminal nature.   Monitoring will be conducted subject to the requirements to minimize interception of all non-pertinent communications.  All monitoring will be recorded.

## PERIOD OF INTERCEPTION

84.     Because of the continuing nature of the offenses as discussed above, it is further requested that authorization to intercept not automatically terminate when the types of communications described above are first obtained, but be permitted to continue until all wire communications are intercepted which fully reveal the manner in which the subjects of this investigation conduct and participate in the above-described offenses, and which reveal the full nature, scope and extent of the above-described offenses; the identities and roles of accomplices, aiders and abettors, co-conspirators, other participants in the offenses; the dispositions and locations of the proceeds from the offenses; and the types, existence and locations of all records and other physical evidence of the offenses.

Even if the objectives set forth in the preceding sentence have not been fully achieved, it is hereby requested that the court's order provide that authorization to intercept shall automatically terminate after thirty days, the thirty day period running from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under the court's order or ten days after the order is entered.

GLEN F. VIRDEN
Senior Special Agent
Kansas Bureau of Investigation

Sworn to before me and subscribed in my presence this ___5___ day of March, 2013.

Judge of the Geary County District Court
State of Kansas

70

THOMPSON

IN THE DISTRICT COURT OF GEARY COUNTY, KANSAS

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION ) | |
| OF THE STATE OF KANSAS ) | CASE NO. |
| FOR AN ORDER AUTHORIZING THE ) | |
| INTERCEPTION OF WIRE ) | UNDER SEAL |
| COMMUNICATIONS TO AND FROM ) | |
| T-MOBILE USA WIRELESS TELEPHONE: ) | |
| 785-226-1783 ) | |
| BEARING INTERNATIONAL MOBILE STATION ) | |
| IDENTIFICATION # (IMSI) 310260445955245 ) | |

### ORDER AUTHORIZING THE INTERCEPTION
### OF WIRE COMMUNICATIONS

Application under oath having been made before me by Steven L. Opat, Geary County Attorney,

based on the sworn affidavit of Glen F. Virden, Senior Special Agent, Kansas Bureau of

Investigations, an investigative or law enforcement officer of the State of Kansas within the meaning

of Section 5 of K.S.A. 22-2514, *et seq*, for an Order authorizing the interception of wire

communications pursuant to K.S.A. 22-2514, *et seq*, and full consideration having been given to the

matter set forth therein, the Court finds:

A.  there is probable cause to believe that Albert DeWayne Banks, DOB ███████ and Anthony

Carlyle Thompson, DOB █████, and others named in the affidavit of the said Glen F.

Virden, and others yet unknown (hereinafter "Target Subjects"), have committed, and are

committing, and will continue to commit offenses enumerated in Article 57 of K.S.A. 21-

5701 *et seq*, specifically possession of controlled substances with intent to distribute, and

distribution of controlled substances, in violation of K.S.A. 21-5701 *et seq*, specifically 21-

**EXHIBIT 5**

D000775

5705 and 5706, unlawful use of a communication facility to commit and facilitate the commission of drug trafficking offenses, in violation of K.S.A. 21-5707; attempts, conspiracies or solicitations to possess with intent to distribute or to distribute controlled substances, in violation of K.S.A. 21-5701 *et seq*, and K.S.A. 21-5301 and 21-5302 and 21-5304; unlawful acts involving proceeds derived from violations of K.S.A. 21-5701-5717. (Hereinafter the "Target Offenses");

B.    there is probable cause to believe that particular wire communications of the said Albert DeWayne Banks and the said Anthony Carlyle Thompson and others yet unknown (hereinafter "Target Interceptees"), concerning the above-described Target Offenses will be obtained through the interception for which authorization has herewith been applied. In particular, there is probable cause to believe that the interception of wire communications to and from the cellular telephone with the assigned telephone number 785-226-1783, bearing IMSI 310260445955245 with service provided by T-Mobile USA Wireless with subscriber listed as one Jason Roberts, although it is clear that the principal user is and has been identified as Anthony Carlyle Thompson, will further disclose, detail and reveal the specifics of the above offenses, including the depth of the conspiracy and the manner and means of how and with whom these offenses are being committed, including the unknown sources from which the distribution by Albert DeWayne Banks, Anthony Carlyle Thompson, and others is made possible;

C.    it has been established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ; and

D.    there is probable cause to believe that 785-226-1783 has been and will continue to be used in connection with commission of the above-described offenses.

WHEREFORE, IT IS HEREBY ORDERED that Special Agents of the Kansas Bureau of Investigation, and other agencies acting under the supervision of the KBI, are authorized, pursuant to an application as authorized by K.S.A. 22-2515, made by Steven L. Opat, the duly elected and authorized County Attorney for Geary County, State of Kansas, to intercept wire communications to and from the above-described telephone.

PROVIDED that such interception(s) shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, or for a period of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct an interception under this order or ten (10) days after this order is entered, whichever is earlier.

1T IS ORDERED FURTHER that in the event that the target telephone is transferred outside the territorial jurisdiction of this court, interceptions may take place in any other jurisdiction within the United States.

IT 1S ORDERED FURTHER that the authorization given is intended to apply not only to the target telephone number listed above, but also to any other telephone number or telephone accessed through the above-referenced IMSI number, and to any other IMSI number accessed through the target telephone number referenced above, within the thirty (30) day period. The authorization is also intended to apply to the target telephone number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target

telephone while the telephone is off the hook or otherwise in use.

IT IS ORDERED FURTHER that, based upon the request of the Applicant pursuant to K.S.A. 22-2514, and the definitions set forth therein, and K.S.A. 22-2515 and 2516, T-Mobile , an electronic communication service provider as defined in Section 2510(15) of Title 18, United States Code and K.S.A. 22-2514, shall furnish the KBI and/or it's agents or designees with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such provider is according the persons whose communications are to be intercepted, with the service provider to be compensated by the KBI for reasonable expenses incurred in providing such facilities or assistance.

IT IS ORDERED FURTHER that, to avoid prejudice to the government's criminal investigation, the provider of the electronic communications service and its agents and employees are Ordered Not To Disclose or Cause Disclosure of the Order or the request for information, facilities and assistance by the KBI or the existence of the investigation to any person other than those of its agents and employees who require this information to accomplish the services hereby ordered. In particular, said provider and its agents and employees shall not make such disclosure to a lessee, telephone subscriber or any interceptee or participant in the intercepted communications.

IT IS ORDERED FURTHER that this Order shall be binding on any subsequent provider of electronic communications services as defined in Title 18, United States Code, Section 2510(15) and K.S.A. 22-2514 *et seq*, that provides services to the target telephone number(s) listed above upon service of a certified copy of this Order without any further court order being required.

IT IS ORDERED FURTHER that this order shall be executed as soon as practicable and that all monitoring of wire communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to

Dustin J. Wedgewood  RCPD   _(signature)_   3/6/13

Michael PARR   RCPD   _(signature)_   3/6/13

Nate Boeckman   RCPD   _(signature)_   3/6/13

Robert Couty   KBI   _(signature)_   3/6/13

Sherri Moore   KBI   _(signature)_   3/6/13

DAVE BREDE   KBI   _(signature)_   3/6/13

Bill White   TPD   _(signature)_   3/6/13

Andrew Beightel   TPD   _(signature)_   3-6-13

RyAN Boyer   KBI   _(signature)_   3-6-13

Gary Koles   KBI   _(signature)_   3-6-13

RICHARD FINK   RCPD   _(signature)_   3-6-13

Eric S. Coffman   GESO   _(signature)_   3-6-13

Justin Stopper   GESO   _(signature)_   3/6/2013

D000779

the pending investigation. The interception of wire communications must terminate upon the attainment of the authorized objectives, not to exceed thirty (30) days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception of this order or ten (10) days after he order is entered.

Monitoring of conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119, Title 18, United States Code and K.S.A. 22-2514 *et seq.*. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named Target Interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall spot check to insure that the conversation has not turned to criminal matters.

IT IS ORDERED FURTHER that, pursuant to Section 2518(5), Title 18, United States Code and K.S.A. 22-2514 *et seq*, in the event intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

IT IS ORDERED FURTHER that Steven L. Opat, Geary County Attorney and /or Antonio Cruz Assistant Geary County Attorney shall provide this Court with a report on or about the tenth, twentieth, and thirtieth days following the date of this Order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If any of the above-ordered reports should become due on a weekend or holiday, IT IS ORDERED FURTHER that such report shall become due on the next business day thereafter.

D000780

| Print Name / Agency | Sign | Date |
|---|---|---|
| Mike Rumford   ISBI | | 3-6-13 |
| Deo Swann KBI | | 3/6/13 |
| Fran Sheldan KBI | Fran Sheldan | 3-16-13 |
| Scott Ferris KBI | Scott Ferris | 3/6/13 |
| Vidal Campos KBI | | 3/6/13 |
| Chris Turner   KBI | | 3/6/13 |
| MATTHEW LYON   KBI | matthew lyon | 07-06-2013 |
| Rod Page   KBI | Rod Page | 03-06-2013 |
| ED BARTKOSKI KBI | | 03-06-2013 |
| Brad Ingalls   RCPD | By W. Ing | 03/06/2013 |
| SHAWN STANTON RCPD | | 3/6/2013 |
| Dan Bortnick RCPD | | 03-06-2013 |
| Luke Breault   RCPD | | 3-6-13 |
| John M. Doehling RCPD | Joe Doehling | 3/6/13 |
| Brad Schoen | B.Schn | 3-6-13 |
| Don Bresi | | 3-6-12 |
| Jeff Childs | | 3-6-12 |
| Julia Goggt | Julia Gogg | 3-6-2e 13 |
| Jessie Beck | | 3.06.13 |
| Kurt Moldrup | | 3.6.13 |
| Emmett Smith | | 3/6/2013 |
| Robert Denks | | 83-06-2013 |
| BRIAN JOHNSON RCPD | | 03/06/13 |
| Mark French RCPD | Mark French | 03/06/13 |
| Rick Duntsch | RD | 3/6/13 |
| BREK JAGER | Brek C. Jager | 03/06/13 |

D000781

IT IS ORDERED FURTHER that this Order, the application, affidavit and proposed order, and all interim reports filed with this Court with regard to this matter, shall be sealed until further order of this Court, except that copies of the order, in full or redacted form, may be served on the KBI and the service provider as necessary to effectuate this order.

DONE and ORDERED this __5__ day of __March__, 20_13_, at in Junction City, Kansas.

HONORABLE David R Platt
District Judge

| PRINT NAME/AGENCY | SIGN | DATE |
|---|---|---|
| GLEN VIRDEN   KBI | | 03/06/13 |
| Doug Younger   KBI | Doug Younger | 03/06/2013 |
| Robert Conde   KBI | Robert J Conde | 03/06/2013 |
| Tim Leakey KBI | Tim Leakey | 03/06/13 |
| Amanda Young   KBI | Amanda Young | 3/06/13 |
| Steve Bundy   KBI | Steve Bundy | 3/6/13 |
| Michael Lind   KBI | | 3-6-13 |
| Shane Finley   KBI | | 3-6-13 |
| Frank Papish   KBI | Frank Papish | 3/6/13 |
| KELLY W. RAlston KBI | Kelly w. | 3/6/13 |
| Shawn Campiti   KBI | Shawn Campiti | 3-6-2013 |
| Jon. RANKIN   KBI | Jon Rankin | 3/6/13 |
| Traci Allen   KBI | Traci Allen | 3-6-13 |
| Chris Farris   KBI | | 3-6-13 |
| JOSH KYLE   RCPD | John D. Kyle | 3-6-13 |
| Mike Life   JCPD | | 03-06-13 |
| Angela C. Weeks   GESO | Angela C Weeks | 03.06.13 |
| Cathy Fahey   JCPD | Cathy Fahey | 3-6-13 |
| JOSHUA BROWN   JCPD | | 03062013 |
| TODD Goodrey   JCPD | | 030613 |
| STEVEN L. OPAT   GECA | Steven L Opat | 3/6/13 |
| Alvin Babcock   JCPD | | 3.6-13 |
| Tony Cruz   GECA | Tony Cruz | 3/6/13 |
| Tim Brown   JCPD | Tim Brown | 03/06/13 |
| MAVERICK CAMPBELL   GESO | | 03/06/13 |
| | | 3.06.13 |
| Tony Wolf   Geary County SO | | |
| William R Arnold Jr.   JCPD | Willie R Arnold Jr | 03/06/13 |
| Cory Odell   JCPD | | 3/6/13 |
| Rish Girders   JCPD | | 3-6-13 |
| Kelly Roberts   TPD | Kelly Roberts | 3-6-13 |

D000783

# IN THE COURT OF GEARY COUNTY
# STATE OF KANSAS

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION | } | |
| | } | |
| FOR AN ORDER AUTHORIZING THE | } | No. _____ |
| | } | |
| INTERCEPTION OF WIRE COMMUNICATIONS | } | |

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Glen F. Virden, Senior Special Agent, Kansas Bureau of Investigation, being of lawful age and duly sworn upon my oath depose and state:

1.     I am an "Investigative" law enforcement officer duly deputized with statutory authority for the State of Kansas, and as further recognized and defined by K.S.A. 22-2514(5).

2.     This affidavit is submitted in support of an application for an order authorizing the interception of the wire communications of **Johnny Lee Ivory III, B/M Date of Birth** ███████, and others listed below, over telephone number **(929) 268-6183**, a personal cellular telephone currently in service with Sprint Nextel with Mobile Station Identification Number (MSID) 000003477244840 and Electronic Serial Number (ESN) 256691437000557176. Sprint Nextel records indicate the phone to be an Individual Boost Prepaid Account with the name James Williams with an address of PO Box 54988, Irvine, California attached to the account. The Affiant knows this phone to be used by **Johnny Lee Ivory III** as indicated within this document. The Affiant requests authority to intercept the wire communications of individuals communicating on telephone number **(929) 268-6183**.

3.     Affiant believes the following individuals will be intercepted over telephone number **(929) 268-6183**; **Johnny Lee Ivory III,** Albert Dewayne Banks and others yet unknown.

**EXHIBIT 6**

1

D007115

4.     Affiant requests authority to intercept the conversations and the background conversations intercepted in the vicinities of the aforementioned telephone while the telephone is off the hook or otherwise in use. Affiant requests this authority in order to obtain evidence concerning the above persons' involvement in the following offenses: Possession of Cocaine in violation of Kansas Statutes Annotated (K.S.A.) 21-5706(a); Distribution of Cocaine in violation of K.S.A. 21-5705(a)(1); Conspiracy to commit these offenses in violation of K.S.A. 21-5302; and the Use of a Communications Facility to facilitate the commission of the above offenses in violation of K.S.A. 21-5707(a)(1). All offenses are in violation of Kansas Law, which have been and are being committed by the persons identified herein and others yet unknown.

5.     The Affiant has been a law enforcement officer since 2001 with the Kansas Bureau of Investigation (KBI). The Affiant is currently a Senior Special Agent with the Topeka Region of the Special Operations Division for the KBI. The Affiant is a graduate of Cowley County Community College with an associate of applied science degree in Criminal Justice and Southwestern College with a bachelor's degree in Criminal Justice. The Affiant, while so employed in law enforcement, has received training in narcotics investigations to include, but not limited to: Kansas Law Enforcement Training Center's Basic Training Academy, the Kansas Bureau of Investigation's Advanced Investigations Academy, the Kansas Bureau of Investigation's Clandestine Lab Certification School, Kansas Top Gun Narcotics training, and the U.S. Drug Enforcement Administration's Basic Narcotics Investigators School. Affiant has investigated numerous narcotics cases. These investigations have included, but are not limited to undercover purchases of narcotics, controlled purchases of narcotics using cooperating individuals and search warrants. The Affiant has arrested numerous individuals for violations of both state and federal violations of controlled substances statutes. As a result, Affiant has interrogated many defendants, informants and others who were either sellers, distributors, purchasers, manufacturers or users of controlled substances. The Affiant is familiar with how controlled substances are obtained, diluted, packaged, distributed, sold, used, and manufactured. Affiant is also familiar with the records, books, and documents needed to carry on such illicit activity.

D007116

(a)     Based on the above experience, Affiant believes there is probable cause to believe the subjects of this investigation, both known and unknown, have committed, are committing and will continue to commit offenses involving possession, distribution and conspiracy to distribute cocaine.   Such violations involve the use of communication facilities in order to facilitate the commission of the above offenses, each being in violation of Kansas Uniformed Controlled Substances Act.

(b)     That particular wire communications of the subjects of this investigation concerning the above offenses will be obtained through the interception of such communications to and from telephone number **(929) 268-6183**.  In particular, there is probable cause to believe that the communications to be intercepted will concern dates, times, and places for commission of the aforementioned offenses when the above named interceptee communicates with the listed interceptees and other unknown suppliers, co-conspirators, aiders and abettors.   There is further probable cause to believe that the communications to be intercepted will disclose the location of assets owned or controlled by the persons involved, and the manner, extent and identity of persons who direct and/or participate in the illegal activities set forth herein.  These communications are expected to constitute admissible evidence of the above-described offenses.

(c)     That telephone number **(929) 268-6183**, has been, is being, and will continue to be used in connection with the commission of the above offenses.
The interception of these communications is expected to concern verbal and messaging discussions of the continuing conduct, financing, managing, supervising, directing, or ownership of all or part of an illegal narcotics enterprise, including orders and instructions to subordinates, the receipt of information pertaining to the obtaining and distribution of controlled substances, and other conversations relating to the administration, control, and management of the aforementioned illegal drug activity.

6.     Normal investigative procedures have been tried and have failed to achieve the goals of this investigation, or reasonably appear unlikely to succeed if tried, or are too dangerous to employ, as more fully explained below.

D007117

## INVESTIGATIVE INVOLVEMENT OF STATE AND LOCAL LAW ENFORCEMENT

7.      This investigation is a result of a joint effort by the Affiant, other Agents of the Kansas Bureau of Investigation (KBI), Officers of the Junction City Police Department (JCPD), Officers of the Geary County Sheriff's Office (GESO), Officers of the Riley County Police Department (RCPD), Officers of the Topeka Police Department (TPD), Officers of the Shawnee County Sheriff's Office (SCSO), and Agents of the Federal Bureau of Investigation (FBI).  The investigation covers a period of time from June 2012 to the present.  The statements contained in this affidavit are based in part on information provided by Agents/Officers of the above-listed law enforcement agencies.  Because this affidavit is being submitted for the purpose of securing authorization for the interception of wire communications, Affiant has not included each and every fact known to the Affiant concerning this investigation.  Affiant has set forth only the facts that Affiant believes are necessary to establish the necessary foundation for an order authorizing the interception of wire communications.   If a court order is granted authorizing the interception of wire communications in this case, only those persons and agencies authorized by law to make such interceptions will be allowed to do so.

8.      In April, 2012, Detective Nate Boeckman of the RCPD contacted Detective Alvin Babcock of the JCPD Drug Operation Group (DOG) with information that Anthony Thompson (AKA "Ant") and Albert Banks (AKA "AB") were distributing cocaine within the Junction City, Geary County, KS area and the Manhattan, Riley County, KS area.  RCPD received this information from a Source of Information (SOI) to be referred to as "SOI #1" from this point forward. SOI #1 appeared to have knowledge of some of the criminal elements related to Anthony Thompson and Albert Banks, but was not allowed to have intimate knowledge of the day to day operations or the source of supply of the cocaine.

9.      SOI #1 did give information saying Anthony Thompson and Albert Banks were receiving powder cocaine from an unknown supplier/s then transporting (or having it transported) back to the Junction City, Geary County, KS area where they would convert the powder cocaine to crack cocaine themselves (evidence of this conversion will

4

be explained in this affidavit). SOI #1 did not have direct knowledge of when the powder cocaine purchases were occurring, who was driving to purchase the powder cocaine and even if one of the aforementioned persons were actually obtaining the cocaine or having another person unknown to this investigation acquire and transport the cocaine to Anthony Thompson and Albert Banks. SOI #1 has continued to give some credible information to Agents/Officers but beyond that, SOI #1 has not been beneficial to the investigation. As stated above, SOI #1 has limited knowledge related to the full scope of the cocaine distribution network, other co-conspirators and the source of supply for the cocaine.

10.    The Affiant was contacted by Lieutenant Mike Life of the JCPD and asked to assist with the investigation. The Affiant met with Agents/Officers of the aforementioned agencies in an attempt to garner information related to persons who might be involved in the distribution of cocaine. The Affiant then contacted an individual who had been a Cooperating Individual (CI) for the KBI since 1985 (to be referred to as CI #1 from this point forward). The Affiant had a meeting with CI #1 and asked if CI #1 would be willing to assist in the investigation to which CI #1 agreed. Since CI #1's association with the KBI beginning in 1985, CI #1 has successfully been an integral part of a number of State and Federal investigations which culminated with the prosecution and convictions of numerous persons related to the distribution of drugs. CI #1 has had a number of Agents within the KBI as his/her handler. The Affiant has had contact with a number of these Agents who spoke highly of CI #1 and his/her abilities to assist in investigations culminating in successful prosecution.

11.    On 05-16-2012, then KBI Task Force Agent (TFA) John Culver was contacted by RCPD in reference to Albert Banks possibly leaving the Junction City, KS area en route to Topeka, Shawnee County, KS to purchase drugs for distribution. TFA Culver, RCPD and JCPD coordinated a surveillance operation to follow Albert Banks in an attempt to locate the person whom he was receiving his drugs from for distribution. TFA Culver was told Albert Banks was supposedly traveling with a white female who was later seen as the driver of the vehicle. The vehicle Albert Banks and the white female were in was described as a maroon colored Cadillac Escalade. TFA Culver observed this vehicle leave the Junction City area and observed the license tag on the

D007119

vehicle which was bearing Kansas tag 669BHV. This vehicle was later found to be registered to a 2002 Cadillac Escalade with a primary owner of Mike Roth and secondary owner of Kristina Orth both of Junction City, Geary County, KS. The Affiant would later find out Kristina Orth is the girlfriend of Mike Roth.

12.     As Agents followed Albert Banks and Kristina Orth from Junction City, Geary County, KS the vehicle made several overt actions which appeared to be in an attempt to make sure they were not being followed. The vehicle traveled east on I-70 where it exited at the Maple Hill exit. The vehicle then made a u-turn in the middle of the road and then re-entered I-70 and continued eastbound on I-70. Once the vehicle reached the Topeka, Shawnee County, KS area, it exited onto SE California Avenue and traveled south where it entered the McDonald's drive thru at SE 29th and California. It then went south on California Avenue to SE 30th Street where it turned east then south on SE Swygart and pulled into the parking lot of 3024 SE Swygart. Albert Banks then exited the vehicle walked into the apartment building at this location. Kristina Orth remained in the vehicle with an undetermined number of children who were found to have been traveling in the vehicle.

13.     3024 SE Swygart Apartment F was, at that time, the residence of **Johnny Lee Ivory III (AKA "5", "J5" and "Jizzle")**. **Johnny Lee Ivory III** is a confirmed member of the Traveling Vice Lords Gang. He has a lengthy criminal history to include; possession of opiates/opium/narcotic drugs, possession of depressants/stimulants, discharge of a firearm at an occupied dwelling as well as others which will be explained further later in this affidavit. **Johnny Lee Ivory III**, at that time, was believed to reside at this residence with his then girlfriend, Whitnie A. Livingston. RCPD had received information from SOI #1 indicating **Johnny Lee Ivory III** was perhaps a source of supply for cocaine for Albert Banks and Anthony Thompson. This had not been confirmed as **Johnny Lee Ivory III** had not been located as to his whereabouts at that time although it was believed he still resides in Topeka, Shawnee County, KS. On 05-10-2012, Topeka Police Department (TPD) Officers located one-half (1/2) pound of marijuana, two (2) loaded handguns and approximately $10,000.00 in US Currency at this apartment where **Johnny Lee Ivory III** stated he resided (TPD case number 10732-12).

6

14.     Albert Banks eventually exited the apartment complex and got into the passenger side of the vehicle Kristina Orth was driving.  The vehicle exited the parking lot, drove north on SE California Avenue, turned east on SE 29th, turned north into the Dillon's parking lot, circled the parking lot, exited the parking lot and crossed SE 29th Street where it entered into a shopping center parking lot and parked in front of the Subway restaurant and remained there for approximately 15 minutes without anyone entering or exiting the vehicle.  After approximately 15 minutes, the vehicle got back onto SE 29th Street and turned north on SE California Avenue.  The vehicle entered onto I-70 and traveled west to Junction City, Geary County, KS where it was followed to an unknown address (address unknown to the Affiant) on 13th Street where it was believed Albert Banks was possibly distributing cocaine from.

