IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| ALBERT DEWAYNE BANKS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 15-3093-HLT-GEB |
| | ) | |
| STEVEN L. OPAT, et. al., | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| ANTHONY THOMPSON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 15-3117-HLT-GEB |
| | ) | |
| GLEN VIRDEN, et. al., | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS SPRINT/NEXTEL, VIRGIN MOBILE/SPRINT PCS, AND T-MOBILE USA INC.'S MOTION FOR SUMMARY JUDGMENT (Doc. 181/182)**

The Carrier Defendants never even read the order.  That's the simple but obvious conclusion from the Carrier Defendants' well-written motion for summary judgment.  But emperor's finery cannot conceal the logical nakedness.  Sprint and T-Mobile never read the wiretap order.  They did not act in compliance with the terms of the order.   And they are therefore precluded from relying on the good faith of others to save them.   Their motion for summary judgment should be denied.

<u>INTRODUCTION</u>

The Carrier Defendants' dispositive issues nearly hit the mark but are slightly off.   While the ideas behind them probably do center the ideas critical to the

litigation, the questions are more accurately rendered as follows:

1.     Did the [terms] of Judge Platt's wiretap orders authorize the interception of text messages?

2.     Did the Carrier Defendants, [who had no knowledge of any side "understanding" between law enforcement and the judge about the intent of the orders], act in good faith in executing the wiretap orders [when they disclosed text messages even though the terms of the actual orders did not authorize such disclosure]?

No, they did not.   And the Court is not required to fully resolve those questions in this motion, but rather only to determine whether a rational trier of fact *could* find for the Plaintiffs where, taking all facts and reasonable inferences in favor of Mr. Banks and Mr. Thompson, the Carrier Defendants acted in direct contradiction to the explicit terms of wiretap orders and in violation of both Kansas and federal law.

The Carrier Defendants repeatedly emphasize the understanding between the judge and the law enforcement defendants about what the orders "actually" meant, despite their terms.   Even if that understanding were accurate or lawful, however, the Carrier Defendants *were not party to that understanding*.   They received the same guidance and process they did in the thousands of other wiretap orders they highlight—a CALEA coversheet and the Order for T-Mobile, a CALEA fax for Sprint.

The Carrier Defendants did not "rely on" or act "in accordance with" the terms of the orders.   The terms certainly did not say anything about text messages— "electronic communications"—and there was no explanation or memo attached about

how Judge Platt defined the term "wire communications" more expansively than the statute.   The Carrier Defendants relied on law enforcement officers' handwritten notes to, respectively, "Turn on SMS" or "upgrade to T-3."

But the orders did not authorize that, and pursuant to *both* federal and state law, the Carrier Defendants are liable.   To interpret otherwise would open the doors to an almost complete evisceration of the wiretap statutes.   If carriers were only required to review law enforcement coversheets, the need for orders—much less, accurate orders—would essentially be gone.

The Carrier Defendants' motion should be denied.

### RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiffs are prepared to admit or deny each of the Carrier Defendants "undisputed" material facts.   However, it should be noted that many of the "facts" listed by the Carrier Defendants are merely recitations of language from other documents and that those documents speak for themselves.   Nevertheless, responses to the Carrier Defendants' facts are listed below:

1.   ADMITTED.

2.   ADMITTED.

3.   ADMITTED.   However, the relevant portion of the quoted document, requesting "wire, oral, *or* electronic communication(s)," is a disjunctive phrase and Judge Platt's orders only authorized wire communications.

4.   ADMITTED.

5.   ADMITTED.

6.     ADMITTED, but Mr. Virden's rank or title was and is irrelevant, except to the extent that his experience should impute to him a greater expectation and duty to know the laws he is enforcing.   *See, e.g.*, *State v. Oram*, 266 P.3d 1227, 1236, 46 Kan. App. 2d 899 (Kan. Ct. Ap. 2011) ("Deputies are presumed to know the law of the jurisdiction they are enforcing.   Therefore, a failure to understand the law by the very person charged with enforcing it is not objectively reasonable under the Fourth Amendment.").

7.     ADMITTED.

8.     ADMITTED.

9.     ADMITTED in part.   But the statute(s) which provide authority for the requested interception define "wire communications" as "any aural transfer made…through the use of facilities for the transmission of communications by the aid of wire…" 18 U.S.C. § 2510(1); K.S.A. 22-2514(1).   Those statutes define, in part, "electronic communications" to exclude "any wire…communication." 18 U.S.C. § 2510(12); K.S.A. 22-2514(11).

10.    ADMITTED but irrelevant.

11.    ADMITTED but irrelevant, except to the extent that one could reasonably infer that the references to text messages could have caused the ordering judge to believe that KBI agents already had access to text messages (whether via cooperating individual(s), phone seizures, or the like) and there was therefore no necessity to order those in the wiretap order, thus explaining the court's declining to do so.

12.   ADMITTED.

13.   ADMITTED.

14.   ADMITTED.

15.   ADMITTED.

16.   ADMITTED.

17.   ADMITTED.

18.   ADMITTED.

19.   ADMITTED but the lawfulness of that order is DENIED.

20.   ADMITTED.

21.   ADMITTED.   Although plaintiffs are without information sufficient to admit or deny, the titles of various divisions within the corporations are irrelevant.

22.   ADMITTED based on affidavit, but largely irrelevant.   Plaintiffs are without independent information sufficient to admit or deny, but if the numbers are accurate, one could reasonably infer that the Carrier Defendants and their law enforcement divisions ought to be experienced and well-versed in the statutory definitions of various types of phone-based communications.

23.   Plaintiffs are without information sufficient to admit or deny, but the percentage of orders that request one type of data or another is irrelevant.   Put more colloquially, if all the other wiretap orders jumped off a bridge, would T-Mobile do it in this case?