## WIRE INTERCEPT ON ALBERT BANKS' PHONE

15. On 03/07/2013 a lawful intercept of wire communications was initiated on telephone number (785) 375-6704, which had no subscriber information but is being used by Albert Banks.  Numerous phone conversations have been intercepted which detail the activities of Albert Banks and other co-conspirators distributing crack cocaine.  Although all the call data and call content regarding this intercept will not be outlined in this affidavit, the Affiant will outline calls made to and from telephone number **(929) 268-6183** believed to be used by **Johnny Lee Ivory III** as he had conversations with Albert Banks.

16.     On 03/07/2013 at approximately 10:15 pm, a phone conversation was intercepted between Albert Banks and the subject believed to be **Johnny Lee Ivory III**.  Albert Banks asked the male believed to be **Johnny Lee Ivory III** where he wanted Albert Banks to come to.  The male told Albert Banks to "come up here on Kansas (Kansas Avenue in Topeka, KS) to this Travelers Inn (motel).  Come get me".  Albert Banks asked again where to go and the male said, "The Travelers Inn, come up on Kansas, hop on 37[th] (Street) right".  Albert Banks said he was "Coming down Cali (California Avenue)".  The male then said to, "get on Kansas, never mind, just meet me

7

D007121

at the crib (his residence), meet me at the crib. I'm on my way there". The two then hung up.

17. On 03/08/2013 at approximately 3:39 pm, Albert Banks called the male believed to be **Johnny Lee Ivory III**. Albert Banks told him he (**Johnny Lee Ivory III**) left his phone. **Johnny Lee Ivory III** said he figured that. Albert Banks asked **Johnny Lee Ivory III** if he was going to take that one back (return one phone). **Johnny Lee Ivory III** said he was just going to keep it and sell that one (the one he left which Albert Banks had in his possession). Albert Banks then asked **Johnny Lee Ivory III** if he was going to keep two (2) phones then and **Johnny Lee Ivory III** said yep. Albert Banks went on to ask **Johnny Lee Ivory III** if he had a different one (phone) and **Johnny Lee Ivory III** said yeah. Albert Banks said, "I need to get me a Boost Mobile phone". **Johnny Lee Ivory III** said, "Yep, I just bought that mother fucker a week ago". Albert Banks went on to say, "Well shit, I'll hit you up in a little bit. Step out your way (come meet with **Johnny Lee Ivory III**)". Both agreed and then hung up.

18. On 03/08/2013 at approximately 8:42 pm, Albert Banks called **Johnny Lee Ivory III**. Albert Banks said he was going to "slide your way (meaning he was coming to see **Johnny Lee Ivory III**)". **Johnny Lee Ivory III** said, "Yeah shit, you're already here". Albert Banks said, "No, I'm about to leave right now". Both said, "Alright" and then hung up.

19. At approximately 10:39 pm, Albert Banks called **Johnny Lee Ivory III** and said, "I'm in front of your mom's house". **Johnny Lee Ivory III** said, "Aw shit, I ain't even there". Albert Banks said, "Where you want me to go to?" **Johnny Lee Ivory III** said, "I'm over here on ah ah Wanamaker". Albert Banks asked if he was at a restaurant. **Johnny Lee Ivory III** response was, "Ah no, over here on Harvey like, like, you get on the highway where you came from and like go all the way around right after first Wanamaker but the second one where you go around the roundabout then you gonna get off right there at Huntoon and then you gonna go past the light two lights. You gonna go straight, the street is right there on the left. It's right there on the left. It's right behind Home Depot street. Called Harvey. It's the apartments. You'll see em, can't miss". Albert Banks said, "So when I get off Wanamaker there's a right, don't make a left". **Johnny Lee Ivory III** said the "apartments behind the Home Depot street called

8

Harvey". Albert Banks said, "Alright" and **Johnny Lee Ivory III** said, "Alright call me when you get off on Huntoon".

20. At approximately 10:56 pm, Albert Banks called **Johnny Lee Ivory III** and said, "Hey, I go through this roundabout right?" **Johnny Lee Ivory III** said "Yep" then Albert Banks said, "I get through the roundabout you give make a right?" They agree then **Johnny Lee Ivory III** said, "You gonna bust a left right there at the light (inaudible), you gonna past Wanamaker and then you gonna bust it, a quarter the way up you gonna bust a left on Harvey. They then hang up.

21. At approximately 11:07 pm, Albert Banks called **Johnny Lee Ivory III** and said, "Shit, I'm on Huntoon". **Johnny Lee Ivory III** asks, "You on Huntoon?" and Albert Banks said, "Yeah". **Johnny Lee Ivory III** asks if he is at Huntoon and Wanamaker. Albert Banks said he was "Right down Huntoon right now. I tell you a street in a second". **Johnny Lee Ivory III** tells him to "Bust a left off the highway" and Albert Banks said, "It say uh, 12th and uh Huntoon". **Johnny Lee Ivory III** asks, "12th and Huntoon?" and Albert Banks said, "Yeah". **Johnny Lee Ivory III** asks, "Which way is yo car facin, east or west?" Albert Banks said, "East". **Johnny Lee Ivory III** told him to, "Go back down, you went too far. Come back around and go west". Albert Banks said he "Was looking for that damn Home Depot you was talking about". They continue to have more conversation towards trying to direct Albert Banks to **Johnny Lee Ivory III**. Albert Banks eventually said he was at, "Huntoon and Harvey". **Johnny Lee Ivory III** tells him to, "Bust that right" and Albert Banks said he, "Just did". **Johnny Lee Ivory III** then says, "Bust that left and you'll find some apartments. I'm coming out".

22. On 03/10/2013 at approximately 3:13 pm, Albert Banks called an unknown male at telephone number (785) 226-2907. The unknown male said, "What's up homie" and Albert Banks said, "What's happenin". Albert Banks asked, "You up here?" The unknown male said, "Nope". Albert Banks asked, "You down here" and the unknown male said, "Nah". Albert Banks said, "You didn't leave nobody with no bags?" The unknown male said, "Yeah dude lives right upstairs from where I used to live at, the Mexican dude". Albert Banks asked, "Is he at home right now" and the unknown male said, "Yeah he at home". Albert Banks said, "I'm on California, I'm about to pull up

D007123

over there" and the unknown male said, "Alright, I'm goin to call him right now". The call ended.

23.    On 03/10/2013 at approximately 5:19 pm, Albert Banks called **Johnny Lee Ivory III**. At one point Albert Banks said, "Where's Omar (not sure if this is the correct verbiage but it sounded like Omar)?" **Johnny Lee Ivory III** said, "My dude's out of town but I'm straight though.   I'm just waiting on something to get back.   Late tomorrow supposed to be back".  Albert Banks said, "Oh yeah" and **Johnny Lee Ivory III** said, "Yeah, I got a little bit though". Albert Banks said, "I got that five bucks, shit". **Johnny Lee Ivory III** said, Huh" and Albert Banks said, "I got that five bucks, shit it ain't gonna go down today.  I'm tryin to do a thang wit you, yeah I'm just waitin.  I got that five bucks for ya".   **Johnny Lee Ivory III** said, "Alright, well yeah, shit, uh, whenever he hit me, I'll hit you".

24.    On 03/11/2013 at approximately 6:32 pm, Albert Banks received a call from **Johnny Lee Ivory III**. Albert Banks said, "Hello" and **Johnny Lee Ivory III** said, "Shit, I got that for you".  Albert Banks said, "Oh yeah".  **Johnny Lee Ivory III** said, "Yeah".  Albert Banks said, "OK, as soon as (inaudible) gets back here, gonna slide your way" and the call ended.

25.    On 03/12/2013 at approximately 10:15 am, Albert Banks received a call from phone number (785) 226-2907 and talked to an unknown male.  The unknown male asked if Albert Banks tried to call.  Albert Banks said, "Yeah, I was tryin to get that white dude number but I got it already".  The unknown male said, "Oh, you got it" and Albert Banks said, Yeah, I got it".  The two then hang up shortly thereafter.

26.    On 03/12/2013 at approximately 10:51 am, Albert Banks received a call from **Johnny Lee Ivory III**. Albert Banks said, "Hello" and **Johnny Lee Ivory III** said, "What up brothern".  Albert Banks said, "What's happenin? Hey man (inaudible) I'll be up there to get me something here is a little bit later.  Man, shit, them motha fuckas took the cat and went to the dub (?) and didn't come back till damn near one o'clock in the morning".  **Johnny Lee Ivory III** said, "Oh yeah" and Albert Banks said, "Hell yeah". **Johnny Lee Ivory III** said, "Uh, alright fo real ain't it".  Albert Banks said, "I was madder than a motha fucka" and **Johnny Lee Ivory III** said, "Yeah, I'll bet.  I was just seein what was goin on".  Albert Banks said, "Yeah, I'm comin to get that".  **Johnny Lee**

D007124

**Ivory III** said, "Alright, bet" and Albert Banks said, "I'll hit ya when I get ready to ride out".

27.     On 03/13/2013 at approximately 8:21 am, Albert Banks received a text message from telephone number (785) 226-2907 which read, "I give u 22 for 5oo happy strawberry n blueberry the original happy taste like the throwback I'm bout to stop fuckin wit mexico he ain't servin ma people.."

28.     On 03/14/2013 at approximately 2:33 pm, Albert Banks sent a text message to **Johnny Lee Ivory III** which read, "I will b up there today i need to make like 3 more dollars".

29.     At approximately 3:30 pm, **Johnny Lee Ivory III** sent a text message to Albert Banks which read, "Ok".

30.     At approximately 8:30 pm, Albert Banks called **Johnny Lee Ivory III** and asked, "Where you want to talk at?" **Johnny Lee Ivory III** said, "I'm out, I'm out eatin right now". Albert Banks said, "I'm just pullin in". **Johnny Lee Ivory III** said, "I'm up here at south side. I'm just now sittin down to eat". Albert Banks said, "Where's Cuddy at?" **Johnny Lee Ivory III** said, "Uh, I don't know. You got his number?" Albert Banks said, "Huh uh, he in my other phone. I just lost that motha fucker last night". **Johnny Lee Ivory III** said, "I'm a text it to ya. I'll be done eatin here in a little bit". Albert Banks agrees and they hang up.

31.     At approximately 8:30 pm, Albert Banks received a text from **Johnny Lee Ivory III** which read, "818-967-4212"

32.     At approximately 9:05 pm, Albert Banks called **Johnny Lee Ivory III** and when **Johnny Lee Ivory III** answered, Albert Banks said, "Hey, let me call ya back bro".

33.     At approximately 9:14 pm, Albert Banks called **Johnny Lee Ivory III** back and said, "Hey, I'm about to go over here and set in front of your mom house. Man I was on the phone talkin to you nigga, I got pulled over by the damn police". **Johnny Lee Ivory III** said, "What". They talked over the top of each other and then Albert Banks said, "I'm at that damn Quick Shack and shot across that motha fuckin street, over there to the car wash and dude swooped in there like, why you shoot across the street like that. I'm like man, I ain't red, I was just lookin at my phone man and just hit the gas and went across the street. He like, ah you was textin. I like, nah man. Somebody was callin

D007125

my phone and I was lookin to see who it was. He was, ah alright. He wrote me a warning and let me go. **Johnny Lee Ivory III** responded, "He was goin get him some brethren cheeks. Both laughed. **Johnny Lee Ivory III** then said, "He was goin get him some cheeks of you would have said you was textin". Both laughed. Albert Banks said he told the officer, "Hell no I wasn't textin". **Johnny Lee Ivory III** then said, "He was sayin bust em Danno". The two talked over each other again. **Johnny Lee Ivory III** said, "I'm bout to be there in ten minutes" and Albert Banks said, "Alright".

34.    The Affiant received a faxed copy of a call log from the Kansas Highway Patrol (KHP) indicating KHP Trooper Marcus Seirer (K325) stopped a vehicle bearing Kansas license tag 181DMY being driven by Albert Banks (date of birth ████████) in the 2800 block of California Avenue on 03/14/2013 at approximately 9:08 PM. The vehicle was a 2001 four door Buick Century registered to Robert Thomas Keeley of 6826 Meade Loop, Apartment 8 in Fort Riley, KS. Albert Banks has been observed driving this particular vehicle throughout this investigation on numerous occasions.

35.    On 03-14-2013, Special Agent in Charge (SAC) Doug Younger, Senior Special Agent (SSA) Tim Leakey, the Affiant, and Task Force Agent (TFA) Vidal Campos conducted a surveillance operation in Topeka, Shawnee County, Kansas on Albert Banks pursuant to a phone call intercepted during the course of the wire intercept involving Albert Banks.

36.    Albert Banks had told a subject he would deliver narcotics to them in Junction City, Geary County, Kansas. After the Junction City Police Department (JCPD) had been watching the location per the phone call, The Affiant checked the phone ping for Albert Banks' phone and learned it was near I-70 and US75 in Topeka, Kansas. The Affiant then notified SAC Younger that Albert Banks was in the Topeka area to possibly pick up cocaine or crack cocaine to take back to Junction City, Kansas to distribute.

37.    SAC Younger then arranged for SSA Leakey, TFA Campos, and the Affiant to assist him with surveillance in the Topeka, Kansas area. At approximately 9:00 pm, TFA Campos located Albert Banks' vehicle stopped by a KHP Trooper near 29th and California facing south. TFA Campos contacted the Trooper after the traffic stop and learned that Albert Banks was the sole occupant of the vehicle and given a warning citation. The Trooper also stated Albert Banks was the subject driving the

D007126

vehicle and identified in the warning citation. Shortly, after the traffic stop, monitors on Albert Banks' phone notified surveillance Albert Banks had made a phone call and stated he would be in front of the person's mother's house in about 10 minutes. This call was also believed to be to **Johnny Lee Ivory III**.

38.    TFA Campos then stated **Johnny Lee Ivory's** mother lives at 3139 Michigan, Topeka, Shawnee County, Kansas. TFA Campos knew that **Johnny Lee Ivory III** often stays with his mother from information he received from Topeka Police Department (TPD) arrest information showing Debbie L. Young is **Johnny Lee Ivory III's** mother and that she resides at 3139 Michigan, Topeka, Kansas. TFA Campos had also ran City of Topeka Utilities on the address and found that 3139 Michigan, Topeka, Kansas utilities are in the name of Debbie L. Young TFA Campos also learned Albert Banks had been the subject of arrest prior at the aforementioned address. **Johnny Lee Ivory III** has listed Young as his emergency contact person with Young identifying herself as his mother.

39.    After spending approximately one half (1/2) hour at the residence, two subjects came out of the residence and left in Albert Banks' vehicle. Surveillance was then able to follow the vehicle to the area of 12th and Topeka Boulevard when the vehicle turned west on 12th from Topeka. After losing site of the vehicle, surveillance attempted to relocate it using the Ping Order from Albert Banks' phone to attempt to locate them. However, the phone showed it was stationary for a period of time. As surveillance continued to use the Ping Order (15 minutes apart on the phone pings) it was learned that Albert Banks was out of the area and moving towards the 32nd and Michigan area again. Once surveillance made it from the 12th and Topeka Boulevard area to 3139 Michigan, Albert Banks vehicle was once again found parked in the driveway.

40.    At approximately 9:46 pm, Albert Banks called an unknown male at telephone number (785) 226-2907 and asked, "You shot back at the house?" The unknown male answered, "Yeah, I'm already back into town". Albert Banks said, "You got the different (inaudible)?" The unknown male replied, "Yep". Albert Banks said, "I'm down here man. What's up with the bag?" The unknown male said, "I got to go over to the uh, pick it up, let me call them to go pick it up. Where you at?" Albert Banks said, "Shit, I'm over here off of Cali (California Avenue in Topeka)". The unknown

D007127

male said, "Ok, you close by me then.  You down the street" and Albert Banks said, "Ok".  The unknown male said, "Alright, I'll call you right back".

41.    At approximately 9:50 pm, the unknown male called Albert Banks back from telephone number (785)226-2907 and said, "Yeah man, he ain't answerin the phone".  Albert Banks said, "Oh, ok" and then the two hung up.

42.    At approximately 11:13 pm, Albert Banks left 3139 Michigan, Topeka, Kansas and drove north on Michigan to 29th, east on 29th to California, north on California to I-70, and then west on I-70 to Junction City.  Albert Banks was followed to his residence in Junction City which he arrived at approximately 12:18 am on 03-15-2013.  Albert Banks then stayed at his residence for a matter of minutes, left and then began delivering crack cocaine to subjects in Junction City, according to the phone monitoring.

43.    On 03/15/2013 at approximately 8:08 PM, **Johnny Lee Ivory III** called Albert Banks and said, "I got this".  They talk about **Johnny Lee Ivory III** needing to get brakes on his vehicle.  Albert Banks then said he needed to "make some more change, I'm still fuckin with this shit I got from you" referring to make some more money. **Johnny Lee Ivory III** asked Albert Banks how much he had and Albert Banks said he had "two (referring to tow thousand dollars).  **Johnny Lee Ivory III** asked Albert Banks if he said "ten" and Albert Banks said "two".  Albert Banks said that was all he had until he "got some more of this shit off of him" (referring to selling some more of the illegal drugs he had in his possession at that time.  Albert Banks said he had like "four" left and **Johnny Lee Ivory III** asked him if he just "copped" referring to recently obtaining more illegal drugs from a different person.  Albert Banks said, "Nah, I'm saying I still got some of what I got from you and I already had some shit before I got some from you". **Johnny Lee Ivory III** said, "Yeah, I forgot you did just get some".  Albert Banks said, "I'm tryin to get all this shit off at the same time and then fuck with you.  That's why I was like you called me the next day and said you put that in (referring to **Johnny Lee Ivory III** making an order from his supplier for Albert Banks) and I was like, damn nigger I got all this shit".  **Johnny Lee Ivory III** said that was what he was calling about. **Johnny Lee Ivory III** said he was going to try to get a ride "there" (to Albert Banks) and then asked Albert Banks of he wanted **Johnny Lee Ivory III** to call him on this phone

D007128

number or the other one. Albert Banks said both of them were his phones but ht other one was on the charger as it was dead. Albert Banks said it didn't matter though and **Johnny Lee Ivory III** could call either one.

44.     At approximately 10:20 PM, **Johnny Lee Ivory III** called Albert Banks back and said he was about to "shake down there" meaning he was coming to where Albert Banks was at. Albert Banks told **Johnny Lee Ivory III** to call him when he got "here" referring to where Albert Banks was. **Johnny Lee Ivory III** said, "You don't need nothing" and Albert Banks said, "No, I'm tryin to dump some of this shit off man so I can do some of what the fuck we was talkin about". **Johnny Lee Ivory III** said, "Aright but you ain't even got to hit me. You can just cop that and then when you sell some you can just give me that" meaning Albert Banks did not have to pay him for it right now and he could get it on the front. Albert Banks said, "Aright". **Johnny Lee Ivory III** said, "I mean if that will help you" and Albert Banks said, "I'm cool bro, I just need to get some shit off, I be ready when I get this shit off. That's all it is. My phone ain't been ringin today". **Johnny Lee Ivory III** said, "Damn, mine ain't neither". Shortly thereafter they discontinued conversing when Albert Banks told **Johnny Lee Ivory III** to call him when he got there.

45.     On 03/23/2013 at approximately 12:22 PM, Albert Banks called **Johnny Lee Ivory III** and said he just pulled in here (Topeka) and asked **Johnny Lee Ivory III** if he was at his mom's. **Johnny Lee Ivory III** answered him but it was inaudible. Albert Banks said alright and then hung up.

46.     At approximately 12:25 PM, **Johnny Lee Ivory III** called v and asked what street he was on. Albert Banks said he "was about to get off on Cali (referring to California Avenue in Topeka)". **Johnny Lee Ivory III** said, "Hey you remember where we went to those apartments a couple weeks ago. Just meet you over there". Albert Banks said, "Uhhh, those apartments, where at". **Johnny Lee Ivory III** said, "Aright, since you about to get off on Cali, bust a left on 23rd Street and then when you get to Bellview, bust a right and then go about a quarter the way up and park". The conversation then ended shortly thereafter.

47.     On 03/23/2013, Special Agent in Charge (SAC) Doug Younger received a call from SSA Matthew Lyon indicating Albert Banks was coming to Topeka, Kansas

D007129

from Junction City, Kansas to pick up narcotics. SAC Younger went to the area of I-70 and Auburn Road and waited for Albert Banks to drive by in his gold Buick bearing Kansas tag 181DYM. SAC Younger was assisted in locating Albert Banks by SSA Lyon due to an ongoing wire intercept and ping order which had been initiated on Albert Banks' phone on 03/07/2013.

48.     At Approximately 12:20 PM, SAC Younger saw Albert Banks and began following him east on I-70 into Topeka, Kansas. SAC Younger followed Albert Banks east on I-70 to California, south on California to 23rd, east on 23rd to Bellview, then south on Bellview about a quarter block down where Albert Banks parked on the west side of the street facing south. At Approximately 12:34 PM, SAC Younger then watched as Albert Banks walked into 2317 Bellview, Topeka, Kansas with a light skinned black male (later found to be **Johnny Lee Ivory III**) following him into the residence. While SAC Younger was following Albert Banks he was also being given directions as to where Albert Banks was going due to SSA Lyon intercepting the conversation between Albert Banks and **Johnny Lee Ivory III** wherein Albert Banks was being given directions by **Johnny Lee Ivory III**. SSA Lyon stated that Albert Banks was talking to a male subject with a phone number of (929)268-6183.

49.     At approximately 1:01 PM, SAC Younger saw Albert Banks and **Johnny Lee Ivory III** come out of the apartment and get into a maroon KIA bearing Kansas tag 648CKC and drive south on Bellview to 25th, west on 25th to California, south on California to the Snippery, a business located on the east side of California, where they parked from approximately 1:04 PM to 1:07 PM. The two then left again driving south on California to 29th, west on 29th to Michigan, then south on Michigan to 3139 Michigan, the residence of **Johnny Lee Ivory III** mother at approximately 1:11 PM. At this point of the surveillance, SAC Younger was joined by Officer Emmett Smith of the RCPD and GESO Deputy Justin Stopper who were assisting with the ongoing KBI investigation in Geary County and Riley County. At approximately 1:16 PM, Albert Banks and **Johnny Lee Ivory III** left 3139 Michigan and were lost by surveillance. At Approximately 1:28 PM, SAC Younger was stopped at the stop sign at 31st and California, when he relocated **Johnny Lee Ivory III** and Albert Banks traveling north on California after they had turned from traveling east on 32nd. SAC Younger then recognized **Johnny Lee Ivory III**

16

from photographs which he has seen almost daily for the past month of **Johnny Lee Ivory III**. SAC Younger then followed them north on California to 25th where they turned east. Officer Smith then saw them park on the east side of the street facing north in front of 2317 Bellview at approximately 1:31 PM. At approximately 1:33 PM, Albert Banks and **Johnny Lee Ivory III** again left driving the maroon KIA. This time they drove west on 25th to California and then south on California to Lott. At Lott they turned west and surveillance lost them. At approximately 2:09 PM, they arrived back at 2317 Bellview.

50.     At about 2:30 PM, JCPD Detective Al Babcock emailed SAC Younger a picture of **Johnny Lee Ivory III** at which time SAC Younger again was able to positively identify **Johnny Lee Ivory III** from the picture.

51.     At approximately 2:31 PM, Albert Banks went back to his vehicle and left by himself. He drove to California then north on California to the Phillips 66 where he parked at the pumps.  Albert Banks did not pump gas into his vehicle but instead went into the business. At approximately 2:34 PM, Albert Banks left the gas station and continued to travel north on California to I-70. At I-70, SAC Younger followed Albert Banks west to Wanamaker where Officer Smith and Deputy Stopper continued the surveillance and followed Albert Banks back to Junction City, Kansas.

52.     On 03/26/2013 at approximately 8:10 PM, Albert Banks called **Johnny Lee Ivory III**. Albert Banks told **Johnny Lee Ivory III** he should come to where Albert Banks was at.  **Johnny Lee Ivory III** said he didn't have any "wheels" (means of traveling to where Albert Banks was at).  **Johnny Lee Ivory III** talked about going to Junction City tomorrow. Albert Banks talked about the death of Martye Madkins III brother Elijah Madkins III.  Albert Banks said Martye Madkins III didn't even go to the funeral (in Junction City).   Albert Banks said Martye Madkins III was talking about driving to Louisiana and killing the warden.  Martye Madkins said he was going to "Shoot the bitch husband in the head, I'm fixin to get that bitch. They're going to gun his ass down down there".  Albert Banks said the Warden lives "in a house on the prison compound".  Albert Banks went on to say, "They might of knock that nigga ass off (the guards killed Elijah Madkins)."  Albert Banks talked about some drug he ingested which made him feel funny during the funeral yesterday.  Albert Banks then talked about

17

Jamaica getting shot at the club previously. Albert Banks said the person who shot Jamaica beat the charge and said it was self defense and the shooter was out on the bricks now (not imprisoned). **Johnny Lee Ivory III** said she (Jamaica) might get him back. Albert Banks talked about seeing a white male getting pulled over by the police in Junction City and the police found a gram of meth, weed and a loaded .45 Taurus on his hip and the white male wasn't charged. Albert Banks said he was looking at the DA (District Attorney) "like what you gonna do with this guy" and was thinking, "You ain't goin to take this to the feds". Albert Banks said the DA didn't have any intention taking his (Albert Banks') case to trial. Albert Banks talked about going to Portland, Oregon and how he was told by another person when you get off the bus there are people standing right there trying to sell you weed. Albert Banks was told to come to Oregon and you don't even have to pay for a card there as the unknown male would get him a card to buy the weed. Albert Banks said he had $100,000 and then they laughed. Albert Banks said all **Johnny Lee Ivory III** had to do was put away a grand a day for 100 days. Albert Banks told **Johnny Lee Ivory III** to put up a "Ben ($100.00)" a day and he could do it. **Johnny Lee Ivory III** said he "ain't at a point where he can set back and do that". After more conversation, Albert Banks lost connection and the call ended.