24.   ADMITTED based on affidavit, but largely irrelevant.   Plaintiffs are without independent information sufficient to admit or deny, but if the numbers are

accurate, one could reasonably infer that the Carrier Defendants and their law enforcement divisions ought to be experienced and well-versed in the statutory definitions of various types of phone-based communications.

25.    Plaintiffs are without information sufficient to admit or deny, but the percentage of orders that request one type of data or another is irrelevant.   *See generally* Bridge Question, *supra*.

26.    DENIED.   The order alleged that the phone belonged to Anthony Thompson, but the order listed a different subscriber.   *See generally* Exhibit D1 to Carrier Defendants' Motion.

27.    It is ADMITTED that a handwritten notation by an unknown person on a fax cover page said "Turn on SMS."   The implication that was a "directive" imputed to the order is DENIED.   The notation was not in response to any question on the form and was not part of the standard form.

28.    ADMITTED.

29.    ADMITTED in part.   Plaintiffs are without information sufficient to admit or deny if the record was kept in the ordinary course of business, but do acknowledge there is a "CALEA Coversheet" with certain information on it.   The document makes no reference to an order, does not attach an order (*compare* to Exhibit D1, *supra*), and in boxes "Text Message Pen Data" and "Text Message Content" (x2), there are no checkmarks.   *See generally* Exhibit E1 to Carrier Defendants' Motion.

30.    DENIED.   The coversheet is not an order.   There is a handwritten notation saying "upgrade to T3," but it is at the top of the page outside of any of the form's information requests.   Further, it is likely the "upgrade" refers to the upgrade

from a pen register-type of information gathering to a wiretap and has nothing to do with what kind of information is ordered to be given. *Id.*

31.   DENIED.   There is a reference that "Tim Botts" called "back in." Plaintiffs are without sufficient information to admit whether those are account notes or something else, or how they relate to a wiretap, or what it meant to "upgrade" a wire.   *See generally* Exhibit E2 to Carrier Defendant's Motion.

32.   ADMITTED that the words "Text Provisioned? Yes" appear on the page referred to.   Any implication that there was authority to do so is DENIED.

33.   DENIED as irrelevant.   The Carrier Defendants unlawfully intercepted and disclosed text messages to third parties, whether they "monitor[ed], stor[ed], or retain[ed]" anything.

34.   ADMITTED but irrelevant.   As noted in fact 11, law enforcement provided content of text messages before a wiretap was even authorized.   That could have very likely led the judge to believe further orders for texts were not needed. Further, the Carrier Defendants never received these affidavits as part of their interception and disclosure.

35.   DENIED as irrelevant.   The affidavit makes no mention of how the text message information was acquired and makes no mention, in the cited paragraphs, of the "March 5 Wiretap Orders."   Further, the Carrier Defendants never received these affidavits as part of their interception and disclosure.

36.   DENIED.   No record or court reporter transcript was kept of the conversations among Judge Platt, county attorney Opat, or Agent Virden.   *See*

*Plaintiff Exhibit C*, Judge Platt Testimony Excerpt, Case No. 13-cr-40060-DCC (Doc. 1013) (D. Kan. Hrg., Aug. 22, 2014), at 359-60; *Plaintiff Exhibit D*, Glen Virden Testimony Excerpt, Case No. 13-cr-40060-DCC (Doc. 1012) (D. Kan. Hrg., Aug. 21, 2014), at 206-07.

37.    DENIED.   There are two documents that purport to be "Clarification Orders," but they appear irregular.   *First*, they are of a different font and format from any of the other wiretap orders issued before or after the clarification.   *Second*, it appears that the signatures are some type of stamp, especially when compared with each other and with other signatures on other orders.   *Third*, the orders refer to affidavits explaining that certain companies denied text messages, but to the best of their recollection Plaintiffs have not seen such affidavits and do not recall any having been produced in this action.   *See Plaintiff Exhibit A*, Banks Declaration, at ¶ 5; *Plaintiff Exhibit B*, Thompson Declaration, at ¶ 5.   *Finally*, when asked about the clarifying orders by Judge Crabtree, Agent Virden could not recall them.   *See Plaintiff Exhibit D*, Glen Virden Testimony Excerpt, Case No. 13-cr-40060-DCC (Doc. 1012) (D. Kan. Hrg., Aug. 21, 2014), at 248.   Additionally, based on these documents, it can reasonably be inferred it was not burdensome for a phone company to realize that "wire" communications and "electronic" communications are different things, not authorized by the initial orders.

38.    DENIED in part.   It is admitted that the document says that, but see response to 37, *supra.*

39.    DENIED in part.   It is admitted that the document says that, but see

response to 37, *supra*.

40.    ADMITTED.

41.    ADMITTED as to the text of the order.   Any implications of that ruling and/or dicta are denied.

42.    ADMITTED.

43.    ADMITTED in part.   Plaintiffs recall that the litigation of those motions was handled primarily by other parties in the criminal case.   Further, the text discussion was a very small portion of the August 21-22, 2014, hearing, which seemed to Plaintiffs to focus on the issue of sealing of wiretap data drives.

44.    ADMITTED.

45.    ADMITTED.

46.    ADMITTED.

## PLAINTIFFS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS

*\*\*Plaintiffs note for the Court that, in order to avoid confusion, they are continuing with the numbering started by the Carrier Defendants.*

47.    The KBI relies on the cell phone companies to "ensure the orders are legitimate" and "review the type of information they're to send."   *See Plaintiff Exhibit E*, Chris Turner Testimony Excerpt, Case No. 13-cr-40060-DCC (Doc. 682) (D. Kan. Hrg., Feb. 9, 2015), at 8.