53.     On 03/28/2013 at approximately 12:06 AM, and unknown male called **Johnny Lee Ivory III** from Albert Banks' phone. When **Johnny Lee Ivory III** answered the unknown male said, "Hey 5" which the Affiant knows to be a street name used by **Johnny Lee Ivory III**. The unknown male told **Johnny Lee Ivory III** that Albert Banks told the unknown male to call **Johnny Lee Ivory III** and have **Johnny Lee Ivory III** give Cuddy Albert Banks' new number to him (Cuddy) and tell him (Cuddy) to call Albert Banks at his new number.

54.     At approximately 12:01 PM, Albert Banks sent **Johnny Lee Ivory III** a text message which read, "Tis ab cal me at tis number 7852260860". Translated it means, this is AB (Albert Banks). Call me at this number 785-226-0860.

18

D007132

## CONFIDENTIAL SOURCES

55.    To date, there are two cooperating individuals (CI's) that have been developed and assisting with the investigation into Albert Banks' illegal drug distribution. Neither of these CI's are, nor can they be, utilized to assist with the investigation involving **Johnny lee Ivory III** as they are already assisting with the Albert Banks investigation and therefore would have no reason (in the minds of Albert Banks or **Johnny Lee Ivory III**) to look towards **Johnny Lee Ivory III** for illegal drugs to purchase.  Only one of the CI's may remotely even know the identity of **Johnny Lee Ivory III** and is in no way a friend or business partner of his.  No other CI's have been developed to assist in the investigation of **Johnny Lee Ivory III** and no CI's are anticipated to be developed at this point in the investigation.

## FACTS AND CIRCUMSTANCES

56.    Based upon the Affiant's investigation and those of other law enforcement agencies, the following facts and circumstances are set forth.  The Affiant believes the investigation has revealed that **Johnny Lee Ivory III** and Albert Banks are involved in the distribution of illegal drugs and have been for some time. Given the content of the phone conversations between **Johnny Lee Ivory III** and Albert Banks as well as the amounts of crack cocaine sold to CI #1 by Albert Banks, and the amounts of controlled substances available to sell, the Affiant believes **Johnny Lee Ivory III** and Albert Banks have been and will continue to be involved in an ongoing conspiracy to distribute illegal drugs. The conspiracy includes numerous persons both known and unknown. **Johnny Lee Ivory III** and Albert Banks continue to realize profits from the sale of controlled substances. Based on all the information the investigation has been able to gather thus far, it is the consensus of the law enforcement investigators that **Johnny Lee Ivory III** and Albert Banks, in association with others, are involved in extensive illegal drug activity. This is evident by the sales of controlled substances to CI #1, observations made during

D007133

those sales, and phone conversations intercepted between **Johnny Lee Ivory III** and Albert Banks.

## GOALS OF THE INVESTIGATION

57.    It is the goal of the Law Enforcement personnel involved in this investigation to identify all persons involved in this operation whether they are in Kansas or any other state.   The identity of persons that are transporting, manufacturing and/or storing illegal drugs in Kansas is being and will continue to be pursued.   The identities and prosecution of the conspirators involved in the transportation, manufacturing, storing and distribution of illegal drugs to and from the state of Kansas is hoped to be achieved. Another goal of this investigation is to dismantle this organization that is under the control of **Johnny Lee Ivory III** and Albert Banks.  It is believed this organization is responsible for the distribution of large amounts of illegal drugs in Shawnee, Geary and Riley County, Kansas.    At this time, the clear scope of the organization, all the conspirators, their involvement and the amount of illegal drugs being distributed have not been identified.  Without the ability to monitor the phone belonging to **Johnny Lee Ivory III**, it is believed the full scope of the operation will not be disclosed nor will it be dismantled.  While a prosecutable case has been made on Albert Banks, the full extent of the source of supply coming from **Johnny Lee Ivory III** and his source of supply have not been determined and likely will not be discovered without the wire intercept of his conversations between himself and Albert Banks as well as conversation **Johnny Lee Ivory III** will have with others within his organization.  Without a wire interception the persons involved in this targeted distribution operation will be allowed to continue.

## NEED FOR WIRE INTERCEPTIONS

58.    Investigation to date has failed to disclose and prove the full scope of the targeted organization and the locations and sources of all supply sources currently being used by the subject(s) of this investigation.  Direct evidence linking the source of the supply to the flow of illegal drugs in the present conspiracy would be difficult, if not impossible, to obtain using standard investigative techniques.  This is evidenced by the

D007134

fact CI #1 has not and will not be taken into the organization's full confidence and advised of the source or sources of the illegal drugs.

59.     Affiant believes the requested wire interception will produce the requisite information identifying and establishing a direct link to the sources and supply of the illegal drugs.  Based upon the combined experience of Affiant and all law enforcement personnel involved in this investigation, based upon all of the facts set forth herein, it is the Affiant's belief that the interception of wire communications is the only available technique which has a reasonable likelihood of securing evidence demonstrating the scope of the illegal drug activity.

## OTHER INVESTIGATIVE PROCEDURES

60.     There are numerous investigative procedures, which are usually employed in an investigation of this type which appear unlikely to succeed if attempted. Other procedures which might reveal the scope of this conspiracy and those involved are simply too dangerous to employ, or would compromise the integrity of the investigation.

### A.     PHYSICAL SURVEILLANCE

61.     Physical surveillance has been utilized in this investigation and has proven to be of limited value. Although it has identified some interaction between **Johnny Lee Ivory III** and Albert Banks, but it has not led investigators to the source of supply for **Johnny Lee Ivory III**.  Both of the aforementioned subjects have been followed to locations which cannot be determined as the source of supply or merely just a location for other activities.  Physical surveillance – if not used in conjunction with other techniques, including electronic surveillance – is of limited value.  Physical surveillance, even if highly successful, does not always assist in gathering evidence of the criminal activity under investigation.  It is an investigative technique that is used to confirm meetings between alleged co-conspirators, but, in many cases, only leads investigators to speculate as to the purposes of these meetings, because the surveillance itself often proves association between the conspirators at a given time and place.  It is also a technique used

21

D007135

to corroborate information obtained from cooperating individuals, which are non-existent in the investigation of **Johnny Lee Ivory III**. Physical surveillance of alleged conspirators will not, however, conclusively establish the elements of the subjects' violations, and this technique has not, and most likely will not, establish the identities of all conspirators. In addition, continued physical surveillance is not expected to enlarge information now available to substantiate the elements of criminal violations for which the state's application seeks to intercept wire communications. Prolonged or regular surveillance of the movements of the suspects is instead likely to be noticed, causing the suspects to become even more cautious and secretive in their illegal activities, causing them to flee to avoid apprehension and prosecution and/or possibly compromising the investigation. It must also be noted that the conspirators have utilized techniques to avoid being surveilled by law enforcement such as driving erratic or slower than all other traffic, making sudden stops or unexpected sudden turns while engaged in physical surveillance by law enforcement. It should also be noted that the conspirators have employed counter surveillance techniques such as having lookouts place themselves around buildings, vehicles and/or residences to watch for persons that continue to drive past or near the locations where suspected drug trafficking offenses are, or will be committed. Finally, it is not possible to determine the full nature and scope of the aforementioned offenses by the use of simple physical surveillance, given the number of conspirators, the complexity of the criminal violations, the multi-jurisdictional locations and travels of some of the conspirators, and the varying rolls played by the targets of this investigation. Officers of the Junction City Police Department, the Riley County Police Department and Kansas Bureau of Investigation agents have attempted to conduct surveillance of meets between **Jonny Lee Ivory III** and Albert Banks but that has proven difficult at best due to their erratic driving behaviors and what appear to be means of driving patterns used to identify if someone is indeed following them.

D007136

### B.    COOPERATING INDIVIDUALS

62.    No cooperating individuals have been identified in the investigation of
**Johnny Lee Ivory III** and none are likely to be developed for various reasons which may
include fear of retaliation.  During the course of the investigation involving Albert Banks,
it has been concluded this organization doesn't distribute to persons they don't already
know and trust due to the mistrust the subjects have of individuals they are acquainted
with or have conducted business with prior.

### C. UNDERCOVER AGENTS

63.    It is very unlikely and not anticipated any undercover Agents will have the
ability to make purchases from any of those involved in this organization.  It is the belief
of law enforcement, any undercover person/s (if developed) would most likely never be
given the opportunity to advance within the ranks of the organization to a place where the
true conspiracy/conspirators would be identified.  It is also the belief of law enforcement
that the possibility of gaining the knowledge of the source of supply for this organization
involving **Johnny Lee Ivory III** would not occur as the identity of this person/s has been
kept secret throughout this investigation.  The undercover agent would never be fully
trusted and any further relevant information related to the scope of the illegal drug
activity would never be known.

### E.    USE OF JUDICIAL AND ADMINISTRATIVE SUBPOENAS

64.    Based upon Affiant's experience and conversations with other Agents and
Administration of the Kansas Bureau of Investigation as well as Officers and
Administration of the Junction City Police Department and the Riley County Police
Department, who have considerable experience in investigating these individuals, similar
operations and violations of the law such as these, it is the common consensus that the
service of subpoenas to persons believed to be involved in this conspiracy and their
associates would not be successful in achieving the stated goals of this investigation.  If

D007137

any principals of this conspiracy, their co-conspirators, or any other participants were approached to cooperate each and every one would refuse to assist. This is especially true in this case, given the close ties among the inner circle of conspirators and many of the principals. Many of the principals in this investigation have been subjects of previous investigations and are aware of the techniques used by law enforcement to garner information. Moreover it would be unwise to afford any kind of immunity to such persons given that such immunity would not guarantee truthful admissions concerning the scope of the illegal drug activity being investigated. Additionally, service of subpoenas would alert the conspirators to the existence of this investigation and prompt the targets to take measures to thwart it. Finally, participants in such a criminal enterprise are often reluctant to implicate others out of fear for their own safety or as a result of their loyalty to their fellow conspirators.

## F.    SEARCH WARRANTS

65.    The execution of search warrants in this investigation has been considered. Use of warrants alone is unlikely to reveal the total scope of the criminal operation, the identities of all conspirators, or the precise roles each plays within the conspiracy.  It is extremely unlikely, given the history of this criminal organization, that the majority of the contraband controlled by the conspirators could be located at any given time unless electronic surveillance was employed.  Affiant believes the execution of search warrants at this time would compromise the investigation.

66.    For the reasons set forth in the preceding paragraphs, normal methods of investigation have been attempted and failed, or reasonably appear unlikely to succeed, and/or are too dangerous to employ.  At this time the only reasonable method of developing the necessary evidence of the above-listed violations is to intercept the wire communications of the subjects of this investigation. Such interceptions will reveal the details of this conspiracy involving the importation and distribution of controlled substances, possession with the intent to distribute controlled substances, and use of communication facilities to further these offenses, in violation of Kansas Law.

D007138

## MINIMIZATION

67.    All monitoring of wire communications will be conducted in such a way as to minimize the interception of communication.   Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Conversations, which are of a non-criminal or non-evidentiary nature, once minimized, will be spot-monitored in order to determine if the topic of the conversation has switched to a criminal or evidentiary nature.

68.    The interception of communications will be discontinued if the voice of one or more of the named interceptees is not identified as participating in the communication within a reasonable period of time, or in the case of conversations of others unknown which are of a non-criminal or non-evidentiary nature; spot-monitoring will be used to determine if conversations have switched to an evidentiary or criminal nature.    Monitoring will be conducted subject to the requirements to minimize interception of all non-pertinent communications.  All monitoring will be recorded.

## PERIOD OF INTERCEPTION

69.    Because of the continuing nature of the offenses as discussed above, it is further requested that authorization to intercept not automatically terminate when the types of communications described above are first obtained, but be permitted to continue until all wire communications are intercepted which fully reveal the manner in which the subjects of this investigation conduct and participate in the above-described offenses, and which reveal the full nature, scope and extent of the above-described offenses; the identities and roles of accomplices, aiders and abettors, co-conspirators, other participants in the offenses; the dispositions and locations of the proceeds from the offenses; and the

D007139

types, existence and locations of all records and other physical evidence of the offenses. Even if the objectives set forth in the preceding sentence have not been fully achieved, it is hereby requested that the court's order provide that authorization to intercept shall automatically terminate after thirty days, the thirty day period running from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under the court's order or ten days after the order is entered.

GLEN F. VIRDEN
Senior Special Agent
Kansas Bureau of Investigation

Sworn to before me and subscribed in my presence this ___2___ day of April, 2013.

Judge of the Geary County District Court
State of Kansas

26

D007140

IN THE DISTRICT COURT OF GEARY COUNTY, KANSAS

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION | ) | |
| OF THE STATE OF KANSAS | ) | CASE NO. |
| FOR AN ORDER AUTHORIZING THE | ) | |
| INTERCEPTION OF WIRE | ) | UNDER SEAL |
| COMMUNICATIONS TO AND FROM | ) | |
| SPRINT/NEXTEL WIRELESS TELEPHONE: | ) | |
| 929-268-6183 | ) | |
| BEARING MOBILE STATION IDENTIFICATION # | ) | |
| (MSID) 000003477244840 AND ELECTRONIC SERIAL | ) | |
| # (ESN) 256691437000557176 | ) | |

## ORDER AUTHORIZING THE INTERCEPTION
## OF WIRE COMMUNICATIONS

Application under oath having been made before me by Steven L. Opat, Geary County Attorney, based on the sworn affidavit of Glen F. Virden, Senior Special Agent, Kansas Bureau of Investigations, an investigative or law enforcement officer of the State of Kansas within the meaning of Section 5 of K.S.A. 22-2514, *et seq*, for an Order authorizing the interception of wire communications pursuant to K.S.A. 22-2514, *et seq*, and full consideration having been given to the matter set forth therein, the Court finds:

A.    there is probable cause to believe that Johnny Lee Ivory, DOB ███████ Albert DeWayne

Banks, DOB ███████ and Anthony Carlyle Thompson, DOB ███████ and others named in

the affidavit of the said Glen F. Virden, and others yet unknown (hereinafter "Target

Subjects"), have committed, and are committing, and will continue to commit offenses

enumerated in Article 57 of K.S.A. 21-5701 *et seq*, specifically possession of controlled

substances with intent to distribute, and distribution of controlled substances, in violation

**EXHIBIT 7**

D007142

of K.S.A. 21-5701 *et seq*, specifically 21-5705 and 5706, unlawful use of a communication facility to commit and facilitate the commission of drug trafficking offenses, in violation of K.S.A. 21-5707; attempts, conspiracies or solicitations to possess with intent to distribute or to distribute controlled substances, in violation of K.S.A. 21-5701 *et seq*, and K.S.A. 21-5301 and 21-5302 and 21-5304; unlawful acts involving proceeds derived from violations of K.S.A. 21-5701-5717. (Hereinafter the "Target Offenses");

B.    there is probable cause to believe that particular wire communications of the said Johnny Lee Ivory, Albert DeWayne Banks, Anthony Carlyle Thompson and others yet unknown (hereinafter "Target Interceptees"), concerning the above-described Target Offenses will be obtained through the interception for which authorization has herewith been applied. In particular, there is probable cause to believe that the interception of wire communications to and from the cellular telephone with the assigned telephone number 929-268-6183, bearing MSID 000003477244840 and ESN 256691437000557176 with service provided by Sprint/Nextel Wireless which is a subscribed prepaid account with James Williams, although it is clear that the principal user is and has been identified as Johnny Lee Ivory III, will further disclose, detail and reveal the specifics of the above offenses, including the depth of the conspiracy and the manner and means of how and with whom these offenses are being committed, including the unknown sources from which the distribution by Johnny Lee Ivory, Albert DeWayne Banks, Anthony Carlyle Thompson, and others is made possible;

C.    it has been established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ; and

D.    there is probable cause to believe that 929-268-6183 has been and will continue to be used in connection with commission of the above-described offenses.

D007143

WHEREFORE, IT IS HEREBY ORDERED that Special Agents of the Kansas Bureau of Investigation, and other agencies acting under the supervision of the KBI, are authorized, pursuant to an application as authorized by K.S.A. 22-2515, made by Steven L. Opat, the duly elected and authorized County Attorney for Geary County, State of Kansas, to intercept wire communications to and from the above-described telephone.

PROVIDED that such interception(s) shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, or for a period of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct an interception under this order or ten (10) days after this order is entered, whichever is earlier.

1T IS ORDERED FURTHER that in the event that the target telephone is transferred outside the territorial jurisdiction of this court, interceptions may take place in any other jurisdiction within the United States.

IT IS ORDERED FURTHER that the authorization given is intended to apply not only to the target telephone number listed above, but also to any other telephone number or telephone accessed through the above-referenced MSID number, and to any other MSID number accessed through the target telephone number referenced above, within the thirty (30) day period. The authorization is also intended to apply to the target telephone number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target

telephone while the telephone is off the hook or otherwise in use.

IT IS ORDERED FURTHER that, based upon the request of the Applicant pursuant to K.S.A. 22-2514, and the definitions set forth therein, and K.S.A. 22-2515 and 2516, Sprint / Nextel, an electronic communication service provider as defined in Section 2510(15) of Title 18, United States Code and K.S.A. 22-2514, shall furnish the KBI and/or it's agents or designees with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such provider is according the persons whose communications are to be intercepted, with the service provider to be compensated by the KBI for reasonable expenses incurred in providing such facilities or assistance.

IT IS ORDERED FURTHER that, to avoid prejudice to the government's criminal investigation, the provider of the electronic communications service and its agents and employees are Ordered Not To Disclose or Cause Disclosure of the Order or the request for information, facilities and assistance by the KBI or the existence of the investigation to any person other than those of its agents and employees who require this information to accomplish the services hereby ordered. In particular, said provider and its agents and employees shall not make such disclosure to a lessee, telephone subscriber or any interceptee or participant in the intercepted communications.

IT IS ORDERED FURTHER that this Order shall be binding on any subsequent provider of electronic communications services as defined in Title 18, United States Code, Section 2510(15) and K.S.A. 22-2514 *et seq*, that provides services to the target telephone number(s) listed above upon service of a certified copy of this Order without any further court order being required.

IT IS ORDERED FURTHER that this order shall be executed as soon as practicable and that all monitoring of wire communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to

the pending investigation. The interception of wire communications must terminate upon the attainment of the authorized objectives, not to exceed thirty (30) days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception of this order or ten (10) days after he order is entered.

Monitoring of conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119, Title 18, United States Code and K.S.A. 22-2514 *et seq.*. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named Target Interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall spot check to insure that the conversation has not turned to criminal matters.

IT IS ORDERED FURTHER that, pursuant to Section 2518(5), Title 18, United States Code and K.S.A. 22-2514 *et seq*, in the event intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

IT IS ORDERED FURTHER that Steven L. Opat, Geary County Attorney and/or Antonio Cruz Assistant Geary County Attorney shall provide this Court with a report on or about the tenth, twentieth, and thirtieth days following the date of this Order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If any of the above-ordered reports should become due on a weekend or holiday, IT IS ORDERED FURTHER that such report shall become due on the next business day thereafter.

D007146

IT IS ORDERED FURTHER that this Order, the application, affidavit and proposed order, and all interim reports filed with this Court with regard to this matter, shall be sealed until further order of this Court, except that copies of the order, in full or redacted form, may be served on the KBI and the service provider as necessary to effectuate this order.

DONE and ORDERED this ___2___ day of ___April___, 20__13__, at in Junction City, Kansas.

HONORABLE, DAVID R. PLATT
DISTRICT JUDGE
8TH JUDICIAL DISTRICT, STATE OF KANSAS

D007147

# IN THE COURT OF GEARY COUNTY
# STATE OF KANSAS

IN THE MATTER OF THE APPLICATION   }
}
FOR AN ORDER AUTHORIZING THE     }    No. _____
}
INTERCEPTION OF WIRE COMMUNICATIONS}

## AFFIDAVIT IN SUPPORT OF APPLICATION

     I, Glen F. Virden, Senior Special Agent, Kansas Bureau of Investigation, being of lawful age and duly sworn upon my oath depose and state:

     1.    I am an "Investigative" law enforcement officer duly deputized with statutory authority for the State of Kansas, and as further recognized and defined by K.S.A. 22-2514(5).

     2.    This affidavit is submitted in support of an application for an order authorizing the interception of the wire communications of **Otis Ponds, B/M Date of Birth** █████████, and others listed below, over telephone number **(316) 347-0088**, a personal cellular telephone currently in service with Verizon Wireless with Electronic Serial Number(ESN) A000003962BB8A. Verizon Wireless records indicate the phone number to be subscribed to **OAS PHONEINTHEBOX** which the Affiant knows is not the person using the cellular telephone as described in detail within this document. The Affiant requests authority to intercept the wire communications of individuals communicating on telephone number **(316) 347-0088**.

     3.    Affiant believes the following individuals will be intercepted over telephone number **(316) 347-0088**; **Otis Ponds**, Anthony Carlyle Thompson, Albert Dewayne Banks, and others yet unknown.

     4.    Affiant requests authority to intercept the conversations and the background conversations intercepted in the vicinities of the aforementioned telephone while the telephone is off the hook or otherwise in use. Affiant requests this authority in

1

**EXHIBIT 8**

D009137

order to obtain evidence concerning the above persons' involvement in the following offenses: Possession of Cocaine in violation of Kansas Statutes Annotated (K.S.A.) 21-5706(a); Distribution of Cocaine in violation of K.S.A. 21-5705(a)(1); Conspiracy to commit these offenses in violation of K.S.A. 21-5302; and the Use of a Communications Facility to facilitate the commission of the above offenses in violation of K.S.A. 21-5707(a)(1).  All offenses are in violation of Kansas Law, which have been and are being committed by the persons identified herein and others yet unknown.

      5.      The Affiant has been a law enforcement officer since 2001 with the Kansas Bureau of Investigation (KBI).  The Affiant is currently a Senior Special Agent with the Topeka Region of the Special Operations Division for the KBI.  The Affiant is a graduate of Cowley County Community College with an associate of applied science degree in Criminal Justice and Southwestern College with a bachelor's degree in Criminal Justice.  The Affiant, while so employed in law enforcement, has received training in narcotics investigations to include, but not limited to: Kansas Law Enforcement Training Center's Basic Training Academy, the Kansas Bureau of Investigation's Advanced Investigations Academy, the Kansas Bureau of Investigation's Clandestine Lab Certification School, Kansas Top Gun Narcotics training, and the U.S. Drug Enforcement Administration's Basic Narcotics Investigators School.  Affiant has investigated numerous narcotics cases.  These investigations have included, but are not limited to undercover purchases of narcotics, controlled purchases of narcotics using cooperating individuals and search warrants.  The Affiant has arrested numerous individuals for violations of both state and federal violations of controlled substances statutes.  As a result, Affiant has interrogated many defendants, informants and others who were either sellers, distributors, purchasers, manufacturers or users of controlled substances.  The Affiant is familiar with how controlled substances are obtained, diluted, packaged, distributed, sold, used, and manufactured.  Affiant is also familiar with the records, books, and documents needed to carry on such illicit activity.

      (a)      Based on the above experience, Affiant believes there is probable cause to believe the subjects of this investigation, both known and unknown, have committed, are committing and will continue to commit offenses involving possession, distribution and conspiracy to distribute cocaine.  Such violations involve the use of

2

communication facilities in order to facilitate the commission of the above offenses, each being in violation of Kansas Uniformed Controlled Substances Act.

(b)     That particular wire communications of the subjects of this investigation concerning the above offenses will be obtained through the interception of such communications to and from telephone number **(316) 347-0088**. In particular, there is probable cause to believe that the communications to be intercepted will concern dates, times, and places for commission of the aforementioned offenses when the above named interceptee communicates with the listed interceptees and other unknown suppliers, co-conspirators, aiders and abettors. There is further probable cause to believe that the communications to be intercepted will disclose the location of assets owned or controlled by the persons involved, and the manner, extent and identity of persons who direct and/or participate in the illegal activities set forth herein. These communications are expected to constitute admissible evidence of the above-described offenses.