48.    No record or court reporter transcript was kept of the conversations among Judge Platt, county attorney Opat, or Agent Virden.   *See Plaintiff Exhibit C*, Judge Platt Testimony Excerpt, Case No. 13-cr-40060-DCC (Doc. 1013) (D. Kan. Hrg., Aug. 22, 2014), at 359-60; *Plaintiff Exhibit D*, Glen Virden Testimony Excerpt, Case

No. 13-cr-40060-DCC (Doc. 1012) (D. Kan. Hrg., Aug. 21, 2014), at 206-07.

49.     Under the Communications Assistance for Law Enforcement Act (CALEA), telecommunications providers have a legal duty to "ensure that any interception of communications…can be activated only in accordance with a court order or other lawful authorization…" 47 U.S.C. §1004.

50.     Under CALEA regulations, Carrier Defendants had (and have) a legal duty to ensure that "appropriate legal authorization" is used to intercept communications.   Appropriate legal authorization is "[a] court order signed by a judge or magistrate authorizing or approving interception of wire or electronic communication" or "other authorization, pursuant to 18 U.S.C. 2518(7)." 47 C.F.R. 1.20000, 1.20002(a)(1)(A) and (2).

51.     18 U.S.C. § 2510(1) defines a "wire communication" as "any aural transfer made…through the use of facilities for the transmission of communications by the aid of wire…"

52.     18 U.S.C. § 2510(12) defines an "electronic communication" as "any transfer of signs, signals, writing…by a wire…but does not include…any wire or oral communication."

53.     K.S.A. 22-2514(1) defines a "wire communication" as "any aural transfer made…through the use of facilities for the transmission of communications by the aid of wire…"

54.     K.S.A. 22-2514(11) defines an "electronic communication" as "any transfer of signs, signals, writing…by a wire…but does not include…any wire or oral

communication."

55.    Per statute, wire communications and electronic communications are different things.

56.    T-Mobile also provided CSLI (Cell-Site Location Information) without explicit authorization in the wiretap orders.   CSLI is another form of electronic communications, per statute.   That information was disclosed to federal agents. *See Plaintiff Exhibit B*, Thompson Declaration, at ¶ 13.

## ARGUMENT

### *Legal Standard*

Mr. Banks and Mr. Thompson are in general agreement with the standards for summary judgment as outlined by the Carrier Defendants.   However, the well-worn phrase—that summary judgment is "not a disfavored procedural shortcut" but an important procedure "designed to secure the just, speedy and inexpensive determination of every action"—has outlived its usefulness and courts should be mindful of that.   While a thorough analysis of the death of the civil jury trial is well beyond the scope of this motion, the effectiveness of summary judgment as a case management tool deserves to be analyzed skeptically.

Consider National Judicial Caseload Profiles from September 1997 and September 2020.   From 1992 to 1997, the median time "from filing to trial" in federal civil cases rose from 15 to 19 months.   *See Federal Court Management Statistics, National Judicial Caseload Profile*, September 1997, at 1 (*available at* https://www.uscourts.gov/sites/default/files/statistics_import_dir/District_FCMS_Se

p_1997.pdf), *accessed August 23, 2021*.   The number of trials completed dropped from 32 to 26 per judgeship.   *Id.*   In September 2020, the numbers showed that from 2015 to 2020, the median time "from filing to trial" in federal civil cases rose from 26.8 to 27.1 months.   *See Federal Court Management Statistics, National Judicial Caseload Profile*, September 2020, at 1 (*available at* https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020.pdf), *accessed August 23, 2021*.   The number of trials completed dropped from 17 to 12 per judgeship.   *Id.*

Again, the implications and causes of these numbers are beyond the scope of this case, but it is at least clear that summary judgment's increased use since *Celotex* has not stemmed a rising tide of litigation, nor has it resulted in "speedier" or more "just" litigation.   It has probably harmed the right to trial by jury.   Thus, to the extent that the "policy" justifications are used in defense of summary judgment, those justifications should be viewed skeptically.

As to what the law is, Mr. Thompson and Mr. Banks do not dispute the Carrier Defendants' summary but believe that a rational trier of fact could easily find that the Carrier Defendants are liable.

### *The Carrier Defendants are not Immune from Liability*

The Carrier Defendants assert that they are immune from liability under 18 U.S.C. § 2511(2)(a)(ii), which provides that "[n]o cause of action shall lie in any court against any provider of wire or election communications service…for providing information, facilities, or assistance in accordance with the *terms of a court order*…" (emphasis added).   K.S.A. 22-2514 *et seq.*, the Kansas wiretap statute under which

these orders were claimed, contains no such immunity.

In a footnote, Carrier Defendants try to backdoor their way to state immunity by arguing that the state statute is "more permissive."   This is backwards.   The federal wiretap statute only preempts state laws that are more permissive (i.e. less protective to citizens) as to "statutory authorization" for securing a wiretap.   *State v. Willis*, 7 Kan. App. 2d 413, 413 (1982).   In other words, if a state statute makes it easier to get a wiretap, it is preempted.   If it is harder, it is not.   The Kansas statute is more restrictive.   *See United States v. Banks*, 13-CR-40060 (Doc. 650) (D. Kan. May 15, 2015), at 8 (rejecting application of good faith defense and noting that "Kansas law would prevent the Court from applying it" because "a state may elect to impose greater protections than does Title III").   The permissiveness about civil liability is not what preemption is discussing.   Allowing more civil suits against providers, as the Kansas statute would presumably do by not including an immunity provision, makes it harder to secure a wiretap, not easier.   It is not preempted.