(c)     That telephone number **(316) 347-0088**, has been, is being, and will continue to be used in connection with the commission of the above offenses. The interception of these communications is expected to concern verbal and messaging discussions of the continuing conduct, financing, managing, supervising, directing, or ownership of all or part of an illegal narcotics enterprise, including orders and instructions to subordinates, the receipt of information pertaining to the obtaining and distribution of controlled substances, and other conversations relating to the administration, control, and management of the aforementioned illegal drug activity.

6.     Normal investigative procedures have been tried and have failed to achieve the goals of this investigation, or reasonably appear unlikely to succeed if tried, or are too dangerous to employ, as more fully explained below.

## INVESTIGATIVE INVOLVEMENT OF STATE AND LOCAL LAW ENFORCEMENT

7.     This investigation is a result of a joint effort by the Affiant, other Agents of the Kansas Bureau of Investigation (KBI), Officers of the Junction City Police Department (JCPD), Officers of the Geary County Sheriff's Office (GESO) and Officers

D009139

of the Riley County Police Department (RCPD). The investigation covers a period of time from June 2012 to the present. The statements contained in this affidavit are based in part on information provided by Agents/Officers of the above-listed law enforcement agencies. Because this affidavit is being submitted for the purpose of securing authorization for the interception of wire communications, Affiant has not included each and every fact known to the Affiant concerning this investigation. Affiant has set forth only the facts that Affiant believes are necessary to establish the necessary foundation for an order authorizing the interception of wire communications. If a court order is granted authorizing the interception of wire communications in this case, only those persons and agencies authorized by law to make such interceptions will be allowed to do so.

8. In April, 2012, Detective Nate Boeckman of the RCPD contacted Detective Alvin Babcock of the JCPD Drug Operation Group (DOG) with information that Anthony Thompson (AKA "Ant") and Albert Banks (AKA "AB") were distributing cocaine within the Junction City, Geary County, KS area and the Manhattan, Riley County, KS area. RCPD received this information from a Source of Information (SOI) to be referred to as "SOI #1" from this point forward. SOI #1 appeared to have knowledge of some of the criminal elements related to Anthony Thompson and Albert Banks, but was not allowed to have intimate knowledge of the day to day operations or the source of supply of the cocaine.

9. SOI #1 did give information saying Anthony Thompson and Albert Banks were receiving powder cocaine from an unknown supplier/s then transporting (or having it transported) back to the Junction City area where they would convert the powder cocaine to crack cocaine themselves (evidence of this conversion will be explained in this affidavit). SOI #1 did not have direct knowledge of when the powder cocaine purchases were occurring, who was driving to purchase the powder cocaine and even if one of the aforementioned persons were actually obtaining the cocaine or having another person unknown to this investigation acquire and transport the cocaine to Anthony Thompson and Albert Banks. SOI #1 has continued to give some credible information to Agents/Officers but beyond that, SOI #1 has not been beneficial to the investigation. As stated above, SOI #1 has limited knowledge related to the full scope of the cocaine distribution network, other co-conspirators and the source of supply for the cocaine.

4

10.    The Affiant was contacted by Lieutenant Mike Life of the JCPD and asked to assist with the investigation.    The Affiant met with Agents/Officers of the aforementioned agencies to in an attempt to garner information related to persons who might be involved in the distribution of cocaine.    The Affiant then contacted an individual who had been a Cooperating individual (CI) for the KBI since 1985 (to be referred to as CI #1 from this point forward).  The Affiant had a meeting with CI #1 and asked if CI #1 would be willing to assist in the investigation to which CI #1 agreed. Since CI #1's association with the KBI beginning in 1985, CI #1 has successfully been an integral part of a number of State and Federal investigations which culminated with the prosecution and convictions of numerous persons related to the distribution of drugs.  CI #1 has had a number of Agents within the KBI as his/her handler.  The Affiant has had contact with a number of these Agents who spoke highly of CI #1 and his/her abilities to assist in investigations culminating in successful prosecution.

11.    On 05-30-2012, Detective Alvin Babcock of the JCPD received phone call from Detective Nate Boeckman of the RCPD informing him that Detective Nate Boeckman had received information alleging Albert Banks had left a package of cocaine wrapped in either brown tape or a brown paper bag in an alley between 13th and 14th Streets and Franklin and Monroe Streets in Junction City, Geary County, KS the previous evening.  Detective Nate Boeckman advised Detective Alvin Babcock that RCPD was conducting surveillance on a residence in Manhattan, Riley County, KS where it was believed Albert Banks was residing at the time.  Detective Nate Boeckman advised a white in color Chrysler 300 having black rims had arrived at the residence. The driver of the vehicle was identified by RCPD Detectives as Chris Howard.  A short time later, Chris Howard and Albert Banks were seen leaving the residence in the aforementioned vehicle.

12.    Also within the investigation, a source of supply has been located in the Wichita, Sedgwick County, KS area.  This source of supply is using telephone number (316) 347-0088. The subscriber is OAS PHONEINTHEBOX but is believed to be Otis Ponds who resides in the Wichita, Sedgwick County, Kansas Area.

D009141

### WIRE INTERCEPT ON  ANTHONY THOMPSON'S PHONE

13.     On 03/07/2013 a lawful wire intercept was initiated on telephone number (785) 226-1783 Jason Roberts but is being used by Anthony Thompson.  Anthony Thompson is distributing crack cocaine in the Junction City, Geary County, Kansas area. Numerous phone conversations have been intercepted which detail the activities of Anthony Thompson and other co-conspirators distributing crack cocaine.

14.     On 03/08/2013 at approximately 3:38 p.m. a phone conversation was intercepted between Anthony Thompson and the subject believed to Otis Ponds.  During this conversation, it was believed that Anthony Thompson asks Otis Ponds if he's "bounced out already." After Otis Ponds advised "yeah", Anthony Thompson says "well shit". Anthony Thompson asks Otis Ponds if he could "grab a little easy" for him.  Otis Ponds agrees and advising "yeah, I got you." The call was ended after this.

15.     On 3/8/2013 at approximately 3:39 p.m. a short phone conversation was intercepted between Anthony Thompson and Otis Ponds.  During that conversation, Anthony Thompson asks Otis Ponds if an unknown person was "trippin' on a, on that good we had a; he was tripping on that was he?" Otis Ponds advised "I had already put it back."  Anthony Thompson says "ah, you did?"  Otis Ponds again tells Anthony Thompson "I put that shit back." A short time later Otis Ponds advises that someone unknown "didn't have the money"  and the unknown  "didn't even know it was gone." Near the end of the conversation, Otis Ponds tells Anthony Thompson "yeah, I'll do that for you, as soon as I get down here."   Anthony Thompson responded to Ponds, "ok, that's what's up homey, love." The two then hung up.

16.     On 3/8/2013 at approximately 3:42 p.m. a phone conversation was intercepted; in which, Otis Ponds calls Anthony Thompson.  Anthony Thompson asks Otis Ponds "what was up, homey".  Otis Ponds asks Anthony Thompson "hey, if you see that nigga Martye, tell that nigga to call me asap." Anthony Thompson tells Otis Ponds "okay, I just, I seen him but okay, I got ya." Otis Ponds advises "yeah, if he got that change tell him that uh, (inaudible)" Anthony Thompson says "ok".     Otis Ponds

6

D009142

responded with "it's 780." Anthony Thompson tells Otis Ponds "alright". Otis Ponds also advises "alright", and the two hung up.

17.    On 3/8/2013 at approximately 7:52 p.m. a phone conversation was intercepted between Otis Ponds and Anthony Thompson.   Anthony Thompson answers the phone.   Otis Ponds asks Anthony Thompson for a favor.   Anthony Thompson agrees and Otis Ponds asks Anthony Thompson if he has a "hundred flip". Anthony Thompson initially says "shit I don't have, but I got yeah, I got it. What you want me to do?" Otis Ponds tells Anthony Thompson to "go take it to Renee, she gonna have to give you a hundred so I can keep it moving over there." Anthony Thompson agrees.   Further in the conversation, Otis Ponds tells Anthony Thompson that "I was supposed to go to the place, but shit nigga's went to taking so long." Anthony Thompson later asks if Otis Ponds had a "little change." Anthony Thompson tells Otis Ponds that "AB says you was going to wear (inaudible) too." Otis Ponds advises that he(Otis Ponds) went to his "little stache".   Otis Ponds and Anthony Thompson agree, and Otis Ponds advises Otis Ponds will see them "in about forty-five." Anthony Thompson agrees and tells Otis Ponds "yeah, I'll take that over there, now homey". Otis Ponds wants Anthony Thompson and AB to meet him at "the house." The call was ended shortly after.

18.    On 3/9/2013 at approximately 3:49 p.m. a phone conversation was intercepted between Otis Ponds and Anthony Thompson.     Initially, during the conversation the audio sounds as if Anthony Thompson is having a conversation with someone unknown.   Otis Ponds then asks "what's happenin' playa".     Anthony Thompson then acknowledges that Otis Ponds had answered the telephone and responded to Ponds "what's up my nigga?" During a portion of the conversation, Anthony Thompson tells Otis Ponds "we got some in, we in the back, we at the back door." Otis Ponds says "oh, I thought you was trippin' or something." Anthony Thompson wants Otis Ponds to "open the door man" and a few seconds later the call is ended.

19.    On 3/14/2013 at approximately 2:51 a.m. a phone conversation was intercepted between Otis Ponds and Anthony Thompson.   During a portion of the conversation, Otis Ponds tells Anthony Thompson "you know my motto, sell my half." Anthony Thompson and Otis Ponds then start laughing.  Anthony Thompson asks Otis

D009143

Ponds if he(Otis Ponds) wants to talk with Martye; in which, Otis Ponds agrees. Otis Ponds and Martye then have a conversation, and the call is ended shortly after.

20.     On 3/15/2013 at approximately 1:54 p.m. a phone conversation was intercepted from Anthony Thompson to Otis Ponds.   During the conversation, Otis Ponds advised that Otis Ponds was on his way to Kansas City and explains that Otis Ponds had to drop a "sister" off and grab "lil mamma" and come back.  Anthony Thompson asks Otis Ponds "what you want me to do with smoke?" Otis Ponds then asks Anthony Thompson "ah shit, oh your sister says you hadn't hollered at him." Otis Ponds tells Anthony Thompson "check this out, this is what I need you to do though, ah shit, ah what he trying to, what he need to, to get together?"  Anthony Thompson responded to Ponds with "I don't know, I really don't know."  Otis Ponds responded to Anthony Thompson advising that "ok, man, he need to take a break.  That's what he needs to do." Anthony Thompson asks "what?"  Otis Ponds said "you need to know he needs to just take a break for a minute." OTIS PONDS is briefly inaudible, but then advises "you know he's so crazy his money's going to get fucked." OTIS PONDS says "ah, but um, shit ah, don't even trip shit if he needs something let me know, and then he can call, call me, and I'll tell you where it's at." ANTHONY THOMPSON advises "ok." The two then end the call within seconds.

21.     On 3/16/2013 at approximately 12:31 p.m. a phone conversation was intercepted; in which, Anthony Thompson calls Otis Ponds.   During that phone call, Anthony Thompson asks Otis Ponds "what you ah, you said you need me to (inaudible) with change." Otis Ponds advises "I was going to have you, go to the uh, if you got it on you, go uh to the room, ah grab that, it's a 208, I need to get that room, uh, for the uh, for the night.  Til tomorrow.   Cause I got to, I'm about to take, bring my bitch down there she gotta work tomorrow, I mean tonight."  Anthony Thompson asks "oh, you coming down tonight?"   Otis Ponds responded "yeah I'm coming down right here in a hot second. My bitch gotta work tonight at seven at Mustangs."  Anthony Thompson asks "what you ah, everything cool or what?"  Otis Ponds tells Anthony Thompson "yeah, that's what I'm ah, calling a nigga for now, that's why I hadn't left yet."  Anthony Thompson asks Otis Ponds "you want me to send you a lil change?"  Otis Ponds asks Anthony Thompson "ah shit, no, what was you talking about homey?"  Anthony

8

D009144

Thompson says "I was probably gonna grab one or something." Otis Ponds says "grab one, shit, then I'll, bitch, bitch the crazy thing about it all is that nigga I still got, I still got damn near a the uh, da whole down there." Anthony Thompson asks Otis Ponds "for real, ready?" Otis Ponds says "yeah, at the room, ready. That's why I'm trying to hurry up and get down there, but I had moved it. What did you, you need some right now?" Anthony Thompson says "oh shit, not, not man, I don't really need it like right, right then. I was just, I was really going come in hot, I didn't know you was coming down here today. Shit." Otis Ponds responded "shit, what you was gonna come down this way"; in which, Anthony Thompson advises "yeah." Otis Ponds asks Anthony Thompson "what you gotta bring the kids or something?" Anthony Thompson tells Otis Ponds "no, uh uh." Anthony Thompson then explains that his kids are "down here" advising to Otis Ponds that it's Spring Break. Otis Ponds then confirms "ok, uh, what you need, oh ok, you need one. I'm calling a nigga now, nigga everything, uh nigga uh, he gotta uh, like a little janitorial service." Anthony Thompson interrupts Otis Ponds and says "ah, shit it don't matter, (inaudible) whatever, shit it don't matter." Otis Ponds tells Anthony Thompson "ok, I got ya. I'll just get with you, uh, I'll get with you when I get back." Anthony Thompson says "ah, ok, that'll work." Otis Ponds tells Anthony Thompson the "room is like eighty three dollars or something at the Quality Inn it's already 208, just tell them you're paying for me another day, Otis Otis Ponds." Anthony Thompson confirms with "Quality 208, ok." The two begin talking about Martye. Otis Ponds tells Anthony Thompson that he(Otis Ponds) would call as soon as "I'm(meaning Otis Ponds) there." After a short conversation, the two then hang up.

22.     On 3/16/2013 at approximately 2:29 p.m. a phone conversation was intercepted between Otis Ponds and Anthony Thompson. Anthony Thompson tells Otis Ponds that Otis Ponds needs to go pick the keys up. Anthony Thompson asks if anything was in the room. Otis Ponds tells Anthony Thompson there was some clothes and "shit" in the room but doesn't sound concerned. Otis Ponds then says "I'm getting you together right now, we just going do the uh, we just gonna go in half on one so." Anthony Thompson tells Otis Ponds "ok, that will work." Otis Ponds responded "alright, bet." Anthony Thompson and Otis Ponds then end the call.

D009145

23.     On 3/16/2013 at approximately 2:29 p.m. text messages were intercepted between Otis Ponds and Anthony Thompson.  The initial text from Otis Ponds to Anthony Thompson read "We gud bro."  On the same date at approximately 3:24 p.m. Anthony Thompson responded with a text message with "Bet."  On the same date at approximately 3:47 p.m. Otis Ponds responded with a text message to Anthony Thompson reading "Were u at fam".   After this, two telephone calls were intercepted from Otis Ponds to Anthony Thompson; however, Anthony Thompson did not answer the telephone.  On the same date at approximately 4:15 p.m. Otis Ponds again sends a text to Anthony Thompson reading "Were u at fam cal me bac asap".

24.     On 3/16/2013 at approximately 4:27 p.m. a phone conversation was intercepted between Anthony Thompson and Otis Ponds.      During that phone conversation, Otis Ponds tells Anthony Thompson "go up there to the front desk get the key right." Anthony Thompson tells Otis Ponds "uh huh, I'm in the hat but I can go do it though."   Otis Ponds says "yeah, when you go in the room, look in that coffee thing." Anthony Thompson responded to Ponds with "ok."  Otis Ponds says "that's the whole thing, but shit just take your part out of it."   Anthony Thompson again responded to Ponds with "ok."  Otis Ponds then tells Anthony Thompson that Otis Ponds has to go to Lawrence but tells Anthony Thompson when he does that, to pull up by the trash can and look on the side of that "storage thing."   Otis Ponds tells Anthony Thompson that Anthony Thompson will know what he(Otis Ponds) is talking about.  Otis Ponds wants Anthony Thompson to "put that up for me if you can." Anthony Thompson agrees with "ok."   The call ended shortly after.   (The item Otis Ponds discusses with Anthony Thompson near the storage thing was a paper bag containing a bag of Cocaine seized by the Affiant in the action described below.)

25.     On 03/16/2013, the Affiant was contacted by monitors who were monitoring telephone number (785)226-1783 being used by Anthony Anthony Thompson.  Monitors described the above phone call between Otis Ponds and Anthony Thompson; including Otis Ponds conversation with Anthony Thompson about the item by the "storage thing."  The Affiant, with other surveillance officers monitoring, walked to the shed located on the south side of the Quality Inn.  The Affiant located a brown paper bag between the curb and the shed; located in the parking lot.      The Affiant

D009146

secured the brown paper bag with contents and transported the item to the Junction City Police Department for inspection. Upon inspection of the contents of the brown paper bag and contents; the Affiant noted a clear baggy containing an off white chunky substance was located inside the brown paper bag. The Affiant weighed the clear baggy with the off white chunky substance. The baggy with off white chunky substance had an approximate gross weight of 25.7 grams. The Affiant then conducted a field test on a portion of the off white chunky substance utilizing a Scott Reagent Modified 07 field test kit. When testing the off white chunky substance; the Affiant noted the test revealed a presumptive positive for the presence of Cocaine. The Affiant packaged and secured the item as evidence.

26.     On 3/29/2013, the Affiant received a Forensic Laboratory report which stated cocaine base was indicated in the aforementioned item and had a net weight of 24.69 grams.

27.     On 3/16/2013 at approximately 4:28 p.m. a short phone conversation was intercepted between Otis Ponds and Anthony Thompson. Otis Ponds tells Anthony Thompson "the coffee thing is in the restroom." Anthony Thompson replies with "oh, ok." Later, Otis Ponds tells Anthony Thompson "look for the brown bag on the side of that thing." Anthony Thompson replies with "ok." The call is then ended.

28.     On 3/16/2013 at approximately 6:09 p.m. a phone conversation was intercepted between Otis Ponds and Anthony Thompson.  During the conversation Anthony Thompson tells Otis Ponds "yeah this is here, but shit, ah you sure you this ain't, what it, you didn't put it in here." Otis Ponds tells Anthony Thompson "na, it ain't in there, that's the whole, that's one the whole thing.  Man, somebody has found that ah, paper." Anthony Thompson interrupts Otis Ponds and says "you got some soft in here too or something." Otis Ponds says "yeah, no that's the whole thing, thats the whole that's all." Anthony Thompson says "oh this is, what about this other one." Otis Ponds says "what other one." Anthony Thompson says "there's two things in here." Otis Ponds says "did I take some and put it in this." Anthony Thompson interrupts and says "it's in a ziplock, you got some in a big ziplock bag." Otis Ponds tells Anthony Thompson "I did, that's, that's, that's the uh, that's the cut up for me to (inaudible.)" Anthony Thompson says "oh, ok, oh, ok." Later, Anthony Thompson tells Otis Ponds "that chunk, that's the

D009147

whole thing." Anthony Thompson replies with "(inaudible)this is other shit, that's some other shit." Otis Ponds says "yeah, that's the that's the shit to uh cut it up with the uh." Anthony Thompson then asks Otis Ponds "what you get for the half of this?" Otis Ponds tells Anthony Thompson "shit, just whatever half uh, (inaudible) 675." Anthony Thompson replies with "oh, ok, two uh, I mean six uh," Otis Ponds interrupts with "675." Otis Ponds tells Anthony Thompson to "take all that outta there." Otis Ponds then tells *ANTHONY THOMPSON* ~~Otis Ponds~~ to "look again." Anthony Thompson and Otis Ponds have a conversation about an item that was missing, and Anthony Thompson tells Otis Ponds that the "housekeepers be moving around." Anthony Thompson suggested that the item "fell up under there"; in which, Otis Ponds advises the item couldn't have. Anthony Thompson and Otis Ponds have a brief conversation and the call is ended.

29.    On 3/16/2013 at approximately 6:14 p.m. a phone conversation was intercepted between Anthony Thompson and Otis Ponds. During that conversation Anthony Thompson tells Otis Ponds "I don't see it, homey (inaudible) they had a white boy shit pulling up over there too. I was just said fuck it, I don't see it that mothafucker should just been sitting right there." Otis Ponds responded thinking that the "white boy, probably seen it." Otis Ponds explains that there was a "white boy out there" "moving around." Otis Ponds then speaks to someone else off of the telephone. Anthony Thompson asked Otis Ponds "what the white boy looked like." Otis Ponds says "it was an older white dude." Later in the conversation Anthony Thompson says "twenty one, that's a couple riggedy's right there, at least a rack." Anthony Thompson and Otis Ponds talk about the potential of Anthony Thompson just not seeing the item where it was located. The call is ended.

30.    On 03/16/2013 at approximately 7:47 p.m. a phone conversation was intercepted between Otis Ponds and Anthony Thompson. During that conversation Otis Ponds and Anthony Thompson talk about the "white dude" seen and Otis Ponds asks if he(white dude) was driving a "black car." Anthony Thompson advises "yep"; in which, Otis Ponds tells Anthony Thompson "that motherfucker is still sittin' outside." Anthony Thompson tells Otis Ponds that "he look like the police." Otis Ponds tells Anthony Thompson "that's what I was wondering." Anthony Thompson described how he was looking for the item. Further in the conversation, Otis Ponds tells Anthony Thompson

12

D009148

the item had been sitting there since "yesterday morning when I left." Otis Ponds tells Anthony Thompson that Otis Ponds is "down here now." Otis Ponds tells Anthony Thompson that the female has to work at "Mustangs tonight." Otis Ponds describes a female that he(Otis Ponds) is taking to Lawrence because she has to work at the "VIP joint" tomorrow.    Otis Ponds tells Anthony Thompson "I gotta make that shit up somehow." Later in the conversation, Otis Ponds tells Anthony Thompson "that in the room, that just got there today." Otis Ponds says "that shit that was missing that was there yesterday." The call then is ended.

31.    On 3/16/2013 at approximately 10:22 p.m. a phone conversation was intercepted between Otis Ponds and Anthony Thompson.    During a portion of the conversation, Otis Ponds tells Anthony Thompson "I'm going have to move that, uh, that green and shit from over at that bitches house. This bitch talking bout she ain't even got no, uh, no change. I'm like how the fuck you ain't got no change, she said it was poppin' last night.  But your sister said she seen her, and said the bitch look like she was uh, twerk, I mean uh, tripped out, like shit, like the bitch was high or something." Anthony Thompson asks if Otis Ponds was "talking about the black one."    Otis Ponds agrees. Otis Ponds later says that "she gonna have to pay up, I ain't fucking with you like that." Otis Ponds and Anthony Thompson continue their conversation about the female.    Otis Ponds later describes himself as "not a pimp" but a "jack of all trades."

32.    On 3/16/2013 at approximately 10:24 p.m. a text message was intercepted from Otis Ponds to Anthony Thompson that read "Bro only do 7g I need a ball". Anthony Thompson responded to Otis Ponds with a text that read "K".

33.    On 3/16/2013 at approximately 11:19 p.m. a phone conversation was intercepted between Otis Ponds and Anthony Thompson.    Otis Ponds discusses forgetting to talk to AB about grabbing "one of those things." Otis Ponds and Anthony Thompson have a conversation about females.    During the conversation, Otis Ponds talks about a female that "now wants to be a dope girl." Otis Ponds talks about wanting to tell the female "I shouldn't have to move no sack, bitch you should be having to move it. The only time I'm a moving a sack is for my niggas." Otis Ponds continued to talk about the female with Anthony Thompson.    Otis Ponds then talks about a chick named "Smiley" who had called him.  Otis Ponds says "I was going to do the cup trick to her, I

D009149

was going to put it in a McDonald's cup and just set it somewhere and be like hun let me get the (inaudible) bitch let me get the money (inaudible.)" Anthony Thompson advises "right now she's cool, but I just don't, you know what I'm saying, I'm just going to give you the heads up that she can go bad, man, at any given time. So you know what I'm saying." Otis Ponds tells Anthony Thompson that Anthony Thompson's sister told Otis Ponds "don't fuck with her." Otis Ponds and Anthony Thompson continue their conversation; including talking about a subject named "Wig." Otis Ponds and Anthony Thompson talk for several seconds about a female in a "strip joint" doing "tricks" for "$350 a pop". The call is ended shortly after.

34.     On 3/18/2013 at approximately 12:45 p.m. a phone conversation was intercepted between Anthony Thompson and Otis Ponds. During the conversation, Otis Ponds advises to Anthony Thompson that Otis Ponds was at the room. Otis Ponds and Anthony Thompson talk about looking for an item "up under a trash can beside the pallet" that was gone. Otis Ponds explains the item must have been taken, and describes a loss of "thirty four, thirty five hundred dollar loss it took 24 hours." Otis Ponds says, "I had something to do with that change, I had some shit I needed to do with it." Anthony Thompson asks Otis Ponds if Otis Ponds had talked to "Bo" explaining to Otis Ponds that "Bo" probably found the item. Otis Ponds advises that he had been trying to call "Bo". Anthony Thompson tells Otis Ponds that he would attempt to call him.