Regardless, the Carrier Defendants' immunity claims still fail.   Neither of the Carrier Defendants provided text messages "in accordance with the terms of a court order."   The *terms* of the court orders at issue in this case provided authorization only for the interception of "wire communications," which are not texts.   *See Plaintiffs' Statement of Facts*, ¶¶ 51-55.   The reality of the situation is demonstrated by the Carrier Defendants' motion.   Not once do they assert that they relied on the terms of the orders.   Not once do they even assert that they read the orders before provisioning text interception.

Instead, the Carrier Defendants now rely on two things.   *First*, they rely on various handwritten notations on fax coversheets.   In fact, it appears that Sprint did not even have an order before provisioning texts.   *See* Exhibits D1 and E1; *see also generally Carrier Defendants' SOF*, ¶¶ 26-33 (noting Sprint Exhibit E1 is a fax with 3 pages and no order attached).   *Second*, they rely on the apparent fact that most wiretaps include requests for text messages.   *See generally Carrier Defendants' SOF*, ¶¶ 21-25.   Neither is sufficient for immunity.   The statute does not provide immunity to service providers who "got handwritten notes" from law enforcement. Nor does it provide immunity for service providers "because lots of people ask for texts."   Rather, immunity only attaches to providers who provide assistance in accordance with the *terms* of a court order.   They did not do that here.

Knowing that they did not act in accordance with the actual *terms* of the court orders, Carrier Defendants next try to broaden those terms.   Noting that Judge Crabtree had previously concluded that Judge Platt and Agent Virden "understood the intended scope" of the order, Carrier Defendants try to shield themselves beneath that understanding.   This should fail.

The Carrier Defendants were not party to those understandings or the discussions that led to them.   There is no evidence they were informed of that understanding, knew of the affidavits, or ever discussed it with the law enforcement officers.   Instead, from the perspective of the carriers, they received a fax coversheet with handwritten notations for texts, a court order (at least in the case of T-Mobile) that explicitly did not authorize interception of texts, and nothing else.   *See Carrier*

*Defendants' SOF*, ¶¶ 26-33.   From the perspective of a reasonable provider of communications services, that is not enough to justify the provision of texts based on an unknown understanding between law enforcement and the judge.

Further, under the Communications Assistance for Law Enforcement Act (CALEA), telecommunications providers have a legal duty to "ensure that any interception of communications…can be activated only in accordance with a court order or other lawful authorization…" 47 U.S.C. §1004.   *See Plaintiffs' SOF*, ¶ 49. Under that statute, other lawful authorizations do not include secret understandings between judges and law enforcement.

Pursuant to the implementing CALEA regulations, Carrier Defendants had (and have) a legal duty to ensure that "appropriate legal authorization" is used to intercept communications.   Appropriate legal authorization is "[a] court order signed by a judge or magistrate authorizing or approving interception of wire or electronic communication" or "other authorization, pursuant to 18 U.S.C. 2518(7)." 47 C.F.R. 1.20000, 1.20002(a)(1)(A) and (2). *See Plaintiffs' SOF*, ¶ 50.   In other words, Carrier Defendants have a legal duty to do more than they did here, and the alleged "good faith" of law enforcement defendants does not excuse them from doing so.

There are sound reasons for this interpretation.   *First*, even if the law enforcement defendants here were entitled to a good faith defense, they are in a different position than the Carrier Defendants, because they would have at least been "in the room" when orders happened.   The Carrier Defendants have a different situation and a different legal duty.   They were not involved in the investigation,

received nothing but fax notes and "wire" orders, and acted in the face of orders that explicitly *did not* authorize text messages.   To impute the law enforcement officers' alleged good faith to them would contravene the purposes of the wiretap statute(s) as implemented here.

*Second*, the big picture matters.   When Congress created the wiretap statutes, it did so in recognition of the intimacy of wire communications and the privacy interests as well.   It created a complicated and precise scheme to allow for the interception of wired communications.   *See United States v. Banks*, 13-CR-40060 (Doc. 650) (D. Kan. May 15, 2015), at 6-7.   The complications and precision are a feature, not a bug.   They are intended to make it difficult to secure wiretaps as well to ensure that when a wiretap is authorized it is done after a thorough review by an objective judge.

The Carrier Defendants' position would eviscerate that by allowing service providers to essentially "take law enforcement's word for it" in the form of CALEA coversheet notations, telephone calls for "upgrades," or other non-court-order-based authorizations.   It essentially allows them to guess as to the "true" understanding of an order instead of complying with what the words actually say.   Just because the carriers may occasionally guess right does not mean the guessing is "right" in the first place.   The law is written and designed to prevent that type of guessing—that gambling—to ensure that the privacy of telephone communications is upheld.

### Issue Preclusion Does Not Save Carrier Defendants

Carrier Defendants attempt to remove the issue from the field by asserting

16

that the question is precluded based on Judge Crabtree's rulings in the underlying criminal case.   Here, Carrier misconstrues Judge Crabtree's orders.   *First*, it should be noted that Judge Crabtree explained that "[n]o orders authorized interception of 'electronic communications,'" but that "investigators believed" the orders did so and "service providers in fact intercepted text messages."   *See United States v. Banks*, 13-CR-40060 (Doc. 421) (D. Kan. Aug. 29, 2014), at 2.   Judge Crabtree further noted that the defendants there "rightly" distinguished between "wire" and "electronic" communications.   *Id.* at 3.   But the Court noted that the "statutory suppression remedy" only applied to "wire and oral" communications.   *Id.* at 3-4.

Judge Crabtree thus proceeded to analyze the issue under a constitutional framework, finding that there was a reasonable expectation of privacy and requiring the government to show a recognized exception to the warrant requirement, implying that the scope of the order did not authorize the interception of texts.   *Id.* at 6-7.   In analyzing the "good faith" of the officers, the Court "consider[ed] the *personal knowledge* Judge Platt and the KBI officers had about the type of communications the order intended to authorize."   *Id.* at 7 (emphasis added).   Ultimately, Judge Crabtree found that the "broader understanding" of the authorization included text messages, and that reliance on that understanding was reasonable, citing a case opposing the idea of ruling that an officer had to "disbelieve" a judge.   *Id.* at 9. Judge Crabtree did not rule that the texts were intercepted in accordance with the terms of the order.   Rather, he ruled that even though they were intercepted outside of the terms of the order, the "broader understanding" protected them from the

exclusionary rule remedy.