35.     On 3/21/2013, Detective Alvin Babcock of the Junction City Police Department drove to the Quality Inn Motel at 305 E. Chestnut Street in Junction City, Geary County, Kansas. Detective Babcock confirmed Otis Ponds had rented room #208 at the same motel for the dates of 3/15/2013, 3/16/2013, and 3/17/2013. Detective Babcock identified that Otis Ponds had switched rooms on 3/17/2013. At that time Otis Ponds was identified as staying in room #205 of the same Quality Inn Motel; until 3/20/2013. Later, Detective Babcock reported checking the validity of Otis Ponds driver's license; in which, Detective Babcock was advised that Otis Ponds' Kansas driver's license was suspended.

36.     On 3/22/2013 at approximately 12:45 p.m. a phone conversation was intercepted between Anthony Thompson and Otis Ponds. Otis Ponds tells Anthony Thompson about some the "damn cop shit." Otis Ponds discusses being followed by

14

police and Otis Ponds avoiding them.   Otis Ponds said "he didn't think I knew who he was."   Otis Ponds discusses that when he was parked at the motel, the person drove by and got his tag near the CD Tradepost.   Otis Ponds tells Anthony Thompson that the person wrote down the tag.   Otis Ponds then tells Anthony Thompson "then when the name pop up, it's gonna be my cousin, and he gonna, he, my cousin look just like me. So he (inaudible)."   Anthony Thompson replied "see that's the good thing about it."   Otis Ponds tells Anthony Thompson "yeah, this nigga got life."   Anthony Thompson then says "that's what you gonna, that's what you gonna hit em with if they ever try to bloop you ain't ya."   Otis Ponds then tells Anthony Thompson "Man, hell yeah, my name is Devon Otis Ponds partner.   Shit I lost my ID, one of ya'll motherfuckers Junction City motherfuckers stoled it."   Anthony Thompson replied with "yep."   Otis Ponds describes how he would leave prior to law enforcement finding out who he really was.   Later in the conversation, when Otis Ponds is talking about coming back to town with his "lil bitch that work at the aircraft," Otis Ponds says he's gonna "slide in on the under."   Anthony Thompson says "let me shoot this change down there.   Even if you don't come, I'll just come grab it tomorrow, it don't matter."   Otis Ponds says to Anthony Thompson "ole boy, that 1250 dude ain't, dude ain't poppin with it."   Otis Ponds later says "I'll probably go holla at ole busy and them."   Anthony Thompson says "ok, what's that like 14," with Otis Ponds response as "yeah, 14."   Later Anthony Thompson says "I might have enough on me, let me count my change up and see, if not I might have to shoot to the Hat."   Otis Ponds then says "ok, but shit, don't let nobody even know."   Anthony Thompson agrees. Otis Ponds and Anthony Thompson end the call shortly after.

37.   On 3/22/2013 at approximately 8:31 p.m. a phone conversation was intercepted between Otis Ponds and Anthony Thompson.   Initially during the telephone call, Anthony Thompson says "ah shit, I'm uh, shoot you 7 up there."   Otis Ponds replies with "shoot me 7, alright bet."   During the conversation, Otis Ponds tells Anthony Thompson to "put it to Otis Otis Ponds" with Anthony Thompson confirming this advising it was going to be at the "money gram."   Otis Ponds describes that the money gram closes early.   Later in the conversation, Otis Ponds tells Anthony Thompson that he will get "it" advising that "I got enough money to square at that."   Otis Ponds and

15

Anthony Thompson then began talking about a female.   The phone conversation ends soon after.

38.    On 3/23/2013 at approximately 12:26 a.m. a phone conversation was intercepted between Anthony Thompson and Otis Ponds.    Anthony Thompson and Otis Ponds negotiate to meet at "Eve's".    Otis Ponds tells Anthony Thompson that he was staying the night.   Otis Ponds admits to "switching everything up."  Otis Ponds tells Anthony Thompson that Otis Ponds was going to the Best Western or Marriot.    Otis Ponds says he's going to go back home, and chill out; advising that he was still "trying to recover off that loss." Otis Ponds tells Anthony Thompson that "ya'll just going to have to come up my way for a minute."    Otis Ponds and Anthony Thompson finish the conversation and the call was ended.

39.    On 3/23/2013 at approximately 2:58 p.m. a phone conversation was intercepted between Anthony Thompson and Otis Ponds.   Initially, the two begin speaking about Martye.    Otis Ponds then speaks about a female being on "pills" including "Loratabs;" Otis Ponds begins talking about a female and prostitution.   Later, Otis Ponds says " hey on that, what we was talking about, is you ready on that end?" Anthony Thompson's initial response was inaudible.   Otis Ponds replies to Anthony Thompson with "yeah."   Anthony Thompson then asks Otis Ponds if he was "down here." Otis Ponds advises "no, no, no I'm already back, I had to bring baby, baby back." Anthony Thompson says "nah, for real, I probably will be in a little bit though."  Otis Ponds later tells Anthony Thompson, "I've got something even better going." Otis Ponds wants to tell Anthony Thompson about it "in your face." Anthony Thompson agrees and advises that Anthony Thompson could "bring the boys up tomorrow."   The two talk about going to the casino and the weather. Otis Ponds begins talking about his "hoe" that could've done a trick for three grand.    Otis Ponds gives further advice for women to Anthony Thompson. Anthony Thompson and Otis Ponds begin talking about "Smiley" and "Smiley's" recent arrest involving the possession of Cocaine and Marijuana.   Otis Ponds says "she must've not got caught with no work." The two then began discussing the possibility that "Smiley" possibly working for law enforcement.   Otis Ponds tells Anthony Thompson about needing to have his female do all the work, so that Otis Ponds

D009152

doesn't have to "touch nothing." Otis Ponds and Anthony Thompson continue their phone call about females; and after a lengthy conversation, the call was ended.

40.    On 3/24/2013 at approximately 1:35 p.m. a phone conversation was intercepted between Anthony Thompson and Otis Ponds. Otis Ponds asks Anthony Thompson if Anthony Thompson was going to bring his kids down today. Anthony Thompson advised that he was going to wait until after the funeral. Otis Ponds advises that Otis Ponds was going to tell his probation officer and tell them Otis Ponds was going to go to a funeral. Otis Ponds and Anthony Thompson talk about AB. Later, Otis Ponds asks "what you wanna do, you wanna go four on four on that Q?" Anthony Thompson advises "oh, yeah." Otis Ponds later says "I wish we could go eight on eight on motherfucker, that half a thing." Anthony Thompson says "yeah, we need to get it moving." Otis Ponds and Anthony Thompson talk about Martye and the phone conversation is ended shortly after.

41.    On 03/07/2013 a lawful wire intercept was initiated on telephone number (785) 375-6704 which had no subscriber information but is being used by Albert Banks. Albert Banks is distributing crack cocaine in the Junction City, Geary County, Kansas area. Numerous phone conversations have been intercepted which detail the activities of Albert Banks and other co-conspirators distributing crack cocaine.

42.    On 3/7/2013 at approximately 9:27 p.m. a text message was intercepted from Otis Ponds to Albert Banks. The text message was sent twice within the same minute and read "Were u at bro need to get sum reg bro?"

43.    On 3/8/2013 at approximately 1:30 p.m. a phone conversation was intercepted between Otis Ponds and Albert Banks. The phone call was from Albert Banks to Otis Ponds; in which, Albert Banks advised to Otis Ponds "I'm just going to hold on off, I'm gonna get the rest of that on off, (inaudible), I've still got to give you forty dollars man." Otis Ponds says "I know, I forgot all about, I was just thinking about that like damn, I was wondering why my money was short." Albert Banks interrupts Otis Ponds advising "(inaudible) forty dollars." Otis Ponds says "huh, yeah, ok, well shit, don't even trip. But I might just go on and grab, grab your H town anyway you know and just bring it back like fuck it." Albert Banks responded to Ponds with "ok, shit, I'll

D009153

be ready by the time you get back though." Otis Ponds agrees with "alright" and the call
is ended shortly after.

44.    On 3/10/2013 at approximately 5:24 p.m. a phone conversation was
intercepted between Otis Ponds and Albert Banks.  Otis Ponds had called Albert Banks
and asked Albert Banks where he was at.  Albert Banks reply was inaudible.  Otis Ponds
tells Albert Banks that "alright cuz I got some that uh, some bread that you can get too."
Albert Banks responded to Ponds with "oh, alright I'll be there in a second."  The call is
ended shortly after.

45.    On 3/12/2013 at approximately 8:29 p.m. a phone conversation was
intercepted between Otis Ponds and Albert Banks.    During the conversation, Albert
Banks tells Otis Ponds about a recent CD Albert Banks had purchased that is about
somebodies mom "smoking crack."  Albert Banks confirms he had purchased the CD's in
Topeka on the day of the call.  Later in the conversation Otis Ponds asks Albert Banks
"what's up with your boy?"  Albert Banks said "I've been waiting on him to call me, but
he never called back." Otis Ponds tells Albert Banks "I need ah, when I get down there
I'm gonna need ah, ah, (inaudible) yeah." Albert Banks tells Otis Ponds "alright it's all
good." Otis Ponds says "yeah I need some of that, you, you got uh."  Albert Banks says
"hey you know you still got a little bit of that green left man." Otis Ponds says "where?"
Albert Banks says "in that little baby wipe thing."  Otis Ponds tells Albert Banks that he
had forgotten about it and says "well shit I'm good then, I ain't trippin." Albert Banks
and Otis Ponds then talk further about the CD and other music.  The call is ended shortly
after.

46.    On 3/13/2013 at approximately 11:50 a.m. a phone conversation was
intercepted between Albert Banks and Otis Ponds.    Initially, Albert Banks and Otis
Ponds discuss a new CD and other music.   The two then discuss Martye's brothers death.
Later in the conversation, Albert Banks tells Otis Ponds "it's all good on that end."  Otis
Ponds asks "on the what?"  Albert Banks says "on the end."  Otis Ponds says "no shit.  I
wish you would've told me last night.  Cause I just went in and got down. Ah, but you
said 1250 to huh?" Albert Banks says "yeah."  Otis Ponds says "ok, I gots, my dude right
now I'm about to meet up with for the same ticket.  And we gonna compare notes when I
get there, and shit, if your notes is better than mine, then shit."

D009154

47.     On 3/22/2013 at approximately 10:44 a.m. a phone conversation was intercepted between Albert Banks and Otis Ponds.  During that conversation, Otis Ponds originally asks "what you think about if a mother fucker say ah, 16 for that ah, half half of that (inaudible) some of that old, uh, what's that shit, some of that old keshu.  Is that cool?"  Albert Banks replies with "ah, ah, ah, a half a thing."  Otis Ponds says "yep." Albert Banks asks "hold up, that's it's name, keshu?"  Otis Ponds then tells Albert Banks "yep, no, uh it um oh, what's that shit that you had, AK-47 or some shit?"  Albert Banks again replies "what's the name of it?"  Otis Ponds tells Albert Banks "shit that's what I'm saying, that's what it is?"  Albert Banks asks Otis Ponds again "that's what it is?"  Albert Banks can be heard talking to someone in the background.  A short time later, Albert Banks comes back and says "a half a p?"  Otis Ponds and Albert Banks agree that it's $16 dollars or as Otis Ponds said "8 a q."  The conversation is ended shortly after.

48.     On 3/24/2013 at approximately 2:31 p.m. a phone conversation was intercepted between Albert Banks and Otis Ponds.  Otis Ponds talks about trying to stop Albert Banks when Albert Banks left Lucky's.  Otis Ponds and Albert Banks talked about how things were slow.  Otis Ponds said "I've been taking too many losses."  Albert Banks and Otis Ponds began talking about females.  After that Otis Ponds brings up Martye; in which, Albert Banks talks about Martye wanting some money.  Otis Ponds asks Albert Banks "did Ant tell you what I seen yesterday when I was taking baby to work."  Otis Ponds advised "I seen the people on the otherside, on the front side."  Otis Ponds later explained there was three different people on different locations of the block. Otis Ponds told Anthony Thompson that he was "down here" and had been.  Albert Banks later tells Otis Ponds that "it's also the end of the month, so you gotta start budgeting and shit.  Cause at the end of the month, shit start getting slow."  Otis Ponds agreed.  Albert Banks ask Otis Ponds if Otis Ponds knew that "Ant got wooped on at the club."  Otis Ponds advised he had "heard."  Albert Banks began talking about hearing that "they shut the roads down there to the dub."  Albert Banks believed it was due to the snow.  Otis Ponds later said "even if a nigga was trying to go back shit, nigga couldn't." Otis Ponds asks Albert Banks if "you still right?"  Albert Banks replied "I'm still cool, I'm almost (inaudible).  It's slow motion, this shit have been gone."  Otis Ponds tells Albert Banks "shit nigga, I've been sittin', sittin' and sittin' on my shit. Yeah I ain't,

D009155

man, if I don't keep it undone, it ain't gettin' sold." Otis Ponds later says "I think it's time to switch towns. Shit, shoot my ass down to old Parsons for a little bit, see what the hell is going on down there." Albert Banks asks Otis Ponds "that's at the bottom of Kansas ain't it." Otis Ponds advised "yep." The conversation is ended shortly after.


## CONFIDENTIAL SOURCES

49.     To date, there are two cooperating individuals (CI's) that have been developed and assisting with the investigation into Albert Banks and Anthony Thompson's illegal drug distribution. Neither of these CI's are, nor can they be, utilized to assist with the investigation involving **Otis Ponds** as they are already assisting with the Albert Banks and Anthony Thompson investigation and therefore would have no reason (in the minds of Albert Banks, Anthony Thompson or **Otis Ponds**) to look towards **Otis Ponds** for illegal drugs to purchase. Neither of the CI's have any knowledge of **Otis Ponds**. No other CI's have been developed to assist in the investigation of **Johnny Otis Ponds** and no CI's are anticipated to be developed at this point in the investigation.


## FACTS AND CIRCUMSTANCES

50.     Based upon the Affiant's investigation and those of other law enforcement agencies, the following facts and circumstances are set forth. The Affiant believes the investigation has revealed that **Otis Ponds**, Anthony Thompson and Albert Banks are involved in the distribution of illegal drugs and have been for some time. Given the content of the phone conversations between **Otis Ponds,** Anthony Thompson and Albert Banks as well as the amounts of crack cocaine sold to CI #1 by Anthony Thompson and Albert Banks, and the amounts of controlled substances available to sell, the Affiant believes **Otis Ponds**, Anthony Thomspon and Albert Banks have been and will continue to be involved in an ongoing conspiracy to distribute illegal drugs. The conspiracy includes numerous persons both known and unknown. **Otis Ponds**, Anthony Thompson

D009156

and Albert Banks continue to realize profits from the sale of controlled substances. Based on all the information the investigation has been able to gather thus far, it is the consensus of the law enforcement investigators that **Otis Ponds**, Anthony Thompson and Albert Banks, in association with others, are involved in extensive illegal drug activity. This is evident by the sales of controlled substances to CI #1, observations made during those sales, and phone conversations intercepted between **Otis Ponds**, Anthony Thompson and Albert Banks.

## GOALS OF THE INVESTIGATION

51.    It is the goal of the Law Enforcement personnel involved in this investigation to identify all persons involved in this operation whether they are in Kansas or any other state. The identity of persons that are transporting, manufacturing and/or storing illegal drugs in Kansas is being and will continue to be pursued. The identities and prosecution of the conspirators involved in the transportation, manufacturing, storing and distribution of illegal drugs to and from the state of Kansas is hoped to be achieved. Another goal of this investigation is to dismantle this organization that is under the control of **Otis Ponds**, Anthony Thompson and Albert Banks. It is believed this organization is responsible for the distribution of large amounts of illegal drugs in Sedgwick, Geary and Riley County, Kansas. At this time, the clear scope of the organization, all the conspirators, their involvement and the amount of illegal drugs being distributed have not been identified. Without the ability to monitor the phone belonging to **Otis Ponds**, it is believed the full scope of the operation will not be disclosed nor will it be dismantled. While a prosecutable case has been made on Anthony Thompson and Albert Banks, the full extent of the source of supply coming from **Otis Ponds** and his source of supply have not been determined and likely will not be discovered without the wire intercept of his conversations between himself, Anthony Thompson and Albert Banks as well as conversations **Otis Ponds** will have with others within his organization. Without a wire interception the persons involved in this targeted distribution operation will be allowed to continue.

D009157

Case 5:13-cr-40060-DDC   Document 379-21   Filed 07/01/14   Page 1 of 6

IN THE DISTRICT COURT OF GEARY COUNTY, KANSAS

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION | ) | |
| OF THE STATE OF KANSAS | ) | CASE NO. |
| FOR AN ORDER AUTHORIZING THE | ) | |
| INTERCEPTION OF WIRE | ) | UNDER SEAL |
| COMMUNICATIONS TO AND FROM | ) | |
| VERIZON WIRELESS TELEPHONE: | ) | |
| 316-347-0088 | ) | |
| ELECTRONIC SEARL NUMBER | ) | |
| (ESN) A000003962BB8A | ) | |

## ORDER AUTHORIZING THE INTERCEPTION
## OF WIRE COMMUNICATIONS

Application under oath having been made before me by Steven L. Opat, Geary County Attorney,

based on the sworn affidavit of Glen F. Virden, Senior Special Agent, Kansas Bureau of

Investigations, an investigative or law enforcement officer of the State of Kansas within the meaning

of Section 5 of K.S.A. 22-2514, *et seq*, for an Order authorizing the interception of wire

communications pursuant to K.S.A. 22-2514, *et seq*, and full consideration having been given to the

matter set forth therein, the Court finds:

A.      there is probable cause to believe that Otis Ponds DOB ████ Albert DeWayne Banks,

        DOB ████ Anthony Carlyle Thompson, DOB ████ and others named in the affidavit

        of the said Glen F. Virden, and others yet unknown (hereinafter "Target Subjects"), have

        committed, and are committing, and will continue to commit offenses enumerated in Article

        57 of K.S.A. 21-5701 *et seq*, specifically possession of controlled substances with intent to

        distribute, and distribution of controlled substances, in violation of K.S.A. 21-5701 *et seq*,

**EXHIBIT 9**

D009165

specifically 21-5705 and 5706, unlawful use of a communication facility to commit and facilitate the commission of drug trafficking offenses, in violation of K.S.A. 21-5707; attempts, conspiracies or solicitations to possess with intent to distribute or to distribute controlled substances, in violation of K.S.A. 21-5701 *et seq*, and K.S.A. 21-5301 and 21-5302 and 21-5304; unlawful acts involving proceeds derived from violations of K.S.A. 21-5701-5717. (Hereinafter the "Target Offenses");

B.       there is probable cause to believe that particular wire communications of the said Otis Ponds, Albert DeWayne Banks, Anthony Carlyle Thompson and others yet unknown (hereinafter "Target Interceptees"), concerning the above-described Target Offenses will be obtained through the interception for which authorization has herewith been applied. In particular, there is probable cause to believe that the interception of wire communications to and from the cellular telephone with the assigned telephone number 316-347-0088, bearing ESN A000003962BB8A with service provided by Verizon Wireless with subscriber listed as OAS Phoneinthebox, although it is clear that the principal user is and has been identified as Otis Ponds, will further disclose, detail and reveal the specifics of the above offenses, including the depth of the conspiracy and the manner and means of how and with whom these offenses are being committed, including the unknown sources from which the distribution by Otis Ponds, Albert DeWayne Banks, Anthony Carlyle Thompson, and others is made possible;

C.       it has been established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ; and

D.       there is probable cause to believe that 316-347-0088 has been and will continue to be used in connection with commission of the above-described offenses.

D009166

WHEREFORE, IT IS HEREBY ORDERED that Special Agents of the Kansas Bureau of Investigation, and other agencies acting under the supervision of the KBI, are authorized, pursuant to an application as authorized by K.S.A. 22-2515, made by Steven L. Opat, the duly elected and authorized County Attorney for Geary County, State of Kansas, to intercept wire communications to and from the above-described telephone.

PROVIDED that such interception(s) shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, or for a period of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct an interception under this order or ten (10) days after this order is entered, whichever is earlier.

1T IS ORDERED FURTHER that in the event that the target telephone is transferred outside the territorial jurisdiction of this court, interceptions may take place in any other jurisdiction within the United States.

IT 1S ORDERED FURTHER that the authorization given is intended to apply not only to the target telephone number listed above, but also to any other telephone number or telephone accessed through the above-referenced IMSI number, and to any other IMSI number accessed through the target telephone number referenced above, within the thirty (30) day period. The authorization is also intended to apply to the target telephone number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target

telephone while the telephone is off the hook or otherwise in use.

IT IS ORDERED FURTHER that, based upon the request of the Applicant pursuant to K.S.A. 22-2514, and the definitions set forth therein, and K.S.A. 22-2515 and 2516, Verizon Wirelss, an electronic communication service provider as defined in Section 2510(15) of Title 18, United States Code and K.S.A. 22-2514, shall furnish the KBI and/or it's agents or designees with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such provider is according the persons whose communications are to be intercepted, with the service provider to be compensated by the KBI for reasonable expenses incurred in providing such facilities or assistance.

IT IS ORDERED FURTHER that, to avoid prejudice to the government's criminal investigation, the provider of the electronic communications service and its agents and employees are Ordered Not To Disclose or Cause Disclosure of the Order or the request for information, facilities and assistance by the KBI or the existence of the investigation to any person other than those of its agents and employees who require this information to accomplish the services hereby ordered. In particular, said provider and its agents and employees shall not make such disclosure to a lessee, telephone subscriber or any interceptee or participant in the intercepted communications.

IT IS ORDERED FURTHER that this Order shall be binding on any subsequent provider of electronic communications services as defined in Title 18, United States Code, Section 2510(15) and K.S.A. 22-2514 *et seq*, that provides services to the target telephone number(s) listed above upon service of a certified copy of this Order without any further court order being required.

IT IS ORDERED FURTHER that this order shall be executed as soon as practicable and that all monitoring of wire communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to

the pending investigation. The interception of wire communications must terminate upon the attainment of the authorized objectives, not to exceed thirty (30) days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception of this order or ten (10) days after he order is entered.

Monitoring of conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119, Title 18, United States Code and K.S.A. 22-2514 *et seq.*. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named Target Interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall spot check to insure that the conversation has not turned to criminal matters.

IT IS ORDERED FURTHER that, pursuant to Section 2518(5), Title 18, United States Code and K.S.A. 22-2514 *et seq*, in the event intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

IT IS ORDERED FURTHER that Steven L. Opat, Geary County Attorney and /or Antonio Cruz Assistant Geary County Attorney shall provide this Court with a report on or about the tenth, twentieth, and thirtieth days following the date of this Order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If any of the above-ordered reports should become due on a weekend or holiday, IT IS ORDERED FURTHER that such report shall become due on the next business day thereafter.

D009169

IT IS ORDERED FURTHER that this Order, the application, affidavit and proposed order, and all interim reports filed with this Court with regard to this matter, shall be sealed until further order of this Court, except that copies of the order, in full or redacted form, may be served on the KBI and the service provider as necessary to effectuate this order.

DONE and ORDERED this __2__ day of _____April_____, 20_13_, at in Junction City, Kansas.

HONORABLE DAVID R. PLATT
DISTRICT JUDGE
8TH JUDICIAL DISTRICT, STATE OF KANSAS

THE 8ᵀᴴ JUDICIAL DISTRICT
FOR THE STATE OF KANSAS

IN THE MATTER OF THE APPLICATION OF
COUNTY ATTORNEY STEVEN L. OPAT FOR AN          UNDER SEAL
ORDER AUTHORIZING INTERCEPTION OF
WIRE COMMUNICATIONS ON TELEPHONE
NUMBER (785) 226-1783

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR EXTENSION OF THE WIRE TAP ORDER OF MARCH 5, 2013

        Comes now Senior Special Agent Glen Virden of the Kansas Bureau of Investigation and being duly sworn on oath, does state and aver the following:

      1.     That he is the Senior KBI agent in charge of the investigation into the continuing conspiracy by Albert Dwayne Banks, Anthony Carlyle Thompson, Otis Ponds and Johnny Lee Ivory and numerous others whose names appear in the initial affidavits presented herein and within the progress reports previously submitted to this court for its review pursuant to statute; those previously submitted affidavits and those previously submitted progress reports including the report of April 4, 2013 are incorporated by reference herein as though more fully set forth herein.