Issue preclusion does not apply here.  The issue was not identical.  Judge Crabtree specifically noted that the terms of the wiretap orders did not authorize interception of "electronic communications."  He did not say that the scope of the order, as written, included texts.  Rather, he said the terms of the order did not include texts but he was not going to suppress the texts because there was not a statutory suppression remedy and the constitutional exclusionary remedy was not warranted because of the officers' "good faith" "understanding" of the scope of the order based on their "personal knowledge."

Here, the issue is whether the Carrier Defendants', who were not parties to the underlying litigation, are shielded from civil liability where the actual terms of an order do not authorize the provision of text messages, but where a "broader understanding" shielded otherwise illegally obtained texts from exclusion in a criminal case.  There, Judge Crabtree relied on the "personal knowledge" of the officers and state judge.   Here, the Carrier Defendants had no "personal knowledge" of the "broader understanding."  They had no personal knowledge of anything but the terms of the order and the handwritten notations on their CALEA cover sheets. In fact, Sprint probably did not even have the order.   The "actual" scope of the order was never changed by Judge Crabtree.   The consequences of violating the order were analyzed by him in light of law enforcement's personal knowledge.

Here, the Carrier Defendants are not authorized to operate based on their "personal knowledge" or "understanding" of orders.  Rather, pursuant to Title III

and CALEA, they have a duty to operate pursuant to "appropriate legal authorization" represented in the "terms" of a written order.   This is not a burdensome obligation.   T-Mobile even claims that they reject "requests" when there is a "legal deficiency."   *See* Carrier Defendant Exhibit D4 (Doc. 182-8), at 1 (claiming such rejection practices, but not explaining how they go about making those determinations).

Additionally, Verizon (and Sprint on another phone) rejected provision of text messages based on the orders here.   Did it create an undue burden?   No.   Sprint and T-Mobile chose not to follow their legal duty, and they should be held liable for it.   The privacy interests of telephone users should not be left up to the chance or whims of whether a particular carrier on a particular day chooses to reject the statutory language of a an otherwise-acceptable court order in the hopes that a "broader understanding" is at work.

*The Wiretap Orders Do Not Authorize the Interception of Text Communications*

Carrier Defendants next attempt to re-read the wiretap authorizations to mean that text interceptions are included when Judge Platt used phrases like "all communications" in different contexts.   Points for trying, but the argument must fail.   First, the paragraph cited by Carrier Defendants is clearly contextualizing "all" communications in the context of not shutting the wire down after the "first interception that reveals the…illegal activities."   *See* Carrier Defendant Exhibit C (Doc. 182-3), at 4.   In other words, the Order authorizes by its terms wire communications, but is not required to cease after the first criminal *wire* phone call

is recorded.   In broader context, the conclusion is clear. *See* Exhibit C to Carrier Defendants' Motion, at 4.   The Order states:

> "WHEREFORE, IT IS HEREBY ORDERED that Special Agents…are authorized…to intercept ***wire*** communications to and from the above-described telephone.
> PROVIDED that ***such*** interceptions shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted…"

(emphasis and ellipsis added).   It is clear the order is talking about continuing to intercept wire communications after the first such interception.   It did not suddenly transform into an ill-defined free-for-all to get "all" the kinds of communications.

Second, such an order would also be unlawful.   18 U.S.C. § 2518(4) specifically requires that "[e]ach order authorizing or approving the interception of any wire, oral, or electronic communication under this chapter shall specify…(c) a particular description of the *type of communication* sought to be intercepted…"   There is a parallel requirement in the Kansas statute.   *See* K.S.A. 22-2516(4) (requiring orders to "specify with particularity a description of the type of communication sought to be intercepted").   So, Carrier Defendants' interpretation is far beyond what the order means, but even if it is not, the resulting order would still be unlawful.

Carrier Defendants then try to say that the order was for the "target telephone number—not just its phone calls."   The same problems apply.   The statutes (not cited again) require particularity of *type* of communication.   There is no blanket authorization for the entire phone.   A more reasonable inference is that the order means all wire communications from that phone number.

The Carriers then move further afield, arguing that the phrase "all information, facilities and technical assistance necessary" delimits the order and authorizes interception of everything. They neglect to complete the phrase, however, which directs the provision of the above "to accomplish *the* interceptions unobtrusively…" This language mirrors the statute. *See, e.g.*, K.S.A. 22-2516(2). "The interceptions" are separate and different from "information, facilities, and technical assistance." This is an order requiring the phone companies to help law enforcement accomplish "the interceptions"—previously defined as "wire communications." It is a question of "how to," not of "what to," intercept.

Carriers next decontextualize the phrase "electronic communication service" by *italicizing* the first two words and saying, essentially, "see, look…the words electronic communication are in the order!" The term "electronic communication service" is a term of art defined in the statute as "any service which provides to users thereof the ability to send or receive wire or electronic communications." K.S.A. 22-2514(14); 18 U.S.C. § 2510(15). There is still a distinction between wire and electronic communications for the purpose of a wiretap order.

They next argue the affidavits mention "electronic communications," which is true, but as noted above, Judge Platt read the affidavits and only authorized "wire communications." Also, the Carriers never had the applications or affidavits. They had an order with clearly defined terms, and fax coversheets. They chose to follow the fax coversheets.