      2.     This sworn affidavit is offered in support of the application of Steven L. Opat, Geary County Attorney, for an order continuing the interception of wire communications on telephone number 785-226-1783, and the granting of an extension for a period not to exceed thirty (30) days from this date in order to further facilitate the continuing investigation and gathering of evidence regarding the ongoing and unabated conspiracy between those parties named herein above and others yet unknown to distribute controlled substances, and commit crimes ancillary to the distribution of controlled substances all as set forth in the documents previously provided to and reviewed by this court and as set forth in the application of Steven L. Opat for an order extending the order of March

         **EXHIBIT 10**

D002633

5, 2013.

Senior Special Agent Glen Virden

Subscribed and sworn to before me this 4th day of April, 2013.

The Honorable David R. Platt
Judge of the 8th Judicial District, State of Kansas

Page 2 of 2

D002634

IN THE DISTRICT COURT OF GEARY COUNTY, KANSAS

IN THE MATTER OF THE APPLICATION        )
OF THE STATE OF KANSAS                   )        CASE NO.
FOR AN ORDER AUTHORIZING THE             )
INTERCEPTION OF WIRE                     )        UNDER SEAL
COMMUNICATIONS TO AND FROM               )
T-MOBILE USA WIRELESS TELEPHONE:         )
785-226-1783                             )
BEARING INTERNATIONAL MOBILE STATION     )
IDENTIFICATION # (IMSI) 310260445955245  )

## ORDER

Application under oath having been made before been made before me by Steven L. Opat, duly elected County Attorney for Geary County, State of Kansas, an "investigative or law enforcement officer" of the State of Kansas within the meaning of Section 2510(7) of Title 18, United States Codes, and K.S.A. 22-2514, for an Order authorizing the **Continued** interception (i.e. an extension) of wire communications pursuant to K.S.A. 22-2514 *et seq*, particularly 22-2515(a)(11) and (20) as previously authorized by this Court on March 5, 2013, and therefore full consideration having been given to the matter set forth therein, the Court **Finds**:

      A.      there is probable cause to believe that Anthony Carlyle Thompson, Albert DeWayne Banks, Johnny Lee Ivory, Otis Ponds, others named in the affidavits and progress reports herein, and others as yet unknown, have committed, and are committing specifically possession of controlled substances (with intent to distribute) and distribution of controlled substances, in violation of K.S.A. 21-5701 *et seq*, specifically 21-5705 and 5706; unlawful use of a communication facility to commit and facilitate the commission of drug trafficking offenses, in violation of K.S.A. 21-5707; attempts,

**EXHIBIT 11**

conspiracies or solicitations to possess with intent to distribute or to distribute controlled substances, in violation of K.S.A. 21-5701 *et seq*, and K.S.A. 21-5301 and 21-5302 and 21-5304; unlawful acts involving proceeds derived from violations of K.S.A. 21-5701-5717, hereinafter the "Target Offenses";

B.      there is probable cause to believe that particular wire communications of Anthony Carlyle Thompson, Albert DeWayne Banks, Johnny Lee Ivory, Otis Ponds, others named in such previously submitted affidavits an progress reports, and others as yet unknown, concerning the above-described offenses will be obtained through the interception for which authorization has herewith been applied. In particular, there is probable cause to believe that the interception of wire communications to and from the telephone bearing number 785-226-1783, bearing International Mobile Subscriber Identity Number (IMSI): 310260445955245, Target Phone, which is a T-Mobile USA Wireless cellular telephone, subscribed to Jason Roberts, with the primary user having been identified as Anthony Carlyle Thompson, will concern the specifics of the above offenses, including the manner and means of the commission of the offenses(s);

C.      it has been established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are to dangerous to employ; and

D.      there is probable cause to believe that the telephone bearing the number 785-226-1783, bearing International Mobile Subscriber Identity Number (IMSI): 310260445955245, which is a T-Mobile USA Wireless cellular telephone, subscribed to Jason Roberts, with the primary user having been identified as Anthony Carlyle Thompson, has been and will continue to be used in connection with commission of the above-described offenses.

WHEREFORE, IT IS HEREBY ORDERED that Senior Special Agent Glen Virden of the K.B.I., and other agencies acting under the supervision of a K.B.I. agent, are authorized, pursuant to an application signed by Steven L. Opat, Geary County Attorney, an authorized "investigative or law enforcement officer" of the State of Kansas within the meaning of Section 2514 of K.S.A. chapter 22, that is an attorney authorized by law to prosecute, to **Continue** to intercept wire communications to an from the above-described telephone.

PROVIDED that such interception(s) shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of their confederates, their place of operations, and the nature of the conspiracy involved therein, or for a period of thirty (30) days measured from the day on which investigative or law enforcement officers first continue to conduct an interception under this order.

IT IS ORDERED FURTHER that in the event that the target telephone is transferred outside the territorial jurisdiction of this court, interceptions may take place in any other jurisdiction within the United States.

IT IS ORDERED FURTHER that the authorization apply not only to the target telephone number(s) listed above, but to any changed telephone number or IMSI subsequently assigned and utilized by the target telephone within the thirty (30) day period, but to any changed telephone number or IMSI or any other telephone number subsequently assigned to or used by the instrument bearing the same IMSI as the target cellular phone within the thirty (30) day period. It is also Ordered that the authorization apply to background conversations intercepted in the vicinity of the

target telephone while the telephone is off the hook or otherwise in use.

IT IS ORDERED FURTHER that, based upon the request of the Applicant pursuant to Chapter 119 of Title 18, United States Code, and K.S.A. 22-2514 & 2516 as amended, T-Mobile USA Wireless an electronic communication service provider as defined by law shall furnish the K.B.I. will all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such provider is according the persons whose communications are to be intercepted, with the service provider to be compensated by the K.B.I. for reasonable expenses incurred in providing such facilities or assistance.

IT IS ORDERED FURTHER that in the event that the service provider changes during the course of the interception, interception may continue with the new service provider without further order of this Court. The State of Kansas will advise the Court of the change of service provider in the periodic progress reports submitted to this Court.

IT IS ORDERED FURTHER that, to avoid prejudice to the government's criminal investigation, the provider of the electronic communications service and its agents and employess are ordered not to disclose or cause a disclosure of the Order or the request for information, facilities and assistance by the K.B.I. or the existence of the investigation to any person other than those of its agents and employees who require this information to accomplish the services hereby ordered. In particular, said provider and its agents and employees shall not make such disclosure to a lessee, telephone subscriber or any interceptee or participant in the intercepted communications.

IT IS ORDERED FURTHER that this order shall be executed as soon as practicable and that all monitoring of wire communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to

the pending investigation. The interception of wire communications must terminate upon that attainment of the authorized objectives, not to exceed thirty (30) days measured from the earlier of the day on which investigative or law enforcement officers first begin to **Continue** to conduct an interception of this Order.

Monitoring of conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119, Title 18 United States Code and K.S.A. 22-2516 as amended. Interceptions must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation is overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall spot check to insure that the conversation has not turned to criminal matters.

IT IS ORDERED FURTHER that, pursuant to Chapter 119, Title 18, United States Code, and K.S.A. 22-2516 as amended, in the event intercepted communications are in a code or foreign language, and an expert in the code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

IT IS ORDERED FURTHER that Steven L. Opat Geary County Attorney or Tony Cruz Assistant Geary County Attorney, shall provide this Court with a report on or about the tenth, twentieth, and thirtieth days following the date of **the Extension of the Order of March 5, 2013** as Authorized this date showing what progress has been made toward achievement of the authorized objectives and need for continued interception. If any of the above-ordered reports should become due on a weekend or holiday, IT IS ORDERED FURTHER that such report shall become due on

the next business day thereafter.

IT IS ORDERED FURTHER that, pursuant to law, Federal and State, (K.S.A. 22-2516), to prevent premature disclosure of an ongoing investigation, guard against fugitives, and better ensure the safety of agents and others, service of any notice requested by law may be delayed for a period of thirty (30) days after the termination of the monitoring period authorized by the warrant.

IT IS ORDERED FURTHER that T-Mobile USA Wireless, its affiliates, officers, employees, and agents not disclose the Court's Order or the underlying investigation, until notice is given as provided above.

IT IS ORDERED FURTHER that this **Order of Extension**, the application, any affidavit(s) and/or progress reports filed with this Court with regard to this matter, shall be sealed until further order of this Court, except that copies of the Order, in full or redacted form, may be served on the service provider as necessary to effectuate this Order.

DONE and ORDERED this ___4___ day of April, 2013, at ___3127___ ~~a.m.~~/p.m. in Junction City, Kansas.

_____
HONORABLE DAVID R. PLATT
DISTRICT JUDGE
8TH JUDICIAL DISTRICT
STATE OF KANSAS

# IN THE COURT OF GEARY COUNTY
## STATE OF KANSAS

IN THE MATTER OF THE APPLICATION    }
}
FOR AN ORDER AUTHORIZING THE    }    No. _____
}
INTERCEPTION OF WIRE COMMUNICATIONS}

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Glen F. Virden, Senior Special Agent, Kansas Bureau of Investigation, being of lawful age and duly sworn upon my oath depose and state:

1.    I am an "Investigative" law enforcement officer duly deputized with statutory authority for the State of Kansas, and as further recognized and defined by K.S.A. 22-2514(5).

2.    This affidavit is submitted in support of an application for an order authorizing the interception of the wire/oral and/or electronic communications of **Johnny Lee Ivory III, B/M Date of Birth** ▮▮▮▮▮▮ and others, over telephone number **(307) 256-7015**, a personal cellular telephone currently in service with Virgin Mobile USA/Sprint PCS with Mobile Station Identification Number (MSID) 000003072216731 and Electronic Serial Number (ESN) 268435462500657801. Virgin Mobile/Sprint PCS records indicate the phone to be subscribed to James Williams.  The Affiant knows **Johnny Lee Ivory III** is using the telephone and in fact had this phone put in the name of James Williams as indicated further in this affidavit.  The Affiant requests authority to intercept the wire/oral and/or electronic communications of individuals communicating on telephone number **(307) 256-7015**.

3.    This affidavit is submitted and incorporates all information related herein to this investigation, and all previous information submitted in prior affidavits and progress reports  requesting continued authority to intercept wire/oral and/or electronic

**EXHIBIT 12**

1

D007653

communications related to Albert Banks, Anthony Thompson, Otis Ponds, Johnny Lee Ivory and others known and as of yet unknown, as previously set forth therein.

4.     The conspiracy is ongoing and unabated; the interceptions previously obtained reveal that the drug trafficking conspiracy is ongoing and expanding; that certain information has been intercepted regarding crimes of violence being committed by several of the conspirators and confederates of Albert Dewayne Banks and Anthony Thompson, most notably Martye Madkins III; as described in other affidavits and/or progress reports. In addition the recent changing of phones by Albert Banks and Johnny Lee Ivory indicates a heightened sense of scrutiny by the conspirators and the only method available to continue the investigation into the conspiracy and trafficking in controlled substances is by the intercepting of wire/oral and/or electronic communications over telephone number **(307) 256-7015**, and others, combined with such surveillance as is possible.

5.     On 04/05/2013 at approximately 8:29 PM, a conversation was intercepted between **Johnny Lee Ivory** and a Virgin Mobile representative; this communication was intercepted from telephone number (929) 268-6183, which was and had been used by **Johnny Lee Ivory** as described in earlier affidavits and progress reports submitted to this Court.     The Affiant transcribed this particular telephone conversation with the transcription as follows: (UM is the Virgin Mobile representative and IVORY is **Johnny Lee Ivory**)

**Call #1329 (8:29 PM) outgoing to 888-322-1122-51#9 Virgin Mobile Aircard**
Recording
Activate press 1
Let me get someone to help you
Recording still
UM - ASKING FOR THE SERIAL NUMBER OF PHONE IVORY IS TRYING
TO ACTIVATE AND TELLS HIM IT IS ON THE BACK OF THE PHONE.
TAKE OUT THE BATTERY AND IT SHOULD START WITH A 268 OR 270
IVORY - IT'S 268435462500657801
UM - IS VERIFYING THE NUMBER IN THEIR SYSTEM AND SAYS THE
SYSTEM IS TELLING HIM THE NUMBER IS CORRECT AND HE NEEDS
IVORY'S ZIP CODE
IVORY - MY ZIP CODE
UM - YES PLEASE
IVORY - YOU MEAN MY AREA CODE
UM - NO YOUR ZIP CODE

D007654

IVORY - ALRIGHT WELL I'M CALLING FROM A DIFFERENT UH A
DIFFERENT UH STATE BUT I WANT MY NUMBER A DIFFERENT YOU
KNOW A DIFFERENT NUMBER
UM - OK SIR ARE YOU VISITING THERE OR ARE YOU STAYING THERE
PERMANENTLY
IVORY - YEAH I'M BOUT TO, YEAH I'M STAYING HERE PERMANENTLY.
I JUST MOVER HERE, UH I DON'T KNOW IT
UM - OK SIR BECAUSE I NEED A ZIP CODE TO BE ABLE TO PROVIDE
YOU A PHONE NUMBER
IVORY - YEAH, I'M I'M LOOKING UP THE ZIP CODE
UM - OK GO AHEAD
IVORY - OK HOLD ON.  IT'S 82001
UM - OK THANK YOU. THIS IS GOING TO BE IN YOUR NAME?
IVORY - YEAH
UM - OK WILL YOU PLEASE PROVIDE ME YOUR FIRST NAME
IVORY - JAMES
UM - AND YOUR LAST NAME PLEASE
IVORY - WILLIAMS
UM - THAT'S W-I-L-L-I-E-M-S
IVORY - CORRECT
UM - OK JAMES, WHAT I NEED YOU TO DO IS THINK OF A 6 DIGIT
NUMBER, THAT NUMBER WILL BE YOUR PIN NUMBER, YOU WILL NEED
THAT NUMBER SO WHENEVER YOU CALL (EXPLAINS WHY THE PIN
NUMBER IS NEEDED).  THE PIN NUMBER CAN BE YOUR DATE OF
BIRTH OR A NUMBER THAT IS EASY TO REMEMBER
IVORY - UH ███████████
UM - VERIFIES THE NUMBER ███████   ALSO THERE WILL BE A
SECURITY QUESTION SHOULD YOU FORGET YOUR PIN NUMBER
THEY WILL ASK YOU FOR YOUR SECURITY QUESTION. I HAVE TWO
OPTIONS FOR THIS ACCOUNT, THE FIRST ONE IS UH WHAT'S YOUR
FAVORITE CITY AND UH THE SECOND ONE IS WHAT'S YOUR
FAVORITE PET NAME.  WHICH OPTION WOULD YOU LIKE FOR THIS
ACCOUNT
IVORY - UH, THE FIRST ONE
UM - UH OK, YOUR FAVORITE CITY
IVORY - YEAH
UM - OK AND CAN YOU PROVIDE ME THE ANSWER TO THAT SECURITY
QUESTION PLEASE
IVORY - MIAMI
UM - OK.  AND I WILL ALSO NEED YOU TO PROVIDE ME YOUR STREET
ADDRESS PLEASE
IVORY - MY STREET ADDRESS?
UM - YES PLEASE
IVORY - UH, YOU MEAN MY HOME ADDRESS?  HELLO
UM - YES SIR
IVORY - YOU SAY YOU NEED MY HOME ADDRESS?

D007655

UM - YES, YES PLEASE

IVORY - OK IT'S 2401 MICHIGAN AVENUE

UM - OK. OK SIR WHAT WE NEED TO DO NOW IS SET UP A PLAN FOR THE ACCOUNT. WE HAVE A $35.00, 45 AND 55 PLANS, WHICH ONE OF THESE WOULD YOU LIKE

IVORY - WELL I GOT A $50 CARD, YOU AIN'T GOT NO $50?

UM - NO SIR. SORRY, THESE ARE THE PLANS WHICH ARE COMPATIBLE WITH THE PHONE.  WHAT I CAN DO IS GIVE YOU THE $45 PLAN WHICH WILL GIVE YOU 1200 MINUTES AND 1200 TEXT MESSAGES AND ACCESS TO THE INTERNET

IVORY - ALRIGHT, WHAT'S, WHAT'S, WHAT'S THE UNLIMITED ONE THEN

UM - THE UNLIMITED IS $55 SIR

IVORY - OH YEAH

UM - YES, I'LL GO AHEAD AND CHOOSE THE $45 PLAN.  YOU CAN ALWAYS CHANGE THE PLAN......WHAT I AM DOING NOW IS ACTIVATING THE ACCOUNT AND IF YOU WILL GIVE ME A FEW MORE SECONDS THEN I WILL PROVIDE YOU WITH YOUR NEW PHONE NUMBER

UM - OK DO YOU HAVE A PEN AND PAPER TO WRITE DOWN YOUR NEW PHONE NUMBER?

IVORY - YEAH

UM - OK YOUR NEW PHONE NUMBER IS 307 256 7015

IVORY - OK THANK YOU, HEY CAN YOU PUT….

UM - HOLD ON HOLD ON JAMES

IVORY - YEAH

UM - YEAH, BEFORE YOU HUNG UP I WILL NEED TO PROGRAM THIS PHONE AND I DON'T KNOW IF YOU NEED ME TO ASSIST YOU WITH A PAYMENT ALSO

IVORY - YEAH UH HERE'S THE PAYMENT RIGHT HERE

UM - OK GO AHEAD PLEASE

IVORY - PIN NUMBER IS 136 545 943 229 48 11

UM - OK THANK YOU ONCE YOU MAKE THE PAYMENT THERE WILL BE A $5 EXTRA ON YOUR BALANCE.  OK YOU SAID THIS IS, YEP I'M SEEING THIS IS A $50 CARD SO THE OTHER $5 WILL BE ON THE ACCOUNT SIR WHICH WILL BE ON THE BALANCE, THAT WILL STAY ON YOUR BALANCE.

UM - OK, I'M GOING TO GO AHEAD AND PROGRAM THE PHONE DO YOU HAVE THE PHONE ON NOW?

IVORY - NO, OH YOU WANT ME TO TURN IT ON? CAUSE IT'S DEAD

UM - NO NO, I NEED YOU TO TURN IT ON PLEASE

IVORY - YOU SAY TURN IT ON?

UM - YEAH, ON PLEASE

IVORY - ALRIGHT LET ME GET TO A CHARGER

UM - OK

IVORY - HELLO

D007656

UM - YES SIR I'M HERE
IVORY - I'M WAITIN I'M WAITIN FOR IT TO BOOT UP
UM - OK (EXPLAINS DETAILS OF PAYMENT AND SUCH)
IVORY - ALRIGHT
UM - IS THE PHONE ON
IVORY - IT SAYS CONNECTING, CONTACTING NETWORK
UM - OK
IVORY - YOU WANT ME TO HIT CANCEL
UM - OK YEAH, GO AHEAD UNDER THAT PLEASE
IVORY - ALRIGHT WHAT TO DO NOW
UM - OK WHAT I LIKE FOR YOU TO DO IS DIAL THE POUND (#) KEY
TWICE
IVORY - DO WHAT
UM - DIAL THE POUND KEY TWICE. THAT'S THE KEY BELOW THE
NUMBER 9
IVORY - YEAH
UM - OK AND THEN I LIKE FOR YOU TO DIAL 847 446 #
IVORY - UH HUH
UM - AND WHAT DO YOU SEE ON THE SCREEN NOW
IVORY - YOU WANT ME TO HIT UH SEND
UM - NO NO WHAT DO YOU SEE ON THE SCREEN
IVORY - WHAT'S ON THE SCREEN
UM - YEAH
IVORY - JUST THE NUMBERS STILL # # 847 446 #
UM - OK WELL WHAT I'D LIKE FOR YOU TO DO IS GO AHEAD AND
CANCEL THAT PLEASE THEN I'D LIKE FOR YOU TO GO TO MENU
IVORY - UH HUH
UM - THEN GO TO UH SYSTEM SETTINGS AND THEN GO TO SYSTEM
UPDATE
IVORY - UH HUH
UM - AND THEN UPDATE PROFILE
IVORY - ALL IT SAYS IS THE NETWORK IS PAIRING YOUR SERVICES
UM - SORRY
IVORY - I SAID ALL IT SAYS IT'S THE NETWORK IS PREPARING YOUR
SERVICES
UM - OK PERFECT (NOW TALKS ABOUT THE PHONE AND THE
PROGRAMMING SERVICES)
IVORY - OK SO I GOT THE INTERNET, IS THAT TAKING UP MY TIME?
UM - PARDON
IVORY - I SAID IF I GET ON THE INTERNET WILL THAT TAKE MY TIME,
MY MINUTES
UM - NO
IVORY - OH, ALRIGHT, COOL
UM - IT'S UNLIMITED SIR
IVORY - IS THAT EVERYTHING
UM - WELL UH, NO NO, IS THE PHONE ALREADY BEEN PROGRAMMED.

D007657

I NEED YOU TO MAKE CALL TO MAKE SURE THAT IT'S WORKING
IVORY - ALRIGHT WELL UH WHEN I GET THAT IT JUST POWERED OFF
AND POWERED BACK ON
UM - YEAH THAT'S RIGHT NOW THAT IT'S ON I LIKE YOU TO MAKE
CALL TO MAKE SURE THAT IT'S WORKING
IVORY - (INAUDIBLE)
IVORY - IT'S STILL TAKIN, IT'S STILL BOOTIN UP
UM - OK SHOULD ONLY TAKE A FEW MORE SECONDS.  PROBABLY
ABOUT ANOTHER 20 TO 40 SECONDS THEN IT SHOULD BE READY
IVORY - ALRIGHT
UM - OK IS IT STILL UPDATING?
IVORY - YEAH IT SAYS SEARCHING FOR PRL UPDATE
UM - OH OK PERFECT
UM - OK UM OK THAT SHOULD UM SHOULD BE ALMOST READY NOW
IVORY - YEAH IT'S ACTIVATED
UM - OK IS IT WORKING NOW?
IVORY - YEAH
UM - UH OK PERFECT JAMES (TELLS HIM HE CAN NOW MAKE AND
RECEIVE CALLS AND ALL THE OTHER SERVICES) (TALKS ABOUT A
SURVEY)
IVORY - OK THANK YOU
UM - OK THANK YOU JAMES AND WELCOME TO VIRGIN MOBILE HAVE A WONDERFUL
EVENING SIR
IVORY - OK YOU TOO

6.      Affiant believes that due to the heightened awareness of **Johnny Lee Ivory**, Albert Dewayne Banks, Anthony Thompson and Otis Ponds and others known and unknown, **Johnny Lee Ivory** has changed his number to continue to conspire and distribute controlled substances without detection.

7.      On 04/06/2013 at approximately 4:58 AM, a conversation was intercepted on telephone number **(307) 256-7015** between **Johnny Lee Ivory** and Anthony Thompson.  During the conversation, Anthony Thompson told **Johnny Lee Ivory** he (Anthony Thompson) would come to the Shell Gas Station (located in Junction City, Geary County, KS) and meet **Johnny Lee Ivory**.  During the conversation, **Johnny Lee Ivory** told Anthony Thompson this phone number **(307-256-7015)** was **Johnny Lee Ivory's** business number.  The Affiant knows **Johnny Lee Ivory** has no means of lawful employment and in fact sells illegal drugs for monetary gain.  This being said, the "business number" given to Anthony Thompson is actually used to obtain and distribute illegal drugs.

6

8.　　On 04/04/2013 a conversation was intercepted on telephone number 929-268-6183 (phone being used by Johnny Lee Ivory) wherein Albert Banks told Johnny Lee Ivory that Anthony Thompson wanted Johnny Lee Ivory to call him (Call #343). This indicates the ongoing relationship between the conspirators as outlined in previous affidavits

9.　　On 04/04/2013 the following conversation was intercepted between Johnny Ivory and Albert Banks (Call #400) on intercepted telephone number 929-268-6183:

Johnny: Hello

AB: What up

Johnny: What up my nig

AB: Hey uh (inaudible) another one of them my partner is coming down here from the Joe he's going to want like 3 or 4

Johnny: Ah yeah

AB: Yeah I told him it was already ready though

Johnny: Alright bet

AB: So yeah he (inaudible) I want one but when uh he get down here I'll call you and let you know what's up but uh what you got goin

Johnny: Shit nothing on my way to uh holler at Ant

AB: Did you uh, started to call you see if you could bring me one before I fucking left

Johnny: Yup I'm flying up on him here in a minute

AB: Alright well shit I'm trying to get another partner

Johnny: Ah (inaudible) if you can't get down my way I'll come back up here

AB: Alright I'll let you know I got a few (inaudible) car

Johnny: Alright, bet

AB: Alright

Johnny: Alright

10.　　On 04/05/2013 the following conversation was intercepted between Johnny Ivory and Albert Banks (Call #853) on intercepted telephone number 929-268-6183:

D007659

IVORY: What's up brother?

AB: What's happening?

IVORY: Aw shit.

AB: Aw, you up bright an early.

IVORY: Nigger, I'm always up bright and early.

AB: Hey, You came here last night. He told you to call you and bring it.

IVORY: Oh yea, when he want it?

AB: Shit, 3 or 4, whatever you going to bring.

IVORY: I'll always bring what he want, I'm not trying to bring no extras.