They argue again that there were 18 references to text messages in the

affidavits.   Again, it could be reasonable to infer that is why Judge Platt declined to authorize such interception.   If they already had text access (via phone seizure, cooperating witness, undercover, etc.), perhaps the judge found there was not necessity.   Regardless, his order was for wire communications.

Finally, the Carrier Defendants bring up the clarification orders.   There are several problems.   First, the fact that "clarifying" orders were necessary at all reveals that the "terms of" the first orders were not statutorily acceptable. Especially at the summary judgment stage, where the evidence is to be taken in the light most favorable to Plaintiffs, *and* all reasonable inferences are drawn in favor of the Plaintiffs, it seems apparent that this fact itself is enough to prove that a rational trier of fact could decide from the face of the orders and the Carrier Defendants' behavior that they violated the terms of the statute.   They might not, but they could, and that is enough to survive summary judgment.

Second, the orders are irregular.   Compare the font and format of the "clarifying" orders with the other orders issued on the wiretaps.   Compare the signatures on the two "clarifying" orders with each other, and with signatures from other orders.   They appear to be stamped on.   Further, the affidavits referenced (about the other companies rejecting the first orders) have not been produced, to Plaintiffs' recollection.   *See Carrier Defendant SOF*, ¶ 37 and plaintiff response with attached exhibits.   Those questions should limit the evidentiary value of those orders.   But regardless, the "terms of" the March 5 orders did not authorize texts. The Carrier Defendants knew, or should have known, that.   And they provided texts

anyway.

*Jurisdictional Limit*

Carrier Defendants next argue against the jurisdictional limit question, which they correctly note that Plaintiffs do not claim against the Carriers.  The Carriers here rely on the "express terms" of the order to argue for immunity.  *See* Carrier Defendant Memorandum (Doc. 182), at 20.  Although this argument is not necessary, as Plaintiffs have asserted no jurisdictional claim against the Carrier Defendants, it does reveal a "good for the goose, but *not* for the gander" approach that they are taking regarding the actual words of the March 5 orders.

**Good Faith**

The Carrier Defendants grasp for the protection embraced by their law enforcement officers codefendants—good faith.  But the Carrier Defendants cannot successfully invoke the doctrine.  Good faith is reserved for objectively reasonable actions based on innocent mistakes of fact.  Here, the express terms of the wiretap order—the only statutorily acceptable thing the Carrier Defendants had personal knowledge of—authorized them to intercept only wire communications.  Their failure to read and clarify the orders is not "objectively reasonable."

"No area of the law is more sensitive than that of electronic surveillance, since such activity intrudes into the very heart of personal privacy."  *State v. Adams*, 2 Kan. App. 2d 135, 138, 576 P.2d 242 (1978) (quoting *In re Oleander*, 213 Kan. 282 (1973)).  Given the intrusiveness of electronic surveillance, the law strictly regulates such surveillance activities.  Both state and federal legislatures have created legal

regimes for electronic surveillance that possess "strict procedural requirements and degree of judicial oversight," *id.*, and a "comprehensive statutory scheme providing explicit requirements, procedures, and protections." *United States v. Rice*, 478 F.3d 704, 712 (6th Cir. 2007). Consequently, courts must "strictly construe" judicial wiretap authorizations because "[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devises." *United States v. McNulty*, 729 F.2d 1243, 1265 (10th Cir. 1983).

Violations of the law carry consequences. Any person whose "wire, oral, or electronic communication is intercepted, disclosed or used in violation of this act shall have a civil cause of action against any person who intercepts, discloses or uses, or procures any other person to intercept, disclose or use" such communications. *K.S.A. 22-2518; see also 18 U.S.C. § 2520(a).*

Under federal law, a violation occurs when "any person...intentionally intercepts [or uses or discloses], endeavors to intercept [or use or disclose], or procures any other person to intercept [or use or disclose] or endeavor to intercept [or use or disclose], any wire, oral, or electronic communication" when the person "know[s] or ha[s] reason to know that the information was obtained...in violation of" the law. *18 U.S.C. § 2511(1)(a)-(e)* (brackets added).

Both wiretap statutes, however, have a "good faith" defense in civil cases. *See K.S.A. 22-2518(2); 18 U.S.C. § 2520(d).* According to K.S.A. 22-2518(2), "[a] good faith reliance by any person on a court order authorizing the interception of any wire, oral or electronic communication shall constitute a complete defense in any civil or

24

criminal action brought against such person based upon such interception." *See also* 18 U.S.C. §2520(d) ("A good faith reliance on…a court warrant or order…is a complete defense against any civil or criminal action brought under this chapter or any other law.").

Nevertheless, good faith is not an easily achieved immunity. A "defendant may invoke the defense of good faith reliance on a court order *only* if he can demonstrate (1) that he had a subjective good faith belief that he acted legally pursuant to a court order; and (2) that this belief was reasonable." *Dahl v. Charles F. Dahl, MD, PC*, 744 F.3d 623, 631 (10th Cir. 2014) (emphasis added). Here, the Carrier Defendants meet neither prong. First, they never even really argue that they acted "pursuant to a court order" because there was no court order that authorized provision of texts.

Second, even if they believe they did act pursuant to the court order, that belief is not objectively reasonable. Citizens are presumed to know the law. S*ee, e.g.*, *State v. Cook*, 187 P.3d 1283, 1289-90 (Kan. 2008) (holding that even regular citizens are "presumed to know that the legislature has made certain conduct illegal" and reiterating that "ignorance of the law is no excuse for violating law"). That same presumption is true of law enforcement. *State v. Oram*, 266 P.3d 1227, 1237 (Kan. Ct. App. 2011) (holding that officers in Kansas are "presumed to know the law of the jurisdiction that they are enforcing. Therefore, a failure to understand the law by the very person charged with enforcing it is not objectively reasonable...").