AB: Just bring 3 then.

IVORY: Allright that, then I'm going to set this right up, I'm going to call you
when I'm on the way way.

AB: Ok.

IVORY: Allright.

      11.    On 04/05/2013 the following conversation was intercepted
between Johnny Ivory and Albert Banks (Call #910) on intercepted telephone
number 929-268-6183:

IVORY: Hello?

AB: Hey.

IVORY: What up?

AB: It a no go.

IVORY: Huh?

AB: It a no go.

IVORY: Oh yea?

AB: Yea.

IVORY: Well I glad I didn't hop on that road jack.

AB: Yea, that why I been calling you. I just got off the phone with him. He was
like, no man, you need the money right now man, he said he coming to get the
money, he said I ain't got the money I'm going to call and tell him.

IVORY: Oh, all right. Yea, I was just going to hop in the load too

AB: Yea. I'm glad I called you.

8

D007660

IVORY: Hell yea, I'm glad you called me too.

AB: Oh, shit, I'll hit you in a little bit brother.

IVORY: All right, bet.

AB: All right.

12.     On 04/10/2013 the following conversation was intercepted between Johnny Ivory and Albert Banks (Call #4202) on intercepted telephone number 929-268-6183:

Albert Banks: Hello

Ivory: Hey did you need some more...inaudible...

AB: Shit, yeah I do think I do need you to leave me some.

Ivory: Alright, uh, we we go, we got to go get it

AB: Alright

Ivory: Alright. Bout to pull up

13.     The following conversations were intercepted on telephone number 785-226-1783 (Anthony Thompson's telephone) and were between Albert Banks and Anthony Thompson.   The conversations were synopsized and are not transcripts of the actual calls.   The following synopses are the actual as typed by the monitors.

14.     03/18/2013 Call #3674.   The Affiant knows ANT to be Anthony Thompson and AB to be Albert Banks.

Outgoing call from ANT to Unknown male sounds like AB. ANT asked if AB was in Ogden. ANT asks about the lost item. AB denies grabbing the item. ANT asks if he's done anything yet. AB says he went to court today. AB going to trial July 18th. Court was for arraignment. AB asks where ANT was at. ANT says he was about to come to town. ANT talking about "Wack" being in town still. ANT says that Unknown Male put that 21 over by the room. AB told him to stop putting the stuff over by AB's house. AB told him to stop doing that. Was supposed to be over by a pallet or something. ANT going to stop by AB's house now.

9

D007661

15.    03/22/2013 Call #4608.  This conversation is between Anthony Thompson and Albert Banks.  The Affiant knows "Wack" to be Otis Dean Ponds. Outgoing call to AB.  They want to know where each other are at.  AB said he just pulled up to Ogden.  Then they discuss the details of the funeral which is set for Monday.  Monday is the first day back in school for AB.  Ant has been to the funeral home to see the body and he was big.  They talked about him being in the joint.  Ant said he could see the marks on his neck.  AB asked if Ant was going back to the town and if Wac ever got ahold of him.  Wac said he saw about Babcock seeing him and got on him.  Babcock was coming out of AB's alley.  He went one way and Babcock went the other, then he sw him by his car and probably running his tag.  They start talking about shit that was lost.  They mention Martye and people who were over there with some woman.  One of them said they need to take that watered down shit back to Wichita.  They talk about Martye getting into it with Smiles.  He was hard on her.  She told Martye to talk to Ant and AB if he has a problem with them.  They start talking about "bread".  Ant doesn't have any change right now and he has stuff he has to take care of.  Some one got a discount and got it down to seven.  Ant mentions some mother fuckers who got bread and spent forty to fifty grand in the past month.  Martye was saying go to the bank of crack.  AB is waiting on someone to bring the money.  Ant said he is going to the town.  AB tells him to call him when he gets there.

16.    03/26/2013 Call #6576.  The Affiant knows ANT to be Anthony Thompson and AB to be Albert Banks.

Outgoing call from ANT to AB.  AB tells ANT that he just got pulled over and that the cops were looking for weapons.  ANT told AB that the cops just went to Dorian's looking for weapons.  AB told ANT that the cop pulled AB out of the car and patted him down for weapons while he had K2 in his pocket.  The cop told AB that his tag was illegal.  AB told Ant that the cop wanted to search his car but that AB wouldn't let him.  AB tells ANT the story of him and Dorian fighting about somebody stealing a gun.  Then they talked about Martye and the funeral

10

17.    04/05/2013 Call #10011.  The Affiant knows Ant to be Anthony Thompson and AB to be Albert Banks.

Incoming Call to Ant from AB. AB mad because someone (possibly Wack) was suppose to pick him up an hour ago. Ant says the police may be watching "E's (some club). AB tells Ant to hold one because he is getting another call. AB gets back on the phone and says he just talked to whoever was suppose to pick him up and he said his phone was ringing. AB says he is going to call 5. AB says Ivory want to take three down there for 12-5 a piece. AB says he just don't want to ride down there. Then AB and Ant start talking about Ant and going to school. AB starts talking about different sports hats. Ant says he will call AB in a little bit. The Affiant knows "Wack" to be Otis Dean Ponds.

18.    04/05/2013 Call #10091.  The Affiant knows Ant to be Anthony Thompson and AB to be Albert Banks.

Outgoing call from Ant to AB. Greet each other. Ant asks AB if he went to get his change. AB says he is going to get it. AB asks if "Wack" is around. Ant says he is right there with him.

19.    04/09/2013 Call #11426.  The Affiant knows AB to be Albert Banks and Ant to be Anthony Thompson.

Outgoing to AB, Ant said he was leaving his mamma's house. They talk about playing gold at the Y and Country Club. AB asked Ant if he was good. AB told Ant that he was not going to be good because he (supplier) was going down to where Mo was from for a week. AB told him to hold on real quick (Long pause) They talk about their supplier being gone. They both agree to meet on 12th Street.

20.    This is not an all inclusive list of phone calls intercepted between Albert Banks, Anthony Thompson and Johnny Ivory but merely a few of the calls showing the ongoing conspiracy between the conspirators and the distribution of illegal drugs.

21.    Although surveillance operations have been fruitful, to a degree, within this investigation, current surveillance operations have been more difficult due to the heightened sense of paranoia between some of the conspirators in this investigation, in part to law enforcement activities related to this investigation

11

D007663

and in part due to actions beyond the control of those involved within this investigation. Conversations intercepted within this investigation have indicated persons within this investigation are becoming more suspicious, convinced law enforcement is following them, and therefore taking measures in an attempt to avoid being seen by law enforcement, or at least minimize detection by law enforcement, as evidenced by the conversations intercepted and the changing of some phones by the conspirators.

## MINIMIZATION

22.     All monitoring of wire/oral and/or electronic communications will be conducted in such a way as to minimize the interception of communication. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.  Conversations, which are of a non-criminal or non-evidentiary nature, once minimized, will be spot-monitored in order to determine if the topic of the conversation has switched to a criminal or evidentiary nature.

23.     The interception of communications will be discontinued if the voice of one or more of the named interceptees is not identified as participating in the communication within a reasonable period of time, or in the case of conversations of others unknown which are of a non-criminal or non-evidentiary nature; spot-monitoring will be used to determine if conversations have switched to an evidentiary or criminal nature.  Monitoring will be conducted subject to the requirements to minimize interception of all non-pertinent communications.  All monitoring will be recorded.

D007664

**PERIOD OF INTERCEPTION**

24.     Because of the continuing nature of the offenses as discussed above, it is further requested that authorization to intercept not automatically terminate when the types of communications described above are first obtained, but be permitted to continue until all wire communications are intercepted which fully reveal the manner in which the subjects of this investigation conduct and participate in the above-described offenses, and which reveal the full nature, scope and extent of the above-described offenses; the identities and roles of accomplices, aiders and abettors, co-conspirators, other participants in the offenses; the dispositions and locations of the proceeds from the offenses; and the types, existence and locations of all records and other physical evidence of the offenses.  Even if the objectives set forth in the preceding sentence have not been fully achieved, it is hereby requested that the court's order provide that authorization to intercept shall automatically terminate after thirty days, the thirty day period running from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under the court's order or ten days after the order is entered.


GLEN F. VIRDEN
Senior Special Agent
Kansas Bureau of Investigation


Sworn to before me and subscribed in my presence this _12_ day of April, 2013.


HONORABLE DAVID R. PLATT
DISTRICT JUDGE
8TH JUDICIAL DISTRICT,
STATE OF KANSAS

13

D007665

IN THE DISTRICT COURT OF GEARY COUNTY, KANSAS

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION ) | |
| OF THE STATE OF KANSAS ) | CASE NO. |
| FOR AN ORDER AUTHORIZING THE ) | |
| INTERCEPTION OF WIRE ) | UNDER SEAL |
| COMMUNICATIONS TO AND FROM ) | |
| VIRGIN MOBILE USA/SPRINT PCS: ) | |
| 307-256-7015 ) | |
| MOBILE STATION IDENTIFICATION NUMBER ) | |
| # (MSID) 000003072216731 ) | |
| ELECTRONIC SERIAL NUMBER ) | |
| # (ESN) 268435462500657801 ) | |

**ORDER AUTHORIZING THE INTERCEPTION**
**OF WIRE COMMUNICATIONS**

Application under oath having been made before me by Steven L. Opat, Geary County Attorney,

based on the sworn affidavit of Glen F. Virden, Senior Special Agent, Kansas Bureau of

Investigations, an investigative or law enforcement officer of the State of Kansas within the meaning

of Section 5 of K.S.A. 22-2514, *et seq*, for an Order authorizing the interception of wire/oral and/or

electronic communications pursuant to K.S.A. 22-2514, *et seq*, and full consideration having been

given to the matter set forth therein, the Court finds:

A.      there is probable cause to believe that Albert DeWayne Banks, B/M DOB ████ Anthony

        Thompson DOB ████ Otis Ponds, Johnny Ivory III and others named in the affidavit of

        the said Glen F. Virden, and others yet unknown (hereinafter "Target Subjects"), have

        committed, and are committing, and will continue to commit offenses enumerated in Article

        57 of K.S.A. 21-5701 *et seq*, specifically possession of controlled substances with intent to

**EXHIBIT 13**

D007667

distribute, and distribution of controlled substances, in violation of K.S.A. 21-5701 *et seq*, specifically 21-5705 and 5706, unlawful use of a communication facility to commit and facilitate the commission of drug trafficking offenses, in violation of K.S.A. 21-5707; attempts, conspiracies or solicitations to possess with intent to distribute or to distribute controlled substances, in violation of K.S.A. 21-5701 *et seq*, and K.S.A. 21-5301 and 21-5302 and 21-5304; unlawful acts involving proceeds derived from violations of K.S.A. 21-5701-5717. (Hereinafter the "Target Offenses");

B.  there is probable cause to believe that particular wire/oral and/or electronic communications of the said Albert DeWayne Banks, Anthony Thompson, Otis Ponds, Johnny Ivory III and others yet unknown (hereinafter "Target Interceptees"), concerning the above-described Target Offenses will be obtained through the interception for which authorization has herewith been applied. In particular, there is probable cause to believe that the interception of wire/oral and/or electronic communications to and from the cellular telephone with the assigned telephone number 307-256-7015, bearing MSID 000003072216731 and ESN 268435462500657801 with service provided by Virgin Mobile/Sprint PCS with subscriber listed as one James Williams, although it is clear that the principal user is and has been identified as Johnny Lee Ivory III, will further disclose, detail and reveal the specifics of the above offenses, including the depth of the conspiracy and the manner and means of how and with whom these offenses are being committed, including the unknown sources from which the distribution by Albert DeWayne Banks, Anthony Carlyle Thompson, Otis Ponds, Johnny Ivory and others is made possible;

C.  it has been established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ; and

D007668

D.      there is probable cause to believe that 307-256-7015 has been and will continue to be used in connection with commission of the above-described offenses.

WHEREFORE, IT IS HEREBY ORDERED that Special Agents of the Kansas Bureau of Investigation, and other agencies acting under the supervision of the KBI, are authorized, pursuant to an application as authorized by K.S.A. 22-2515, made by Steven L. Opat, the duly elected and authorized County Attorney for Geary County, State of Kansas,  to intercept wire/oral and/or electronic communications to and from the above-described telephone.

PROVIDED that such interception(s) shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, or for a period of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct an interception under this order or ten (10) days after this order is entered, whichever is earlier.

1T IS ORDERED FURTHER that in the event that the target telephone is transferred outside the territorial jurisdiction of this court, interceptions may take place in any other jurisdiction within the United States.

IT 1S ORDERED FURTHER that the authorization given is intended to apply not only to the target telephone number listed above, but also to any other telephone number or telephone accessed through the above-referenced MSID number, and to any other MSID/IMSI number accessed

D007669

through the target telephone number referenced above, within the thirty (30) day period. The authorization is also intended to apply to the target telephone number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

IT IS ORDERED FURTHER that, based upon the request of the Applicant pursuant to K.S.A. 22-2514, and the definitions set forth therein, and K.S.A. 22-2515 and 2516, Virgin Mobile USA/Sprint PCS , an electronic communication service provider as defined in Section 2510(15) of Title 18, United States Code and K.S.A. 22-2514, shall furnish the KBI and/or it's agents or designees with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such provider is according the persons whose communications are to be intercepted, with the service provider to be compensated by the KBI for reasonable expenses incurred in providing such facilities or assistance.

IT IS ORDERED FURTHER that, to avoid prejudice to the government's criminal investigation, the provider of the electronic communications service and its agents and employees are Ordered Not To Disclose or Cause Disclosure of the Order or the request for information, facilities and assistance by the KBI or the existence of the investigation to any person other than those of its agents and employees who require this information to accomplish the services hereby ordered. In particular, said provider and its agents and employees shall not make such disclosure to a lessee, telephone subscriber or any interceptee or participant in the intercepted communications.

IT IS ORDERED FURTHER that this Order shall be binding on any subsequent provider of electronic communications services as defined in Title 18, United States Code, Section 2510(15) and K.S.A. 22-2514 *et seq*, that provides services to the target telephone number(s) listed above upon

service of a certified copy of this Order without any further court order being required.

IT IS ORDERED FURTHER that this order shall be executed as soon as practicable and that all monitoring of wire/oral and/or electronic communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation. The interception of wire/oral and/or electronic communications must terminate upon the attainment of the authorized objectives, not to exceed thirty (30) days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception of this order or ten (10) days after the order is entered.

Monitoring of conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119, Title 18, United States Code and K.S.A. 22-2514 *et seq.*. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named Target Interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall spot check to insure that the conversation has not turned to criminal matters.

IT IS ORDERED FURTHER that, pursuant to Section 2518(5), Title 18, United States Code and K.S.A. 22-2514 *et seq*, in the event intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

D007671

IT IS ORDERED FURTHER that Steven L. Opat, Geary County Attorney and /or Antonio Cruz Assistant Geary County Attorney shall provide this Court with a report on or about the tenth, twentieth, and thirtieth days following the date of this Order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If any of the above-ordered reports should become due on a weekend or holiday, IT IS ORDERED FURTHER that such report shall become due on the next business day thereafter.

IT IS ORDERED FURTHER that this Order, the application, affidavit and proposed order, and all interim reports filed with this Court with regard to this matter, shall be sealed until further order of this Court, except that copies of the order, in full or redacted form, may be served on the KBI and the service provider as necessary to effectuate this order.

DONE and ORDERED this _12_ day of _April_, 20 _13_, at in Junction City, Kansas.

HONORABLE DAVID R. PLATT
DISTRICT JUDGE
8TH JUDICIAL DISTRICT, STATE OF KANSAS

D007672

# IN THE COURT OF GEARY COUNTY
# STATE OF KANSAS

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION | } | |
| FOR AN ORDER AUTHORIZING THE | } | No. _____ |
| INTERCEPTION OF WIRE COMMUNICATIONS | } | |

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Glen F. Virden, Senior Special Agent, Kansas Bureau of Investigation, being of lawful age and duly sworn upon my oath depose and state:

1.     I am an "Investigative" law enforcement officer duly deputized with statutory authority for the State of Kansas, and as further recognized and defined by K.S.A. 22-2514(5).

2.     This affidavit is submitted in support of an application for an order authorizing the interception of the wire/oral and/or electronic communications of **Albert Dewayne Banks, B/M Date of Birth** ███████ and others, over telephone number **(785) 717-9771**, a personal cellular telephone currently in service with Virgin Mobile USA/Sprint PCS with Mobile Station Identification Number (MSID) 000007853750181 and Electronic Serial Number (ESN) 268435460914908669. Virgin Mobile/Sprint PCS records indicate the phone to be subscribed to Glenda Robertson. The Affiant knows Glenda Robertson is in an intimate relationship with **Albert Banks.** The Affiant also knows **Albert Banks** to be using this phone currently as indicated within this document. The Affiant requests authority to intercept the wire/oral and/or electronic communications of individuals communicating on telephone number **(785) 717-9771**; this is a new number which was recently obtained by Albert Dewayne Banks for purposes of continuing the conspiracy and distribution of controlled substances as outlined herein.

**EXHIBIT 14**

i

D003016

3.    This affidavit is submitted and incorporates all information related herein to this investigation and all previous information submitted in prior affidavits and progress reports requesting continued authority to intercept wire/oral and/or electronic communications related to Albert Banks, Anthony Thompson, Otis Ponds, Johnny Lee Ivory and others known and as of yet unknown, as previously set forth therein.

4.    The conspiracy is ongoing and unabated; the interceptions previously obtained reveal that the drug trafficking conspiracy is ongoing and expanding; that certain information has been intercepted regarding crimes of violence being committed by several of the conspirators and confederates of Albert Dewayne Banks and Anthony Thompson, most notably Martye Madkins III; as described in other affidavits and/or progress reports. In addition the recent changing of phones by Albert Banks and Johnny Lee Ivory indicates a heightened sense of scrutiny by the conspirators and the only method available to continue the investigation into the conspiracy and trafficking in controlled substances is by the intercepting of wire/oral and/or electronic communications over telephone number **(785) 717-9771**, and others, combined with such surveillance as is possible.

5.    On 04/04/2013 a conversation was intercepted on telephone number 929-268-6183 (phone being used by Johnny Lee Ivory) wherein Albert Banks told Johnny Lee Ivory that Anthony Thompson wanted Johnny Lee Ivory to call him (Call #343). This indicates the ongoing relationship between the conspirators as outlined in previous affidavits

6.    On 04/04/2013 the following conversation was intercepted between Johnny Ivory and Albert Banks (Call #400) on intercepted telephone number 929-268-6183:

Johnny: Hello

AB: What up

Johnny: What up my nig

AB: Hey uh (inaudible) another one of them my partner is coming down here from the Joe he's going to want like 3 or 4

Johnny: Ah yeah

AB: Yeah I told him it was already ready though

2

Johnny: Alright bet

AB: So yeah he (inaudible) I want one but when uh he get down here I'll call you
and let you know what's up but uh what you got goin

Johnny: Shit nothing on my way to uh holler at Ant

AB: Did you uh, started to call you see if you could bring me one before I fucking
left

Johnny: Yup I'm flying up on him here in a minute

AB: Alright well shit I'm trying to get another partner

Johnny: Ah (inaudible) if you can't get down my way I'll come back up here

AB: Alright I'll let you know I got a few (inaudible) car

Johnny: Alright, bet

AB: Alright

Johnny: Alright

5.      On 04/05/2013 the following conversation was intercepted between
Johnny Ivory and Albert Banks (Call #853) on intercepted telephone number 929-268-
6183:

IVORY: What's up brother?

AB: What's happening?

IVORY: Aw shit.

AB: Aw, you up bright an early.

IVORY: Nigger, I'm always up bright and early.

AB: Hey, You came here last night. He told you to call you and bring it.

IVORY: Oh yea, when he want it?

AB: Shit, 3 or 4, whatever you going to bring.

IVORY: I'll always bring what he want, I'm not trying to bring no extras.

AB: Just bring 3 then.

IVORY: Allright that, then I'm going to set this right up, I'm going to call you
when I'm on the way way.

AB: Ok.

IVORY: Allright.

D003018

6. On 04/05/2013 the following conversation was intercepted between Johnny Ivory and Albert Banks (Call #910) on intercepted telephone number 929-268-6183:

IVORY: Hello?

AB: Hey.

IVORY: What up?

AB: It a no go.

IVORY: Huh?

AB: It a no go.

IVORY: Oh yea?

AB: Yea.

IVORY: Well I glad I didn't hop on that road jack.

AB: Yea, that why I been calling you. I just got off the phone with him. He was like, no man, you need the money right now man, he said he coming to get the money, he said I ain't got the money I'm going to call and tell him.

IVORY: Oh, all right. Yea, I was just going to hop in the load too

AB: Yea. I'm glad I called you.

IVORY: Hell yea, I'm glad you called me too.

AB: Oh, shit, I'll hit you in a little bit brother.

IVORY: All right, bet.

AB: All right.

7. On 04/10/2013 the following conversation was intercepted between Johnny Ivory and Albert Banks (Call #4202) on intercepted telephone number 929-268-6183:

Albert Banks: Hello

Ivory: Hey did you need some more...inaudible...

AB: Shit, yeah I do think I do need you to leave me some.

Ivory: Alright, uh, we we go, we got to go get it

AB: Alright

Ivory: Alright. Bout to pull up

4

D003019

8.    The following conversations were intercepted on telephone number 785-226-1783 (Anthony Thompson's telephone) and were between Albert Banks and Anthony Thompson.  The conversations were synopsized and are not transcripts of the actual calls.  The following synopses are the actual as typed by the monitors.

9.    03/18/2013 Call #3674

Outgoing call from ANT to Unknown male sounds like AB. ANT asked if AB was in Ogden. ANT asks about the lost item. AB denies grabbing the item. ANT asks if he's done anything yet. AB says he went to court today. AB going to trial July 18th. Court was for arraignment. AB asks where ANT was at. ANT says he was about to come to town. ANT talking about "Wack" being in town still. ANT says that Unknown Male put that 21 over by the room. AB told him to stop putting the stuff over by AB's house. AB told him to stop doing that. Was supposed to be over by a pallet or something. ANT going to stop by AB's house now.

10.    03/22/2013 Call #4608

Outgoing call to AB. They want to know where each other are at. AB said he just pulled up to Ogden. Then they discuss the details of the funeral which is set for Monday. Monday is the first day back in school for AB. Ant has been to the funeral home to see the body and he was big. They talked about him being in the joint. Ant said he could see the marks on his neck. AB asked if Ant was going back to the town and if Wac ever got ahold of him. Wac said he saw about Babcock seeing him and got on him. Babcock was coming out of AB's alley. He went one way and Babcock went the other, then he sw him by his car and probably running his tag. They start talking about shit that was lost. They mention Martye and people who were over there with some woman. One of them said they need to take that watered down shit back to Wichita. They talk about Martye getting into it with Smiles. He was hard on her. She told Martye to talk to Ant and AB if he has a problem with them. They start talking about "bread". Ant doesn't have any change right now and he has stuff he has to take care of. Some one got a discount and got it down to seven. Ant mentions some mother fuckers who got bread and spent forty to fifty grand in the past month. Martye was saying go to the bank of crack. AB is waiting on someone to bring the money. Ant said he is going to the town. AB tells him to call him when he gets there.

5

D003020

11.    03/26/2013 Call #6576

Outgoing call from ANT to AB. AB tells ANT that he just got pulled over and that the cops were looking for weapons. ANT told AB that the cops just went to Dorian's looking for weapons. AB told ANT that the cop pulled AB out of the car and patted him down for weapons while he had K2 in his pocket. The cop told AB that his tag was illegal. AB told Ant that the cop wanted to search his car but that AB wouldn't let him. AB tells ANT the story of him and Dorian fighting about somebody stealing a gun. Then they talked about Martye and the funeral

12.    04/05/2013 Call #10011

Incoming Call to Ant from AB. AB mad because someone (possibly Whack) was suppose to pick him up an hour ago. Ant says the police may be watching "E's (some club). AB tells Ant to hold one because he is getting another call. AB gets back on the phone and says he just talked to whoever was suppose to pick him up and he said his phone was ringing. AB says he is going to call 5. AB says Ivory want to take three down there for 12-5 a piece. AB says he just don't want to ride down there. Then AB and Ant start talking about Ant and going to school. AB starts talking about different sports hats. Ant says he will call AB in a little bit.

13.    04/05/2013 Call #10091

Outgoing call from Ant to AB. Greet each other. Ant asks AB if he went to get his change. AB says he is going to get it. AB asks if Whack is around. Ant says he is right there with him.

14.    04/09/2013 Call #11426

Outgoing to AB. Ant said he was leaving his mamma's house. They talk about playing gold at the Y and Country Club. AB asked Ant if he was good. AB told Ant that he was not going to be good because he (supplier) was going down to where Mo was from for a week. AB told him to hold on real quick (Long pause) They talk about their supplier being gone. They both agree to meet on 12th Street.