The Carrier Defendants occupy a similar role and are certainly charged with

knowledge of the laws they are helping to enforce.   *See Plaintiffs' SOF*, at ¶¶ 49,50. In fact, they might be in the best position to be familiar with the wiretap statute. *See Plaintiff's SOF*, at ¶ 47 (describing how KBI relies on phone companies to ensure orders are legitimate and to "review what type of information to send").   The Carrier Defendants boast about how many requests they get each year, both to show their knowledge but also to justify their failure to individually analyze each authorization. They supposedly deal with thousands of such requests every year, yet they want the Court to believe they were not aware "wire communications" did not include texts. That belief is unreasonable.

Further, good faith is not generally applied in a statutory context where the plain language of a statute controls.   *See, e.g.*, *State v. Pettay*, 326 P.3d 1039, 1041 (Kan. 2014) ("The State's arguments do not justify application of a good faith exception in light of the plain language of K.S.A. 22-2501, which had been held to statutorily control the permissible circumstances, purposes, and scope for a search incident to arrest long before Pettay's vehicle search.").   In fact, "objective reasonableness sometimes turns on the clarity of existing law." *United States v. Workman*, 863 F.3d 1313, 1321 (10th Cir. 2017).   The wiretap laws are clear and plain.  *See Heggy v. Heggy*, 944 F.2d 1537, 1539 (10th Cir. 1991) (finding Title III wiretap act to be "clear and unambiguous"); *Thompson v. Dulaney*, 970 F.2d 744, 748 (10th Cir. 1992) (language of § 2511 is "clear and broad").

Here, the statute is clear, the definitions are clear, and Carrier Defendants' legal duty is clear as well.   In *Quigley v. Rosenthal*, the Tenth Circuit, in rejecting a

"good faith" defense to a punitive damage claim, noted that attorneys had failed to discover that "use" of intercepted calls was unlawful. *Quigley v. Rosenthal*, 327 F.3d 1044, 1070-71 (10th Cir. 2003). They further criticized the attorneys in that case for failing to "research[] or even consider[] the legality of" what they were doing. *Id.* at 1071 n.15 (brackets added). They reasoned that "a reasonably competent attorney researching the issue" should have discovered a change in the law from three months prior (October to December 1994), and that the failure to "research the issue" and decision to use recordings "constituted an extreme departure from ordinary care, in a situation where a high degree of danger was apparent." *Id.* (internal quotations and brackets omitted).

Here, the Carrier Defendants are in a similar situation. They did not have to even research the question. The definitions and language are right in the statute. A statute which the Carrier Defendants have a legal obligation to know. And where they do not understand an order, "one would hope" the Carrier Defendants would "clarify their understanding of any unclear provision" before disclosing private texts and CLSI. *See, e.g.*, *United States v. Nicholson*, 721 F.3d 1236, 1243 (10th Cir. 2013) (applying that standard to law enforcement). And failing to read the actual order is not objective reasonable. *See, e.g.*, *United States v. Gant*, 587 F. Supp. 128, 134 (S.D. Tex. 1984) ("The officers merely elaborated upon their 'good faith reliance' upon a warrant which they did not even read. Such subjective good faith has been patently condemned as a rationale for applying the good faith exception…").

The Carriers argue that they were reasonable in their belief that there were

"explicit and conspicuous" instructions on the fax coversheets telling them to "turn on SMS" and "upgrade" its wiretap.   *See* Carrier Defendants Brief (Doc. 182) at 23. These arguments are flawed.   First, these were *handwritten* notations, outside of the form content, attached to orders where the actual terms did not authorize texts.   In fact, it appears Sprint never even received the order.   *See generally* Exhibit E1 (fax of 3 pages, no order) *compare to* Exhibit D1 (T-Mobile fax, order attached).   Further, the "upgrade to T3" is a reference to an upgrade from trap and trace/pen register data to an actual wiretap.   It has nothing to do with texts versus calls.   Certainly, a trier of fact could decide that the "instructions" were not sufficient and that the Carriers did not rely on them, but rather got lazy, did not read an order, and provisioned texts without legal authorization.   The facts and inferences weigh in favor of Plaintiffs.

Plaintiffs have already addressed the Carriers' arguments that the language "throughout the order" allows texts, and their argument that the orders "appear" to include texts is irrelevant.   Carrier Defendants have a legal duty to ensure that wiretaps cannot happen without appropriate legal authorization.

The fact that they acted "consistent with the thousands of wiretap orders they receive each year" is not the defense they think it is.   Objective reasonableness, the Fourth Amendment, and good faith are *individualized* examinations.   The Carrier Defendants argument is essentially an admission they do not actually read the orders because they get so many.   But that is not how the law works.   If an officer performs 1000 traffic stops in a year and is objectively reasonable in 999 of them, but not in the last one, the evidence from the last one will be suppressed, and the officer is

potentially liable for constitutional violations.   Even if this was the only order that Carrier Defendants messed up in all of 2013, they *still messed it up*.   And they are still liable for it.

Carrier Defendants cite case law that they contend supports their position. Their argument is self-defeating.   First, they cite *Massachusetts v. Sheppard*, 468 U.S. 981 (1984), for the proposition that they can rely on the word of law enforcement. What they are asking is for the elimination of the "neutral and detached magistrate" requirement that is fundamental to Fourth Amendment law.   *Sheppard*, as quoted, says that officers are not "required to disbelieve a *judge* who has just advised [them], by *word* and by action" that they have authority to perform the search.   *Id.* at 989-90 (emphasis added).   Carrier Defendants want that to mean they can rely on law enforcement to essentially issue the wiretap orders.   The proposition is mind-boggling.   The judge's orders nowhere include "word [or] action" authorizing text messages.   To accept the Carriers' position would be to write the role of the judge out of the wiretap process.   That cannot be what the statute intends.