15.    This is not an all inclusive list of phone calls intercepted between Albert Banks, Anthony Thompson and Johnny Ivory but merely a few of the calls showing the ongoing conspiracy between the conspirators and the distribution of illegal drugs.

D003021

16.     This is not an all inclusive list of phone calls intercepted between Albert Banks, Anthony Thompson and Johnny Ivory but merely a few of the calls showing the ongoing conspiracy between the conspirators and the distribution of illegal drugs.

## MINIMIZATION

17.     All monitoring of wire/oral and/or electronic communications will be conducted in such a way as to minimize the interception of communication. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Conversations, which are of a non-criminal or non-evidentiary nature, once minimized, will be spot-monitored in order to determine if the topic of the conversation has switched to a criminal or evidentiary nature.

18.     The interception of communications will be discontinued if the voice of one or more of the named interceptees is not identified as participating in the communication within a reasonable period of time, or in the case of conversations of others unknown which are of a non-criminal or non-evidentiary nature; spot-monitoring will be used to determine if conversations have switched to an evidentiary or criminal nature. Monitoring will be conducted subject to the requirements to minimize interception of all non-pertinent communications. All monitoring will be recorded.

## PERIOD OF INTERCEPTION

19.     Because of the continuing nature of the offenses as discussed above, it is further requested that authorization to intercept not automatically terminate when the types of communications described above are first obtained, but be permitted to continue until all wire communications are intercepted which fully reveal the manner in which the

7

D003022

subjects of this investigation conduct and participate in the above-described offenses, and which reveal the full nature, scope and extent of the above-described offenses; the identities and roles of accomplices, aiders and abettors, co-conspirators, other participants in the offenses; the dispositions and locations of the proceeds from the offenses; and the types, existence and locations of all records and other physical evidence of the offenses. Even if the objectives set forth in the preceding sentence have not been fully achieved, it is hereby requested that the court's order provide that authorization to intercept shall automatically terminate after thirty days, the thirty day period running from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under the court's order or ten days after the order is entered.

GLEN F. VIRDEN
Senior Special Agent
Kansas Bureau of Investigation

Sworn to before me and subscribed in my presence this _12_ day of April, 2013.

HONORABLE DAVID R. PLATT
DISTRICT JUDGE
8TH JUDICIAL DISTRICT,
STATE OF KANSAS

8

## IN THE DISTRICT COURT OF GEARY COUNTY, KANSAS

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION ) | |
| OF THE STATE OF KANSAS ) | CASE NO. |
| FOR AN ORDER AUTHORIZING THE ) | |
| INTERCEPTION OF WIRE ) | UNDER SEAL |
| COMMUNICATIONS TO AND FROM ) | |
| VIRGIN MOBILE USA/SPRINT PCS: ) | |
| 785-717-9771 ) | |
| MOBILE STATION IDENTIFICATION NUMBER ) | |
| # (MSID) 000007853750181 ) | |
| ELECTRONIC SERIAL NUMBER ) | |
| # (ESN) 268435460914908669 ) | |

## ORDER AUTHORIZING THE INTERCEPTION
## OF WIRE COMMUNICATIONS

Application under oath having been made before me by Steven L. Opat, Geary County Attorney,

based on the sworn affidavit of Glen F. Virden, Senior Special Agent, Kansas Bureau of

Investigations, an investigative or law enforcement officer of the State of Kansas within the meaning

of Section 5 of K.S.A. 22-2514, *et seq*, for an Order authorizing the interception of wire/oral and/or

electronic communications pursuant to K.S.A. 22-2514, *et seq*, and full consideration having been

given to the matter set forth therein, the Court finds:

A.    there is probable cause to believe that Albert DeWayne Banks, B/M DOB      Anthony

    Thompson DOB      Otis Ponds, Johnny Ivory and others named in the affidavit of the

    said Glen F. Virden, and others yet unknown (hereinafter "Target Subjects"), have

    committed, and are committing, and will continue to commit offenses enumerated in Article

    57 of K.S.A. 21-5701 *et seq*, specifically possession of controlled substances with intent to

**EXHIBIT 15**

D003025

distribute, and distribution of controlled substances, in violation of K.S.A. 21-5701 *et seq*,

specifically 21-5705 and 5706, unlawful use of a communication facility to commit and

facilitate the commission of drug trafficking offenses, in violation of K.S.A. 21-5707;

attempts, conspiracies or solicitations to possess with intent to distribute or to distribute

controlled substances, in violation of K.S.A. 21-5701 *et seq*, and K.S.A. 21-5301 and 21-

5302 and 21-5304; unlawful acts involving proceeds derived from violations of K.S.A. 21-

5701-5717. (Hereinafter the "Target Offenses");

B.    there is probable cause to believe that particular wire/oral and/or electronic communications

of the said Albert DeWayne Banks, Anthony Thompson, Otis Ponds, Johnny Ivory and others

yet unknown (hereinafter "Target Interceptees"), concerning the above-described Target

Offenses will be obtained through the interception for which authorization has herewith been

applied. In particular, there is probable cause to believe that the interception of wire/oral

and/or electronic communications to and from the cellular telephone with the assigned

telephone   number   785-717-9771,   bearing   MSID   000007853750181   and   ESN

268435460914908669 with service provided by Virgin Mobile/Sprint PCS with subscriber

listed as one Glenda Robertson, although it is clear that the principal user is and has been

identified as Albert DeWayne Banks, will further disclose, detail and reveal the specifics of

the above offenses, including the depth of the conspiracy and the manner and means of how

and with whom these offenses are being committed, including the unknown sources from

which the distribution by Albert DeWayne Banks, Anthony Carlyle Thompson, Otis Ponds,

Johnny Ivory and others is made possible;

C.    it has been established that normal investigative procedures have been tried and have failed,

reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ; and

D003026

D.   there is probable cause to believe that 785-717-9771 has been and will continue to be used in connection with commission of the above-described offenses.

WHEREFORE, IT IS HEREBY ORDERED that Special Agents of the Kansas Bureau of Investigation, and other agencies acting under the supervision of the KBI, are authorized, pursuant to an application as authorized by K.S.A. 22-2515, made by Steven L. Opat, the duly elected and authorized County Attorney for Geary County, State of Kansas, to intercept wire/oral and/or electronic communications to and from the above-described telephone.

PROVIDED that such interception(s) shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, or for a period of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct an interception under this order or ten (10) days after this order is entered, whichever is earlier.

IT IS ORDERED FURTHER that in the event that the target telephone is transferred outside the territorial jurisdiction of this court, interceptions may take place in any other jurisdiction within the United States.

IT IS ORDERED FURTHER that the authorization given is intended to apply not only to the target telephone number listed above, but also to any other telephone number or telephone accessed through the above-referenced MSID number, and to any other MSID/IMSI number accessed

D003027

through the target telephone number referenced above, within the thirty (30) day period. The authorization is also intended to apply to the target telephone number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

IT IS ORDERED FURTHER that, based upon the request of the Applicant pursuant to K.S.A. 22-2514, and the definitions set forth therein, and K.S.A. 22-2515 and 2516, Virgin Mobile USA/Sprint PCS , an electronic communication service provider as defined in Section 2510(15) of Title 18, United States Code and K.S.A. 22-2514, shall furnish the KBI and/or it's agents or designees with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such provider is according the persons whose communications are to be intercepted, with the service provider to be compensated by the KBI for reasonable expenses incurred in providing such facilities or assistance.

IT IS ORDERED FURTHER that, to avoid prejudice to the government's criminal investigation, the provider of the electronic communications service and its agents and employees are Ordered Not To Disclose or Cause Disclosure of the Order or the request for information, facilities and assistance by the KBI or the existence of the investigation to any person other than those of its agents and employees who require this information to accomplish the services hereby ordered. In particular, said provider and its agents and employees shall not make such disclosure to a lessee, telephone subscriber or any interceptee or participant in the intercepted communications.

IT IS ORDERED FURTHER that this Order shall be binding on any subsequent provider of electronic communications services as defined in Title 18, United States Code, Section 2510(15) and K.S.A. 22-2514 *et seq*,  that provides services to the target telephone number(s) listed above upon

service of a certified copy of this Order without any further court order being required.

IT IS ORDERED FURTHER that this order shall be executed as soon as practicable and that all monitoring of wire/oral and/or electronic communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation. The interception of wire/oral and/or electronic communications must terminate upon the attainment of the authorized objectives, not to exceed thirty (30) days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception of this order or ten (10) days after he order is entered.

Monitoring of conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119, Title 18, United States Code and K.S.A. 22-2514 *et seq.*. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named Target Interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall spot check to insure that the conversation has not turned to criminal matters.

IT IS ORDERED FURTHER that, pursuant to Section 2518(5), Title 18, United States Code and K.S.A. 22-2514 *et seq*, in the event intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

D003029

IT IS ORDERED FURTHER that Steven L. Opat, Geary County Attorney and /or Antonio Cruz Assistant Geary County Attorney shall provide this Court with a report on or about the tenth, twentieth, and thirtieth days following the date of this Order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If any of the above-ordered reports should become due on a weekend or holiday, IT IS ORDERED FURTHER that such report shall become due on the next business day thereafter.

IT IS ORDERED FURTHER that this Order, the application, affidavit and proposed order, and all interim reports filed with this Court with regard to this matter, shall be sealed until further order of this Court, except that copies of the order, in full or redacted form, may be served on the KBI and the service provider as necessary to effectuate this order.

DONE and ORDERED this _12_ day of _April_, 20_13_, at in Junction City, Kansas.

_____

HONORABLE DAVID R. PLATT
DISTRICT JUDGE
8TH JUDICIAL DISTRICT, STATE OF KANSAS

D003030

# IN THE COURT OF GEARY COUNTY
## STATE OF KANSAS

IN THE MATTER OF THE APPLICATION   }
                             }
FOR AN ORDER AUTHORIZING THE     }     No. _____
                             }
INTERCEPTION OF WIRE COMMUNICATIONS}

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Glen F. Virden, Senior Special Agent, Kansas Bureau of Investigation, being of lawful age and duly sworn upon my oath depose and state:

1.     I am an "Investigative" law enforcement officer duly deputized with statutory authority for the State of Kansas, and as further recognized and defined by K.S.A. 22-2514(5).

2.     This affidavit is submitted in support of an application for an order authorizing the interception of the wire/oral and/or electronic communications of **Anthony Carlyle Thompson, B/M Date of Birth** ▇▇▇▇▇▇ and others, over telephone number **(785) 226-2893**, a personal cellular telephone currently in service with T-Mobile USA with International Mobile Security Identity (IMSI) 310260566871100. T-Mobile USA records indicate the phone number has no name attached as the subscriber as it is an IN PREPAID CUSTOMER. The Affiant knows **Anthony Carlyle Thompson** is the person using the telephone as described in detail within this document. The Affiant requests authority to intercept the wire/oral and/or electronic communications of individuals communicating on telephone number **(785) 226-2893**.

3.     This affidavit is submitted and incorporates all information related herein to this investigation, and all previous information submitted in prior affidavits and progress reports requesting continued authority to intercept wire/oral and/or electronic communications related to Albert Banks, Anthony Thompson, Otis Ponds, Johnny Lee Ivory and others known and as of yet unknown, as previously set forth therein.

1

**EXHIBIT 16**

4.      The conspiracy is ongoing and unabated; the interceptions previously obtained reveal that the drug trafficking conspiracy is ongoing and expanding; as described in other affidavits and/or progress reports. In addition, the changing of phones by Albert Banks and Johnny Lee Ivory indicates a heightened sense of scrutiny by the conspirators and the only method available to continue the investigation into the conspiracy and trafficking in controlled substances is by the intercepting of wire/oral and/or electronic communications over telephone number **(785) 226-2893**, and others, combined with such surveillance as is possible.

5.      On 04/09/2013 at approximately 1:25 PM, Anthony Thompson received an incoming text on telephone number (785) 226-1783 from Otis Ponds (316-347-0088) which read; *Bro change ur number bro asap and cl me frm ur sis phn on the 785 number.* The Affiant, and other law enforcement officers have detected a paranoia amongst some of the conspirators within this investigation as of lately. The Affiant believes this could be a reason Otis Ponds was so adamant in the previous text message to **Anthony Carlyle Thompson** telling him to change his telephone number, which in fact he did as indicated in the following text messages.

6.      On 04/10/2013 an incoming text message from **(785) 226-2893** was intercepted on telephone number (316) 347-0088 (phone being used by Otis Ponds) wherein Anthony Thompson wrote "This ant" (Call #2015 at 8:23 PM).

7.      At 8:26 PM (Call #2018), an outgoing text message from (316) 347-0088 to **(785) 226-2893** was intercepted which read "Bet" indicating Otis Ponds had received the text message from Anthony Thompson and acknowledged this telephone number as being the new number used by Anthony Thompson.

8.      On 04/11/2013 at approximately 1:26 PM, a phone conversation was intercepted between Anthony Thompson on telephone number 785-226-1783 and Lisa Austin. The following is the transcript of the call:

AT = Anthony Thompson

LA = Lisa Austin

AT: Hello?

LA: Hey son, where you at, you in Junction?

AT: Yeah, don't say nothing I'm going to call you right back.

LA: Ok call me right back because I'm tired of riding around in Jalisa

When listening to the actual phone call it was evident Anthony Thompson did not want Lisa Austin saying anything on this telephone. He actually hung up on Lisa as she was talking, indicative of his paranoia. It is believed he most likely called Lisa back using telephone number **(785) 226-2893**.

    9.    On 04/13/2013 at approximately 10:50 PM, Otis Ponds called Anthony Thompson at telephone number **(785) 226-2893**. The call was transcribed and is as follows:

Otis = Otis Ponds

Ant = Anthony Thompson

Otis: Wassup bobo?

Ant: Where you at bro?

Otis: Shit, on my way to the Tan.

Ant: oh shit.

Otis: Where you at?

Ant: I'm at the, at the room.

Otis: Ah for real, I'll probably be down in like 20 minutes

Ant: God damn man,

Otis: What happened?

Ant: Thought you was already here, I got somebody waiting on something.

Otis: Ah for real? Where Bro at?

Ant: Oh he had to go up to (Inaudible)

Otis: Ah for real?

Ant: yeah

Otis: Damn

Ant: Yeah, I'll be head out in about 20 minutes.

Otis: Ah I bet, you ain't even left yet nigga!

Ant: (Inaudible) yeah I went to the club real quick

Otis: ah ok

Ant: yeah,(inaudible)

Otis (inaudible) wait on you then

3

Ant: huh?

Otis: I'll just wait on you then.

Ant: Alright

10.     On 04/15/2013 at approximately 1:13 PM, Anthony Thompson called Albert Banks from telephone number (785) 226-2893 (Call #275). During the phone call, Albert Banks told Anthony Thompson that Albert Banks had talked to Johnny Ivory and told him (Ivory) that Anthony Thompson wanted "two or three" (referring to a quantity of illegal drugs believed to be ounces of cocaine) . During the conversation, Albert Banks tells Anthony Thompson that he (Thompson) needs to talk to "Auntie and them" as they are about to go to the bank and pick up that "change" (US Currency). Albert Banks said to have "Auntie and them" make sure they get it and he (Banks) will come get "his" (US Currency) too.

11.     Given the fact the conspiracy is ongoing and unabated, as well as the number of phone calls previously documented to and from **Anthony Carlyle Thompson** which have proven the distribution and conspiracy to distribute illegal drugs; the Affiant believes **Anthony Carlyle Thompson** will utilize this telephone to continue to contact persons within this investigation for the purpose of distributing illegal drugs. The Affiant is well aware of the common practice wherein drug distributors will discontinue use of telephones and acquire new telephones periodically in an attempt to thwart law enforcement from detecting their illegal activities thus stopping their illegal drug trafficking operation.

**MINIMIZATION**

12.     All monitoring of wire/oral and/or electronic communications will be conducted in such a way as to minimize the interception of communication.  Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.  Conversations, which are of a non-criminal or non-evidentiary nature, once minimized, will be spot-monitored in order to determine if the topic of the conversation has switched to a criminal or evidentiary nature.

13.     The interception of communications will be discontinued if the voice of one or more of the named interceptees is not identified as participating in the communication within a reasonable period of time, or in the case of conversations of others unknown which are of a non-criminal or non-evidentiary nature; spot-monitoring will be used to determine if conversations have switched to an evidentiary or criminal nature.   Monitoring will be conducted subject to the requirements to minimize interception of all non-pertinent communications.  All monitoring will be recorded.


## PERIOD OF INTERCEPTION


14.     Because of the continuing nature of the offenses as discussed above, it is further requested that authorization to intercept not automatically terminate when the types of communications described above are first obtained, but be permitted to continue until all wire communications are intercepted which fully reveal the manner in which the subjects of this investigation conduct and participate in the above-described offenses, and which reveal the full nature, scope and extent of the above-described offenses; the identities and roles of accomplices, aiders and abettors, co-conspirators, other participants in the offenses; the dispositions and locations of the proceeds from the offenses; and the types, existence and locations of all records and other physical evidence of the offenses. Even if the objectives set forth in the preceding sentence have not been fully achieved, it is hereby requested that the court's order provide that authorization to intercept shall

5

automatically terminate after thirty days, the thirty day period running from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under the court's order or ten days after the order is entered.


GLEN F. VIRDEN
Senior Special Agent
Kansas Bureau of Investigation


Sworn to before me and subscribed in my presence this _____ 16 day of April, 2013.


Judge of the Geary County District Court
State of Kansas

6

IN THE DISTRICT COURT OF GEARY COUNTY, KANSAS

**APPLICATION FOR AN ORDER AUTHORIZING THE INTERCEPTION
OF WIRE COMMUNICATIONS**

COMES NOW Steven L. Opat, the duly elected Geary County Attorney, Kansas and as authorized by K.S.A. 22-2515(a) and upon his oath, does hereby make application for an order authorizing the interception of wire, oral and/or electronic communication(s) by the Kansas Bureau of Investigation and its designees, said interception(s) providing evidence of those offenses designated in K.S.A. 22-2515(a)(11) and (20), and offenses committed ancillary to and in furtherance of such designated offenses.

All as set forth in the attached affidavit of Glen F. Virden, Senior Special Agent for the Kansas Bureau of Investigation, said affidavit being attached to this application and incorporated herein verbatim, having been reviewed in its totality by Steven L. Opat with the said Glen F. Virden for the purpose of obtaining the order authorizing such wire, oral and/or electronic interception(s).

Respectfully submitted,

_Steven L. Opat_

Steven L. Opat
Geary County Attorney

Subscribed and sworn to before me by Steve L. Opat on this _16_ day of _Apr._ , 2013.

~~Notary Public~~ _Judge_

IN THE DISTRICT COURT OF GEARY COUNTY, KANSAS

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION ) | |
| OF THE STATE OF KANSAS ) | CASE NO. |
| FOR AN ORDER AUTHORIZING THE ) | |
| INTERCEPTION OF WIRE ) | UNDER SEAL |
| COMMUNICATIONS TO AND FROM ) | |
| T-MOBILE USA: ) | |
| 785-226-2893 ) | |
| INTERNATIONAL MOBILE SECURITY IDENTITY ) | |
| # (IMSI) 310260566871100 ) | |

## ORDER AUTHORIZING THE INTERCEPTION
## OF WIRE COMMUNICATIONS

Application under oath having been made before me by Steven L. Opat, Geary County Attorney,

based on the sworn affidavit of Glen F. Virden, Senior Special Agent, Kansas Bureau of

Investigations, an investigative or law enforcement officer of the State of Kansas within the meaning

of Section 5 of K.S.A. 22-2514, *et seq*, for an Order authorizing the interception of wire/oral and/or

electronic communications pursuant to K.S.A. 22-2514, *et seq*, and full consideration having been

given to the matter set forth therein, the Court finds:

A.   there is probable cause to believe that Albert DeWayne Banks, B/M DOB ███ Anthony

Thompson DOB ███ Otis Ponds, Johnny Ivory III and others named in the affidavit of

the said Glen F. Virden, and others yet unknown (hereinafter "Target Subjects"), have

committed, and are committing, and will continue to commit offenses enumerated in Article

57 of K.S.A. 21-5701 *et seq*, specifically possession of controlled substances with intent to

**EXHIBIT 17**

D003077

distribute, and distribution of controlled substances, in violation of K.S.A. 21-5701 *et seq*, specifically 21-5705 and 5706, unlawful use of a communication facility to commit and facilitate the commission of drug trafficking offenses, in violation of K.S.A. 21-5707; attempts, conspiracies or solicitations to possess with intent to distribute or to distribute controlled substances, in violation of K.S.A. 21-5701 *et seq*, and K.S.A. 21-5301 and 21-5302 and 21-5304; unlawful acts involving proceeds derived from violations of K.S.A. 21-5701-5717. (Hereinafter the "Target Offenses");

B.    there is probable cause to believe that particular wire/oral and/or electronic communications of the said Albert DeWayne Banks, Anthony Thompson, Otis Ponds, Johnny Ivory III and others yet unknown (hereinafter "Target Interceptees"), concerning the above-described Target Offenses will be obtained through the interception for which authorization has herewith been applied. In particular, there is probable cause to believe that the interception of wire/oral and/or electronic communications to and from the cellular telephone with the assigned telephone number 785-226-2893, bearing IMSI 310260566871100 with service provided by T-Mobile USA with no name attached as the subscriber as it is an IN PREPAID CUSTOMER, although it is clear that the principal user is and has been identified as Anthony Carlyle Thompson, will further disclose, detail and reveal the specifics of the above offenses, including the depth of the conspiracy and the manner and means of how and with whom these offenses are being committed, including the unknown sources from which the distribution by Albert DeWayne Banks, Anthony Carlyle Thompson, Otis Ponds, Johnny Ivory and others is made possible;

C.    it has been established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ; and

D.      there is probable cause to believe that 785-226-2893 has been and will continue to be used

in connection with commission of the above-described offenses.

WHEREFORE, IT IS HEREBY ORDERED that Special Agents of the Kansas Bureau of

Investigation, and other agencies acting under the supervision of the KBI, are authorized, pursuant

to an application as authorized by K.S.A. 22-2515, made by Steven L. Opat, the duly elected and

authorized County Attorney for Geary County, State of Kansas,   to intercept wire/oral and/or

electronic communications to and from the above-described telephone.

PROVIDED that such interception(s) shall not terminate automatically after the first

interception that reveals the manner in which the alleged co-conspirators and others as yet unknown

conduct their illegal activities, but may continue until all communications are intercepted which

reveal fully the manner in which the above-named persons and others as yet unknown are

committing the offenses described herein, and which reveal fully the identities of their confederates,

their places of operation, and the nature of the conspiracy involved therein, or for a period of thirty

(30) days measured from the day on which investigative or law enforcement officers first begin to

conduct an interception under this order or ten (10) days after this order is entered, whichever is

earlier.

1T IS ORDERED FURTHER that in the event that the target telephone is transferred outside

the territorial jurisdiction of this court, interceptions may take place in any other jurisdiction within

the United States.

. IT 1S ORDERED FURTHER that the authorization given is intended to apply not only to

the target telephone number listed above, but also to any other telephone number or telephone

accessed through the above-referenced MSID number, and to any other MSID/IMSI number accessed

service of a certified copy of this Order without any further court order being required.

IT IS ORDERED FURTHER that this order shall be executed as soon as practicable and that all monitoring of wire/oral and/or electronic communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation. The interception of wire/oral and/or electronic communications must terminate upon the attainment of the authorized objectives, not to exceed thirty (30) days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception of this order or ten (10) days after he order is entered.

Monitoring of conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119, Title 18, United States Code and K.S.A. 22-2514 *et seq.*. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named Target Interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall spot check to insure that the conversation has not turned to criminal matters.

IT IS ORDERED FURTHER that, pursuant to Section 2518(5), Title 18, United States Code and K.S.A. 22-2514 *et seq*, in the event intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

D003081

IT IS ORDERED FURTHER that Steven L. Opat, Geary County Attorney and /or Antonio

Cruz Assistant Geary County Attorney shall provide this Court with a report on or about the tenth,

twentieth, and thirtieth days following the date of this Order showing what progress has been made

toward achievement of the authorized objectives and the need for continued interception. If any of

the above-ordered reports should become due on a weekend or holiday, IT IS ORDERED

FURTHER that such report shall become due on the next business day thereafter.

IT IS ORDERED FURTHER that this Order, the application, affidavit and proposed order,

and all interim reports filed with this Court with regard to this matter, shall be sealed until further

order of this Court, except that copies of the order, in full or redacted form, may be served on the

KBI and the service provider as necessary to effectuate this order.

DONE and ORDERED this ___16___ day of ___April___, 20_13_, at in Junction City,

Kansas.

HONORABLE DAVID R. PLATT
DISTRICT JUDGE
8TH JUDICIAL DISTRICT, STATE OF KANSAS

D003082