Moreover, while good faith is intended to protect officers from "magistrate errors," *United States v. Potts*, 559 F. Supp. 2d 1162, 1173-74 (D. Kan. 2008), this case is so clear that a "reasonably well-trained officer" should have known of the order's deficiency despite Judge Platt's authorization.   *United States v. Gonzales*, 399 F.3d 1225, 1230 (10th Cir. 2005).   Because the law enforcement defendants did not, reliance upon the order was not objectively reasonable and thus not protected by good faith.   *Id.* at 1231.   Further, "[w]hile officers are generally entitled to rely on

the magistrate's judgment, they are also required to exercise their own professional judgment.   Indeed, [they] are presumed to have a reasonable knowledge of the law." *Gonzalez,* 399 F.3d at 1231.   The same can be said of the Carrier Defendants—they had a duty to exercise their own judgment, especially with regard to an order that did not authorize what the fax coversheets were demanding.   *See also, e.g.*, *State v. Powell*, 325 P.3d 1162, 1171 (Kan. 2014) (noting *Groh v. Ramirez*, 540 U.S. 551 (2004) and explaining that for "well-established" particularity requirement, "even a cursory reading of the warrant…perhaps just a glance…would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal").

Additionally, the Filipino law case is not nearly so helpful to the Carriers as they think it is.   They cite *United States v. Peterson*, 812 F.2d 486 (9th Cir. 1987) to argue that they are not in the "same position" as law enforcement to evaluate wiretap orders and their scope.   This cannot be serious.   Carrier Defendants, each multi-billion-dollar companies dealing almost exclusively with the provision of electronic communication services, with undoubtedly well-staffed and well-qualified legal departments, are in a worse position to interpret an eight-page order dealing with wiretaps than law enforcement officers with no specialized wiretap training?

In fact, as noted above, law enforcement relies on the carriers to help get this stuff right.   *See Plaintiffs' SOF*, at ¶ 47.   And the Carriers own policy includes the ability to reject and clarify orders.   *See* Carrier Defendant Exhibit D4 (Doc. 182-8), at 1 (claiming such rejection practices, but not explaining how they go about making

those determinations).   It is true that the Carrier Defendants had no personal knowledge of the "broader understanding" that supposedly existed between Judge Platt, Opat, and Virden, but that means the order is even more important.   Dealing with technology is their job.   They did not do it well here.

Carrier Defendants highlight the fact that they each "independently understood" the Orders to mean texts.   What one can reasonably infer they mean is that they "independently didn't read the orders."   Not to get too repetitive, but again this is proven by (1) the terms of the orders themselves; (2) the fact that Sprint may not have even had an order at all; (3) the Carriers' repeated emphasis on their "extensive" experience with wiretaps and what they "perceived the scope" to be; and (4) the fact they rely on handwritten notations by law enforcement officers to justify their actions.

Carrier Defendants rely on *Dahl v. Charles F. Dahl, M.D. et al*, 744 F.3d 623 (10th Cir. 2014) for their good faith defense.   There are critical distinctions, however.

First, that case involves a lay person interpreting the statute, regarding one phone call, not a highly sophisticated company who deals with "thousands" of wiretaps each year.

Second, the defendant in *Dahl* had a subjective belief the order allowed his continued monitoring of telephone calls.   Here, the Carrier Defendants cannot and do not even say they had a belief as to what the actual order(s) say.

Third, they had a belief about what the handwritten notations meant, what lots of other wiretaps request, and the like.   But they cannot say they had even a

subjective belief the terms of the actual order authorized the texts in this case.   They did not have any "personal knowledge" of any "broader understanding" of the judge.

Finally, even if they did have such a subjective belief, that belief is not objectively reasonable.   *Dahl*, 744 F.3d at 631 (outlining test for good faith). Plaintiffs need not rehash the myriad arguments again.

As to the territorial limits, again, the Plaintiffs do not assert such a claim against the Carrier Defendants and so a response is unnecessary.   However, the Plaintiffs would again note that the Carriers are quick to rely on the "express terms" of the orders when it suits them.

## CONCLUSION

The Carrier Defendants had a duty to wiretap only with proper legal authorization.   That legal authorization is statutorily defined as a court order.   The Carrier Defendants did not comply with the express terms of any court order in this case.   *See* Carrier Defendants Brief (Doc. 182) at 26 (the belief in scope was "not expressly born out in the language of wiretap orders").   Instead, they acted on their "belief" as to the scope of the order.   And even though their belief may have been correct in the "thousands" of *other* wiretap orders they deal with each year, their belief was not correct here.

Here, the Carrier Defendants likely did not even read the order and had no personal knowledge of any broader "understanding" of their scope.   They, as the custodians of some of the most intimate and private data of millions of citizens, are charged by statute to take great care to ensure that wiretap orders are precise and

that interceptions only occur under the most stringent of circumstances. They failed in that job here, and the good faith of others will not save them.

Taking the evidence in the light most favorable to Anthony Thompson and Albert Banks, along with the reasonable inferences therefrom, it is clear a rational trier of fact can (and will) find that the Carrier Defendants unlawfully intercepted the text communications of Mr. Banks and Mr. Thompson and that they did so without a subjectively or objectively reasonable basis to do so.

The motion should be DENIED.

Respectfully submitted,

s/Michael Shultz
Michael Shultz, #23133
Shultz Law Office, P.A.
445 N. Waco
Wichita, Kansas 67202
(316) 269-2284 Telephone
(316) 269-2011 Fax
michael@shultzlaw.net
*Attorney for Plaintiffs*

CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2021, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: none.

s/Michael Shultz
Michael Shultz, #23133